**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **SAWELIJA TYREE FLOYD,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:08cv133-MEF** |
| | ) | **(CR No. 3:05-cr-00187-LSC-SRW)** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## UNITED STATES'S RESPONSE TO § 2255 MOTION

COMES NOW the United States of America ("the Government") by and through its

attorneys, Leura G. Canary, United States Attorney, and Sandra J. Stewart, Assistant United

States Attorney, and in compliance with this Court's February 26, 2008 order, responds to

Petitioner Sawelija Tyree Floyd's Motion Under § 2255 To Vacate, Set Aside, Or Correct

Sentence By A Person In Federal Custody, as follows:

### I. PROCEDURAL HISTORY AND RELEVANT FACTS

On September 8, 2005, a grand jury for the Middle District of Alabama returned a two-

count indictment against Petitioner Sawelija Tyree Floyd ("Floyd") charging him with possession

with the intent to distribute crack cocaine and marijuana.  *See* GX A (Doc. 1)[1], a copy of the

original indictment in this case, attached to this response.  More specifically, count one of the

indictment charged that, on or about July 29, 2005, in Lee County, within the Middle District of

Alabama, Floyd knowingly and intentionally possessed with the intent to distribute a mixture and

---

[1]References to "Doc." are to the docket entries and documents in the criminal record in
this case, criminal case number 3:05-cr-00187-LSC-SRW.

substance containing a detectible amount of cocaine base ("crack"), a Schedule II controlled

substance, in violation of 21 U.S.C. § 841(a)(1). *See* GX A at 1. Count two of the indictment

charged that, on or about July 29, 2005, in Lee County, within the Middle District of Alabama,

Floyd knowingly and intentionally possessed with the intent to distribute a mixture and substance

containing a detectible amount of marijuana, a Schedule I controlled substance, in violation of 21

U.S.C. § 841(a)(1). *Id*. at 1-2. At his arraignment on the initial indictment, Floyd, represented

by counsel, entered pleas of not guilty to the charges. (Doc. 12)

A.    **Motion To Suppress**

        After arraignment, Floyd retained new counsel, William Rives Blanchard, to represent

him. (Doc. 17) Shortly after his retention, Blanchard filed a Motion To Suppress Statements &

Physical Evidence on behalf of Floyd. *See* GX B (Doc. 20), a copy of Floyd's Motion To

Suppress Statements & Physical Evidence, attached to this response. In that motion, counsel for

Floyd made the following arguments in support of suppression:

1.    The initial warrantless entry into the defendant's residence by officers of
      the Auburn Police Department was carried out in violation of the
      defendant's right to be free of unreasonable searches and seizures.

      a.    The initial approach to the house by the six officers without a
            legitimate warrant or probable cause was a pretext designed to
            create an opportunity to conduct a search of the premises for
            evidence of a crime.

      b.    The initial opening of the residence was involuntary and without
            the consent of the occupants.

      c.    The opening of the residence did not create probable cause and
            exigent circumstances sufficient to justify entry into the residence
            by the officers.

2.    The search warrant obtained by the Auburn Police Department must be

invalidated because it was based upon evidence discovered in an illegal
and unconstitutional warrantless search.

3.    The defendant's incriminatory statements were obtained from him during
an illegal detention in violation of his right not to give evidence against
himself.

*Id*. at 3-6.  The Government filed a Response To Suppress Statements & Physical Evidence, *see*

GX C (Doc. 22), a copy of the Government's response to the motion to suppress, attached to this

response, along with the following exhibits:  a copy of the Search Warrant at issue in Floyd's

case; a copy of the Application For Search Warrant at issue in Floyd's case; a copy of the

Affidavit In Support Of Application For Search Warrant in the case; a criminal history record

indicating that a Violation of Court Order ("VCO") order had issued in Floyd's case; a copy of

the VCO order; and a copy of Floyd's *Miranda* rights waiver in the case.  *See* GX C, Exhibits A,

B, C, and D.  The case was set for a hearing.  (Doc. 21)

**B.    Facts From Motion To Suppress Hearing**

A hearing on Floyd's motion to suppress was held on December 14, 2005.  *See* GX D

(Doc. 59), a copy of the December 14, 2005 suppression hearing transcript, attached to this

response.  This Court summarized the testimony from that hearing in its Recommendation Of

The Magistrate Judge as follows:

In December or January, 2005, the Auburn, Alabama police department
began investigating Tyrone White, a police officer then employed by the
department, for "fixing tickets."  On July 27, 2005, Lt. Jerry Holder and Sgt. Chris
Murray met with Auburn Municipal Judge Joe Bailey.  Lt. Holder had a list of
people whose court files he wanted Judge Bailey to review in connection with the
Tyrone White investigation.  On that list was defendant Tyree Floyd.  The officers
believed, based on a statement in their possession, that White had helped Floyd
get a favorable plea agreement in a case before Judge Bailey.

The Auburn police officers wanted to talk with defendant Floyd – and, the

3

court infers, with others on the list – about the investigation of White. Judge
Bailey reviewed Floyd's file in the presence of the officers. He decided to issue a
VCO (Violation of Court Order) order for Floyd's arrest, an order used routinely
by the municipal court as a "pickup" order for those on suspended sentences.
Judge Bailey believed that Floyd had violated a condition of his two-year
probation on a previous conviction (in May, 2004) for driving with a revoked
license by incurring another conviction for disorderly conduct in February 2005.
Judge Bailey also believed that Floyd had associated with known criminals and
failed to cooperate with the Auburn police department in its investigation of
White. White had persuaded Judge Bailey to suspend the 30 day jail sentence that
he normally would have imposed on Floyd for the disorderly conduct conviction,
and Judge Bailey believed that he had been improperly manipulated into doing so.

On Friday, July 29, 2005, officers from the Auburn police department,
including Lt. Holder and Sgt. Murray, approached the front door of defendant's
residence, a two-bedroom duplex. The officers went to the residence to arrest
Floyd pursuant to the VCO order. They also wanted to talk with Floyd concerning
the White investigation. Four officers in plain clothes approached the front of the
duplex at approximately 10:30 a.m., while two others (one of them in uniform)
went to the rear. One of the officers knocked on the front door. A male voice
said, "Who is it?" One of the officers, Sgt. James Tatum, replied, "Police
department, open the door."

Within 30 seconds to a minute, Floyd's girlfriend, Jamillah McCray,
opened the door "all the way up." McCray was known to the officers from
previous calls to her residence and that of her grandmother. As soon as McCray
opened the door, Tatum asked her where Floyd was. The officers detected a
strong odor of burning marijuana coming out of the residence. Lt. Holder
commented on the smell to the other officers. By this point, four to five officers
had gathered at the door. Floyd came to the front door almost immediately. One
of the officers told Floyd that he had a warrant for his arrest and asked him to step
outside. Floyd did so, and was taken into custody. An officer read Floyd his
Miranda rights. Floyd thereafter made a statement to officers that the drugs in the
residence were his.

While Floyd was being arrested, four of the officers stepped inside to
secure the residence and to keep evidence from being destroyed because they
smelled burning marijuana. They asked McCray, who was just inside the front
door with Mitchell, if there were any other persons present, and if there were
firearms in the residence. McCray said that no-one else was there, but there was a
weapon in the bedroom. McCray led the officers to the weapon. As officers
entered the residence, they observed three or four fairly large pieces of crack
cocaine on the kitchen counter, along with a box of baking soda and some kind of

cooking device.  McCray and Mitchell were placed in handcuffs and Mirandized.
When both McCray and Floyd declined to consent to a search, the officers secured
the residence and obtained a search warrant from Lee County District Judge
Russell Bush before searching further or seizing evidence.

When police executed the warrant, they found, in addition to the crack
cocaine they had previously observed, more crack cocaine inside a brown paper
bag in the bedroom (for a total of 310-312 grams), some powder cocaine (587
grams), and a large trash bag containing several bags of marijuana (a little over 19
pounds).  They also found a piece of a blunt and a small plastic bag of marijuana
in or on the toilet, and several sets of scales, some plastic bags, and $3000 in U.S.
currency in the house.  Thereafter, Floyd signed a <u>Miranda</u> waiver form and then
signed a written confession admitting to ownership of the confiscated drugs.

The VCO order directed the clerk of the municipal court to set Floyd's
case for a hearing "on the next regular business day after ... Defendant is in
custody."  Because Floyd was picked up on a Friday, the next regular business day
was Monday, August 1, 2005.  Judge Bailey released Floyd by written order,
pending further order of the court, on August 1 after Floyd made bond on the drug
charges.  Floyd agreed "in some part" to cooperate with the investigation into the
drug arrest.  Police also took a statement from him regarding Tyrone White.

*See* GX H (Doc. 29), a copy of the Recommendation Of The Magistrate, at 1-5 (all footnotes

omitted), attached to this response.

## C.    <u>Rulings On The Motion To Suppress</u>

After the hearing, the Government filed a Post-Hearing Brief.  *See* GX E (Doc. 25), a

copy of the Government's Post-Hearing Brief, attached to this response.  Floyd responded to the

Government's brief in his own Post-Hearing Brief.  *See* GX F (Doc. 26), a copy of Floyd's Post-

Hearing Brief, attached to this response.  In his post-hearing brief, Floyd argued the following:

1.    The VCO was invalid and deficient because it did not meet the
requirements of the Alabama Rules of Criminal Procedure setting forth the
procedures that must be followed when a sentence of probation is imposed
and revoked.  Specifically, the VCO did not comply with Rules 3.2(a)
(arrest warrant shall state the charged offense); 27.1 (conditions of
probation must be incorporated into a court's written order of probation
and given to the probationer); 27.4(a)(2) (requiring written order to the

defendant to show cause specifying alleged infractions); 27.4(b) (only after show cause order issued may court issue warrant for arrest); and 33.3(c) (defendant shall not be arrested unless the citation is accompanied by arrest warrant issued in compliance with Rules 3.1(a) and 3.2(a)).

2.    The arrest warrant was also invalid because it was not supported by probable cause and was a ruse to obtain the arrest and interrogation of Floyd for the benefit of the officer's conducting the Tyrone White investigation.

3.    The judge lost his neutrality by becoming a "rubber stamp for the police" in this case.  By involving the judge directly in the investigation of alleged misconduct, the Auburn Police Department and members of the clerk's staff caused the judge to lose his neutrality and become blinded to the need for probable cause or some other sufficient legal basis for the issuance of an arrest warrant against the defendant.

4.    The *Leon*[2] good faith exception to the valid warrant requirement did not apply in this case because:  (a)  "There was no underlying affidavit in this case, but the evidence failed to disclose any probable cause for the arrest of Floyd, either for violation of probation or for any new offense"; (b) "Judge Bailey acted as an adjunct police officer in this case, issuing a plainly deficient VCO after meeting with the investigating officer for the <u>White</u> case and going over court files with them"; (c) "although there was no underlying affidavit, there was no probable cause to justify an arrest"; and (d) the VCO was obviously deficient on its face because it did not reference any Show Cause Order or specify an[y] violation or offense.  Accordingly no police officer could have believed it was a valid arrest warrant.

5.    The door to the residence was not opened voluntarily, but instead was opened in response to a show of official authority.  Therefore, the law enforcement officers did not enter the residence lawfully based on McCray's consent.  And because there was no consensual opening of the door to the residence, the law enforcement officers were not lawfully in a place where they could observe or smell illegal activity.

6.    The smell of marijuana emanating from the residence did not provide probable cause and exigent circumstances to support the law enforcement officers' entrance into the residence, and therefore, they were not lawfully in a place from which they could observe the crack cocaine in plain view.

---

[2]*United States v. Leon*, 468 U.S. 897 (1984).

6

7.      The search warrant was based on evidence obtained in violation of the Fourth Amendment in that it was based on evidence discovered after the nonconsensual opening of the door to the residence and the officers' illegal entry into the residence, and on statements made to officers after the illegal entry.

8.      Floyd's post-arrest statements should be suppressed because they were made following an illegal arrest.

*Id*. The Government responded to Floyd's post-hearing brief. *See* GX G (Doc. 28), a copy of the Government's Reply Brief, attached to this response. In its reply, the Government admitted that any revocation of Floyd's probation was contrary to Alabama law, and his arrest was, therefore, based on an invalid warrant. *Id*. at 1-2, ¶¶ 2-3. However, it maintained that the arrest was lawful, because of the good faith reliance of the officers on the VCO order. *Id*. at 2-3, ¶¶ 3-4. It also maintained that Floyd's other arguments were without merit, and should be rejected. *Id*. at 3-11, ¶¶ 5-22.

In its Recommendation Of The Magistrate Judge, this Court recommended that the district court deny Floyd's motion to suppress. *See* GX H (Doc. 29). The Court found, first, that because the Government had conceded that the VCO order was not valid under Alabama law, it would move directly to the issue of whether the *Leon* good faith exception to the exclusionary rule applied to the arrest in this case. *See* GX H at 6-7. Noting that the *Leon* good faith exception applied in all but four limited set of circumstances, the Court found none of those four circumstances applicable in this case. *Id*. Specifically, the Court found that "the municipal judge was not misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. Instead, the judge issued the pickup order in question on his own motion," based on "his review of the defendant's case file."

*Id*. at 7-8.  Further, the Court was "unpersuaded that Judge Bailey 'wholly abandoned his judicial role' in preparing the VCO order."  *Id*. at 8.

As to the two remaining exceptions to application of the *Leon* good faith exception, the Court found:  (1) it could not "conclude that the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in it existence entirely unreasonable, as no affidavit was required for the VCO order, which was essentially a bench warrant";  and (2) "the VCO order was not so facially deficient that the executing officers could not reasonably presume it to be valid."  *Id*. at 8-10.  The Court then concluded that, "[i]n this case it is clear that the officers acted in objectively reasonable reliance on the VCO order in arresting Floyd."  *Id*. at 10.

Further, the Court addressed Floyd's argument that the VCO order was a pretext used by the officers simply to obtain the opportunity to question Floyd in connection with the Tyrone White investigation.  *Id*. at 10-11.  Noting that the subjective intentions of the officers played no role in the Fourth Amendment analysis, the Court found there were objective circumstances to justify the arrest, namely the VCO order on which the officers reasonably relied.  *Id*.

Next, the Court rejected Floyd's arguments that the opening of the door to the residence was involuntary and without the consent of the occupants, and that opening the door to the residence did not create probable cause and exigent circumstances sufficient to justify entry into the residence.  *Id*. at 11-14.  The Court first found that it could not conclude that the law enforcement officers needed the consent of the occupants of the residence to enter and serve what they reasonably believed was a valid VCO order for Floyd's arrest.  *Id*. at 11.  It then found that, once the door was opened and the officers smelled the burning marijuana, "they clearly had the authority to enter the residence to prevent the destruction of evidence and to secure the premises

in order to obtain a search warrant." *Id*. at 11-12.  The Court also found that "the officers were entitled to conduct a protective sweep of the residence incident to the arrest of McCray and [Mitchell] to ensure their safety." *Id*. at 13-14.  The Court then concluded that "the evidence used by officers to secure the search warrant was not discovered in violation of the constitution and, thus, the drugs and other evidence seized as a result of the execution of that warrant are not due to be suppressed." *Id*. at 14.

Finally, the Court rejected Floyd's arguments that his post-arrest statements should be suppressed.  It did so for two reasons.  First, because Floyd's arrest on the VCO order was not unlawful and because the officers had additional probable cause to arrest Floyd after they smelled the strong odor of marijuana emanating from the door of the residence, Floyd's statements were not the result of an illegal arrest.  *Id*.  Second, because there was no evidence before the Court that Floyd made the statements at issue in response to official questioning, the statements were voluntary and not subject to suppression.  *Id*. at 14-15.

After Floyd filed Objections To The Report Of The Magistrate Judge, *see* GX I (Doc. 34), a copy of Floyd's objections, attached to this response, the district court reviewed the record and findings; made a *de novo* determination of those findings, including those portions objected to by Floyd; accepted this Court's recommendation as the order of the court; and denied the motion to suppress.  *See* GX J (Doc. 35), a copy of the Order Accepting Report And Recommendation, attached to this response.

**D.**     **Change of Plea**

While the motion to suppress was still pending, a grand jury in the Middle District of

Alabama returned a superseding indictment against Floyd[3].  *See* GX K (Doc. 31), a copy of the superseding indictment in this case, attached to this response.  The superseding indictment contained four counts.  *Id*.  The first two counts were identical to the two counts in the original indictment.  Specifically, count one of the superseding indictment charged that, on or about July 29, 2005, in Lee County, within the Middle District of Alabama, Floyd knowingly and intentionally possessed with the intent to distribute a mixture and substance containing a detectible amount of cocaine base ("crack"), a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).  *Id*. at 1.  Count two of the superceding indictment charged that, on or about July 29, 2005, in Lee County, within the Middle District of Alabama, Floyd knowingly and intentionally possessed with the intent to distribute a mixture and substance containing a detectible amount of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1).  *Id*.  The two additional charges also involved controlled substances offenses.  Count three charged that, on or about July 29, 2005, in Lee County, within the Middle District of Alabama, Floyd knowingly and intentionally possessed with the intent to distribute 500 grams or more of a mixture and substance containing a detectible amount of cocaine hydrochloride, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).  *Id*. at 2.  Count four charged that, on or about July 29, 2005, in Lee County, within the Middle District of Alabama, Floyd knowingly and intentionally possessed with the intent to distribute a mixture and substance containing a detectible amount of MDMA or Ecstasy, a schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1).  *Id*. at 2.

---

[3]The original indictment was dismissed on motion of the Government.  *See* Docs. 28 and 42.

Floyd entered into plea negotiations and, ultimately, into a Federal Rules of Criminal Procedure 11(a)(2) conditional plea agreement with the Government, in which he agreed to plead guilty, but reserved the right to appeal the suppression issue. *See* GX L (Doc. 40), a copy of the plea agreement in this case, attached to this response. In return for Floyd's pleas of guilty to the four charges in the superceding indictment, the Government agreed to a two-level reduction in the applicable offense level for acceptance of responsibility pursuant to U.S.S.G.[4] § 3E1.1(a), so long as Floyd did not obstruct justice or otherwise fail to accept responsibility for the offense conduct. *See* GX L at 2-3. Also as a part of the plea agreement, Floyd not only retained the right to appeal the suppression issue, but he also retained "his right to appeal and collaterally attack the sentence imposed in this case." *Id.* at 3. Finally, the plea agreement contained the following brief factual basis for the plea:

> 4. The defendant admits the allegations charged in Counts 1-4, and understands that the nature of the charge to which the plea is offered involves proof as to Counts 1-4, that on or about July 29, 2005, in Lee County, Alabama, the defendant knowingly and intentionally possessed, with intent to distribute, controlled substances, namely, 50 grams or more of cocaine base, marijuana, 500 grams or more of cocaine hydrochloride, and 3,4-methylenedioxymeth-amphetamine ("MDMA" or "Ecstasy"), in violation of Title 21, United States Code, Section 841(a)(1).

*Id.*

A change of plea hearing was held before this Court on February 6, 2006. *See* GX M (Doc. 63), a copy of the February 6, 2006 change of plea hearing transcript, attached to this response. At the hearing, the Court ascertained the terms of the plea agreement and that Floyd

---

[4]"U.S.S.G." is a reference to the United States Sentencing Guidelines, specifically, in this case, it is to the November 1, 2005 version of the United States Sentencing Guidelines Manual, which was the version of the Guidelines used in determining the Sentencing Guidelines range applicable in this case.

understood the nature of the terms of that agreement, and it determined the plea agreement was made knowingly, intelligently, and voluntarily.  *Id*. at 2-6.  It explained to Floyd the statutory maximum and minimum sentences applicable in his case; the application of the Sentencing Guidelines; the rights he was relinquishing by pleading guilty instead of insisting on his right to a trial; and the charges he was facing and the elements of those charges.  *Id*. at 6-11.  A factual basis for the plea was then presented, as follows:

> MR. BLANCHARD [DEFENSE COUNSEL]:  Mr. Floyd, are you a resident of Lee County?
>
> THE DEFENDANT:  Yes, sir.
>
> MR. BLANCHARD:  Live in Auburn, Alabama?
>
> THE DEFENDANT:  Yes, sir.
>
> MR. BLANCHARD:  On Ty Court?
>
> THE DEFENDANT:  Yes, sir.
>
> MR. BLANCHARD:  On July 29th of last year, did the Auburn Police Department or elements of the Auburn Police Department come to your residence?
>
> THE DEFENDANT:  Yes, sir.
>
> MR. BLANCHARD:  Did they conduct a search within your residence?
>
> THE DEFENDANT:  Yes, sir.
>
> MR. BLANCHARD:  Were you there at the time?
>
> THE DEFENDANT:  Yes, sir.
>
> MR. BLANCHARD:  Did they find various controlled substances or drugs in your residence?
>
> THE DEFENDANT:  Yes, sir.

12

MR. BLANCHARD:  Were you aware that those controlled substances were present in your residence?

THE DEFENDANT:  Yes, sir.

MR. BLANCHARD:  Did they belong to you?

THE DEFENDANT:  Yes, sir.

MR. BLANCHARD:  All right.  Did you intend to distribute them?

THE DEFENDANT:  Yes, sir.

MR. BLANCHARD:  Did those controlled substances contain – or among those controlled substances, was there at least 50 grams of crack cocaine, sometimes called cocaine base?

THE DEFENDANT:  Yes, sir.

MR. BLANCHARD:  And was there at least 500 grams of powder cocaine, sometimes called cocaine hydrochloride?

THE DEFENDANT:  Yes, sir.

MR. BLANCHARD:  Was there a quantity of marijuana?

THE DEFENDANT:  Yes, sir.

MR. BLANCHARD:  And was there also a substance called MDMA, or methamphetamine [sic.]?  You heard the chemical name read out in court a moment ago.

THE DEFENDANT:  Yes, sir.

MR. BLANCHARD:  Was that also present among what you had?

THE DEFENDANT:  Yes, sir.

MR. BLANCHARD:  And was that all in Lee County, Alabama?

THE DEFENDANT:  Yes, sir.

*Id*. at 11-13.  Floyd then entered his plea of guilty to the four charges in the superseding

13

indictment.  *Id*. at 13-14.  After finding that Floyd was "fully competent and capable of entering an informed plea; that [he was] aware of the nature of the charges and the consequences of the plea; and that the plea of guilty [was] a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense," the Court accepted Floyd's plea and adjudged him guilty of the offenses in the indictment.  *Id*. at 14.

**E.**     **Sentencing**

        Before sentencing, the Government filed a motion for a downward departure pursuant to U.S.S.G. § 5K1.1 on the basis that Floyd had provided substantial assistance to the Government in the prosecution of Tyrone White, and it asked the Court to reduce Floyd's offense level by three levels as a result of that assistance.  (Doc. 55)  A presentence report was prepared (Doc. 64, under seal), and a sentencing hearing was held before the Honorable L. Scott Coogler on December 18, 2006, *see* GX N (Doc. 61), a copy of the December 18, 2006 sentencing hearing, attached to this response.  After hearing objections to the presentence report and resolving all issues raised, the Court proceeded to sentence Floyd.  *See* GX N at 2-9.  The Court found that Floyd's offense level was 34 and his criminal history category was VI, resulting in an advisory Guidelines sentencing range of from 262 to 327 months imprisonment, with various supervised release periods for each charge ranging from a low of two years to a high of five years, and a fine range of from $17,500 to $7,000,000.  *Id*. at 9-10.

        After hearing from the Government on the U.S.S.G. § 5K1.1 motion, the Court found that Floyd had provided substantial assistance to the Government.  *Id*. at 10-11.  Based on that finding, it granted the motion for a downward departure and reduced Floyd's offense level by three levels to a level 31.  *Id*. at 11.  With the offense level of 31 and a criminal history category

of VI, the Sentencing Guidelines imprisonment range was reduced to 188 to 235 months. *Id*. at

11-12. The supervised release periods did not change as a result of the downward departure,

although the fine range was decreased to a range of from $15,000 to $7,000,000. *Id*. The Court

then heard argument from defense counsel, and asked Floyd if he had anything to say. *Id*. at 12-

13. He did not. *Id*. at 13. It then imposed a sentence of imprisonment of 210 months, to be

followed by five years of supervised release, subject to mandatory, general, and special

conditions. *Id*. at 14-17. The Court also ordered that Floyd pay a special assessment of $400 and

it ordered any fine waived due to Floyd's inability to pay. *Id*. at 15.

**F.    Direct Appeal**

A final judgment was entered in this case on December 19, 2006, *see* GX O (Doc. 57), a

copy of the final judgment, attached to this response, and Floyd timely filed a notice of appeal to

the Eleventh Circuit Court of Appeals (Doc. 58). Mr. Blanchard continued to represent Floyd on

appeal. In his brief to the Eleventh Circuit, Floyd raised the following issues:

I.    Whether the district court erred in adopting the report and
recommendation of the magistrate judge denying appellant's motion to
suppress evidence obtained in violation of the Fourth Amendment to the
Constitution of the United States[.]

a.    May an officer in good faith rely upon a legally invalid arrest
warrant where the warrant was facially defective, the officers
should have known it was an invalid warrant, and where the
issuing magistrate had abandoned neutrality?

b.    Is the warrantless search of a residence justified merely and solely
from the perceived aroma of burning marijuana?

c.    May an officer gain warrantless entry into a residence through the
employment of intimidation and force?

d.    May a lawful search warrant be obtained based upon probable

cause originating from an initially unlawful, warrantless intrusion? *See* GX P, a copy of Floyd's 11th Circuit Brief, at page 1, attached to this response.  Thereafter, the Government filed its responsive brief, *see* GX Q, a copy of the Government's 11th Circuit Brief, attached to this response, and Floyd filed a reply brief, *see* GX R, a copy of Floyd's Reply Brief.  On July 12, 2007, the Eleventh Circuit issued an unpublished *per curiam* opinion rejecting Floyd's arguments and affirming the district court.  *See* GX S, a copy of the opinion, *United States v. Floyd*, No. 07-10005 (11th Cir. July 12, 2007).

## II.  CLAIMS RAISED IN THE § 2255 MOTION

In his § 2255 motion, Floyd raises the following nine claims for relief:

1.    His counsel was ineffective for not objecting to the search warrant's supporting affidavit on the grounds that it did not provide the magistrate with any substantial basis for determining the existence of probable cause and the statements of the law enforcement officer were wholly conclusory and self-serving, and counsel was also ineffective for failing to raise the issue on appeal.

2.    His post-arrest statements to law enforcement officers should have been suppressed because they were the result of his illegal arrest by Auburn police officers based on an illegal warrant.

3.    His counsel was ineffective in the district court and on appeal for failing to raise the issue of the illegality of his post-arrest statements in the district court and on appeal.

4.    His superseding indictment was defective because counts two and four of the superseding indictment failed to list specific drug quantities in those counts, but the drug quantities were then used at sentencing to enhance his sentence.

5.    His counsel was ineffective in the district court and on appeal because he failed to raise the defective superseding indictment issue in the district court or on appeal.

6.    The police officers in this case had no probable cause to invade Floyd's

16

legal residence after he was arrested outside and taken into custody, and they did not have probable cause to believe that there were illegal drugs inside his residence.

7.    His counsel was ineffective in the district court because he failed to file a motion to exclude any hearsay from the suppression hearing and he allowed such hearsay to become a part of the suppression hearing record.

8.    His counsel was ineffective in the district court and on appeal because he failed to raise the issue that the police officers had no probable cause to enter his residence after he had been arrested and taken into custody and because they had no probable cause to believe that there were illegal drugs inside the residence.

9.    His counsel was ineffective in the district court because he did not file a second motion to suppress "the new evidence" after the Government filed a superseding indictment in the case, which was based on additional illegal fruits of the invasion of Floyd's and his girlfriend's residence.

One of Floyd's claims for relief is barred from this Court's review because it was raised and decided adversely to him on direct appeal (claim 6, above); two are barred from this Court's review because they could have been raised in the district court and/or on direct appeal, but they were not (claims 2 and 4, above); and the remaining claims (claims 1, 3, 5, 7, 8, and 9) – all ineffective assistance of counsel claims – should be rejected because, as to each claim, Floyd has failed to demonstrate either deficient performance or prejudice.

### III.  RESPONSE TO CLAIMS FOR RELIEF

**A.    Floyd Has Met The One-Year Statute of Limitations Under 28 U.S.C. § 2255.**

Floyd has filed his § 2255 motion in a timely manner under paragraph six of 28 U.S.C. § 2255, which provides a one-year period of time to seek relief under the rule.  Section 2255 states that a motion must be filed within one year from

(1)  the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution and laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255 ¶ 6.  The relevant date for purposes of Floyd's § 2255 motion is paragraph (1), the date on which the judgment of conviction became final.

The final judgment in Floyd's criminal case was entered on December 19, 2006.  *See* GX O (Doc. 57).  He timely appealed his suppression motion to the United States Court of Appeals for the Eleventh Circuit, which issued its opinion in the case on July 12, 2007.  *See* GX S.  A judgment of conviction becomes final for someone who appeals to an appellate court, but not to the Supreme Court thereafter, when the time for seeking certiorari review in the Supreme Court expires.  *See Close v. United States,* 336 F.3d 1283, 1284-85 (11th Cir. 2003); *Kaufman v. United States*, 282 F.3d 1336, 1337-39 (11th Cir. 2002).  Floyd had 90 days from the July 12, 2007 opinion in which to file a petition for a writ of certiorari in the United States Supreme Court, and his conviction and sentence became final for purposes of § 2255 when that 90 days was ended.  *See* Sup.Ct. R. 13(1) and (3); *see also Close v. United States*, 336 F.3d at 1284-85. His conviction and sentence became final, therefore, on October 10, 2007.  Under § 2255, Floyd then had until October 10, 2008 – one year after October 10, 2007 – to file his motion.  He filed the instant motion on February 25, 2008.  It is, therefore, timely under the limitation period in § 2255 ¶ 6(1).

18

**B.**      **Claim 6 Of Floyd's § 2255 Motion Is Barred From This Court's Review**
            **Because It Was Decided Adversely To Him On Direct Appeal, And He Cannot**
            **Relitigate Those Claims In This § 2255 Proceeding.**

In his § 2255 motion, Floyd raises the following claim for relief:

6.      The police officers in this case had no probable cause to invade Floyd's
        legal residence after he was arrested outside and taken into custody, and
        they did not have probable cause to believe that there were illegal drugs
        inside his residence.

This claim was raised by Floyd at trial and on direct appeal, *see* GX P at 1, and decided adversely

to him by the Eleventh Circuit, *see* GX S, *United States v. Floyd*, No. 07-100005, slip op. At 11-

15.  Because the claim has already been decided adversely to Floyd on direct appeal, it is barred

from this Court's review.  As the Eleventh Circuit noted in *United States v. Nyhuis*, "[o]nce a

matter has been decided adversely to a defendant on direct appeal it cannot be re-litigated in a

collateral attack under section 2255."  *See United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th

Cir. 2000) (internal quotation marks omitted), *citing United States v. Natelli*, 553 F.2d 5, 7 (2d

Cir. 1977).

**C.**      **Claims 2 and 4 Of Floyd's § 2255 Motion Are Barred From This Court's Review**
            **Because They Could Have Been Raised On Direct Appeal, But They Were Not.**

In his §2255 motion, Floyd raises the following two claims for relief that are barred from

review in this collateral proceeding because they could have been raised on direct appeal, but

they were not:

2.      His post-arrest statements to law enforcement officers should have been
        suppressed because they were the result of his illegal arrest by Auburn
        police officers based on an illegal warrant.

4.      His superseding indictment was defective because counts two and four of
        the superseding indictment failed to list specific drug quantities in those
        counts, but the drug quantities were then used at sentencing to enhance

his sentence.

Because these two claims could have been raised on direct appeal, but they were not, and because Floyd has not presented this Court with any cause or prejudice to overcome his procedural defaults, the claims should be rejected. The claims also do not implicate Floyd's innocence of the underlying crimes, and they should be rejected for that reason as well.

A motion under § 2255 cannot be used as a substitute for appeal, *see Burke v. United States*, 152 F.3d 1329, 1331 (11th Cir. 1998), and claims not raised on direct appeal that could have been are generally barred from review in § 2255 proceedings, *see Massaro v. United States*, 538 U.S. 500, 504 (2003); *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001). In *Mills v. United States*, 36 F.3d 1052 (11th Cir. 1994), the Eleventh Circuit succinctly summarized the law concerning procedural default as follows:

> Generally speaking, an available challenge to a criminal conviction or sentence must be advanced on direct appeal or else it will be considered procedurally barred in a [Section] 2255 proceeding.... A ground of error is usually "available" on direct appeal when its merits can be reviewed without further factual development.... When a defendant fails to pursue an available claim on direct appeal, it will not be considered in a motion for [Section] 2255 relief unless he can establish cause for the default and actual prejudice resulting from the alleged error.... Alternatively, under the fundamental miscarriage of justice exception, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default....

*Id*. at 1055-56 (internal citations omitted). *See also McCoy v. United States*, 266 F.3d at 1258 ("A claim not raised on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice for his failure to assert his claims on direct appeal."). The burden of demonstrating cause and prejudice or a miscarriage of justice is on the movant. *See*, *e.g.*,

*Bousley v. United States*, 523 U.S. 614, 622 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,'... or that he is 'actually innocent[.]' ").

As noted, Floyd offers nothing to support a cause and prejudice, or actual innocence, analysis, and the burden to establish those things is on him.  Because he has failed in his burden, this Court should reject claims 2 and 4 of the § 2255 motion.[5]

D.    **All Of Floyd's Ineffective Assistance Of Counsel Claims Should Also Be Rejected Because, As To Each Claim, Floyd Has Failed To Establish That His Counsel's Performance Was Deficient And That He Was Prejudiced As A Result.**

In addition to the substantive claims addressed above and which are barred from this Court's review, Floyd appears to raise six claims of ineffective assistance of counsel.  Those claims are the following:

1.    His counsel was ineffective for not objecting to the search warrant's supporting affidavit on the grounds that it did not provide the magistrate with any substantial basis for determining the existence of probable cause and the statements of the law enforcement officer were wholly conclusory and self-serving, and counsel was also ineffective for failing to raise the issue on appeal.

-----

[5]Floyd has also raised ineffective assistance of counsel claims in his § 2255 motion related to these two substantive claims for relief, but he has not asserted ineffective assistance of counsel to overcome his procedural defaults of claims 2 and 4.  To the extent that he does rely on any of his ineffective assistance of counsel claims to overcome his procedural defaults, for the reasons outlined below, his counsel was not ineffective and, therefore, Floyd has failed to demonstrate the necessary cause and prejudice to overcome those procedural defaults.  *See*, *e.g.*, *Black v. United States*, 373 F.3d 1140, 1146 (11th Cir. 2004) ("As [the defendant] cannot show that his ... counsel's performance was deficient, he cannot show that he received ineffective assistance of counsel as to overcome his procedural default for not raising this issue on direct appeal.").

3.      His counsel was ineffective in the district court and on appeal for failing to raise the issue of the illegality of his post-arrest statements in the district court and on appeal.

5.      His counsel was ineffective in the district court and on appeal because he failed to raise the defective superseding indictment issue in the district court or on appeal.

7.      His counsel was ineffective in the district court because he failed to file a motion to exclude any hearsay from the suppression hearing and he allowed such hearsay to become a part of the suppression hearing record.

8.      His counsel was ineffective in the district court and on appeal because he failed to raise the issue that the police officers had no probable cause to enter his residence after he had been arrested and taken into custody and because they had no probable cause to believe that there were illegal drugs inside the residence.

9.      His counsel was ineffective in the district court because he did not file a second motion to suppress "the new evidence" after the Government filed a superseding indictment in the case, which was based on additional illegal fruits of the invasion of Floyd's and his girlfriend's residence.

As demonstrated below, counsel's performance was not deficient with respect to any of these claims of ineffective assistance of counsel. Floyd has also wholly failed to meet his burden of demonstrating prejudice.

**1.      The _Strickland_ Test For Ineffective Assistance Of Counsel Claims**

To succeed on a claim of ineffective assistance of counsel, a petitioner must prove both that his counsel's performance was deficient and that that deficient performance prejudiced his case. _Strickland v. Washington,_ 466 U.S. 668, 694 (1984); _see also Rompilla v. Beard_, 545 U.S. 374, 380 (2005) ("Ineffective assistance under _Strickland_ is deficient performance by counsel resulting in prejudice."). More specifically, Floyd must show that: "(1) counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) the deficient

performance prejudiced the defense." *Stewart v. Sec'y, Dep't. Of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007).

In reviewing counsel's performance to determine whether it meets constitutional requirements, a reviewing court must engage in a " 'highly deferential' review of counsel's performance and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' " *Jennings v. McDonough*, 490 F.3d 1230, 1243 (11th Cir. 2007), *citing Strickland v. Washington*, 466 U.S. at 689. "As a result of this presumption, a petitioner must show that no competent counsel would have taken the action that his counsel did take," and where the record is incomplete or unclear about why counsel acted as he did, the reviewing court must "presume that he did what he should have done, and that he exercised reasonable professional judgment." *Jennings v. McDonough*, 490 F.3d at 1243 (internal quotation marks and citations omitted).

The standard for judging counsel's performance is "reasonableness under prevailing professional norms." *Stewart v. Sec'y, Dep't. of Corr.*, 476 F.3d at 1209 (internal quotation marks and citations omitted); *see also Rompilla v. Beard*, 545 U.S. at 380. Moreover, the test for whether counsel's actions or inactions were reasonable "is not whether counsel could have done something different; instead, [the court] must consider whether the performance fell within the broad range of reasonable assistance... ." *Id.* "The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Id.*

The Eleventh Circuit has described a petitioner's burden with regard to the deficient performance prong of an ineffective assistance of counsel claim as follows:

Because there is such a wide range of constitutionally acceptable performance, a petitioner seeking to rebut the presumption of adequate performance must bear a heavy burden:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. ... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.
>
> ... Thus, in order to show that counsel's performance was unreasonable, the petitioner must establish that *no competent counsel would have taken the action that his counsel did take....*

*Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citations omitted); *accord Grossman v. McDonough*, 466 F.3d 1325, 1345 (11th Cir. 2006).

To succeed on an ineffective assistance of counsel claim, the petitioner must not only show deficient performance, but must also show that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *See Jennings v. McDonough*, 490 F.3d at 1243. The Eleventh Circuit has described a petitioner's burden in demonstrating that his counsel's deficient performance prejudiced his case as also "high," noting that it is not enough to show that any errors had some conceivable effect on the outcome of the proceeding. *See Stewart v. Sec'y, Dep't. of Corr.*, 476 F.3d at 1209; *Robinson v. Moore*, 300 F.3d 1320, 1343-44 (11th Cir. 2002).

Finally, as the Eleventh Circuit has noted, "[i]t is well established that a habeas petitioner must demonstrate both deficient performance and prejudice, and that a failure to demonstrate either prong constitutes a failure to demonstrate ineffective assistance of counsel." *Bottoson v. Moore*, 234 F.3d 526, 532 (11th Cir. 2000); *accord, Robinson v. Moore*, 300 F.3d at 1343. The

24

reviewing court "can evaluate either the prejudice or the performance prong first and, if either

one cannot be met, [the petitioner's] claim must fail." *Dingle v. Sec'y for Dep't. of Corr.*, 480

F.3d 1092, 1099 (11th Cir. 2007).

> **2.    Claim That Counsel Was Ineffective In The District Court And
> On Appeal For Not Objecting To The Search Warrant's Supporting
> Affidavit On The Grounds That It Did Not Provide The Magistrate
> With Any Substantial Basis For Determining The Existence Of
> Probable Cause And The Statements Of Law Enforcement Were
> Wholly Conclusory and Self-Serving**

In his first ineffective assistance of counsel claim (claim1, above), Floyd argues that his

counsel was ineffective in the district court and on appeal for not objecting to the search

warrant's supporting affidavit on the grounds that it did not provide the magistrate with any

substantial basis for determining the existence of probable cause, and the statements of law

enforcement were wholly conclusory and self-serving.  Copies of the search warrant, the

application for the search warrant, and the affidavit in support of the search warrant were

attached to the Government's Response To Suppress Statements & Physical Evidence, *see* GX C,

at Exhibit A.  A review of these documents and the testimony from the suppression hearing

reflect that there was a substantial basis for the issuing magistrate to find probable cause had

been established.  Therefore, Floyd has failed to demonstrate either deficient performance or

prejudice, and his claim should be rejected.

The affidavit in support of the search warrant presented to the magistrate for

consideration contained the following facts sworn to by Sgt Chris Murray, who was on the scene

of Floyd's arrest and could – and did – personally attest to those facts:

> ... that there is now being kept or concealed Cocaine and Marijuana at the
> residence known as 1289 Ty Court, Auburn, Lee County, Alabama.  On July 29,

2005, Sergeant Chris Murray and other members of the Auburn Police
Department went to serve a Violation of Court Order warrant issued by Auburn
Municipal Court on Sawelija Tyree Floyd, alias, at 1289 Ty Court, Auburn Lee
County, Alabama.  Officers knocked on the front door and when it opened, a very
strong odor of burning Marijuana was detected immediately coming from inside
the residence.  Floyd, alias, was taken into custody.  Officers entered the residence
and from the front door, officers could see suspected "crack" Cocaine and a set of
scales on the kitchen counter.  Also present in the residence were J.B. Mitchell
and Jamillah Resheda McCray, alias (a resident).  All three were read their
Miranda rights.  J.B. Mitchell, alias, stated to Sgt. Murray that he and Sawelija
Tyree Floyd were smoking Marijuana when officers knocked on the door.  Both
McCray and Floyd refused to give consent to a further search of the apartment.

*See* GX C at Exhibit A, "Affidavit In Support Of Application For Search Warrant."  Contrary to

Floyd's assertions, this affidavit, and the facts contained therein, provided a substantial basis for

the magistrate's finding of probable cause and the issuance of the warrant.  These facts clearly

established probable cause to believe that violations of the controlled substances act were

occurring at the residence at 1289 Ty Court and that evidence of those crimes would be found at

that residence.  The recited facts were neither conclusory nor self-serving, but were based on

observations of the attesting officer.

Because the affidavit supported the probable cause determination and the issuance of the

warrant, there was no basis on which counsel could have objected in the district court or on

appeal.  Counsel was, therefore, not deficient in failing to raise the issue in the district court or on

appeal.  *See Card v. Dugger*, 911 F.2d 1494, 1520 (11th Cir. 1990) ("Counsel cannot be labeled

ineffective for failing to raise issues which have no merit."); *Diaz v. Sec'y, Dep't of Corr.*, 402

F.3d 1136, 1142 (11th Cir. 2005) ("appellate counsel ... is not ineffective for failure to raise a

meritless issue").  Floyd also cannot demonstrate prejudice.  Therefore, his first claim of

ineffective assistance of counsel must be rejected.

3.    **Claim That Counsel Was Ineffective In The District Court And On Appeal For Failing To Raise The Issue Of The Illegality Of Floyd's Post-Arrest Statements**

In his next claim of ineffective assistance of counsel (claim 3, above), Floyd complains that his counsel was ineffective because he did not raise the issue of the illegality of his post-arrest statements in the district court or on appeal.  However, Floyd's counsel did, in fact, raise the post-arrest statements issue in the district court, *see* GX B at 5, issue III; GX F, at 12-13, so Floyd cannot demonstrate deficient performance with regard to the issue in the district court.  Moreover, counsel, in his affidavit, provides a reasonable explanation for why he did not raise the issue on appeal.  Counsel explains:

> Assuming, as the Eleventh circuit has held in this case, that the initial entry into the residence by the police officers was lawful, the detention of the defendant by the officers was supported by probable cause stemming from their observation of contraband in the residence.  In other words, even if the 'VCO' was deficient, Petitioner's detention was independently justified and authorized.  I argued at trial and on appeal that the VCO was insufficient to allow entry into the residence to effect an arrest of the Petitioner, but that argument was rejected.  Furthermore, I did argue at trial that Petitioner's post-arrest statements should be suppressed because he was in custody pursuant to the VCO when he made them.  I did not judge that issue to be a viable source of relief on appeal.  If the Appellate Court agreed that the physical evidence was due to be suppressed, the verbal statements would have been legally insufficient, standing alone, to support a conviction.  If, on the other hand, the Appellate Court did not mandate suppression of the physical evidence, the admission of Petitioner's statements would be subject to characterization as harmless in view of the other overwhelming evidence, and would not lead to a reversal.

*See* Affidavit of William R. Blanchard at 2, ¶ 2.  Counsel has provided a cogent, well-reasoned explanation for his actions – one that demonstrates his knowledge and grasp of the complex Fourth Amendment issues in this case.  Floyd simply has not shown, as he must to succeed on this claim, that his counsel's performance was deficient.

Furthermore, Floyd cannot demonstrate prejudice, because there is no merit to his claim that his post-arrest statements should have been suppressed. This Court rejected Floyd's arguments after holding a suppression hearing and having the benefit of post-hearing briefs, finding:

> Defendant argues that, because his arrest was illegal, his statements following that arrest must be excluded unless intervening events break the causal connection between the illegal arrest and the confession. Defendant's argument is without merit for two reasons. First, as discussed above, his arrest on the VCO order was not unlawful, as police acted in objectively reasonable reliance on that order in detaining Floyd. Officers had additional probable cause to arrest defendant after they smelled the strong odor of burning marijuana emanating from the door of his residence.
>
> Second, there is no evidence presently before the court that Floyd made any statement in response to official questioning. The facts elicited at the suppression hearing at this case from Lt. Holder were that, after Sgt. Tatum removed a sum of money from Floyd, Tatum called Holder outside. There defendant "made a statement to me, directly to me, that the drugs in the residence were his." Similarly, Sgt. Murray testified that "[s]ome time just briefly after being taken into custody," Floyd "was read his rights by Sergeant James Tatum." Thereafter, Murray said, Floyd made the statement to Tatum that "any drugs found in the house belongs to him basically." No testimony suggested that police solicited these statements or otherwise questioned defendant.
>
> "Voluntary and spontaneous comments by an accused, even after <u>Miranda</u> rights are asserted, are admissible evidence if the comments were not made in response to government questioning." <u>Cannady v. Dugger</u>, 931 F.2d 752,754 (11th Cir. 1991); <u>see also United States v. Johnson</u>, 136 Fed.Appx. 279, 283 (11th Cir. 2005). Absent evidence that Floyd's statement(s) were the product of interrogation, the statements are not due to be suppressed.....

*See* GX H at 14-15. This Court's analysis of the relevant case law and its application of that case law to the facts presented in this case was correct. Therefore, Floyd has demonstrated no prejudice from counsel's presentation of the issue at the trial stage of Floyd's case or in his counsel's failure to raise the issue on appeal.

**4.    Claim That Counsel Was Ineffective In The District Court And On Appeal Because He Failed To Raise The Issue That His Superseding Indictment Was Defective Because Counts Two And Four Of That Indictment Failed To List Specific Drug Quantities In Those Counts, But The Drug Quantities Were Then Used At Sentencing To Enhance His Sentence**

Floyd also argues that his superseding indictment was defective because counts two and four of the indictment did not list specific drug quantities in those counts of the indictment, but the drug quantities involved in those counts of the indictment were then used at sentencing to enhance his sentence. Floyd argues that his counsel was ineffective for failing to object to the superseding indictment on those grounds in the district court and on appeal. However, because the indictment was not defective for failing to contain the drug quantity amounts as to those two counts in the indictment, counsel was not ineffective for failing to raise the issue in either the district or appellate court.

"An indictment is sufficient if '[i]t (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense.' " *United States v. Walker*, 490 F.3d 1282, 1296 (11th Cir. 2007) (internal citation omitted); *see also United States v. Poirier*, 321 F.3d 1024, 1028 (11th Cir. 2003). Floyd's indictment did all three. Specifically, as to both counts two and four, it properly charged all three elements of the 21 U.S.C. § 841(a)(1) offenses: (1) knowledge of one's possession; (2) possession of a controlled substance; and (3) the intent to distribute that substance. *See United States v. Wilson*, 183 F.3d 1291, 1299 n.13 (11th Cir. 1999); *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989). By properly charging the offenses in counts two

and four, the indictment also gave Floyd notice of the charges to be defended against and enabled Floyd to rely upon a judgment under his indictment as a bar against double jeopardy for any subsequent prosecution for the same offense.

Further, counts two and four of the indictment were not deficient simply because they did not contain the quantities of marijuana (count two) and Ecstasy (count four) Floyd was alleged to have possessed with the intent to distribute. Such quantities of drugs, like the type of drug itself, *see, e.g., United States v. Rutherford*, 175 F.3d 899, 906 (11th Cir. 1999), are not required to be alleged in the indictment; they are not elements of the offense. Moreover, under an advisory Sentencing Guidelines system, such as was used in sentencing Floyd, facts – such as drug quantities – used to enhance a defendant's Sentencing Guidelines range, need not be found by a grand jury and charged in the indictment, where such facts do not enhance the sentence beyond the statutory maximum range. *See United States v. Thomas*, 446 F.3d 1348, 1355 (11th Cir. 2006). Floyd was not sentenced beyond the statutory maximum range for his crimes of conviction. Therefore, the drug quantities need not have been charged in the indictment.

Floyd was facing up to a life sentence on count one of his indictment, and he received a sentence of 210 months in prison. Therefore, the failure of the indictment to allege the drug quantities in counts two and four of his indictment in no way affected his sentence. They were not, therefore, required to be charged in the indictment.

Because Floyd's indictment was not deficient because the indictment did not allege the quantities of drugs Floyd was alleged to possess in counts two and four, Floyd's counsel was not deficient for failing to raise this issue in the district court or on appeal. Counsel cannot be found ineffective for failing to raise a non-meritorious issue. *See Card v. Dugger*, 911 F.2d at 1520

("Counsel cannot be labeled ineffective for failing to raise issues which have no merit."); *Diaz v. Sec'y, Dep't of Corr.*, 402 F.3d at 1142 ("appellate counsel ... is not ineffective for failure to raise a meritless issue").  Further, because the issue is meritless, Floyd can demonstrate no prejudice from counsel's failure to raise the issue.  Therefore, this Court should reject this claim of ineffective assistance of counsel.

>    **5.    Claim That Counsel Was Ineffective In The District Court Because He Failed To File A Motion To Exclude Any Hearsay From The Suppression Hearing And He Allowed Such Hearsay To Become A Part Of The Suppression Hearing Record**

Floyd also alleges (in claim 7, above) that his counsel was ineffective in the district court because he failed to file a motion to exclude any hearsay from the suppression hearing and he allowed such hearsay to become a part of the suppression hearing record.  Floyd does not specifically identify places in the suppression hearing transcript where he alleges hearsay evidence was admitted, but even if he had, hearsay evidence is admissible at a suppression hearing and a judge may rely on such evidence in resolving suppression issues.  *See United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.").  Because hearsay is admissible, Floyd's counsel did not perform deficiently in failing to object to its admission.

Moreover, because Floyd has not identified the alleged hearsay testimony, he has left this Court to guess not only as to what hearsay was introduced, but why counsel might have acted as he did.  Where, as here, the record is incomplete or unclear about why counsel acted as he did, counsel is presumed to have done what he should have done.  *See Jennings v. McDonough*, 490

F.3d at 1243.  Therefore, this Court should presume that Mr. Blanchard acted as he should have with regard to the admission of any hearsay evidence.

Finally, Floyd has not demonstrated that but for the introduction of any hearsay evidence at his suppression hearing, this Court would have ruled differently on the motion to suppress.  In other words, he has failed to demonstrate the necessary prejudice.  His claim of ineffective assistance of counsel must, therefore, fail.

> **6.**    **Claim That Counsel Was Ineffective In The District Court And On Appeal Because He Failed To Raise The Issue That The Police Officers Had No Probable Cause To Enter His Residence After He Had Been Arrested And Taken Into Custody And Because They Had No Probable Cause To Believe That There Were Illegal Drugs Inside The Residence**

Floyd next argues that his counsel was ineffective in the district court and on appeal because he failed to raise the issue that the police officers had no probable cause to enter his residence after he had been arrested and taken into custody and because they had no probable cause to believe that there were illegal drugs inside the residence.  Contrary to Floyd's contention, however, his counsel, Mr. Blanchard, thoroughly explored these, and other, probable cause issue both in the trial court and in Floyd's direct appeal.  *See* GX B, GX D, GX F, GX I, GX P.  Counsel's performance was not deficient and Floyd was not prejudiced.  There simply is no merit to this ineffective assistance of counsel claim, and it should be rejected.

> **7.**    **Claim That Counsel Was Ineffective In The District Court Because He Did Not File A Second Motion To Suppress "The New Evidence" After The Government Filed A Superseding Indictment In The Case, Which Was Based On Additional Illegal Fruits Of The Invasion Of Floyd's And His Girlfriend's Residence**

Floyd's final claim of ineffective assistance of counsel (claim 9, above), is that his

counsel was ineffective in the district court because he did not file a second motion to suppress "the new evidence" after the Government filed a superseding indictment in the case, which was based on additional illegal fruits of the invasion of Floyd's and his girlfriend's residence. With regard to this claim, Floyd has demonstrated neither deficient performance or prejudice.

First, with regard to Mr. Blanchard's performance, Floyd does not explain why counsel should have filed a second motion to suppress based on the superseding indictment or on anything that arose from the return of that superseding indictment. Floyd refers to "new evidence" arising after the superseding indictment was returned, but he does not identify to what "new evidence" he is referring. The record in this case does not reflect that any new evidence relative to Floyd's arrest and the search of his residence came to light after the return of the superseding indictment. As Mr. Blanchard notes in his affidavit: "The additional charges continued in the superseding indictment flowed from the same search and seizure which supported the charges in the original indictment. There were no new or independent grounds upon which to premise a second suppression motion." *See* Affidavit of William R. Blanchard at 3, ¶ 4. Floyd has not demonstrated that his counsel's failure to file a second motion to suppress after the return of the superseding indictment fell below an objective standard of reasonableness. Therefore, Floyd's ineffective assistance of counsel claim must fail.

And, once again, Floyd has failed to show the necessary prejudice to succeed on an ineffective assistance of counsel claim. He has not demonstrated that but for counsel's failure to file a second motion to suppress, the Court would have suppressed the fruits of the search of Floyd's residence and/or his post-arrest statements. Floyd's final ineffective assistance of counsel claim should be rejected as well.

## IV.  MISCELLANEOUS

Floyd has failed to plead facts or present sufficient evidence or argument demonstrating that he is entitled to an evidentiary hearing, and his claims for relief should be denied without such a hearing.  *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977); *see also Gordon v. United States*, 496 F.3d 1270, 1281 (11th Cir. 2007) ("An evidentiary hearing is not required when 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.' "), *citing* 28 U.S.C. § 2255.; *Chandler v. McDonough*, 471 F.3d 1360, 1363 (11th Cir. 2006) (Where a defendant fails to proffer any evidence that he would seek to introduce at a hearing, he is not entitled to an evidentiary hearing).  Should this Court determine that Floyd has made any arguments not addressed in this response, the Government would request the opportunity to further respond to those arguments.

Any facts not specifically admitted in this response are denied, and the arguments made as to each claim raised are asserted in the alternative.

## V.  CONCLUSION

For the above reasons, Petitioner Sawelija Tyree Floyd has failed to demonstrate that he

is entitled to any relief from this Court, and his § 2255 motion should be denied without an

evidentiary hearing.

Respectfully submitted this 3rd day of April, 2008.

LEURA G. CANARY
UNITED STATES ATTORNEY


/s/  Sandra J. Stewart
SANDRA J. STEWART
Assistant United States Attorney
131 Clayton Street
Montgomery, AL  36101-0197
(334) 551-1764
(334) 223-7135

35

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **SAWELIJA TYREE FLOYD,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:08cv133-MEF** |
| | ) | **(CR No. 3:05-cr-00187-LSC-SRW)** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2008, I electronically filed the foregoing response and attachments with the Clerk of the Court using the CM/ECF system and mailed, postage prepaid, a copy of this response to the *pro se* Defendant/Petitioner as follows:

Sawelija Tyree Floyd
Rg. #190962
Staton Correctional Facility
P. O. Box 56
Elmore, AL  36025-0056

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/  Sandra J. Stewart
SANDRA J. STEWART
Assistant United States Attorney
131 Clayton Street
Montgomery, AL  36101-0197
(334) 551-1764
(334) 223-7135

**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

SEP - 8 2005

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. _3:05cR 187-F_ |
| | ) | [21 USC 841(a)(1)] |
| SAWELIJA TYREE FLOYD, a/k/a | ) | |
| TYREE FLOYD, a/k/a, | ) | |
| TY FLOYD | ) | **INDICTMENT** |

**The Grand Jury charges:**

### COUNT 1

On or about the 29th day of July, 2005, in Lee County, within the Middle District of

Alabama, the defendant,

SAWELIJA TYREE FLOYD, a/k/a,
TYREE FLOYD, a/k/a,
TY FLOYD,

did knowingly and intentionally possess with intent to distribute a mixture and substance

containing a detectible amount of cocaine base ("crack"), a Schedule II controlled substance, in

violation of Title 21, United States Code, Section 841(a)(1).

### COUNT 2

On or about the 29th day of July, 2005, in Lee County, within the Middle District of

Alabama, the defendant,

SAWELIJA TYREE FLOYD, a/k/a,
TYREE FLOYD, a/k/a,
TY FLOYD,

AO98B-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.    A

did knowingly and intentionally possess with intent to distribute a mixture and substance

containing a detectible amount of marijuana, a Schedule I controlled substance, in violation of

Title 21, United States Code, Section 841(a)(1).

A TRUE BILL:

_____
Foreperson

_____
LEURA GARRETT CANARY
United States Attorney

_____
Todd A. Brown
Assistant United States Attorney

2

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

UNITED STATES OF AMERICA     )
                )
                )
vs.                )     3:05cr187-F
                )
                )
SAWELIJA TYREE FLOYD     )

### MOTION TO SUPPRESS STATEMENTS & PHYSICAL EVIDENCE

**COMES NOW** Sawelija Tyree Floyd, by and through counsel of record, and pursuant to the Fourth and Fifth Amendments to the United States Constitution, moves this Honorable Court for an order suppressing all physical evidence and statements taken and seized as a result of the search of his home and his arrest and interrogation on July 29, 2005. The Defendant moves for an order prohibiting the Government from introducing in this matter all items seized from his residence, all statements and information obtained from the Defendant, and all physical objects and information obtained as a "fruit" or result of the statements received from the Defendant. In support of these motions, the Defendant will show as follows:

### FACTS

1. The Defendant, Sawelija Tyree Floyd, has been indicted for one count of possessing "crack" cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and one count of possessing marijuana with intent to distribute also in violation of 21 U.S.C. § 841(a)(1).



AO886-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.  B

2. At some point in time prior to July 29, 2005, members of the Auburn Police Department concluded that the Defendant, Sawelija Tyree Floyd, was a "large drug trafficker" and determined to detain and interview him.

3. On July 29, 2005, six (6) officers of the Auburn Police Department, including one canine handler, went to the Defendant's home at 1289 Ty Court in Auburn, Alabama, ostensibly to serve him with a warrant for violating a court order. The warrant, allegedly issued by the Auburn Municipal Court, has not been produced in discovery, and the Defendant's independent investigation has not turned up a copy of the supposed warrant or any proof of its issuance by the Auburn Municipal Court.

4. According to one of the officers present, Sergeant Tatum of the Patrol Division knocked on the front door of the Defendant's residence at about 10:30 a.m. A male voice from inside yelled "What?", and Sergeant Tatum replied "Police, open the door". A short time later, the Defendant's fiancée, Jamelia McCray, opened the door. She was asked if Tyree Floyd was home, and she said that he was. She went back into the house and got Mr. Floyd, who came out the front door and was taken into custody outside the residence.

5. At about this point in time, several of the officers claimed to have detected the odor of marijuana coming from inside the house and stepped up to the front door. The reports on file indicate that one or more of them claimed to be able to see what appeared to be crack cocaine on the kitchen countertop.

6. Several of the officers entered the home, secured the occupants with handcuffs (a gentleman named D.J. Mitchell and Ms. McCray were both in the house at the time)

and "cleared" the rest of the house. Permission to search the house was requested and
denied.

7. Sgt. Murray went and obtained a search warrant based upon what the officers had
discovered upon their initial warrantless entry into the house. The search was
conducted about an hour and one-half later, and resulted in the seizure of various drug
and non-drug items from the residence.

8. While the search warrant was being sought, the Defendant was transported to the
police department, read his rights, and interviewed. The interview resulted in an
inculpatory statement by the Defendant. He is reported to have said that the drugs
found in the residence were his, and that no one else there had anything to do with it.

9. The Defendant was arrested by the State authorities, and charged with one count of
trafficking in marijuana and one count of trafficking in cocaine.

## ISSUES PRESENTED

I. **WHETHER THE INITIAL WARRANTLESS ENTRY INTO THE
DEFENDANT'S RESIDENCE BY OFFICERS OF THE AUBURN POLICE
DEPARTMENT WAS CARRIED OUT IN VIOLATION OF THE
DEFENDANT'S RIGHT TO BE FREE OF UNREASONABLE SERAHCES
AND SEIZURES.** U.S. Const. amend. IV.

a. The initial approach to the house by the six (6) officers without a legitimate
warrant or probable cause was a pretext designed to create an opportunity to
conduct a search of the premises for evidence of a crime. Whren & Brown v.
United States, 517 U.S. 806 (1996) (subjective intent of officers is immaterial as
long their actions are objectively justified and supported by probable cause). *See
also*: Scott v. United States, 436 U.S. 128 (1978) and United States v. Clarke, 110
F3d. 612 (8th Cir. 1997) ("although Whren specifically concerned a traffic stop,

we believe that its principle is applicable to all police activities for which probable cause is required").

b.  The initial opening of the residence was involuntary and without the consent of the occupants. <u>United States v. Edmonson</u>, 791 F2d. 512, 514 (11th Cir. 1986); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973) (voluntariness of consent must be judged in light of the totality of the circumstances); <u>Bumper v. North Carolina</u>, 391 U.S. 543 (1968).

c.  The opening of the residence did not create probable cause and exigent circumstances sufficient to justify entry into the residence by the officers. <u>Payton v. New York</u>, 445 U.S. 573 (1980) (the warrantless search of a home is "presumptively unreasonable"); <u>United States v. Burgos</u>, 720 F.2d 1520, 1525 (11th Cir. 1983) (a warrantless search is allowed, however, where both probable cause and exigent circumstances exist).

II.  **WHETHER THE SEARCH WARRANT OBTAINED BY THE AUBURN POLICE DEPARTMENT MUST BE INVALIDATED BECAUSE IT IS BASED UPON EVIDENCE DISCOVERED IN AN ILLEGAL AND UNCONSTITUTIONAL WARRANTLESS SEARCH.** U.S. Const. amend. IV.

<u>Weeks v. United States</u>, 232 U.S. 383 (1914); <u>United States v. Tarzado-Madruga</u>, 897 F.2d 1099, 1112 (11th Cir. 1990) (under the exclusionary rule, evidence obtained in an encounter that is in violation of the Fourth Amendment, including direct products of police misconduct and evidence derived from the illegal conduct or "fruit of the poisonous tree", cannot be used in a criminal trial against the victim of the illegal search and seizure).

III.    **WHETHER THE DEFENDANT'S INCRIMINATORY STATEMENTS WERE OBTAINED FROM HIM DURING AN ILLEGAL DETENTION IN VIOLATION OF HIS RIGHT NOT TO GIVE EVIDENCE AGAINST HIMSELF.** U.S. Const. amend. V.

Taylor v. Alabama, 457 U.S. 687 (1982) (confession obtained through custodial

interrogation after an illegal arrest should be excluded unless intervening events break

the causal connection between the illegal arrest and the confession.)

Respectfully submitted this the 27th day of October 2005.

s/ William R. Blanchard
WILLIAM R. BLANCHARD
Attorney for the Defendant

BLANCHARD LAW OFFICES
505 South Perry Street
Post Office Box 746
Montgomery, Alabama 36101-0746
(334) 269-9691

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **3:05cr187-F** |
| | ) | |
| | ) | |
| **SAWELIJA TYREE FLOYD** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2005, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to the following: AUSA Todd Brown, and I hereby certify that I have mailed by

United States Postal Service the document to the following non-CM/ECF participants:

n/a.

Respectfully submitted,

s/ William R. Blanchard
BLANCHARD LAW OFFICES
505 South Perry Street
Post Office Box 746
Montgomery, Alabama 36101-0746
Office: (334) 269-9691
Fax:    (334) 263-4766
(BLA029)

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

A0898-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT    C
NO.

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )    CR. NO: 3:05-CR-0187-F |
| | ) |
| SAWELIJA TYREE FLOYD | ) |

RESPONSE TO MOTION TO SUPPRESS
STATEMENTS & PHYSICAL EVIDENCE

**COMES NOW** the United States of America, by and through Leura Garrett Canary, United

States Attorney for the Middle District of Alabama, and files the instant response to Defendant's

("Floyd's") Motion to Suppress Statements [and] Physical Evidence (Doc. # 20), filed on October

17, 2005, as follows:

FACTS

1. On Friday, July 29, 2005, Auburn Police Department ("APD") officers went to Floyd's

residence to serve a Violation of Court Order ("VCO") Order on Floyd. During the course of

serving the VCO Order, APD Sergeant James Tatum ("Tatum") and Sergeant Chris Murray

("Murray") went to the front door of Floyd's residence and knocked on the front door. After

identifying themselves as police officers, Floyd's girlfriend (later identified as Jamillah McCray

("McCray")) opened the door. As McCray opened the door, officers detected a strong odor of

burning marijuana. Tatum asked McCray where Floyd was, and at that time Floyd came to the front

door. Tatum then advised Floyd of the VCO Order, read him his Miranda rights, and handcuffed

Floyd.

2.    Murray, APD Lieutenant Jerry Holder ("Holder") and APD Detective Brad Bass

("Bass"), then entered the residence and made contact with a male, later identified as J. B. Mitchell

("Mitchell") and McCray. Officers then observed a large amount of what appeared to be crack

cocaine in front of a microwave oven. APD Officer Brian Lynn advised Mitchell and McCray of their Miranda rights, after which Mitchell stated that he and Floyd were smoking marijuana when the officers knocked on the door. Floyd then told Murray that McCray had nothing to do with the drugs that officers observed in plain view, but that they belonged to him. Murray then asked for consent to search the residence and Floyd refused. Bass told Murray that he had asked McCray for consent to search but that she also had refused. Holder and Lt. Willie Smith ("Smith") cleared the rest of the residence and secured the residence. Murray asked McCray if there were weapons in the residence. McCray stated that she had a handgun next to her bed and officers secured it after McCray directed them to the handgun.

3. Murray then left the residence at approximately 11:45 am to obtain a search warrant, while other officers kept the residence secured. At approximately 1:00 pm, Murray obtained a search warrant from Lee County Judge District Judge Russell Bush. See Attachment A, attached. Shortly thereafter, officers executed the search warrant locating crack cocaine that officers had previously seen; and, powder cocaine, two large trash bags of marijuana, crack cocaine, and ecstasy in a bedroom. After photographing and logging the evidence seized, Murray interviewed Floyd, after he signed a Miranda waiver, and Floyd signed a written confession admitting to ownership of the drugs located in the residence.

## ISSUES

4. Floyd claims the entry into his residence was without a warrant and thus violated his Fourth Amendment rights. Contrary to Floyd's assertion, his claim that the "initial approach to the house…without a legitimate warrant," (*Def. Mot. at* ¶ I(a)) is without merit. Discovery provided by the United States (Bates stamped page 19) shows the existence, as of July 29, 2005, of a VCO Order for Floyd. See Exhibit B, attached. On today's date, APD provided the undersigned with a copy of

2

the actual Order (Bates stamped page 000057), which was also turned over as supplemental discovery on today's date. See Exhibit C, attached.

5. Floyd claims that the "opening of the residence was involuntary and without the consent of the occupants." *Def. Mot. at* ¶ I(b). This assertion is contrary to the facts. McCrary—one of the occupants—opened the residence, not law enforcement officers. As McCrary was not an agent of the government, her opening of the residence cannot be deemed to violate Floyd's Fourth Amendment rights. U.S. Const. Amend IV; See Walter v. United States, 447 U.S. 649, 656 (1980) (search or seizure by private party does not violate Fourth Amendment).

6. Floyd claims that the "opening of the residence did not create probable cause and exigent circumstances sufficient to justify entry into the residence by the officers." *Def. Mot. At* ¶ I(c). However, the smell of burning marijuana and drugs observed in plain view justified securing the residence while officers obtained a valid search warrant after the residents declined to consent to a search of the residence. "If an officer has lawfully executed a valid arrest warrant, he is not required to shut his eyes to contraband in plain view in order to accommodate the arrestee's desire to avoid further charges." United States v. Hromada, 49 F.3d 685, 690 (11th Cir. 1995). As in Hromada, officers in the instant cause executed a lawful arrest warrant. Id. at 687, 690; Exhibit C. Unlike Hromada, officers in the instant cause did not have to break into Floyd's home. Id. at 688. But, as in Hromada, contraband seized from inside the residence was in plain view of—and, in the instant cause, smell of—the arresting officers. Finally, unlike Hromada, where officers seized evidence without a search warrant, officers in the instant cause took the extra, unnecessary, step of obtaining a warrant. Id. at 688-89; Exhibit A.

7. Floyd claims the search warrant signed by Judge Bush "must be invalidated (sic) because it is based upon evidence discovered in an illegal and unconstitutional warrantless search." *Def.*

3

*Mot. At* ¶ II. This claim is without merit, as the discussed in paragraphs 4-6, *supra*.

8. Floyd claims his confession was "obtained from him during an illegal detention in violation of his right not to give evidence against himself." *Def. Mot. At* ¶ II. This claim is without merit as Floyd was arrested pursuant to a valid warrant, and his confessions were made after he was advised, orally and in writing, of his right to remain silent. Miranda v. Arizona, 384 U.S. 436 (1966). See Exhibit D, attached.

9. Accordingly, as Floyd's claims are without merit, the United States respectfully requests this Court to deny Floyd's motion.

Respectfully submitted this 9th day of November, 2005.

> LEURA GARRETT CANARY
> UNITED STATES ATTORNEY
>
> /s/ Todd A. Brown
> TODD A. BROWN
> Assistant United States Attorney
> Post Office Box 197
> Montgomery, Alabama 36101-0197
> (334) 223-7280
> (334) 223-7135 fax
> ASB-1901-O64T
> Todd.Brown@usdoj.gov

4

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CR. NO: 3:05-CR-0187-F** |
| | ) | |
| **SAWELIJA TYREE FLOYD** | ) | |

### CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2005, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the following:

William R. Blanchard, Esq..

Respectfully submitted,

LEURA GARRETT CANARY
UNITED STATES ATTORNEY


/s/ Todd A. Brown
TODD A. BROWN
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
ASB-1901-O64T
Todd.Brown@usdoj.gov

| State of Alabama<br>Unified Judicial System | **SEARCH WARRANT** | Case or<br>Warrant Number |
|---|---|---|
| Form CR-1-b        Rev. 4/99 | | |

IN THE _____Circuit_____ COURT OF _____Lee County_____, ALABAMA
    (Circuit, District, Municipal)          (Name of County or Municipality)

[X]  STATE OF ALABAMA
[]  MUNICIPALITY OF _____State of Alabama_____ v. _Sawelija Tyree Floyd,alias_ and Jamillah Resheda McCray
                                      Defendant

TO ANY LAW ENFORCEMENT OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:

On this day, _Sergeant Chris Murray_, proved that he (she) has probable cause to believe and does believe that
           (Name)

(Description of property to be searched for): Cocaine, or any compound or mixture thereof, Marijuana, and drug paraphernalia, and any other controlled substances in violation of the Alabama Uniform Controlled Substances Act, is located at

(Describe location, person(s) and vehicles to be searched): 1289 Ty Court, Auburn, Lee County, Alabama, along with the following vehicles (1) 1998 Blue Cadillac 48A8W, (2) 2000 Blue Suburban 55B9N, (3) 2004 Maroon Pontiac Gran Prix.

The property (Check appropriate ground(s)):

[]  was, or is expected to be, unlawfully obtained;

[]  was, or is expected to be, used as the means of committing or attempting to commit an offense contrary to the laws of the State of Alabama or political subdivision thereof, to wit:

[]  is, or is expected to be, in the possession of another with intent to use it as a means of committing a criminal offense, or is, or is expected to be, in the possession of another to whom it was delivered for the purpose of concealing it or preventing its discovery;

[X]  constitutes, or is expected to constitute, evidence of a criminal offense under the laws of the State of Alabama or a political subdivision thereof, to-wit:

NOW, THEREFORE, by virtue of the authority given to be by Rule 3, Alabama Rules of Criminal Procedure (Ala.R.Crim.P.), you are hereby commanded to make a search of the above-described person or premises [] IN THE DAYTIME  [X] AT ANYTIME OF THE DAY OR NIGHT  and within __10__ days (not to exceed 10 days) in _Auburn_, Alabama, for the above-described personal property and to maintain due return of this Warrant, along with an inventory of any property seized, to the undersigned as required by Rule 3, Ala.R.Crim.P.

ISSUED to _Sgt Chris Murray_ at _1:00_ o'clock _P_ M. on this the 29th day of _July_, 2005.

                                           Judge/Magistrate

GOVERNMENT'S
EXHIBIT
A

| State of Alabama<br>Unified Judicial System<br><br>Form CR-1        Rev. 4/99 | **APPLICATION FOR SEARCH WARRANT** | Case or<br>Warrant Number |
|---|---|---|

IN THE __Circuit_____ COURT OF __Lee County_____, ALABAMA
    (Circuit, District, Municipal)              (Name of County or Municipality)

[X]  STATE OF ALABAMA
[ ]  MUNICIPALITY OF    __State of Alabama_____ v. Sawelija Tyree Floyd, alias, Jamillah Resheda McCray, alias
                                         Defendant

      I, the undersigned, hereby make application for the issuance of a search warrant as I have probable cause to believe and do believe that the following personal property, to-wit: (Fully describe property) Cocaine, or any compound or mixture thereof, Marijuana, and any other controlled substance in violation of the Alabama Uniform Controlled Substances Act, and drug paraphernalia,

is located or concealed in or upon (Fully describe person, place, premises, and/or vehicle to be searched) **1289 Ty Court,** Auburn, Lee County, Alabama, a red brick duplex , with the numerals "1289" plainly visible on the front of the residence. Said residence being located in a cul-de-sac on the left side of Ty Court, coming from Rick Drive. Also to include the following vehicles: (1) 1998 Blue Cadillac Al tag, 48A8W, 2000 Blue Suburban, AL tag, 55B9N, 2004 Maroon, Gran Prix, 48A7W.

And that the property (Check appropriate ground(s)):

[ ]  was, or is expected to be, unlawfully obtained;

[ ]  was, or is expected to be, used as the means of committing or attempting to commit an offense contrary to the laws
    of the State of Alabama or political subdivision thereof, to wit:

[ ]  is, or is expected to be, in the possession of another with intent to use it as a means of committing a criminal offense,
    or is, or is expected to be, in the possession of another  to whom it was delivered for the purpose of concealing it or
    preventing its discovery;

[X] Constitutes, or is expected to constitute, evidence of a criminal offense under the laws of the State of Alabama or a
    political subdivision thereof, to-wit:

    Applicant states that his (her) request is based upon the facts stated in the affidavit(s) attached hereto.


   __July 29, 2005_____         _Sgt. Chris Murray_____
          Date                              Applicant

| State of Alabama<br>Unified Judicial System<br><br>Form CR-1-a          Rev. 2/95 | **AFFIDAVIT IN SUPPORT OF**<br>**APPLICATION FOR SEARCH WARRANT** | Case or<br>Warrant Number |
|---|---|---|

IN THE __Circuit__          COURT OF _____ LEE _____, ALABAMA
   (Circuit, District, Municipal)           [Name of County or Municipality)

[ X ]  STATE OF ALABAMA
[ ]  MUNICIPALITY OF ___State of Alabama___ v. Sawelija Tyree Floyd alias, Jamillah Resheda McCray
                              Defendant

After an Application for a Search Warrant was made or will be made to the court, I, Sergeant Chris Murray, the undersigned, after being duly sworn to tell the truth and in support of the Application, hereby depose and say as follows: that there is now being kept or concealed Cocaine and Marijuana at the residence known as 1289 Ty Court, Auburn, Lee County, Alabama. On July 29, 2005, Sergeant Chris Murray and other members of the Auburn Police Department went to serve a Violation of Court Order warrant issued by Auburn Municipal Court on Sawelija Tyree Floyd, alias, at 1289 Ty Court, Auburn Lee County, Alabama. Officers knocked on the front door and when it opened, a very strong odor of burning Marijuana was detected immediately coming from inside the residence. Floyd, alias, was taken into custody. Officers entered the residence and from the front door, officers could see suspected "crack" Cocaine and a set of scales on the kitchen counter. Also present in the residence were J.B. Mitchell and Jamillah Resheda McCray, alias (a resident). All three were read their Miranda rights. J. B. Mitchell, alias, stated to Sgt.Murray that he and Sawelija Tyree Floyd were smoking Marijuana when officers knocked on the door. Both McCray and Floyd refused to give consent to a further search of the apartment.

_Sgt. Chris Murray_
                         Affiant

Sworn to and subscribed before me on this the
__29th__ day of __July__, __2005__.
_____
   Judge/Magistrate

43

FLOYD, SAWELIJA TYREE                 694050CB7          2005/ /04

| SEX | RACE | BIRTH DATE | HEIGHT | WEIGHT | EYES | HAIR | BIRTH PLACE | PHOTO |
|-----|------|------------|--------|--------|------|------|-------------|-------|
| M | B | 1977/03/01 | 600 | 155 | BRO | BLK | ALABAMA | N |

```
FINGERPRINT CLASS        PATTERN CLASS
14 05 09 14 11           RS RS RS  RS RS LS  RS LS LS LS
07 TT TT 13 09           AU       WU WU     LS AU
                                            AU
```

```
ALIAS NAMES
FLOYD, REE                    FLOYD, REED
FLOYD, S                      FLOYD, SAWELIA L
FLOYD, SAWELIA LYREL          FLOYD, SAWELIJA T
FLOYD, TYREE                  REED, SAWELIJA TYREE
```

```
SCARS-MARKS-
TATTOOS          SOCIAL SECURITY
ART R ARM        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
SC FHD
TAT L ARM
TAT R ARM
TAT UL ARM
TAT UR ARM
```

IDENTIFICATION DATA UPDATED 2005/07/29

THE CRIMINAL HISTORY RECORD IS MAINTAINED AND AVAILABLE FROM THE
FOLLOWING:
   ALABAMA        - STATE ID/AL01411279

THE RECORD(S) CAN BE OBTAINED THROUGH THE INTERSTATE IDENTIFICATION
INDEX BY USING THE APPROPRIATE NCIC TRANSACTION.


END

SEQ # 0023 MRI # 041421

```
6HX.*08/04/2005 08:40   AL0430100           PAGE NO: 2      *
*ATN/MURRAY                                                *
*OPR/MISSILDINE                                            *
************************************************************
*ARREST-04    06/11/2001                                   *
*  AGENCY-LEE CO SHERIFFS DEPT      ORI(AL0430000)         *
*   LOCAL CASE # 14974           NAME USED-FLOYD,SAWELIJA T *
*   -------------------------------------------------      *
*   CHARGE 01 : RECEIVE STOLEN PROP-2ND DEG                *
*    DISP-CONVICTED              DATE OF DISP-01/31/02      *
*     OFFENSE - RECEIVE STOLEN PROP-2ND DEG                *
*     SENTENCE- CONFINE : 5Y CS                            *
*   SUPERVISION-CUSTODY                                    *
*     RECEIVED -- 01/31/02   CUSTODY NO.- 00190962         *
*       CURRENT STATUS- RELEXPMIN 11/14/03                 *
************************************************************
*ARREST-05    07/29/2005                                   *
*  AGENCY-LEE CO SHERIFFS DEPT      ORI(AL0430000)         *
*   LOCAL CASE #                 NAME USED-FLOYD,SAWELIJA T *
*   -------------------------------------------------      *
*   CHARGE 01 : PROB VIOLATION-V.C.O.                      *
*   -------------------------------------------------      *
*   CHARGE 02 : MARIJUANA POSSESS-TRAFFICKING
```

GOVERNMENT'S
EXHIBIT

_____B_____

PENGAD 800-631-6989

19

IN THE MUNICIPAL COURT FOR THE CITY OF AUBURN, AL

| | |
|---|---|
| CITY OF AUBURN, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| SAWELIJA TYREE FLOYD. | ) |
| | ) |
| Defendant. | ) |

### ORDER

For good cause shown, it is the Court's opinion that the above-named Defendant

should be taken into custody and incarcerated in the Lee County Jail to serve the balance

of the sentence(s) of incarceration heretofore suspended reimbursing the City/County for

all medical expenses.

The Clerk is directed to set this matter for hearing on the next regular business

day after said Defendant is in custody.

So **ORDERED** this the 27th day of July 2005.

_____
Municipal Judge

A copy of this Order is to be forwarded to the following:

Defendant

GOVERNMENT'S
EXHIBIT

C

## AUBURN DEPARTMENT of PUBLIC SAFETY
## AUBURN POLICE DIVISION

DATE: _7-29-05_

TIME: _11:25_

LOCATION: _APD_

### YOUR RIGHTS

I, _Sawelija Tyree Floyd_, am now _28_ years of age, born
_3-1_, 19_77_ at _Lee Co. Al_. I now reside at
_1289 Tye Court Auburn, AL_. I went to the _Some college_
grade in school and I can/cannot read and write.

I have been advised that I must understand my rights before I answer any questions. I have the right to remain silent. Anything I say will be used against me in court. I have the right to talk to a lawyer for advice before I answer any questions and to have him with me during questioning. I have the same right to the advice and presence of a lawyer, even if I cannot afford one. The police cannot furnish me with a lawyer, but one will be appointed for me, if I wish, by the court. If I wish to answer questions now without a lawyer present, I also have the right to stop answering questions at anytime until I talk to a lawyer.

### WAIVER

The above rights have been read (to) (by) me. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me.

SIGNED: X _Sawelyn_

WITNESSED: _Lt Jerry E Holden_

GOVERNMENT'S
EXHIBIT

D

PENGAD 800-631-6089

Page 3

(The above case coming on for hearing at Montgomery,
Alabama, December 14, 2005, before Honorable Susan Russ
Walker, Magistrate Judge, the following proceedings were had
commencing at 2:15 p.m.:)

THE COURT: Next case is United States versus
Sawelija Tyree Floyd. Did I get that right?

THE DEFENDANT: Yes, ma'am.

THE COURT: This is 3:05cr-187-F, and we are here on
a motion to suppress. Is everybody ready to proceed?

MS. MORRIS: We are, Your Honor.

MR. BLANCHARD: Defense is ready, Your Honor.

THE COURT: Thank you. I will hear from the
government.

MS. MORRIS: The government calls Officer Chris
Murray to the stand.

MR. BLANCHARD: Before we proceed, Your Honor, the
Defendant would like the rule of exclusion of witnesses.

THE COURT: The rule has been invoked, those
scheduled to testify please excuse yourselves from the
courtroom. The case agent can remain.

THE CLERK: You do solemnly swear or affirm that the
testimony you give in this cause will be the truth, the whole
truth, and nothing but the truth, so help you God.

THE WITNESS: I do.

---

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


UNITED STATES OF AMERICA


vs.              CR. NO. 05cr-187-F


SAWELIJA TYREE FLOYD


*   *   *   *   *   *   *   *

SUPPRESSION HEARING

*   *   *   *   *   *   *   *

Before Hon. Susan Russ Walker, Magistrate

Judge, at Montgomery, Alabama, Commencing

on December 14, 2005

*   *   *   *   *   *   *   *


APPEARANCES: For the Government: Clark A. Morris

Assistant U.S. Attorney

For the Defendant: William R. Blanchard, Jr.,

Attorney at Law

---

Page 4

CHRIS MURRAY, witness for the Government, having
been duly sworn or affirmed, testified as follows:

DIRECT EXAMINATION

BY MS. MORRIS:

Q. Could you state your name for the record, please.

A. Chris Murray.

Q. And Sergeant Murray, you are a Sergeant with the Auburn
police department; is that correct?

A. Yes, ma'am, that's correct.

Q. How long have you been with the Auburn police
department?

A. Almost 26 years.

Q. And during those 26 years have you spent some time in
any specific unit?

A. Approximately 20 of those years in narcotics.

Q. Are you in narcotics now?

A. Yes, ma'am.

Q. And how long have you been in narcotics from this date
backwards?

A. I went -- the last time I was transferred to it was in
1991.

Q. So from 1991 to present you were in narcotics.

A. Yes, ma'am.

Q. And in the course of your duties as a narcotics officer
with the Auburn police department did you come to investigate

---

Page 2

INDEX OF WITNESSES

Dir.  Crs.  Red.  Rec.

Government's Witnesses:

Chris Murray          4    23    46    53


Defendant's Witnesses:

Jerry Holder         58    72    73

Brad Bass            74

Joe Bailey           88   103   113   116

Brad Bass           119   122

Tyree Floyd         123   125   129

Reporter's Certificate:              131

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    D

Page 5

1  Mr. Floyd?
2  A. I did.
3  Q. Now, let's talk about that. Had you -- how did you get
4  to know or how had you heard about Mr. Floyd?
5  A. We had information from several confidential informants
6  and just people on the street that he was a drug dealer, just
7  dealing drugs.
8  Q. Did they give you any specifics about where he was
9  dealing or what he was dealing?
10  A. We had information that he was dealing large amounts of
11  crack cocaine and marijuana.
12  Q. Did you have any specifics about where he was dealing
13  out of?
14  A. His residence is located or at the time was located at
15  1289 Ty Court in Auburn.
16  Q. Is that T-I or T-Y?
17  A. T-Y Court in Auburn, Lee County, Alabama. And we also
18  had information that he was delivering drugs to locations in
19  Auburn.
20      MR. BLANCHARD: Your Honor, I would move -- object
21  and move to strike that response as non-responsive to the
22  question. He simply stated where he lived. She asked where he
23  was dealing drugs.
24      THE COURT: I heard that. Let me just ask you, was
25  that responsive? Were you telling us where you had learned

Page 6

1  he was dealing drugs from?
2      THE WITNESS: Yes, ma'am.
3      THE COURT: Okay. So he was selling it from that
4  residence is your understanding.
5      THE WITNESS: Yes, ma'am.
6      THE COURT: Okay. I will overrule the objection.
7  Q Now, Sergeant Murray, to your knowledge had Mr. Floyd
8  been in some trouble with the Court in Auburn before?
9  A. Yes, ma'am, he had.
10  Q. And were there any warrants out for his arrest on the
11  date that you approached him?
12  A. Yes, ma'am, there was.
13  Q. Tell the Court if you will about that warrant.
14  A. It was a violation of court order that had been issued
15  by Judge Joe Bailey from the Auburn Municipal Court.
16  Q. Is that a misdemeanor warrant?
17  A. Yes, ma'am, it is.
18  Q. And did you or other agents working with you move to
19  execute that warrant?
20  A. Yes, ma'am, that's correct.
21  Q. And when was that?
22  A. That was on the 29th day of July, approximately 10:55
23  a.m.
24  Q. Okay. And where did you attempt to execute it?
25  A. At his residence, 1289 Ty Court.

Page 7

1  Q. When you went to the residence who was with you?
2  A. Lieutenant Jerry Holder, Lieutenant Willie Smith,
3  Detective Brad Bass, Officer Brian Lynn, Sergeant James
4  Tatum, and I believe Officer Jason Crook.
5      THE COURT: Did this occur in 2005?
6      THE WITNESS: Yes, ma'am.
7  Q. Why did you have all of these officers with you to
8  execute the misdemeanor warrant?
9  A. Well, we had the information that he was a substantial
10  drug dealer and we had the extra officers there in case we
11  had any problems. And, of course, we needed a uniform
12  officer there for identity purposes too.
13  Q. What do you mean you needed a uniform officer there for
14  identity purposes?
15  A. We had one uniformed officer there, the supervisor, to
16  approach the residence so they would understand that it was
17  the police department if they looked out the window or
18  anything.
19  Q. Who was the uniformed officer?
20  A. That was Sergeant James Tatum.
21  Q. And the rest of the officers were in plain clothes; is
22  that correct?
23  A. Officer Jason Crook was a uniform officer and the rest
24  were in plain clothes.
25  Q. And when you got to the residence what happened?

Page 8

1  A. Myself, Sergeant Tatum, Lieutenant Holder and I believe
2  Lieutenant Smith approached the front of the residence. The
3  other officers positioned theirself around towards the rear.
4  It's a duplex. And Sergeant Tatum went up and knocked on the
5  front door.
6  Q. Why were the other officers positioned around the duplex
7  in the back?
8  A. It was mainly in case -- as I stated earlier, we knew
9  that there was a large amount of drugs being sold there and
10  we didn't know if someone would run out the back door. And
11  there were four cars in the driveway, we didn't have any clue
12  as to how many people were in the residence or anything like
13  that.
14  Q. When you say you knew there were drugs being sold out of
15  that house, what do you mean by that? Had you been
16  surveilling the house?
17  A. We had information from confidential informants that he
18  was dealing drugs from that residence.
19  Q. Okay. Prior to approaching the residence had anyone been
20  surveilling that residence?
21  A. Yes, ma'am. We had briefly done a little bit of
22  surveillance on it that morning but had pulled off to not be
23  seen in case somebody came outside.
24  Q. And while you were doing surveillance did you see any
25  traffic around the residence?

## Page 9

1  A. We saw a couple of cars come and go. One of the vehicles
2  that had pulled in was still there when we went to the door.
3  Q. And I'm sorry, I may have missed it, how many vehicles
4  were at the house when y'all --
5  A. Four vehicles.
6  Q. Four vehicles were at the house when you went to the
7  door?
8  A. Yes, ma'am.
9  Q. Who knocked on the door?
10 A. Sergeant James Tatum.
11 Q. And did anyone come to the door?
12 A. Yes, ma'am.
13 Q. Let me ask you this, let me back up a minute. After the
14 knock on the door was there any response?
15 A. Someone from -- a male voice inside the residence said
16 who is it?
17 Q. Okay. And then what happened?
18 A. Sergeant Tatum replied the police department.
19 Q. And then did someone come to the door?
20 A. In a short period of a few seconds or whatever Jamillah
21 McCray opened the door.
22 Q. And did you know who this person was?
23 A. Yes, ma'am.
24 Q. How did you know who this person was?
25 A. I knew her from dealing with her in the past with the

## Page 10

1  police department.
2      THE COURT: Can I get that name again, what was her
3  name?
4  A. Jamillah. The correct spelling I believe is
5  J-A-M-I-L-L-A-H, McCray, M, small C, big C, R-A-Y.
6      THE COURT: Thank you.
7  Q. So, and you say you had known Ms. McCray from her
8  dealings with the police department, what do you mean by
9  that?
10 A. We had answered numerous calls throughout my career at
11 her residence, her grandmother's residence, like I said
12 numerous times over and over and over.
13 Q. What kind of calls?
14 A. Mainly fighting-type calls, disorderly conduct,
15 harassment, that sort of thing.
16 Q. And prior to y'all going to this house or duplex --
17 excuse me, did you know that Ms. McCray lived at that house?
18 A. Yes, ma'am, I did.
19 Q. Okay. So when Ms. McCray came to the door what happened
20 then?
21 A. As soon as she opened the door Sergeant Tatum asked her
22 where Tyree was.
23 Q. And when you said she opened the door, how far open did
24 she open the door?
25 A. She opened the door all the way up.

## Page 11

1  Q. Okay. Did you notice anything when she opened the door?
2  A. Yes, ma'am. A very strong odor of burning marijuana
3  could be detected coming out of the residence.
4  Q. Now, Sergeant Murray, I think you said you have been in
5  narcotics from -- at least steadily since 1991. During your
6  course as a narcotics investigator have you smelled marijuana
7  in the past?
8  A. Yes, ma'am.
9  Q. Approximately how many times have you smelled marijuana?
10 A. Probably several thousand times.
11 Q. So you are familiar with the smell of marijuana; is that
12 correct?
13 A. Yes, ma'am.
14 Q. And that day I think you just testified you smelled what
15 you believed to be marijuana.
16 A. Yes, ma'am, that's correct.
17 Q. Were there other officers at the door with you?
18 A. Yes, ma'am. There were approximately at this point
19 probably four to five officers had gathered, you know,
20 towards the front door.
21 Q. If you know, did any of these other officers smell
22 marijuana?
23 A. Yes, ma'am. Lieutenant Holder made a comment that he
24 smelled marijuana. We kind of all nodded in agreement.
25 Q. Now, when Ms. McCray came to the door and then did y'all

## Page 12

1  ask for Mr. Floyd?
2  A. Sergeant Tatum asked for him by first name. We call him
3  Tyree, not the Sawelija Tyree or however you pronounce it.
4  Q. And what happened after he asked for Tyree?
5  A. It was almost immediate. You could see him coming down
6  the hallway, immediately stepped to the front door.
7  Q. And what happened then?
8  A. I believe Sergeant Tatum told him, or Lieutenant Holder,
9  one of the officers told him we had a warrant for his arrest
10 and asked him to step outside, which he complied. He didn't
11 resist. He stepped outside and he was taken into custody.
12 Q. And at that point what, if anything, did y'all do?
13 A. As they were taking Mr. Floyd into custody myself and
14 Detective Bass, Lieutenant Holder and I believe Lieutenant
15 Willie Smith stepped into the -- just inside the door of the
16 residence.
17 Q. And why did you do that?
18 A. Well, we had detected the odor of marijuana burning and
19 we actually stepped in to secure the residence and to
20 obviously keep any evidence from being destroyed or anything
21 like that.
22 Q. Were there other people in the residence at that time?
23 A. Yes, ma'am, there were two people right inside the front
24 door.
25 Q. And who were they?

## Page 13

1  A. Ms. McCray and an individual by the name of J.B.
2  Mitchell.
3  Q. While you were securing the residence, and I assume were
4  you also securing the other persons in the residence?
5  A. Yes, ma'am, that's correct.
6  Q. Were there any statements -- did Mr. Floyd give any
7  statements that you are aware of?
8  A. Some time just briefly after being taken into custody he
9  was read his rights by Sergeant James Tatum.
10 Q. And did he make any statements after he was read his
11 rights?
12 A. He made a statement but I don't know how -- the time
13 line was on it, but he made a statement to Sergeant Tatum
14 that any drugs found in the house belongs to him basically.
15 Q. Now, as you were in the house securing the residence and
16 the people inside the residence, did you ask anyone if there
17 were any firearms in the residence?
18 A. Yes, ma'am. I did and I believe Lieutenant Holder also
19 asked Ms. McCray because we knew she lived there, were there
20 any other persons present and were there any firearms, any
21 weapons in the residence.
22 Q. And what did she tell you?
23 A. She said there was no other persons there but there was
24 a handgun or -- I don't know how she described it but she
25 said there was a weapon in the bedroom.

## Page 14

1  Q. And what did y'all do then?
2  A. She led Lieutenant Smith and Lieutenant Holder back to
3  the bedroom to retrieve it.
4  Q. Now, as y'all were in the residence questioning the --
5  Ms. McCray about firearms and securing the residence and the
6  people inside the residence, what, if anything, did you see?
7  A. As soon as you enter the residence there's a small den
8  or living room area to the left, and to the right is a small
9  kitchen area. And right as you look into the kitchen there's
10 a kitchen counter immediately to your left. Beside a
11 microwave -- there's a microwave right there on the edge --
12 was a box of baking soda, a little small black -- some kind
13 of little ashtray or cooking device, I don't remember exactly
14 what it was, but there was three or four fairly large pieces
15 of crack cocaine.
16     MS. MORRIS: May I approach, Your Honor?
17     THE COURT: You may.
18 Q. (complies) Sergeant Murray, I am showing you what has
19 been marked as Defendant's Exhibit -- Government's Exhibit 1,
20 do you recognize that?
21 A. Yes, ma'am, I do.
22 Q. What is it?
23 A. This is a photograph that I took on July the 29th, 2005
24 at 1289 Ty Court. This is in the kitchen counter. It's a
25 small black ashtray in the shape of a small frying pan, looks

## Page 15

1  like four pieces of crack cocaine lying on a paper towel and
2  some powder cocaine lying beside it. And there's a can of
3  some type of an air freshener beside it.
4  Q. And Sergeant Murray, does this picture fairly and
5  accurately depict the kitchen counter as you saw it on July
6  29th?
7  A. Yes, ma'am.
8  Q. And does it fairly and accurately depict the description
9  of the crack cocaine that you saw as you entered the
10 residence as you have just described to the Court?
11 A. Yes, ma'am.
12     MS. MORRIS: We'd move for the admission of
13 Government's Exhibit 1.
14     THE COURT: Any objection?
15     MR. BLANCHARD: No objection.
16     THE COURT: It's admitted.
17 Q. Once you saw that crack cocaine on the kitchen counter
18 what, if anything, did you do?
19 A. Well, observing the crack cocaine, securing Mr. Mitchell
20 and Ms. McCray, and I say secured them, we placed them in
21 handcuffs for our safety as well as their safety, I directed
22 Detective Brian Lynn to read both of them their rights. I
23 immediately began to question J.B. Mitchell at that point.
24 Q. Well, okay. And did he tell you anything?
25 A. I asked him the question who was smoking, and I probably

## Page 16

1  referred to it as reefer or dope at that point, referring to
2  marijuana. Who was smoking dope when we knocked on the door.
3  And he said himself and Tyree Floyd were smoking a blunt when
4  we approached the residence or when we knocked on the door.
5  Q. Prior to questioning Mr. Mitchell did you pat him down?
6  A. Yes, ma'am.
7  Q. What, if anything, did you find on him?
8  A. As I recall he had a set of scales in one of his
9  pockets.
10 Q. Okay. Now, you said that -- I believe you said that Mr.
11 Mitchell said that he and Mr. Floyd had been smoking a blunt;
12 is that correct?
13 A. Yes, ma'am.
14 Q. Did you request -- well, did you talk to Ms. McCray?
15 A. Yes, ma'am. She was Mirandized, along with Mr.
16 Mitchell. We asked her about the weapon -- any weapons, any
17 other persons in the house, she led us to the weapon. We
18 asked her for consent to search the residence and she
19 refused.
20 Q. And she refused.
21 A. Yes, ma'am.
22 Q. Now, let's talk about the weapon if you will. I
23 believe -- where did you say the weapon was located?
24 A. It was secured in a gun case in the master bedroom lying
25 on the floor next to the bed.

Page 17

1  Q. And how did y'all find the weapon?
2  A. Ms. McCray led us to it. She led Holder and Smith to it.
3      MS. MORRIS: May I approach, Your Honor?
4      THE COURT: Yes.
5  Q. Sergeant Murray, I am showing you what has been
6  previously marked as Government's Exhibit 2, do you recognize
7  it?
8  A. Yes, ma'am, I do.
9  Q. What is it?
10  A. This is a photograph that I took in the master bedroom
11  at 1289 Ty Court. It's a photograph of several packages of
12  drugs, a white trash bag I believe that contained some
13  powdered cocaine and another large bag contains several bags
14  of marijuana that's been bagged up in gallon zip-loc bags.
15  Q. Does that picture fairly and accurately depict the scene
16  on July 29th of this year?
17  A. Yes, ma'am, it does.
18  Q. Now --
19      MS. MORRIS: Actually we'd move to admit it at this
20  time, Your Honor.
21      THE COURT: Any objection?
22      MR. BLANCHARD: Without objection.
23      THE COURT: It's admitted.
24  Q. Sergeant Murray, I am putting this on the monitor. Can
25  you show the Court where the firearm was found in relation to

Page 18

1  this picture?
2      THE COURT: Let me get mine on.
3      MS. MORRIS: I'm sorry, Judge.
4      THE COURT: That's okay.
5  Q. Well, while she is doing that let me back up. Was the
6  firearm found in the vicinity of where this picture was
7  taken?
8  A. Yes, ma'am, it was.
9  Q. Okay.
10      THE COURT: This is a picture of the carpet next to
11  a bed; is that right?
12      THE WITNESS: I didn't understand.
13      THE COURT: Is this a picture of what is lying on
14  the carpet next to a bed?
15      MS. MORRIS: Yes, Your Honor.
16      THE WITNESS: Yes, ma'am.
17      THE COURT: It's just a little hard to make out. Go
18  ahead.
19  Q. Okay. Could you show the Court where the gun was in
20  relation to this picture.
21  A. It's my understanding the gun was located -- if you are
22  looking at the picture, would have been next to the wall
23  between the wall and the bed. I guess it would be to the
24  right of the larger bag that you see with the zip-loc bag
25  sticking up, it would have been to the right of that trash

Page 19

1  bag.
2  Q. Now, after Ms. McCray refused to give consent to search
3  the house what, if anything, did you do?
4  A. I left the residence, called for transport, somebody to
5  transport J.B. Mitchell. Mr. Floyd was already probably
6  somewhere during this time -- let me back up. Somewhere along
7  this time we asked for consent, she refused. I was called
8  outside by Sergeant Tatum. And he had removed a sum of money,
9  a little over three hundred dollars from Mr. Floyd and handed
10  it to me. And somewhere during this time he made a statement
11  to me, directly to me, that the drugs in the residence were
12  his.
13      THE COURT: He being who?
14      THE WITNESS: Mr. Floyd. And that he was asked about
15  a consent to search the residence and he also refused.
16  Q. And at that point what did you do?
17  A. Then I went back to the residence, explained to the
18  other officers there that both parties had refused consent,
19  and I was going to leave and go get a search warrant.
20  Q. Okay. And did you leave?
21  A. Yes, ma'am.
22  Q. And did you apply for a search warrant?
23  A. I did.
24  Q. Was it signed by a Judge, State Judge?
25  A. Yes, ma'am, it was.

Page 20

1  Q. Who signed it?
2  A. Judge Bush.
3  Q. Okay. And at that point did you execute the search
4  warrant?
5  A. Yes, ma'am, we did.
6  Q. And what, if anything, did you find throughout the
7  house?
8  A. We found along with the cocaine, of course, in the
9  kitchen, crack cocaine, we found an amount of marijuana and
10  powdered cocaine.
11  Q. Roughly how much marijuana did you find?
12  A. What the lab report reflects is a little over 19 pounds.
13  Q. And how much powder cocaine did you find?
14  A. Five hundred and 87 grams.
15      THE COURT: Were both of those in the bedroom?
16      THE WITNESS: Yes, ma'am.
17  Q. Okay. And you found the crack cocaine that was depicted
18  in that picture; is that correct?
19  A. That's correct.
20  Q. And did you find any other crack cocaine throughout the
21  house?
22  A. Yes, ma'am. We found an amount of crack cocaine in a
23  dresser drawer inside a brown paper bag in the bedroom.
24  Q. And in total how much crack cocaine did you find
25  throughout the house?

Page 21

1  A. Somewhere between three hundred and ten to three hundred
2  and 12 grams of crack cocaine.
3      MS. MORRIS: May I approach?
4      THE COURT: You may.
5  Q. Sergeant Murray, I am showing you what has been
6  previously marked as Government's Exhibit 3. Do you recognize
7  that?
8  A. Yes, ma'am, I do.
9  Q. And what is it?
10  A. This is a photograph of the toilet that's in the
11  bathroom adjacent to the master bedroom. Inside the toilet
12  lays a piece of -- I guess you refer to it as a blunt of a
13  cigar that's been hollowed out and put in marijuana. And also
14  on the rim on the toilet seat there's a small plastic bag
15  containing what we believed to be marijuana.
16  Q. And does that picture fairly and accurately depict the
17  scene as you saw it on July 29th of this year?
18  A. Yes, ma'am, it does.
19  Q. At Mr. Floyd's residence, I should say.
20  A. Yes, ma'am.
21  Q. And this is what you found during the course of the
22  search warrant; is that correct?
23  A. Yes, ma'am.
24      MS. MORRIS: At this time we'd move to admit
25  Government's Exhibit 3.

Page 22

1      MR. BLANCHARD: No objection.
2      THE COURT: It's admitted.
3  Q. Did you find any money throughout the house?
4  A. Yes, ma'am. We found three thousand dollars in a dresser
5  drawer in U.S. currency in the bedroom, master bedroom.
6  Q. And did you find any other drug paraphernalia throughout
7  the house?
8  A. There were several items of -- I say several items, we
9  found several sets of scales, plastic bags and what not in
10  different areas of the residence.
11  Q. Now, Sergeant Murray, prior to your obtaining the search
12  warrant and executing the search, did any -- did you or any
13  of the officers working with you search this house?
14  A. No, ma'am.
15  Q. All right.
16      MS. MORRIS: If I may just have a moment, Your
17  Honor.
18      THE COURT: You may.
19      (pause)
20      MS. MORRIS: I think that's all I have at this time,
21  Your Honor.
22      THE COURT: All right. Cross-examination.
23      MR. BLANCHARD: Thank you, Your Honor.
24
25

Page 23

1          CROSS-EXAMINATION
2  BY MR. BLANCHARD:
3  Q. Sergeant Murray, who is Tyrone White?
4  A. He is a police officer -- ex-police officer with the
5  City of Auburn that we are investigating for fixing tickets.
6  Q. Are you a part of that investigation?
7  A. Yes, sir.
8  Q. When did the White investigation begin?
9  A. Either in December of 2004 or January of 2005.
10  Q. Prior to the time that you arrested Mr. Floyd in July of
11  2005 you were already investigating Officer White.
12      MS. MORRIS: Your Honor, I am going to object as to
13  relevance.
14      THE COURT: I have waited to hear how it's
15  relevance.
16      MR. BLANCHARD: I will tie it up, Your Honor.
17      THE COURT: Let me give him a chance to do that.
18  Overruled.
19  Q. Okay. It is correct that prior to the time you arrested
20  Mr. Floyd in July of 2005 you were already investigating Mr.
21  White, or Officer White.
22  A. Yes, sir, that's correct.
23  Q. And you had received information, had you not, that
24  Officer White may have fixed a ticket for Mr. Floyd?
25  A. I don't know -- we had received some information that he

Page 24

1  had gotten some help but I don't think it was over a ticket.
2  Q. You wanted to talk with him about that, didn't you?
3  A. That's correct, yes, sir.
4      THE COURT: Talk with him being Floyd?
5  Q. I'm sorry, talk to Floyd about your investigation of
6  Officer White.
7  A. Yes, ma'am -- I mean yes, sir.
8  Q. And at the time you arrested him you knew you wanted to
9  talk to him about it; isn't that correct?
10  A. Yes, sir.
11  Q. And, in fact, when you interviewed him that day that is
12  a primary subject -- and I am talking about Floyd -- when you
13  interrogated Floyd that day that is a primary subject you
14  interrogated him about, isn't it?
15  A. Well, I don't know if it was a primary subject. He was
16  interviewed about that, but, of course, the drugs were the
17  primary subject, you know, once we located them.
18  Q. You stated that you had information that drugs were
19  being dealt out of his residence, from who, confidential
20  informants?
21  A. Confidential informants, yes, sir.
22  Q. Are you prepared to name them?
23  A. I can name them if I need to.
24  Q. Well, will you name them?
25  A. I don't want to name them in court.

Page 25

1    THE COURT: I will have to rule on it after this
2  proceeding if there's an objection, so let me find out.
3    MS. MORRIS: There will be an objection at this
4  time, Your Honor. I mean I have not quite frankly talked to
5  this officer about naming confidential informants and I feel
6  really uncomfortable with allowing him to do it at this time.
7    THE COURT: All right. Well, if the defense wants to
8  do that I will wait for a motion and we will have the proper
9  hearing if necessary, since there is an objection.
10   MS. MORRIS: Again, Your Honor, it may be something
11  that the government turns over readily.
12   THE COURT: Do you want to speak with him now or are
13  you trying to reserve for later that decision?
14   MS. MORRIS: I would like to reserve for later since
15  this isn't exactly my case and I would like to talk to the
16  prosecutor.
17   THE COURT: I will reserve the ruling. If you do
18  receive a motion from the Defendant I will rule then.
19  Q. Let me ask it this way, Sergeant Murray, had any
20  controlled buys been made from Tyree Floyd's residence?
21  A. Not at that residence, no, sir.
22  Q. And the informants, whoever they were, that you dealt
23  with, did you deem them to be reliable informants?
24  A. Yes, sir, I did.
25  Q. Had they given you information on prior occasions that

Page 26

1  had panned out?
2  A. Yes, sir, they had.
3  Q. Did you ever seek a search warrant based on -- of Mr.
4  Floyd's residence based on the information of those
5  informants or any other information you had?
6  A. No, sir, we had not.
7  Q. Did you feel that you did not have enough information to
8  obtain a search warrant?
9  A. I had not. No, I did not, no, sir.
10  Q. You did not?
11  A. No, sir.
12  Q. You did not have enough.
13  A. No, sir.
14  Q. So at that time there was no probable cause for a
15  warrant to search his residence.
16  A. That's correct, yes, sir.
17  Q. Even though you say you had information that he was a
18  major drug dealer from reliable confidential informants.
19  A. That's correct.
20  Q. When did you first learn, Sergeant Murray, that there
21  was a warrant, sometimes termed a VCO, violation of court
22  order, warrant for Mr. Floyd?
23  A. July the 27th of 2005.
24  Q. That was the first time you learned of it?
25  A. Yes, sir.

Page 27

1  Q. Did you make a report in this case, file a written
2  report?
3  A. I did.
4  Q. Have you reviewed it lately?
5  A. Yes, sir, I have.
6  Q. Now, let me put my copy of it onto the screen. Can you
7  see it?
8  A. Yes, sir.
9  Q. Now, maybe you can see it better. All right. Can you
10  read that?
11  A. Yes, sir.
12  Q. Is that your report?
13  A. It is.
14  Q. Would you read the first line, please.
15  A. Sometime prior to the week of July the 29th, 2005 I
16  learned that we, APD, had an outstanding warrant on Sawelija
17  Tyree Floyd for violation of court order.
18  Q. So according to your report you learned of that sometime
19  prior to the week of July 29th.
20  A. Yes, sir. That's what I state in my report, yes, sir.
21  Q. July 29th was a Friday, was it not?
22  A. That's correct.
23  Q. So sometime prior to that week, according to your
24  report, you learned of the existence of this court order.
25  A. That's what my statement reflects but I have had --

Page 28

1  since this suppression here came up have had time to review
2  some other notes.
3  Q. You now know that it wasn't issued until July 27th; is
4  that correct?
5  A. Yes.
6  Q. So your statement is not correct.
7  A. That part of it is not correct.
8  Q. Why did you write it that way?
9  A. Well, what is the date on my statement?
10  Q. July 29th, 2005.
11  A. On the top of it?
12  Q. Yes, sir.
13  A. I don't know why I wrote it like that, but I found out
14  since that time that the warrant was issued July 27th.
15  Q. So is your statement incorrect in that regard?
16  A. That part of it might be, yes, sir.
17  Q. Okay. Who obtained the violation of court order warrant?
18  A. It was not a situation where the warrant was obtained.
19  If you will let me explain that. We --
20  Q. Well, let me -- if I could just follow up --
21    MS. MORRIS: Your Honor, if he could be allowed to
22  explain.
23    THE COURT: You can question him on that if you
24  wish. I will allow counsel to continue.
25  Q. Did you testify at a preliminary hearing in Lee County

Page 29

1 on September 7, 2005?
2 A. September when?
3 Q. 7th.
4 A. Yes, sir, I did.
5 Q. And at that time were you cross-examined by Trip Walton?
6 A. I was.
7 Q. And do you recall saying that Lieutenant Holder obtained
8 the warrant?
9     MS. MORRIS: May I have a page and line?
10    MR. BLANCHARD: I am looking for it right now.
11 A. I did testify to that, yes, sir.
12 Q. Are you now --
13    MR. BLANCHARD: Page nine.
14    MS. MORRIS: Thank you.
15 Q. Are you now saying that Lieutenant Holder did not obtain
16 the warrant?
17 A. I don't know if that's the right word, obtained, but
18 myself and Lieutenant Holder met with the Judge on some other
19 individuals and Mr. Floyd happens to be one of them that was
20 part of this investigation, and Lieutenant Holder --
21 Q. I'm sorry, I don't mean to interrupt, but part of what
22 investigation?
23 A. The deal with Tyrone White, excuse me, Officer Tyrone
24 White. And when the Judge issued the court order it was given
25 to Lieutenant Holder. In other words, he took custody of the

Page 30

1 court order. So I don't know if that's the proper word to say
2 that Lieutenant Holder obtained it, that he asked for it and
3 they gave it to him, it was not quite like that.
4 Q. Sergeant Murray, the truth of the matter is that you and
5 Lieutenant Holder met with Judge Bailey and asked him to
6 issue a warrant so you could go and get Mr. Floyd and
7 question him about Tyrone White; isn't that the truth?
8 A. No, sir, that's not correct.
9 Q. Well, in that case, let me show you the order that was
10 issued.
11    MR. BLANCHARD: Do you have a copy? The VCO?
12    MS. MORRIS: Yes. (complies)
13    MR. BLANCHARD: May I approach the witness, Your
14 Honor?
15    THE COURT: Yes.
16 Q. (complies) I will show you a copy of what I have marked
17 as Defendant's Exhibit Number 1, do you recognize that?
18 A. It appears to be the -- a copy.
19 Q. A copy of what?
20 A. Of the violation of court order issued by Judge Bailey.
21 Q. And does it appear to be accurate and complete?
22 A. Yes, sir, it does.
23 Q. It contains the name of Sawelija Tyree Floyd in the
24 style of the case, does it not?
25 A. Yes, sir, it does.

Page 31

1 Q. City of Auburn versus Sawelija Tyree Floyd.
2 A. City of Auburn versus Sawelija Tyree Floyd, yes, sir.
3 Q. Over on the right-hand-side is there a case number?
4 A. There is not.
5 Q. You don't regard that as unusual?
6 A. I can explain the reason there isn't one. I think I
7 can.
8 Q. Well, first do you regard it as unusual?
9 A. I don't know about unusual but in this case it was not
10 one put on it.
11 Q. All right. Well, if your -- if the government's counsel
12 want to ask you about that she can, but there's not one
13 there.
14 A. That's correct, there's not one there.
15 Q. And it doesn't say warrant, does it, it says order.
16 A. That's correct.
17 Q. Was there any warrant other than this order?
18 A. This is the only one I am aware of.
19 Q. All right. Would you please read the first paragraph of
20 the order.
21 A. For good cause shown it is the Court's opinion that the
22 above named Defendant should be taken into custody and
23 incarcerated in the Lee County jail to serve the balance of
24 his sentences of incarceration heretofore suspended
25 reimbursing the city/county for all medical expenses.

Page 32

1 Q. And read the second line or paragraph as well.
2 A. The clerk is directed to set this matter for hearing on
3 the next regular business day after said Defendant is in
4 custody.
5 Q. All right. Now, are you aware of any suspended time
6 that Tyree Floyd had to serve at that point?
7 A. Yes, sir, I am.
8 Q. What was that? What suspended time did he have remaining
9 to serve?
10 A. It was my understanding that he had been given a
11 suspended sentence on a driving suspended charge and also on
12 a disorderly conduct charge.
13 Q. When?
14 A. When?
15 Q. When.
16 A. I am not clear on the dates at this point.
17 Q. All right. Are you aware of whether he was placed on
18 probation or just given a suspended sentence?
19 A. Initially -- it's my understanding initially on the
20 traffic ticket gave a suspended sentence. On the
21 disorderly conduct I don't know if the Judge said the
22 sentence was suspended but I know an officer spoke on his
23 behalf that he not get any jail time and the Judge suspended
24 his sentence.
25 Q. He had what, a 60 day suspended sentence on the driving

## Page 33

1  without license or driving while revoked, whatever that was?
2  A. I am not clear on the amount of days but I think it was
3  a hundred and 80.
4  Q. We will come back to that, we will clear that up for the
5  record later. But are you aware that that was a full year
6  prior to the time you made your arrest?
7  A. I don't recall that, no, sir.
8  Q. And are you aware that 30 days suspended sentence was
9  entered in I believe May of 2005, several months prior to the
10  time you made your arrest?
11      MS. MORRIS: I am a little -- if it could be cleared
12  up which suspended sentence he's talking about because I
13  believe there's two at issue here.
14      THE COURT: Can you rephrase to refer clearly?
15      MR. BLANCHARD: Sure.
16  Q. I am referring to the suspended sentence for disorderly
17  conduct. Are you aware that that 30 day suspended sentence
18  was entered in May of 2005?
19  A. I am not -- I don't recall when it was entered in the
20  court record.
21  Q. Are you aware that Mr. Floyd on each of those instances
22  was given a suspended sentence and a fine to pay?
23  A. I am aware of that, yes, sir.
24  Q. Are you aware that he paid all of his fines and court
25  costs well in advance of the time that you arrested him?

## Page 34

1  A. I am aware of that, yes, sir.
2  Q. Now, you refer to this order as a violation of court
3  order warrant.
4  A. Yes, sir.
5  Q. And you said it was a misdemeanor charge.
6  A. That's correct.
7  Q. Under what state statute is that a misdemeanor?
8      MS. MORRIS: Objection, Your Honor. He is not a
9  lawyer and I believe that there is the Judge on his subpoena
10  list. I don't know that this witness is qualified to start
11  quoting statutes.
12      MR. BLANCHARD: Judge, this is a law enforcement
13  officer, he is charged with knowing what the crimes in this
14  state are.
15      THE COURT: The objection is overruled to the extent
16  that he can be asked if he knows.
17  A. I don't know.
18  Q. You don't know if it's a misdemeanor or not, do you?
19  A. I know that -- I would have to assume it's a
20  misdemeanor, it's issued by the City Judge.
21  Q. It doesn't say what order was violated on the warrant
22  itself, does it?
23  A. No, sir, it does not.
24  Q. Are you aware of any order that was violated?
25  A. It's my understanding that when the Judge reviewed the

## Page 35

1  file, his court file, the Judge says -- or he had violated
2  his probation from his driving suspended -- driving suspended
3  ticket or whatever, I think is what he said. I am not a
4  hundred percent on that.
5  Q. You don't know.
6  A. No, sir.
7      MR. BLANCHARD: Judge, I would like to move
8  admission of Defense Exhibit Number 1.
9      THE COURT: Number 1 is what again?
10      MR. BLANCHARD: That's the VCO, the order.
11      THE COURT: All right. Any objection?
12      MS. MORRIS: No, Your Honor.
13      THE COURT: It's admitted.
14  Q. Now, just so that we all understand, you and Lieutenant
15  Holder discussed the Tyrone White case with Judge Bailey and
16  at that time a decision to enter a VCO against Mr. Floyd for
17  this alleged violation of court order was entered.
18  A. Yes, sir.
19  Q. Okay. And you don't know really what the offense was
20  that he was pulled in for.
21  A. I am not a hundred percent. I thought it was driving
22  suspended or the disorderly conduct, could have been either
23  one.
24  Q. When you serve warrants -- I mean you have served
25  warrants before?

## Page 36

1  A. Yes, sir.
2  Q. Don't they usually state with particularity what crime
3  the Defendant has committed?
4  A. Some do, yes, sir.
5  Q. This one does not, does it? Do you want to look at it
6  again?
7  A. No, sir. You are correct in that, it does not.
8  Q. You didn't think it was unusual for that reason?
9  A. No, sir.
10  Q. You didn't really know what you were arresting him for?
11  A. He was being arrested for violation of a court order.
12  Q. But the order did not specify in what way.
13  A. It was not written out, no, sir.
14  Q. Wouldn't it normally say for nonpayment of fines or for
15  failure to attend a CRO or something?
16  A. It could.
17  Q. You don't know if that's a legal requirement or not, is
18  that your testimony?
19  A. I don't know -- yeah, that's correct, I don't know if
20  it's a legal requirement or not. I don't know that the Judge
21  has to specify that on an order that he gives.
22  Q. Now, when you went there that day to Mr. Floyd's
23  residence on the 29th of July, it was yourself and five other
24  agents?
25  A. Five or six, yes, sir.

Condenseit

## Page 37

1  Q. Did you have any information that Mr. Floyd was a
2  violent individual?
3  A. I don't know of any information specifically that he was
4  violent, no, sir.
5  Q. Did you take a narcotic dog agent with you?
6  A. Are you asking did we have the drug dog with us or was
7  his handler? We had a handler, yes, sir.
8  Q. You had a handler, did you also have a dog?
9  A. I don't know if he was there or not at the time we
10  initially went to the residence.
11  Q. Why did you have a handler for a narcotic -- a drug dog
12  there?
13  A. He was assigned at the time and still is assigned to my
14  end of the week and he was just basically called as a body,
15  it really wasn't a question of the dog.
16  Q. You stated that Sergeant Tatum knocked on the door to
17  the residence; is that correct?
18  A. Yes, sir.
19  Q. And that a voice came from inside.
20  A. Yes, sir.
21  Q. The voice, what did the voice say?
22  A. Who is it, I believe was the reply. It was a male
23  voice.
24  Q. Okay. A male voice.
25  A. Yes, sir.

## Page 38

1  Q. Could you see through any of the windows?
2  A. No, sir.
3  Q. And when the voice said who is it, I believe your
4  testimony was that Tatum answered and said police department.
5  A. Yes, sir.
6  Q. He did say that, didn't he?
7  A. Yes, sir.
8  Q. He also said open the door, police, open the door,
9  didn't he?
10  A. He may have, I don't recall that.
11  Q. Well, if Lieutenant Holder put it in his report he
12  probably did, didn't he?
13  A. Yes, sir, he did.
14  Q. All right. Does that help you recall what was said?
15  A. I just remember Tatum knocking on the door, the voice
16  inside saying who is it, and Tatum said police department.
17  Q. A moment ago you said he may also have said police, open
18  the door.
19  A. You said if it's in Lieutenant Holder's statement it
20  happened, so I am just agreeing with the fact that if Holder
21  said it happened, I guess it happened.
22  Q. All right. Okay. You said in your testimony a moment ago
23  on direct that a short period of a few seconds later Jamillah
24  McCray came to the door; is that correct?
25  A. Yes, sir. I would say less than a minute, 30, 45

## Page 39

1  seconds maybe.
2  Q. I believe in your earlier testimony you said it was 30
3  seconds to a minute.
4  A. Okay.
5  Q. Is that correct?
6  A. Yes, sir, if that's what I testified to.
7  Q. Is that what you recall?
8  A. Yes, sir.
9  Q. So nobody opened the door immediately.
10  A. I don't think -- no, sir. It wasn't like immediate, no,
11  sir.
12  Q. There was a delay.
13  A. Yes, sir.
14  Q. Is his a large house?
15  A. It's a duplex, it's a two bedroom duplex.
16  Q. So a fairly small house.
17  A. Yes, sir.
18  Q. And the people you were dealing with lived only on one
19  side of the duplex; is that correct?
20  A. Yes, sir. Facing the duplex they live on the left-
21  hand-side.
22  Q. And the voice you heard when you knocked on the door
23  came from the front, didn't it?
24  A. Yes, I believe it came from the -- towards the kitchen
25  area.

## Page 40

1  Q. So if the person who had been in the kitchen area and
2  answered had come to the door and unlocked it it wouldn't
3  have taken 30 seconds to a minute, would it?
4  A. No, sir.
5  Q. Now, you said that Floyd came out and you put him under
6  arrest, put him in cuffs; is that right?
7  A. Yes, sir.
8  Q. At that time what you were there for had been completed.
9  A. Initially, yes, sir.
10  Q. All right. But then you went on into the house.
11  A. That's correct.
12  Q. Who went in with you?
13  A. Myself, Lieutenant Jerry Holder, Detective Brad Bass,
14  and I believe Willie Smith, yes, sir.
15  Q. Now, during the time you had Floyd outside and you are
16  putting the cuffs on him, where was Ms. McCray, Jamillah
17  McCray?
18  A. Initially she was standing right at the door. And she
19  had stepped back into the area right between the living room
20  area and the kitchen, as soon as we entered the residence.
21  Q. And when you got into the residence you then saw Mr.
22  Mitchell.
23  A. That's correct.
24  Q. You could not see Mr. Mitchell from outside the
25  residence, could you?

Page 41

1  A. I don't recall seeing him myself, no, sir.
2  Q. Well, wasn't there an exterior wall between you and the
3  kitchen area where he was seated?
4  A. Yes, sir.
5  Q. And it jutted out so that you could not see that area
6  until you entered the house.
7  A. That's correct. But I believe when we came in he was
8  standing up. At some point he had moved kind of away from
9  the kitchen table, but I don't recall myself seeing him from
10  the outside.
11  Q. All right. Now, you told us about what you found inside
12  the house, that you saw inside the house when you got there,
13  and you later went and got a search warrant.
14  A. Yes, sir.
15  Q. All right. You are the one that obtained the search
16  warrant.
17  A. Yes, sir.
18  Q. Did you utilize as your probable cause for that search
19  warrant the facts that you had discovered in the house?
20  A. Along with the odor of burning marijuana, yes, sir,
21  coming out when she opened the door.
22  Q. All right.
23  A. When Jamillah McCray opened the door.
24  Q. But you also used the alleged crack cocaine, the blunt,
25  the marijuana, the gun, all of those things that you found in

Page 42

1  the house.
2  A. No, sir. The initial affidavit, I used the odor of
3  burning marijuana and I believe just the evidence that we saw
4  in plain view in the kitchen area when we entered.
5  Q. Which was what?
6  A. Some crack cocaine over by the microwave. I can't recall
7  if I used anything at this point without reviewing the
8  affidavit whether there were items in plain view on the
9  kitchen table or not.
10      MR. BLANCHARD: If I could have a moment to try and
11  find that, Your Honor. Do you have a copy of it?
12      MS. MORRIS: (complies)
13  Q. Do you recall if you mentioned a set of scales being on
14  the kitchen counter?
15      MS. MORRIS: If you could just refresh his
16  recollection.
17      MR. BLANCHARD: May I approach, Your Honor?
18      THE COURT: Yes.
19  Q. (complies) Is that your affidavit?
20  A. Yes, sir. Yes, sir.
21  Q. So as probable cause you cited the odor of burning
22  marijuana, the suspected crack cocaine and a set of scales
23  that you saw inside.
24  A. Yes, sir.
25  Q. And the fact that -- you also cited the fact that

Page 43

1  Mitchell and Floyd -- excuse me, strike that. That Mitchell
2  stated to Murray that he and Floyd were smoking marijuana
3  when you knocked on the door.
4  A. That's correct.
5  Q. All right.
6      MR. BLANCHARD: I think that's yours. (complies)
7      MS. MORRIS: Thank you.
8  Q. When you arrested Mr. Floyd on this alleged VCO order,
9  what was your understanding of what was to be done with him?
10  A. As far as the VCO was concerned he was to be transported
11  to the Lee County jail.
12  Q. And later brought -- I'm sorry, later brought before the
13  Judge for some order regarding the service of his, quote,
14  suspended sentences?
15  A. Yes, sir.
16  Q. Are you aware that without him ever appearing before the
17  Court an order was issued from Judge Bailey on August 1st
18  simply releasing him?
19  A. Yes, sir, I am familiar with that.
20  Q. Did you have anything to do with obtaining that order?
21  A. Probably some, yes, sir.
22  Q. Well, explain what you mean probably some.
23  A. I am sure I communicated with Lieutenant Holder that Mr.
24  Floyd and I had had a conversation concerning the drug
25  charges, and that he had agreed in some part to cooperate

Page 44

1  with us to further our investigation into the drug -- to
2  further the investigation into his drug arrest, so-to-speak.
3  Q. Did you communicate to Lieutenant Holder that you had a
4  discussion with him about Tyrone White?
5  A. I had a very small part in that conversation. Lieutenant
6  Holder and Lieutenant Smith took a statement from him
7  regarding that aspect of it.
8  Q. Let me show you --
9      MR. BLANCHARD: May I approach, Your Honor?
10      THE COURT: Yes.
11  Q. -- what has been marked as Defendant's Exhibit Number 2.
12  Have you seen that before?
13      MS. MORRIS: Excuse me, what is it?
14      MR. BLANCHARD: I'm sorry. (complies)
15      MS. MORRIS: The release, okay.
16  A. Yes, sir, I have seen it.
17  Q. What is it?
18  A. This is an order, City of Auburn, Plaintiff, versus
19  Sawelija Tyree Floyd, Defendant, for good cause shown the
20  Defendant should be released from incarceration in the Lee
21  County jail pending further orders of this Court. So ordered,
22  this the 1st day of August, 2005. It reflects Joe Bailey's --
23  Judge Bailey's signature.
24  Q. That order was entered two days after you arrested him,
25  Floyd.

| Page 45 | Page 47 |
|---|---|

**Page 45**

1  A. I would have to look at the calendar. Are there 31 days

2  in July or 30?

3  Q. Either two or three days.

4  A. He was released the following Monday. He was arrested on

5  a Friday and he was released on the following Monday.

6  Q. Isn't it the truth that it was either communicated by

7  you or Lieutenant Holder or someone to Judge Bailey that you

8  had interrogated Floyd about Tyrone White and didn't need him

9  any more?

10  A. It's my understanding, I talked with Lieutenant Holder

11  and I had talked with Mr. Floyd, and told Mr. Floyd that if

12  he can make bond on the trafficking charges that I would get

13  the Judge to release him from the VCO.

14  Q. After you had talked with him about Tyrone White.

15  A. I had talked with him just briefly about it on that

16  Friday, then Lieutenant Holder and Willie Smith interviewed

17  him concerning Officer Tyrone White.

18     MR. BLANCHARD: Your Honor, I would like to admit

19  Defendant's Exhibit 2, please.

20     THE COURT: Any objection?

21     MS. MORRIS: No, Your Honor.

22     THE COURT: It's admitted.

23  Q. Sergeant Murray, was the sole purpose of your going into

24  the house on Ty Court the smell of the burning marijuana?

25  A. That's what led us inside the residence, yes, sir.

**Page 46**

1  Q. There was nothing else going on inside the residence

2  that you knew of that caused you to go in there.

3  A. Nothing else going -- no, sir, not at that point.

4  Q. And both of the occupants of the house, that is Tyree

5  Floyd and Jamillah McCray refused consent to search; is that

6  correct?

7  A. Yes, sir, that's correct.

8     THE COURT: Just to make sure I understand, did they

9  refuse consent before you walked into the residence?

10     THE WITNESS: No, ma'am.

11     THE COURT: Afterward?

12     THE WITNESS: Yes, ma'am.

13     THE COURT: Okay.

14  Q. Did you ask consent to go into the residence?

15  A. No, sir.

16  Q. And you did not have a search warrant at that time.

17  A. No, sir, we did not.

18  Q. All right. Thank you, I have nothing else at this time.

19     THE COURT: All right. Any redirect?

20     MS. MORRIS: Briefly, Your Honor.

21     REDIRECT EXAMINATION

22  BY MS. MORRIS:

23  Q. Sergeant Murray, defense counsel asked you about any

24  information you had that Mr. Floyd, I believe he said was a

25  violent individual, do you recall that line of questioning?

**Page 47**

1  A. Yes, sir -- yes, ma'am, I do.

2  Q. I believe you testified at least on direct examination

3  and possibly on cross that you had information that Mr. Floyd

4  was distributing drugs or was involved in the drug trade, do

5  you recall that line of questioning?

6  A. Yes, ma'am, I do.

7  Q. Sergeant Murray, in your 15 years in narcotics have you

8  discovered any relationship between drugs and violence?

9  A. Yes, ma'am, I have.

10  Q. Could you explain that to the Court.

11  A. I would suspect that three quarters of your violent

12  crime is somehow related to drug activity or drug abuse.

13  Q. Have you in the course of your narcotics work executed

14  search warrants before?

15  A. Yes, ma'am.

16  Q. Have you found that there's any relationship or to your

17  knowledge is there any relationship between drugs and guns?

18  A. Yes, ma'am.

19  Q. Could you explain that to the Court.

20  A. A lot of the people, not all of them, but a lot of the

21  people we encounter that are distributing drugs are usually

22  armed with some type of firearm.

23  Q. And as a narcotics officer do you take extra care when

24  executing search warrants on drug dealers for that purpose --

25  for that reason? Excuse me.

**Page 48**

1  A. Yes, ma'am, we do.

2  Q. As a narcotics officer do you routinely rely on court

3  orders when arresting people?

4  A. From time to time, yes, ma'am.

5  Q. Do you rely on arrest warrants when you arrest people?

6  A. Yes, ma'am.

7  Q. Were you relying on the Court -- the order issued by the

8  Court, the Municipal Court in Auburn when you went to arrest

9  Mr. Floyd?

10  A. Yes, ma'am, that's correct.

11  Q. Now, Mr. Blanchard asked you about the case number on

12  the VCO as it's been termed and I believe you started to

13  explain to the Court why there was not a case number on the

14  that. Could you go ahead and explain that to the Court.

15  A. Yes, ma'am. As part of the investigation, again, at that

16  time, Officer Tyrone White, we had suspected or we had

17  information and some evidence that some people that worked in

18  the court clerk's office may have been involved in some of

19  the ticket fixing and arrest fixing, so-to-speak, that

20  Officer White was involved in. And so the warrant was

21  given -- it's my understanding, was given directly to

22  Lieutenant Holder to be kept confidential until such time as

23  we decided to execute it. And on the normal thing it would

24  have been given to the court clerk and entered in the

25  computer and been given a case number, but due to our

Page 49

1 investigation we did not feel comfortable with doing that,
2 doing that on this particular instance, and on any of the
3 warrants that were issued involving the Tyrone White issue.
4 Q. Now, you spoke with defense counsel about a meeting that
5 you had with the Judge regarding the Tyrone White case. Could
6 you explain to the Court why you went to meet with the
7 Court -- with the Judge -- explain to the Court why you went
8 to go meet with the state Judge about this case. And if you
9 will, let me back up. If you will explain to the Court
10 basically what the Tyrone White case is all about, I am not
11 sure that's come out. She may know, but --
12 A. We had received information that we have got a police
13 officer named Tyrone White that was taking money to fix
14 traffic tickets. And during the investigation we determined
15 and were told by several witnesses that they had paid Officer
16 White money to fix tickets. In doing this he would go to the
17 arresting officer and tell them whatever story to get
18 assistance for this case. The arresting officer unbeknowing
19 to him would go before the Court and ask for leniency for
20 this particular person. Officer White would then turn around
21 and go back to the person that had been arrested and say you
22 owe me X amount of dollars. So, when we started investigating
23 this case we interviewed every police officer that works at
24 the Auburn police department. They gave us names through
25 their statements and their reports that they had helped --

Page 50

1 from what they could recall, they helped Officer White out on
2 these Defendants, on these tickets. And it was a lot of them.
3 So we then went and met with the Judge on more than one
4 occasion with these names that we had to review the file to
5 corroborate what the officers had told us. In some --
6 Q. Is that why you were meeting with the Judge on the
7 occasion that the VCO was issued?
8 A. Yes, ma'am.
9 Q. Okay.
10 A. That's correct.
11 Q. And go ahead, I'm sorry, to interrupt you.
12 A. We would be given the names, we would go meet with the
13 Judge. We did not have confidence in some of the clerks that
14 worked in the court -- the City Court. And so we dealt solely
15 with the Judge and the head Magistrate at that time, who has
16 since retired. We would take these names, the Judge would get
17 the files pulled and then we would go review them.
18 Q. And when you pulled Mr. Floyd's file what did you
19 discover? Or what did the Court discover, the Judge discover?
20 A. The Court discovered, I'm assuming, in our meeting told
21 us that Mr. Floyd was in violation of his -- I guess he
22 referred to it as his probation or his suspended sentence or
23 whatever, for cause.
24 Q. Okay. Based on these interviews that you had had with
25 all these other police officers when y'all interviewed them

Page 51

1 all was, Mr. Floyd going to be interviewed by y'all about
2 Tyrone White?
3 A. Regardless, yes, ma'am, he would have been.
4 Q. Okay. So you would have gone to his house without the
5 VCO.
6 A. We would have made an attempt to contact him somewhere,
7 at his residence or if we had seen him on the road or
8 whatever, we needed to talk with him, regardless.
9 Q. Defense counsel asked you if the time -- if at the time
10 Mr. White was arrested if your purpose for being there had
11 been completed.
12 A. You mean Mr. Floyd.
13 Q. Mr. Floyd.
14 A. Had been arrested.
15 Q. At the time Mr. Floyd had been arrested if your purpose
16 for being at his house had been completed.
17 A. Initially that would have been the case, yes, ma'am.
18 Q. And when you say initially that would have been the
19 case, what do you mean?
20 A. Initially that was our intention.
21 Q. Well, what changed?
22 A. But we had detected the odor of the burning marijuana
23 coming from inside the residence.
24 Q. Could you read the last sentence -- well, I guess
25 technically the second to last sentence of this order, and

Page 52

1 this is Defendant's Exhibit 1, which is the VCO that we have
2 been discussing; is that correct?
3 A. Yes, ma'am. Yes, ma'am, it is.
4 Q. And I can take this off the monitor if you would like to
5 read it.
6 A. I can read it. The second to the last above so ordered,
7 is that what you are referring to?
8 Q. That's correct.
9 A. The clerk is directed to set this matter for hearing on
10 the next regular business day after said Defendant is in
11 custody.
12 Q. And Mr. Floyd was in custody on the 29th; is that
13 correct?
14 A. That's correct.
15 Q. And he was seen or released on the next business day; is
16 that correct?
17 A. Yes, ma'am, August the 1st.
18 Q. And that was -- and how did he get out of jail again? I
19 mean did he have a bond?
20 A. He had two trafficking -- a trafficking marijuana bond
21 and a trafficking in cocaine bond.
22 Q. And did he make those bonds?
23 A. He made those bonds.
24     MS. MORRIS: That's all I have at this time, Your
25 Honor.

---

Page 53

1    THE COURT: Any further cross?
2    MR. BLANCHARD: Just a few more, Your Honor.
3        RECROSS-EXAMINATION
4  BY MR. BLANCHARD:
5  Q. Sergeant Murray, I can put it back up there if you need
6  it but you just read a sentence from the order issued by
7  Judge Bailey saying that the clerk was directed to set the
8  matter for a hearing the next business day after the
9  Defendant was taken into custody; is that correct?
10  A. That's correct.
11  Q. Are you aware of whether such a hearing took place or
12  not?
13  A. I am not, no, sir.
14  Q. All you know is that Mr. Floyd was released and made
15  bond on the drug charges.
16  A. Yes, sir.
17  Q. You stated that you often rely on court orders when
18  arresting people, and forgive me if I have already covered
19  this, Your Honor, but don't those court orders normally
20  specify some offense?
21  A. Yes, sir, they do sometimes.
22  Q. Doesn't this one more or less just say I, the Judge, am
23  of the opinion this guy ought to be picked up and serve his
24  time?
25    MS. MORRIS: Your Honor, I think the best evidence

---

Page 54

1  there is the court order which is in evidence at this point.
2    THE COURT: It is. Although I think he is asking his
3  understanding of it. To that extent I will overrule the
4  objection.
5  Q. Isn't that essentially what it says, your understanding
6  of it, I am the Judge, I think this guy ought to serve the
7  rest of his suspended time, go get him, put him in the jail.
8  Isn't that essentially what it says?
9  A. It doesn't say -- if I could see it.
10  Q. Sure. (complies)
11    THE COURT: I think the relevant question is his
12  understanding at the time.
13    MR. BLANCHARD: Yes.
14  A. It's my understanding in reading this, it says he should
15  be taken to the Lee County jail until the balance of his
16  sentence or sentences of incarceration heretofore suspended
17  and reimbursing the city and county for all medical expenses.
18  So my understanding of that is he has violated his probation
19  or whatever he has from the City Court.
20  Q. Does it say that?
21  A. No, sir.
22  Q. Then how did you get that understanding?
23  A. Because we routinely serve violation of court orders for
24  people who violate their probation with the City Court.
25  Q. And do they always just look like that?

---

Page 55

1  A. I don't -- most of the time we don't have them with us,
2  no, sir. Usually it's on a traffic stop or something and you
3  get a radio hit on them.
4  Q. It's my understanding from your testimony on redirect
5  that the warrant, that order we just talked about,
6  Defendant's Exhibit Number 1, was not given a number because
7  it was issued in connection with the Tyrone White case.
8  A. That's correct.
9  Q. Have you discussed this matter with Judge Bailey in the
10  last week or two?
11  A. This hearing? Or the VCO or anything?
12  Q. Yes, sir.
13  A. Yes, sir, I have.
14  Q. All right. When did you discuss it with him?
15  A. A little while yesterday and a little while prior to
16  coming over here to the courthouse.
17  Q. Did you talk about the meeting that you had earlier with
18  him?
19  A. No, sir, did not.
20  Q. When it was issued?
21  A. No, sir, did not.
22  Q. What was the substance of the conversation you had with
23  Judge Bailey?
24  A. Concerning the hearing?
25  Q. Concerning this.

---

Page 56

1  A. Just that he was going to ride down here with us today,
2  and basically that it was not clear from what the motion for
3  the suppression was and I dug in my file and located a copy
4  of it and let him read it.
5  Q. Was -- did you have any discussion with him about how or
6  why the order was issued, that is, Defendant's Exhibit 1?
7  A. Yes, sir. We had a little bit of that, yes, sir.
8  Q. Did he tell you any recollection of his as to why he
9  issued it?
10  A. No, sir, I don't think he -- I don't think he had even
11  looked at the file itself until today, so we didn't really
12  get into that much.
13  Q. Did you tell him why you thought he had issued it?
14  A. No, sir, I did not.
15  Q. Was anyone else present at this discussion other than
16  you or he?
17  A. Would have been Lieutenant Holder and Lieutenant Smith
18  and Brad Bass.
19  Q. All of you talked about it together?
20  A. Some of it, and --
21  Q. Did you have a meeting?
22  A. And the Assistant U.S. Attorney. Yes, sir.
23  Q. Did any of you suggest to the Judge why you thought he
24  may have issued this order?
25  A. No, sir.

## Page 57

1  Q. And did he suggest to any of you or tell any of you why
2  he thought he issued it?
3  A. I don't recall him saying specifically, but I am
4  thinking that he may have said, and I am not a hundred
5  percent on this because there were two or three conversations
6  going on, that it was his opinion that Mr. Floyd had
7  violated his probation with City Court.
8  Q. All right.
9      MR. BLANCHARD: Nothing further.
10     THE COURT: Anything further?
11     MS. MORRIS: No, Your Honor.
12     THE COURT: All right. You may step down. Thank you.
13  Next witness?
14     MS. MORRIS: The government rests.
15     THE COURT: Okay. Any witnesses for the Defendant?
16     MR. BLANCHARD: Yes, Your Honor. I would like to
17  call Lieutenant Jerry Holder.
18     THE CLERK: Lieutenant Holder, come to the
19  courtroom, please.
20     (pause)
21     THE CLERK: You do solemnly swear or affirm that the
22  testimony you give in this cause will be the truth, the whole
23  truth, and nothing but the truth, so help you God.
24     THE WITNESS: I do.
25

## Page 58

1      JERRY HOLDER, witness called by the Defendant,
2  having been duly sworn or affirmed, testified as follows:
3          DIRECT EXAMINATION
4  BY MR. BLANCHARD:
5  Q. State your name, please.
6  A. Jerry Holder.
7  Q. How are you employed, Lieutenant Holder?
8  A. I am a police officer with the City of Auburn police
9  department in Auburn, Alabama.
10  Q. How long have you been so employed?
11  A. 26 and a half years.
12  Q. All right. Were you so employed on July 29th, 2005?
13  A. Yes, sir, I was.
14  Q. Okay. And did you take part in the arrest at the
15  residence of Tyree Floyd?
16  A. Yes, sir, I did.
17  Q. Prior to that time did you participate in obtaining a
18  warrant known as a VCO warrant?
19  A. Yes, sir, I did.
20  Q. In what way did you participate in obtaining that
21  warrant?
22  A. I met with Judge Joe Bailey, the Auburn Municipal Court
23  Judge on July the 27th, and we reviewed Mr. Floyd's court
24  file, and at that time he issued a writ for his arrest for
25  violating the court order.

## Page 59

1  Q. What was your purpose in meeting with Judge Bailey on
2  that date?
3  A. To review Mr. Floyd's court file.
4  Q. Was that in conjunction with an investigation of Mr
5  Floyd or some other individual?
6  A. At that particular time I had a list of people that I
7  wanted to check on their court records through Judge Bailey
8  on another investigation.
9  Q. Was that the Tyrone White investigation?
10  A. Yes, sir, it was.
11  Q. All right. Now, when you met with Judge Bailey was
12  anyone else present?
13  A. Myself and Sergeant Murray met with Judge Bailey on July
14  the 27th.
15  Q. On July the 27th.
16  A. Yes, sir.
17  Q. Okay. Whose idea was it to issue this warrant?
18  A. The Judge issued the warrant when he reviewed Mr.
19  Floyd's file.
20  Q. Did you ask him to issue a warrant?
21  A. No, sir, I did not ask him to issue a warrant, I asked
22  him to pull his file and review his file.
23  Q. Did you suggest to him that you would like to talk with
24  Mr. Floyd about the Tyrone White matter?
25  A. I don't recall if I made a suggestion like that or not.

## Page 60

1  Q. You may have?
2  A. I may have.
3  Q. Do you recall if Sergeant Murray made such a suggestion?
4  A. No, sir, I don't recall.
5  Q. In any event you wanted to talk with Tyree Floyd about
6  Tyrone White, didn't you?
7  A. Yes, sir, I needed to ask Mr. Floyd about a case that he
8  had in Municipal Court in which I had a statement from an
9  officer stating that Officer Tyrone White had come to him and
10  negotiated a plea agreement.
11  Q. At the time you spoke with Judge Bailey and Sergeant
12  Murray on the 27th of July, 2005, were you aware of any court
13  orders that Tyree Floyd had violated?
14  A. None other than what the Judge pointed out when he
15  reviewed his file, no, sir.
16  Q. What did the Judge point out?
17  A. When he reviewed his file he pointed out that he had
18  several suspended sentences from other cases in court and
19  that he was in violation of the Court's order so he issued a
20  writ.
21  Q. I'm sorry, how was he in violation of the Court's
22  orders?
23  A. Well, you will have to ask Judge Bailey that, sir, he's
24  the one that said he was in violation and issued a writ for
25  it.

Page 61

1  Q. He didn't tell you how he was in violation?
2  A. He did say he had several suspended sentences from prior
3  cases in court and he was in violation of the Court's orders
4  so he issued a writ.
5  Q. When a judge suspends a sentence -- I may be asking you
6  a legal question, if you don't feel comfortable answering it
7  don't answer it but I want to know what your understanding of
8  it is. When a judge gives a sentence, let's say 30 days and
9  suspends it and says pay your fine, given a two hundred 50
10 dollar fine and 30 days sentence in Municipal Court, I
11 suspend your sentence, how long does that sentence remain
12 suspended?
13 A. I don't know how long it remains suspended but I know
14 there are more variables into it than just the fact that he
15 pays his fines. I have heard Judge Bailey make that speech
16 hundreds of times in City Court. The sentence is suspended on
17 several conditions, that you pay your fines as you set up
18 your partial payment or whatever, that you meet with the
19 Court referral officer like you are supposed to, that you
20 attend any counseling that they recommend, that you get proof
21 back to the Court, that you don't get in any more trouble
22 with the law or any other violations. There's several things
23 that could constitute violation of a court order, not just
24 the payment of a fine.
25 Q. And he puts those in writing, doesn't he?

Page 62

1  A. I think so, yes, sir.
2  Q. If he issues conditions other than payment of fine it
3  would be in writing in the court file.
4  A. There again, sir, I think you would have to ask Judge
5  Bailey that. I have heard him make that speech but I can't
6  sit here and say I sat there and saw him write all that down,
7  but I have heard him say that a number of times.
8  Q. Did Tyree Floyd have a number of files in the Municipal
9  Court, more than one?
10 A. Yes, sir, he had a history in the Municipal Court.
11 Q. And they kept files on him?
12 A. Yes, sir.
13 Q. And did you take those files into your custody?
14 A. Yes, sir.
15 Q. In connection with the Tyrone White matter?
16 A. Yes, sir.
17 Q. You physically removed the files from the clerk's
18 office?
19 A. No, I did not physically remove the files from the
20 clerk's office.
21 Q. Who did?
22 A. On the 27th when the Judge reviewed the file I took the
23 file, I think at that time from him.
24 Q. Well, haven't you had those files in your custody, the
25 court files?

Page 63

1  A. Yes, sir.
2  Q. All right. When did you first take the court files into
3  your custody?
4  A. I am not sure if it was on that date or somewhere
5  similar to that, but back when I began my investigation on
6  Officer White I took custody of a series of files, a number
7  of files that involved cases in which Officer White had been
8  involved in.
9  Q. Including Tyree Floyd's files?
10 A. Including Tyree Floyd's file.
11 Q. Did you just go to the clerk's office and take the files
12 out?
13 A. No, sir. I met with Judge Bailey and told him I needed
14 to review some of those files and gave him a list of them and
15 he had the clerk pull those files and then he delivered them
16 to me.
17 Q. And do you still have them?
18 A. Yes, sir. Well, I think actually Sergeant Murray has
19 Mr. Floyd's file today but I have had them since I took
20 custody of them, yes, sir.
21 Q. They have been in your custody since probably before
22 July 27th, 2005, is that your testimony?
23 A. Either on July 27th or before that day, yes, sir.
24 Q. All right. Now, are you aware that I requested a copy of
25 Mr. Floyd's file or files with the Auburn court, City Court?

Page 64

1  A. No, sir. I am aware that the U.S. Attorney asked me to
2  copy what I had and bring to him so that he could give it to
3  you and I did that last week.
4  Q. All right. Are you familiar with the court file that you
5  had or files on Tyree Floyd?
6  A. Yes, sir.
7      MR. BLANCHARD: Your Honor, what I would like to do
8  is mark as Defendant's Exhibit 3 this folder which contains
9  all of the material given to me by the U.S. Attorney's
10 office, and described to me as Tyree Floyd's Auburn Municipal
11 Court files, which I had requested as discovery.
12     THE COURT: All right.
13     MR. BLANCHARD: May I approach?
14     THE COURT: You may.
15 Q. (complies) Please take a look at the contents of the
16 folder labeled Defendant's Exhibit Number 3. And I would like
17 you to tell the Court if the contents of that folder are the
18 same as the contents or the copies -- not identical, I am
19 looking for a word, and the word is accurate copies of the
20 materials in Tyree Floyd's court files with the Auburn
21 Municipal Court?
22 A. They appear to be copies that I personally made myself
23 last week and delivered to the U.S. Attorney's office, yes,
24 sir.
25     THE COURT: Just so I am not confused, are there

Page 65

1  several court files relating to this Defendant or is there
2  one court file?
3      THE WITNESS: No, ma'am, there's a court file and
4  there's a case file so there's two different files, but the
5  file we are talking about here is the file called the court
6  file that Auburn Municipal Court had that had all of Mr.
7  Floyd's prior court actions in it.
8      THE COURT: Okay.
9  Q. So that court file contains the written materials of all
10 of his case files; is that correct?
11 A. Well, I can't testify to that, all I can say is it has
12 in it what I have copied for you. The first thing in here is
13 a payment history for Mr. Floyd that's a printout from the
14 City Court. I notice down here several cases that the head
15 clerk made a comment they can't locate. So not to confuse the
16 issue, there may be cases that he's been charged with that
17 are not in here because this note says they can't locate
18 them. But --
19 Q. Do you know whether it's can't locate a receipt or can't
20 locate something else? And aren't those --
21 A. I don't know if it's can't locate the receipt or can't
22 locate the file on that particular charge, but it does
23 include a lot of charges.
24 Q. My question to you really is are the materials in that
25 folder the same materials you had and viewed as the court

Page 66

1  file on Tyree Floyd?
2  A. Yes, sir, they appear to be.
3  Q. Okay. If there is anything missing you are unaware of
4  it; is that right?
5  A. That's right.
6  Q. You have been assuming that's all of it.
7  A. Right.
8  Q. Okay.
9  A. I copied everything that I had and delivered it to Mr.
10 Todd Brown.
11 Q. Did you add anything to it?
12 A. To the court file?
13 Q. Yes.
14 A. I don't think I added anything to the court file, unless
15 it was a copy of my statement, but I am thinking that was
16 with the -- my personal statement was with the case file and
17 not necessarily the court file. So no, sir, I don't think I
18 added anything to it.
19 Q. All right.
20     MR. BLANCHARD: Your Honor, I would like to submit
21 Defendant's Exhibit 3 for the record.
22     THE COURT: Any objection?
23     MS. MORRIS: No, Your Honor.
24     THE COURT: It's admitted.
25 Q. Now, Lieutenant Holder, you were present at the time of

Page 67

1  the arrest; is that correct?
2  A. Yes, sir, that is correct.
3  Q. All right. And Sergeant Tatum was also present.
4  A. He was.
5  Q. Along with a number of other officers.
6  A. Yes, sir.
7  Q. This occurred at approximately 10:30 a.m. on Friday the
8  29th of July, 2005.
9  A. Yes, sir.
10 Q. And did you write a report the same day?
11 A. I wrote a statement, my statement for that day, yes,
12 sir.
13 Q. All right. And was your memory fresh at that time?
14 A. Yes, sir.
15 Q. And did you endeavor to write down exactly what you
16 recollected?
17 A. Yes, sir.
18 Q. You knew it was important to get the facts down
19 properly.
20 A. (Witness nods head in the affirmative.)
21 Q. You are trained to do that, aren't you?
22 A. Yes, sir.
23 Q. And you take that seriously.
24 A. Yes, sir.
25 Q. All right. Now, when Sergeant -- were you present when

Page 68

1  Sergeant Tatum knocked on the door?
2  A. I was.
3  Q. Did you hear what occurred when he knocked on the door?
4  A. I did.
5  Q. What happened?
6  A. When Sergeant Tatum knocked on the door I heard a male
7  voice from inside the house yell what.
8  Q. All right. And did Sergeant Tatum reply?
9  A. Yes, he did.
10 Q. What did he say?
11 A. He said police, police department or police officer,
12 come to the door.
13 Q. In your report did you write Sergeant Tatum replied,
14 quote, police, open the door, close quote?
15 A. Yes, sir.
16 Q. Is that what you heard?
17 A. Yes, sir, I guess so, if that's what is in my statement.
18 Q. Did you later enter the residence of Floyd?
19 A. Yes, sir, I did.
20 Q. All right. And participate in a search in that
21 residence?
22 A. I actually did not participate in a search. I entered
23 and helped secure the residence until a search warrant could
24 be obtained. I did not physically search the residence, no,
25 sir.

Page 69

1 Q. Did you have permission when you entered the residence?
2 A. No, I did not.
3 Q. Backing up just a minute. When the knock on the door was
4 made, the voice from inside said what, Tatum said police,
5 open the door, what happened then and how long did it take?
6 A. It didn't take very long at all. Ms. McCray came to the
7 door, opened the door. She was asked if Mr. Floyd was at
8 home. She said he was. And then he approached the door
9 from -- coming from towards the rear of the house.
10 Q. Would you say it was a minute or less than a minute that
11 it took her to come to the door?
12 A. Best I can recall I would say less than a minute, maybe
13 about a minute.
14 Q. Okay. At the time you were standing outside of the
15 residence looking in, before you entered it, could you smell
16 marijuana?
17 A. Yes, sir, very obviously and very clearly.
18 Q. Could you see any drugs inside the house from your
19 vantage point outside?
20 A. At that time I did not.
21 Q. Could you see any individuals in the house other than
22 Ms. McCray?
23 A. There was an individual in the kitchen area.
24 Q. But you couldn't see him, could you?
25 A. I think we asked or someone asked her if anyone else was

Page 70

1 in the house, and at that time either he stood up where we
2 could see him or she said there's one more person here or
3 whatever, but it became clear that he was in the kitchen.
4 Q. That was after you entered, wasn't it?
5 A. No.
6 Q. You asked before you entered?
7 A. Yeah.
8 Q. Okay. Well, you said you think you did or someone else
9 did, you are not sure?
10 A. I am not sure. I remember he was in the kitchen area
11 right there to the right of the door sitting at the table.
12 Q. Now, you had to enter the house before you could see
13 anybody in the kitchen area, didn't you?
14 A. I don't recall if he could be seen or if anybody saw him
15 before we entered or not.
16       MR. BLANCHARD: I am searching for my photographs,
17 Judge. I am going to try to turn this thing on and use it
18 here. There we go.
19       MS. MORRIS: Can I see that?
20       MR. BLANCHARD: Certainly, I'm sorry.
21       MS. MORRIS: Have we been provided this in
22 reciprocal discovery?
23       MR. BLANCHARD: It's just pictures inside the house
24 which you all have.
25       MS. MORRIS: Get us a copy, please.

Page 71

1       MR. BLANCHARD: Okay.
2 Q. Are you able to see that on the screen, Lieutenant?
3 A. I can see that.
4 Q. All right. Are you familiar with that scene? Does it
5 look familiar to you?
6 A. I honestly can't tell.
7 Q. You don't recognize it?
8 A. No, sir. I mean it appears to be a kitchen table.
9 Q. Okay.
10 A. But I can't from the vantage of where it was taken, it
11 could have been taken in any apartment really.
12 Q. Let me show you another one then.
13       MR. BLANCHARD: Here. It's got some writing on it, I
14 didn't put it on there, but it's on there. (complies)
15 Q. All right. Do you see that one?
16 A. Yes, sir. That one is a little more clear now that I can
17 see the front door standing open and that does appear to be a
18 little more recognizable to me.
19 Q. All right, sir. And there's some writing on it that
20 says J.B. Mitchell was sitting in a certain location, you can
21 disregard that. That was written there for my benefit. He
22 either was or he wasn't. But I am asking you if you recognize
23 that as the dining room area where you encountered Mr.
24 Mitchell?
25 A. Yes, sir.

Page 72

1 Q. Okay. And if he was sitting in the chair where it's
2 indicated on that picture there would have been no way to see
3 him until you got inside the door, would there?
4 A. That is correct.
5 Q. Okay.
6       MR. BLANCHARD: I believe that's all I have of this
7 witness, Your Honor.
8       THE COURT: Any cross-examination?
9       MS. MORRIS: Very, very briefly.
10       THE COURT: All right.
11       MS. MORRIS: Just one second, Your Honor.
12             CROSS-EXAMINATION
13 BY MS. MORRIS:
14 Q. Lieutenant Holder, do you routinely rely on court orders
15 in your job?
16 A. Rely on them?
17 Q. Uh-huh.(positive response)
18 A. Yes.
19 Q. Routinely rely on warrants issued by the Court?
20 A. Sure.
21 Q. And did you rely on this VCO that we have been terming
22 when you were at Mr. Floyd's house?
23 A. Yes.
24 Q. Now, you and defense counsel spoke a bit about the
25 Tyrone White case. And I believe you said that you had gone

Page 73

1  to talk to Judge Bailey about some files; is that correct?
2  A. That is correct.
3  Q. Were you intending through your -- due to your
4  investigation of Mr. White to interview Mr. Floyd at some
5  point?
6  A. Yes, ma'am. It was my intention to interview Mr. Floyd
7  about a prior court case in the Auburn Municipal Court in
8  which I had knowledge that he had received assistance through
9  Officer White.
10 Q. And you didn't request that the Judge issue this VCO,
11 did you?
12 A. I did not request that he issue it, no, ma'am.
13    MS. MORRIS: Just one second, Your Honor. I think
14 that's all I have at this time, Your Honor.
15    THE COURT: Anything further?
16       REDIRECT EXAMINATION
17 BY MR. BLANCHARD:
18 Q. Lieutenant Holder, were you aware of any court orders --
19 I think I have asked you that. Never mind, I withdraw that.
20    THE COURT: All right. You may step down.
21    MR. BLANCHARD: Nothing further.
22    THE COURT: All right. Any other witnesses for the
23 Defendant?
24    MR. BLANCHARD: Yes. Bradford Bass.
25    THE WITNESS: Your Honor, may I stay in the room?

Page 74

1     THE COURT: Anybody have any objection?
2     MR. BLANCHARD: I would prefer that he did.
3     THE COURT: I'm sorry, you are saying you would
4  prefer that he stay?
5     MR. BLANCHARD: Yes.
6     THE CLERK: Mr. Bass, please come to the courtroom.
7     (pause)
8     THE CLERK: You do solemnly swear or affirm that the
9  testimony you give in this cause to be the truth, the whole
10 truth, and nothing but the truth, so help you God.
11    THE WITNESS: I do.
12       BRAD BASS, witness called by the Defendant,
13 having been duly sworn or affirmed, testified as follows:
14       DIRECT EXAMINATION
15 BY MR. BLANCHARD:
16 Q. All right. Your name, please.
17 A. Brad Bass.
18 Q. All right, sir. And what is your occupation?
19 A. I work for the judicial department as a court clerk,
20 assistant administrator.
21 Q. And how long have you been so employed?
22 A. Since September 1st of this year.
23 Q. By the way, is that the Auburn Municipal Court?
24 A. Correct.
25 Q. Okay. That you work for. Prior to that what did you do?

Page 75

1  A. Worked for the Auburn police department.
2  Q. What was your job at the Auburn police department?
3  A. Warrant service, admin.
4  Q. Were you present at the time of the arrest of my client,
5  Tyree Floyd?
6  A. Yes, sir, I was.
7  Q. You participated in that.
8  A. Yes, I did.
9  Q. Now, and after that you became clerk of the Court.
10 A. Correct.
11 Q. Since you have been clerk of the Auburn Municipal Court
12 has there been a court file on Tyree Floyd in your
13 possession?
14 A. No, sir.
15 Q. Where has that court file been?
16 A. With Lieutenant Holder.
17 Q. Did it leave the court file -- the clerk's office prior
18 to the time you took over?
19 A. Yes, sir.
20 Q. And have you gotten it back yet?
21 A. No, sir.
22 Q. As clerk of the Court, Mr. Bass, you are responsible for
23 maintaining the records in the court, are you not?
24 A. Yes, sir.
25 Q. And you and I have met before, haven't we?

Page 76

1  A. Correct.
2  Q. Did I come over to Auburn and get some information from
3  you?
4  A. Yes, sir.
5  Q. Let me show you first --
6     MR. BLANCHARD: May I approach, Your Honor?
7     THE COURT: Yes.
8  Q. -- what I have marked as Defendant's Exhibit Number 4
9  and ask you if you recognize it?
10 A. Yes, sir.
11 Q. What is that, please, sir?
12 A. It's a payment history.
13 Q. Payment history of whom?
14 A. Of Mr. Sawelija Tyree Floyd.
15 Q. And does this printout show all of the fines and court
16 costs that he has been charged and paid with your court?
17 A. Yes, sir.
18 Q. All right. Now, are there any -- according to this
19 printout, which was if you look at the bottom, made
20 Wednesday, December 7th, 2005, are there any outstanding
21 fines or costs or has he paid everything he owed to the
22 Court?
23 A. It shows that items have been paid, yes, sir.
24 Q. I'm sorry?
25 A. It shows that items have been paid.

Page 77

1  Q. Well, is this an accurate and complete record?
2  A. Yes, sir. Of the transactions, yes, sir.
3  Q. All right, sir. Are you aware of anything he owes to
4  the Court?
5  A. No, sir.
6  Q. All right. Does it show that everything that he owed to
7  the Court has been paid?
8  A. It shows that everything has been paid, yes, sir.
9  Q. And does it also show that everything he owed to the
10 Court was fully paid prior to the date of his arrest, with
11 one exception which was the traffic ticket he got after his
12 arrest?
13       MS. MORRIS: Excuse me, can you show me what you are
14 referring to, if you don't mind?
15       MR. BLANCHARD: Referring to this.
16       MS. MORRIS: I believe you said it was printed out
17 on December 7th.
18       MR. BLANCHARD: Yes.
19       MS. MORRIS: I don't have that.
20       MR. BLANCHARD: You have a copy with an old date on
21 it.
22       MS. MORRIS: That's what was confusing me, sorry
23 about that.
24       MR. BLANCHARD: Okay.
25 Q. Anyway, what was the question. Oh, does it show that

Page 78

1  everything was fully paid prior to the time of his arrest on
2  July 29th, 2005, except for the case TR-05-7832 which was a
3  speeding ticket he got after his arrest?
4  A. This is going to take me just a minute to look through
5  it.
6  Q. Sure.
7  A. As far as I can see that's the only thing that was
8  outstanding.
9  Q. All right. So would you conclude from an examination of
10 this document that Tyree Floyd at the time of his arrest on
11 the 29th of July, 2005, did not have any unpaid fines with
12 your court?
13 A. Well, this shows the transactions that were made, it
14 doesn't actually show what the agreement was, what the
15 agreement to pay. This just shows the payments that were
16 made.
17 Q. Does it show zero balances on all those cases?
18 A. Yes, sir.
19 Q. Does that indicate to you they were fully paid?
20 A. At a point in time, yes, sir.
21 Q. Well, does it show the dates on which the payments were
22 made?
23 A. Yes, sir.
24 Q. All right. And could you discern from looking at that
25 when the final payment was made?

Page 79

1  A. Yes, sir.
2  Q. All right. Does it appear to you from looking at that
3  that all the fine payments were made prior to the time of his
4  arrest?
5  A. Yes, sir.
6  Q. Okay.
7       MR. BLANCHARD: I would like to submit that document
8  as I believe Defendant's Exhibit Number 4.
9       THE COURT: Any objection?
10      MS. MORRIS: No, Your Honor.
11      THE COURT: It's admitted.
12 Q. Let me now show you what I have marked as Defendant's
13 Exhibit Number 5 and ask you if you recognize that?
14 A. It's a history profile for the same individual.
15 Q. What is a history profile?
16 A. This shows all the arrests and disposition of cases.
17 Q. And this is his entire history with the Auburn Municipal
18 Court.
19 A. Should be, yes, sir.
20 Q. Yeah. All right. It says at the top history for,
21 misspelled, Sawelia, S-A-W-E-L-I-A, Tyree Floyd, and it gives
22 a number S422020573, is that the history for this individual
23 seated at counsel table?
24 A. Yes, sir, as far as I know.
25 Q. Okay. And the first division on it is a profile; is that

Page 80

1  right?
2  A. Correct.
3  Q. Gives things like name, address, birth date, that kind
4  of thing.
5  A. Correct.
6  Q. All right. And then the next area is warrants; isn't
7  that right?
8  A. Yes, sir.
9  Q. And it shows the type of warrant, the warrant number,
10 the date issued, the charge, disposition and the date served.
11 Is that correct?
12 A. Correct.
13 Q. Is there anything on there about a violation of court
14 order warrant having been issued on July 27th, 2005?
15 A. No, sir.
16 Q. All warrants are listed on here, aren't they?
17 A. That one is not.
18 Q. Well --
19 A. Correct.
20 Q. But all warrants should be listed on there, shouldn't
21 they?
22 A. Yes, sir.
23 Q. Do you know why that one isn't?
24 A. No, sir.
25 Q. Then down here -- oh, by the way, on the disposition of

## Page 81

1 the warrants, on the column towards the right-hand-side of
2 the page they are all shown as executed except for one capias
3 warrant which is listed as having been held, that was issued
4 back in 2002; is that correct?
5 A. Yes, sir.
6 Q. When it says held on a warrant, what does that mean?
7 A. It means that a warrant was prepared or a lot of times
8 on these warrants if somebody is ordered to come to court if
9 they come to court the warrant is not actually listed as
10 outstanding, it's just held.
11 Q. And according to your records Mr. Floyd had been in your
12 court several times after that warrant was issued, hadn't he?
13 A. The held warrant?
14 Q. Yes.
15 A. Yes, sir.
16 Q. Okay. Had so if there was any disposition of that
17 warrant it would have been done when he came into court
18 subsequent to the warrant being issued.
19 A. Well, with it being in the held status, I mean it never
20 was in an outstanding status as far as I know.
21 Q. Okay. Now, the final part of this document is entitled
22 cases. And this appears to show a case number and charge on
23 each case and arrest date, a status, court date, disposition,
24 and some other information which is not listed, bond and
25 amount owed; is that right?

## Page 82

1 A. Correct.
2 Q. If you look in the status of each case on this list what
3 does it say on each case?
4 A. Closed.
5 Q. What does that mean?
6 A. It means the case is closed.
7 Q. Does that mean everything has been paid?
8 A. Correct.
9 Q. There's nothing further to be done?
10 A. It means all his fines are paid, yes, sir.
11 Q. Does it mean the sentence has been served?
12 A. I mean if a suspended jail sentence is out there, no,
13 sir, it doesn't.
14 Q. You are the clerk of the court, I asked this question
15 earlier, let me ask it to you. If a Defendant, any Defendant,
16 goes before the Auburn Municipal Court and enters a plea or
17 is found guilty, and the Judge says I am going to give you a
18 two hundred and $50 fine, for instance, and a 30 days jail
19 sentence and I suspend the sentence, how long does that
20 sentence remain suspended?
21 A. Two years is my understanding.
22 Q. Two years.
23 A. Yes, sir.
24 Q. By virtue of what?
25 A. I can't answer that question.

## Page 83

1 Q. You know that under state law a Municipal Judge has
2 authority to put a person on probation for up to two years.
3 A. Yes, sir.
4 Q. Okay. But there's no state law that automatically says a
5 sentence is suspended for two years.
6 A. It's my understanding that that falls under the
7 probation, when he suspends the jail sentence.
8 Q. You are familiar with Mr. Floyd's court records?
9 A. Yes, sir.
10 Q. Is there any indication that Mr. Floyd has ever been put
11 on probation for a specific period of time?
12 A. Without looking at his file, no, sir. I mean I don't
13 have any idea.
14 Q. We have that in evidence as I believe Defendant's
15 Exhibit Number 3. If you would like to examine it.
16     (pause)
17 A. He has several charges that have suspended jail
18 sentences which to me would be probation.
19 Q. Well, my question is, do the records reflect that he was
20 placed on probation in any of those cases for a specific
21 period of time, starting here, ending there?
22 A. No, sir, there's nothing in here that says that.
23 Q. So in your view a suspended sentence of that type would
24 be more or less indefinite; is that right?
25 A. No, sir.

## Page 84

1 Q. You think it would end after two years?
2 A. The Judge generally instructs the individual that he is
3 going to suspend the jail sentence and that as long as they
4 were not in any other trouble for two years that -- and pay
5 their fines and do everything that the Court instructs them
6 to do, that after that two year period that would be the end
7 of it.
8 Q. Do you know if there was ever any such instruction given
9 to Tyree Floyd?
10 A. I have no idea.
11     MR. BLANCHARD: May I approach, Your Honor?
12     THE COURT: You may.
13 Q. I would like you to look at what I have marked as
14 Defendant's Exhibit 6, and let me tell you what that exhibit
15 is. I provided a copy to counsel for the government. That is
16 a document that my office prepared based on the records of
17 the Auburn Municipal Court provided to us. And it shows the
18 arrest date, charge, disposition date, and sentence as best
19 we could ascertain them from Mr. Floyd's records.
20 A. Yes, sir.
21 Q. All right. You follow that?
22 A. Yes, sir.
23 Q. What I am wondering is if you can look at that document
24 and affirm whether it is correct or incorrect.
25     MS. MORRIS: Your Honor, I would just request that

## Page 85

1  if he's going to answer that he is going to need the complete
2  court file and compare it, I don't think he could do it from
3  memory.
4      THE COURT:  What do you need to answer the question?
5      THE WITNESS:  I would need the actual files.
6      THE COURT:  Can you provide those?
7      MR. BLANCHARD:  Isn't that what we have as
8  Defendant's Exhibit 3? Because that's what I have been told,
9  that that is a copy of the actual court file.
10     (pause)
11  A. It's going to take me some time to go through this.
12     THE COURT:  Why don't we take a break and let you
13  look at that. You need about ten minutes?
14     THE WITNESS:  Yes, ma'am.
15     THE COURT:  Okay. Let's take a ten minute break.
16     (At which time, 4:10 p.m., a recess was had until
17  4:20 p.m., at which time the hearing continued.)
18     THE COURT:  Proceed.
19     MR. BLANCHARD:  Thank you, Your Honor.
20  Q. Mr. Bass, have you had now an adequate opportunity to
21  compare Defense Exhibit 3 and Defense Exhibit 6?
22  A. Yes, sir.
23  Q. All right. And the question to you was whether what is
24  in Defense Exhibit 6 adequately and accurately summarizes
25  what is in Defendant's Exhibit 3?

## Page 86

1  A. Yes, sir.
2  Q. It does?
3  A. Yes, sir, it appears to be.
4  Q. All right. So, in 1993 Mr. Floyd was charged with
5  running a red light and pled guilty, we don't know what his
6  sentence was, starting at the top of the form; is that
7  correct?
8  A. Correct.
9  Q. In 1996 he had an expired driver's license which was nol
10  prossed.
11  A. Correct.
12  Q. All right. In 1998, April of 1998 he was charged with
13  driving while suspended, found to be guilty on May 14th,
14  1998, we don't know what the sentence was; is that correct?
15  A. Yes, sir.
16  Q. In the same year, September 16th, 1998, he had another
17  driving while suspended, again found or pled guilty on
18  October 15th, 1998, again we don't know what the sentence
19  was.
20     MS. MORRIS:  Your Honor, we will stipulate it says
21  what it says, that this is correct as -- since he has already
22  testified to it, without having to go through it step by
23  step.
24     THE COURT:  Do you want to ask any further
25  questions?

## Page 87

1      MR. BLANCHARD:  Fine with me.
2      THE COURT:  There's a stipulation that this is
3  accurate.
4      MR. BLANCHARD:  Then I would offer Defendant's
5  Exhibit 6 into the record.
6      THE COURT:  Any objection?
7      MS. MORRIS:  No, ma'am.
8      THE COURT:  It's admitted.
9  Q. Within the last two weeks have you had any discussion
10  with Judge Bailey about this case?
11  A. No, sir, as far as -- no, sir.
12  Q. Have you talked to him at all?
13  A. Yes, sir.
14  Q. But not about this particular matter.
15  A. No, I mean when you came by I informed him that you came
16  by about the files, but no, sir, not in particular.
17  Q. All right.
18     MR. BLANCHARD:  Nothing further.
19     THE COURT:  All right. Cross-examination?
20     MS. MORRIS:  No, Your Honor.
21     THE COURT:  All right. You may step down. Thank you.
22     THE WITNESS:  Thank you.
23     THE COURT:  Any other witnesses for the Defendant?
24     MR. BLANCHARD:  Yes, I would call Municipal Judge
25  Joseph Bailey.

## Page 88

1      THE CLERK:  Judge Bailey, come to the courtroom,
2  please.
3      THE COURT:  May this witness stay in the courtroom?
4      MR. BLANCHARD:  Yes.
5      THE CLERK:  Come forward. You do solemnly swear or
6  affirm that the testimony you give in this cause to be the
7  truth, the whole truth, and nothing but the truth, so help
8  you God.
9      THE WITNESS:  I do. Your Honor, may I wear these
10  glasses? I have had eye surgery.
11     THE COURT:  You certainly may.
12     THE WITNESS:  Thank you.
13     JOE S. BAILEY, witness called by the Defendant,
14  having been duly sworn or affirmed, testified as follows:
15     DIRECT EXAMINATION
16  BY MR. BLANCHARD:
17  Q. State your name for the record, please.
18  A. My name is Joe Sherrill Bailey.
19  Q. And what is your occupation?
20  A. I am a part-time Municipal Judge for the City of Auburn.
21  Q. How long have you been doing that, Judge Bailey?
22  A. Approximately 25 years.
23  Q. And that's a part-time position.
24  A. Yes, sir, it is.
25  Q. What do you do with the rest of your time?

## Page 89

1  A. I represent a couple of clients that have to do with
2  commercial real estate.
3  Q. Now, were you a Municipal Judge -- well, you said 25
4  years, and that's up to today, right?
5  A. I said approximately, I can't recall the exact date I
6  started.
7  Q. All right. Judge, do you remember I think it was Tuesday
8  of last week, Monday or Tuesday I came over and paid a visit
9  to you in your court?
10  A. I do remember that, sir.
11  Q. And do you remember that I showed you a document?
12  A. I do not. I recall that you asked me to see some court
13  documents. I don't recall you showing me any document other
14  than your business card.
15      MR. BLANCHARD: May I approach?
16      THE COURT: You may.
17  Q. (complies) Judge, if I am not wrong I believe I showed
18  you that and ask you if you recall it. Do you recognize that
19  document?
20  A. Yes, sir, I do.
21  Q. Is that your signature on it?
22  A. Yes, sir. That appears to be my signature.
23  Q. All right. Do you now recall that I showed it to you and
24  asked you if you recalled why it was issued?
25  A. Sir, with all due respect, I do not recall you showing

## Page 90

1  me that document.
2  Q. All right.
3  A. I vividly recall you coming into court, it was a busy
4  afternoon, you gave me your business card, you said you were
5  concerned because the court clerk said that the file you
6  wanted to look at was not available. I told you that the
7  court file was either in the custody of the Auburn detectives
8  or the FBI agent that was in charge of the case.
9  Q. All right. One other question about that. Do you recall
10  telling me that you didn't know why this order had been
11  issued but you would look into it and get back to me?
12  A. I absolutely and unequivocally did not say that. I would
13  never say that.
14  Q. All right, sir. Do you recognize this document? You
15  said you do and it's your signature.
16  A. Yes.
17  Q. Do you know why it was issued?
18  A. Yes, sir. It was issued for that individual, for that
19  Defendant to be picked up.
20  Q. All right.
21  A. And put into custody.
22  Q. With all due respect it says for good cause shown on the
23  document.
24  A. Yes, sir.
25  Q. Do you recall what the good cause shown was?

## Page 91

1  A. There were several reasons that the document was
2  executed. One reason was that the individual had previously
3  been put on probation for another offense and when he came to
4  court on the next offense he should have been incarcerated,
5  but because of some alleged wrong doing on some people's
6  parts I was convinced not to put the individual on pro -- in
7  jail and allowed him to be put on probation. He also failed
8  to comply with a payment plan for previous charges that he
9  had. He has quite a criminal history with the Auburn
10  Municipal Court, and although we are very generous in letting
11  Defendants pay either on a weekly or bi-weekly or monthly
12  basis, he had not kept up with his payment plan as he had
13  promised. And also the Auburn detectives had told me that he
14  had been seen -- let me see how I should put this. He was
15  frequenting individuals that were known to have criminal
16  records and that is also a reason that he was picked up
17  because that's a part of -- was in violation of his
18  unsupervised probation.
19  Q. When you put someone on probation in your court do you
20  put them on probation for a specific period of time?
21  A. There's a statutory period of two years for Municipal
22  Court.
23  Q. That is allowable.
24  A. Yes, sir.
25  Q. All right. Do you put them on probation for two years?

## Page 92

1  A. Yes, sir.
2  Q. Do you tell them that?
3  A. I do.
4  Q. You put it in writing?
5  A. Yes, sir.
6  Q. Would it be in their file?
7  A. There's a standard order that has been -- that was
8  issued years ago and it is in that standard order. Now, I am
9  not sure exactly what the procedure is for the clerk
10  providing that to each Defendant. Normally on these pickup
11  orders -- let me back up and say not normally. On these
12  pickup orders every time one is issued the clerk is directed
13  to set a due process hearing for that individual on the next
14  regular business day and at that time the Defendant is
15  explained why the order was issued for his pickup, why he was
16  incarcerated, and he is given every opportunity to tell me
17  the reason that he thinks he has why he should not remain
18  incarcerated to serve the balance of the sentence that I have
19  reinstated. We do have that due process hearing with him
20  present.
21  Q. So, if you suspend a sentence -- so that I understand,
22  if you suspend a sentence in your court is a person
23  automatically on probation for two years?
24  A. I said two years, sir.
25  Q. That's what I said, two years.

Page 93

1  A. I understood you to say three, I'm sorry.
2  Q. No, I'm sorry, two years.
3  A. It is unsupervised unless the order says otherwise.
4  There is some supervision in some cases, in some cases it is
5  unsupervised.
6  Q. But is it for a period of two years?
7  A. Normally.
8  Q. So there's no automatic term.
9  A. I am not sure what you are trying to get at.
10 Q. What I am asking you is this, when you have an
11 individual before you and you suspend their sentence, at that
12 time do you tell them in some cases you are on probation or
13 do you tell them in all cases that they are on probation?
14 A. I tell them in all cases they are on probation.
15 Q. And you say that there is a written document that backs
16 that up.
17 A. Yes, sir.
18 Q. Do you tell them -- and that would be in their court
19 file.
20 A. I can't sit here and tell you that that would be in
21 every court file in every case for the last 20 years, no,
22 sir. It should be.
23 Q. If it is not in a court file would that signify
24 anything?
25 A. With all due respect, it would signify that it's not in

Page 94

1  the file. Now, why it's not in the file, it could be for a
2  myriad of reasons.
3  Q. You stated that -- if I understood you correctly, Mr.
4  Floyd had been on probation for another offense and he had
5  somehow violated his probation?
6  A. There was as I recall at least one previous offense
7  where he -- I believe the charge was rendering false
8  information, I am not positive of that. But he was given an
9  extended suspended sentence, he was allowed to be placed on a
10 payment plan where he was going to pay $25 every two weeks,
11 and although he paid frequently he did not comply with the
12 payment plan that he had promised that he would.
13 Q. On that case he made his last -- according to the court
14 records on that case, Judge, he made his last payment, paid
15 it out entirely, in 2001, September 13th, 2001. Having made a
16 total of one, two, three, four payments over a period of
17 several months. Did you issue a pickup order, arrest warrant
18 for him in part because he had failed to make payments as
19 ordered five years ago or four years ago?
20 A. I don't have the records that you are looking at in
21 front of me, but that -- that would not be something that I
22 would do, no, sir.
23 Q. All right. In fact, if payments were made, if entire
24 court costs and fines were paid some months ago, even though
25 they were not made as ordered, you would be unlikely to order

Page 95

1  someone picked up and jailed for that reason, would you?
2  A. I would say that's a fair statement.
3  Q. And you didn't do it for that reason in this case, did
4  you?
5  A. I didn't do what, issue the pickup orders?
6  Q. For that reason in this case.
7  A. I am going to have to tell you that I do not remember
8  every particular event pertaining to this case. This was a
9  very busy time, we were reviewing a lot of files, but I can
10 tell you I went over the files with every person that I have
11 signed a pickup order on with the clerk, and I can guarantee
12 you with absolute certainty that I had one hundred percent
13 confidence that there was a legitimate reason for that pickup
14 order to be issued.
15 Q. Did you go over the files with Lieutenant Holder and
16 Sergeant Murray?
17 A. I went over many files with those two gentlemen,
18 sometimes they were together, sometimes they were separate.
19 Q. In connection with the Tyrone White matter.
20 A. In connection with that matter and other matters.
21 Q. If I were to show you Tyree Floyd's court record with
22 your court would you be able to determine what it was that --
23 what order he had violated that caused you to issue a
24 violation of court order warrant on him?
25 A. If I have the full court document and enough time to

Page 96

1  review it I think I can.
2  Q. How much time would it take?
3  A. How big is the file?
4  Q. I have a summary here of it, that might help. Well, it's
5  in evidence. Let's see. And the clerk of the court has
6  previously testified that this Defendant's Exhibit 6
7  accurately summarizes his criminal history with your court,
8  showing the dates he was convicted, what he was convicted for
9  and the sentences he received.
10 A. And your question is from reviewing this summary can I
11 tell you why I issued the pickup order?
12 Q. Yes, sir.
13 A. I don't think I can solely from reviewing this summary,
14 I think I can from reviewing this summary and some
15 recollections that I have, having reviewed this.
16 Q. In other words you don't need to review anything else?
17 A. For me to give you my most accurate response I would
18 need to look at every document in the gentleman's file.
19 Q. According to the clerk that's contained in Defendant's
20 Exhibit 3. (complies)
21      (pause)
22 A. Sir, it is my opinion at this time that the pickup order
23 was issued because of the disorderly conduct charge where Mr.
24 Floyd was arrested on February the 26th of 2005. He had a
25 court disposition of April 21, 2005. This is the case where I

## Page 97

1  previously mentioned that someone improperly convinced me to
2  suspend the 30 day jail sentence that I would have normally
3  imposed. When I found out about that and some other alleged
4  activities of people involved -- that Mr. Floyd was being
5  involved with is when I issued the pickup order.
6  Q. So you had him picked up to serve that 30 days suspended
7  sentence.
8  A. Yes, sir.
9  Q. Because you thought someone had improperly advised you
10 or influenced you to give it suspended rather than imposed.
11 A. I was -- I don't remember the words you used, but I was
12 absolutely convinced that I had been manipulated in that way.
13 Q. Not from anything that Mr. Floyd did but from something
14 that someone else did.
15 A. Something someone else did on Mr. Floyd's behalf, and at
16 his behest, apparently.
17 Q. That's never been proven, has it?
18 A. I don't know.
19 Q. In any event, when you gave that sentence it was a
20 suspended sentence.
21 A. Yes, sir.
22 Q. And what -- after that, what did Mr. Floyd do to violate
23 a condition of that suspended sentence?
24 A. It is my recollection that he had failed to cooperate
25 with an ongoing investigation of another criminal matter, and

## Page 98

1  under Alabama law the provisions of any suspended jail
2  sentence can be modified at any time, and I directed Mr.
3  Floyd to -- I told him that I wanted him to cooperate fully
4  with the ongoing investigation.
5  Q. When did you tell him that?
6  A. I'm sorry, I can't tell you -- I can't remember the
7  exact time.
8  Q. Are there any written records to back up your statement
9  that you just made?
10 A. Well, I am sure you are aware, counsel, Municipal Court
11 are not courts of record in Alabama, so my best judgment is
12 that there is no written document to back that up. We are
13 just not --
14 Q. You seem to be saying that you ordered him to cooperate
15 with an ongoing investigation of Tyrone White, is that what
16 you ordered him to do?
17 A. No, sir, I did not mention Tyrone White's name.
18 Q. Well, in what investigation did you order him to comply
19 or to cooperate?
20 A. I told him that it had been brought to my attention that
21 he was not cooperating with an ongoing investigation by the
22 detectives for the City of Auburn who were being assisted by
23 the Federal Bureau of Investigation, and that I wanted his
24 full and complete cooperation with that ongoing testimony --
25 investigation.

## Page 99

1  Q. Did you tell him that at the time he was sentenced to 30
2  days suspended sentence on April 21st, 2005?
3  A. I did not.
4  Q. When did you tell him that?
5  A. I don't recall the exact date. I believe it was sometime
6  in July.
7  Q. Well, was it in July when he was arrested for this
8  offense, when he was -- was he brought before you on his
9  arrest for this offense?
10 A. When you say this offense, are you talking about this
11 disorderly conduct charge?
12 Q. No, sir. I am talking about when he -- well, was he
13 brought before you after he was taken into custody pursuant
14 to your order, which was issued on the 27th of July?
15 A. Indeed he was. As I have testified previously, I always
16 have a due process hearing on the next business day after any
17 individual has been taken into custody.
18 Q. All right.
19 A. At that time they are given every opportunity to explain
20 why they should not be required to remain in custody.
21 Q. All right. And would it have been at that time that you
22 explained to him that you wanted him to cooperate with this
23 investigation?
24 A. That is correct.
25 Q. But Judge, he was arrested, according to your testimony,

## Page 100

1  for not cooperating with it prior to the time you advised him
2  to cooperate.
3  A. He was not arrested. The temporarily suspended jail
4  sentence was simply reinstated.
5  Q. Yes, sir.
6  A. That's not an arrest.
7  Q. On July 29th that's what happened; correct?
8  A. I don't have anything in front of me to confirm the July
9  29 date. I think that's close anyway.
10 Q. All right. And you just testified that on the 1st of
11 August when he came before you that you gave him the
12 condition that you wanted him to comply with the
13 investigation.
14 A. I don't recall saying anything about the 1st of August.
15 Q. Well, you said on the date of the due process hearing.
16 A. I don't have anything in front of me that shows when the
17 date of the due process hearing was, sir, I'm sorry.
18 Q. Let me put it to you this way. If he was taken into
19 custody of the 29th of July and that was a Friday, the due
20 process hearing would have been on Monday, if that was not a
21 holiday; correct?
22 A. Correct.
23 Q. All right. If Monday then was the 1st of August, not a
24 holiday, that would have been the date of the due process
25 hearing.

Page 101

1  A. Correct.
2  Q. All right. And that is the date upon which you advised
3  him that you wanted him to cooperate.
4  A. Correct.
5  Q. All right. Then he could not have violated that
6  condition prior to August 1st, 2005, that logically follows,
7  does it not?
8  A. I guess we need to try not to play semantics here, but I
9  issued the pickup order because I had been told he was not
10 complying, previous to the date, and that information was
11 conveyed to me, I would say at least a week or ten days prior
12 to the issuance of the reinstatement order.
13 Q. You had been advised that he was not complying with the
14 investigation; correct?
15 A. Yes, sir. Yes, sir, I had.
16 Q. But you had not ordered him to comply with the
17 investigation at that time.
18 A. Part of the general order for the suspension of any case
19 is for the Defendant who has the sentence suspended is for
20 them at all times to comply with the Auburn police
21 department. That is a standing order.
22 Q. Standing order.
23 A. Yes, sir.
24 Q. A copy of which is given to each Defendant.
25 A. I can't tell you that each Defendant is given a written

Page 102

1  copy of that, no, sir. I think it is certainly clear for me
2  to say that each Defendant understand that fully before they
3  leave the courtroom, and before they are released from
4  custody.
5  Q. So there's no written order?
6  A. There's certainly not a written order in every case.
7  Q. Is there a probation officer that explains it to them?
8  A. Not at this time.
9  Q. Has there been?
10 A. We have had a court referral officer in the past who did
11 many functions similar to that.
12 Q. Did the court referral officer do that function?
13 A. Not at the time that we are talking about.
14 Q. So unless you explained it in detail on the record in
15 court -- not on the record but in court, there would be no
16 way anyone -- that Mr. Floyd would have known about any such
17 condition; is that right?
18 A. Well, with all due respect, counsel, the Court is not a
19 court of record, and I handle between 12 and 20 thousand
20 cases a year, I just am sorry but I don't have instant
21 recollection of every detail of every one of those cases.
22 Q. Suffice it to say this, Judge, there's no proof that he
23 was advised of any such condition; is that right?
24 A. I don't have anything in my hand at this moment to that
25 effect.

Page 103

1  Q. All right.
2      MR. BLANCHARD: Nothing further.
3      THE COURT: Any questions?
4      MS. MORRIS: Yes, ma'am.
5      THE COURT: Before you begin, Mr. Blanchard, is this
6  your last witness?
7      MR. BLANCHARD: Judge, I am considering recalling
8  one witness for some very brief testimony, no more than a
9  couple of questions.
10     THE COURT: We are running a bit late.
11     MR. BLANCHARD: I understand we are, and I may have
12 just one question for Mr. Floyd.
13     THE COURT: All right. Go ahead.
14     MS. MORRIS: Judge, before I get started maybe I
15 should say this, I don't know how long I will have with the
16 Judge.
17     THE COURT: All right. Let's proceed.
18     MS. MORRIS: Okay.
19          CROSS-EXAMINATION
20 BY MS. MORRIS:
21 Q. Judge Bailey, you have just reviewed I believe the Court
22 records that I think you have in front of you; is that
23 correct?
24 A. Yes, ma'am.
25 Q. When you were looking through that court record do you

Page 104

1  recall seeing that there was an arrest of Mr. Floyd in May --
2  on May 14th of 2004 for driving while his driver's license
3  was revoked?
4  A. Yes, ma'am.
5  Q. And on that occasion he received -- this was -- I think
6  I just said back in 2004; is that correct?
7  A. Well, he has several, let me see here.
8      MR. BLANCHARD: I will stipulate that he was
9  arrested for driving while driver's license revoked on May
10 14th, 2004.
11     MS. MORRIS: I think it's just more important that
12 the Judge look at it himself, Your Honor.
13     THE COURT: He may look at it.
14 A. Is that an issuance date of May 14, 2004?
15 Q. Yes, Your Honor. I mean, it's getting a little confusing
16 in here. Yes, Judge. I think if I can just differentiate
17 between the two that way.
18 A. You have -- feel free to call me Joe if you would like.
19 I do have a copy of that citation in hand.
20 Q. And for that offense Mr. Floyd received a two hundred
21 and 42 dollar fine and a suspended sentence; is that correct?
22 A. For some reason the copy, the back side of the citation
23 which would show, that appears to be flawed in this
24 particular case. The complete back of the citation is not on
25 this copy.

## Page 105

1  Q. Well, would you agree if we had stipulated that that is
2  the case, would that sound about right to you?
3  A. That would be my normal procedure.
4  Q. Okay.
5  A. In every case.
6  Q. Okay. And I believe you just testified, Judge Bailey,
7  that when you suspend someone's sentence you normally suspend
8  that sentence for a period of two years; is that correct?
9  A. That is correct.
10  Q. So, if I can direct your attention, so he was suspended
11  for two years, if you will just -- on I think the date was
12  July 29th of '04, okay?
13  A. Yes, ma'am.
14  Q. And again, let me direct your attention to when Mr.
15  Floyd was arrested again in February 26th of 2005 for
16  disorderly conduct. I believe you and defense counsel were
17  just talking about that offense, do you recall that?
18  A. Yes, ma'am, I do.
19  Q. And on that date Mr. Floyd received a sentence of three
20  hundred and $25 fine and again another suspended sentence.
21  A. That's correct.
22  Q. And I believe you were speaking with defense counsel
23  about someone who improperly got you to give him a suspended
24  sentence on that case.
25  A. Yes, ma'am.

## Page 106

1  Q. Okay. And I know that I am probably messing up your
2  words that you used but something to that effect.
3  A. Right.
4  Q. If you could explain to the Court now that I have
5  directed your attention to both of those occurrences why you
6  feel like you were improper -- it was an improper sentence
7  for you to give out on the disorderly conduct.
8  A. Well, on the facts and circumstances surrounding the
9  disorderly conduct charge, with the previous suspended jail
10  sentence in place, it would be my position to not continue to
11  give suspended jail sentences. That's part of what the
12  Defendant is told, that part of the suspension is based upon
13  the condition that there be no other further convictions
14  other than a minor traffic violation, and they are clearly
15  told that.
16  Q. So not to put words in your mouth but basically because
17  he had received a suspended sentence in 2004 he wouldn't get
18  another suspended sentence in 2005 for another occurrence or
19  criminal act.
20  A. That is absolutely correct.
21  Q. Okay. And when you issued the VCO on the 27th of July
22  did you take into account those two suspended sentences?
23  A. I certainly did.
24  Q. And by take into account, I think you have already said
25  that you felt as though the second suspended sentence was,

## Page 107

1  again, somewhat improperly induced or motivated you to give
2  that sentence.
3  A. I had been given information that without having had I
4  would have immediately had the Defendant incarcerated for the
5  disorderly conduct charge. And I would have reinstated the
6  six months jail sentence for the previous conviction of
7  driving while suspended.
8  Q. And when you say someone, and again I am putting words
9  in your mouth, but improperly enticed, induced, motivated you
10  to give the suspended sentence, exactly what do you mean?
11  A. To the best of my recollection an individual -- a police
12  officer came to me and asked me -- he knew that under normal
13  facts I would incarcerate the individual. He asked me as a
14  favor would I consider not doing that because this individual
15  was going to help somebody as I recall or something. But at
16  any rate I was asked not to do it because the person that
17  asked me knew that having watched me for years that that is
18  exactly what I would do, I would put him in jail for 30 days
19  for this offense, I would reinstate the six months for the
20  other, and have the Defendant serve seven months in jail for
21  violating his parole.
22  Q. Now, Judge Bailey, you and defense counsel also spoke
23  about the suspended sentences. Is it your practice when
24  issuing a suspended sentence to explain to the Defendant or
25  the person who has committed the offense the conditions that

## Page 108

1  go along with the suspended sentence?
2  A. It is. I have this little speil I go through, I tell
3  them I -- I normally tell them against my better judgment --
4  sometimes I don't say that, most times I do -- that I am
5  going to order a certain day jail sentence, I am going to
6  suspend that sentence on the following conditions. And then I
7  dose out the conditions depending upon what the specific
8  charge is, and what requirements -- other legal requirements
9  are and what personal requirements that I put on them myself.
10  And I always tell them that absolutely no more convictions
11  for a period of two years save a minor traffic violation.
12  Q. And do you also explain that during those two years that
13  they have to comply with these conditions?
14  A. Yes, ma'am.
15  Q. And as one of those conditions, I think you just said
16  was to not commit any criminal offenses outside of a traffic
17  ticket.
18  A. Yes, ma'am.
19  Q. I am assuming another one of those conditions is they
20  have to pay their fine.
21  A. That is correct.
22  Q. Are there any other conditions that you regularly place
23  on most if not all of the Defendants -- I am using the word
24  Defendants, but Defendants that come before you?
25  A. It depends on the charge. Certain charges have mandatory

Page 109

1  things that I must include in the order of suspension.
2  Q. Okay. So you have to tailor those conditions to the
3  charge.
4  A. Yes, ma'am, to some --
5  Q. Are there certain -- well, do you normally explain that
6  they must comply or cooperate with law enforcement as a
7  condition of their suspended sentence?
8  A. I do.
9  Q. And so that is your practice to do that?
10  A. Yes, ma'am.
11  Q. And just to clear up, you and defense counsel when y'all
12  were talking there was a lot of talk of probation and we were
13  referring to it as probation. Are you basically calling a
14  suspended sentence a probationary sentence?
15  A. Yes, ma'am. And that may be incorrect on my part, but I
16  use a Municipal Court unsuspended -- unsupervised suspended
17  sentence as unsupervised probation, is probably what would be
18  referred to in the state system and perhaps the federal
19  system.
20  Q. Okay. So you use those two words interchangeably.
21  A. Yes, ma'am.
22  Q. Okay. And I think you mentioned a minute ago that one of
23  the conditions of the suspended sentence is a -- that they
24  have to pay their fine.
25  A. Yes, ma'am.

Page 110

1  Q. But when they pay their fine and it's completely paid
2  and over with, does that mean that the suspended sentence or
3  the probationary sentence is over?
4  A. No, ma'am.
5  Q. They have to serve the full two years; is that correct?
6  A. That is correct. And comply with any other provisions
7  that have been imposed upon them because the sentence was
8  suspended rather than them being incarcerated. The fact that
9  they pay their fine off only reduces the number of reasons
10  they can be picked up and put back in jail by one, i.e.,
11  nonpayment of fine.
12  Q. Okay.
13      MS. MORRIS: May I have one moment, Your Honor?
14      THE COURT: You may.
15      MS. MORRIS: May I approach?
16      THE COURT: Yes.
17  Q. (complies) Judge Bailey, I am showing you what has been
18  marked as Defendant's Exhibit 1. Do you recognize that?
19  A. Yes, ma'am, I believe this is the same copy that defense
20  counsel showed me previously.
21  Q. Yeah. And that's your signature on there; is that
22  correct?
23  A. It certainly appears to be my signature.
24  Q. And if I can draw your attention to the style of the
25  case, it's been noted that there's no court number or case

Page 111

1  number on that document.
2  A. Are you asking me why that is?
3  Q. No, not yet.
4  A. I'm sorry.
5  Q. I am just drawing your attention. Would you agree with
6  me there?
7  A. I agree, there's no case number there, absolutely.
8  Q. And it's been brought out in court that there has been
9  some allegations that there were some problems with your
10  clerk's office, are you aware of those allegations?
11  A. May I inquire as to what type problems you are talking
12  about?
13  Q. Associated with the Tyrone White case, that there may
14  have been some aid in the clerk's office at some point.
15  A. There have been some suggestions of possible
16  impropriety, to my knowledge there has been nothing of
17  significance that has been proven regarding that.
18  Q. Well, maybe I should ask it this way, why isn't there a
19  case number on that document, if you know? Well, I guess you
20  should.
21  A. I can tell you exactly why the case number is not on
22  there.
23  Q. Okay.
24  A. Is because when I -- unfortunately, I have no
25  secretarial staff so I do all of my typing and filing and

Page 112

1  everything, everything else that gets done in my office, and
2  I simply failed to type the case number on the order. Pure
3  and simple.
4  Q. Okay.
5  A. No one else from the clerk's office had anything to do
6  with the preparation of that form in any way.
7  Q. Okay. And I guess I should ask this as well, Judge
8  Bailey, do you routinely, or in your capacity as a Municipal
9  Judge, issue these violation orders or VCOs that we have been
10  referring to?
11  A. I do.
12  Q. Okay. And they are basically pickup orders for those
13  with suspended sentences; is that correct?
14  A. Yes, ma'am.
15  Q. And do most of them look virtually the same as that one?
16  A. Normally I am able to get a case number on them.
17  Q. Okay. Aside from the case number, do they look virtually
18  the same?
19  A. Yes, ma'am, it's a standard form that I have in my
20  computer.
21      MS. MORRIS: One moment, Your Honor. Your Honor, I
22  believe that's all I have at this moment.
23      THE COURT: All right. Any questions?
24      MR. BLANCHARD: Very briefly.
25

## Page 113

REDIRECT EXAMINATION

BY MR. BLANCHARD:

Q. Judge Bailey --

A. Yes, sir.

Q. -- when you put someone on probation and then later proceed perhaps to revoke that probation, do you comply with all of the facets of the Alabama Rules of Criminal Procedure with regard to probation?

A. Can you tell me what provisions you are speaking of, please, sir?

Q. Well, are you aware that the Alabama Rules of Criminal Procedure apply to the Municipal Courts of Alabama?

A. I am, sir.

Q. Are you aware of any of the procedures and practices established by the Alabama Rules of Criminal Procedure with regard to probation?

A. Am I aware of any rule that has anything to do with probation?

Q. In the Alabama Rules of Criminal Procedure, yes, sir.

A. Yes, I am. I believe it's Rule 27 although my memory is not serving as well as it used to be.

Q. Are you aware if there's an order declaring someone delinquent for failure to abide by conditions of their probation, are you aware of what must be in that order?

A. I cannot with specificity tell you that without the rule

## Page 114

book in front of me, no, sir, I'm sorry.

Q. So you don't know whether that order you issued is in compliance with the Alabama Rules of Criminal Procedure or not?

A. Well, I would hope -- certainly hope it was in substantial compliance.

Q. Okay. You went through with the prosecutor a number of things that you said you usually or normally tell people, including the two year term of probation, but you don't always tell them that; is that correct?

A. I don't want to repeat myself too often but we are not a court of record.

Q. I understand.

A. But it is my normal procedure -- I cannot sit here and tell you never once did I fail to do that, but it is my normal procedure, I do things out of rope memory when I am doing things that I do over and over and over, and when I get to the suspension part it's just one, two, three, four, five.

Q. Okay. The point is you don't know for a fact that you advised Tyree Floyd of any of those things, do you?

A. I can sit here and tell you that it is my specific recollection that I attempt to in every case say exactly the same thing to every Defendant.

Q. I understand your answer, but it's not an answer to the question I asked you. The question I asked you is, you don't

## Page 115

know for a fact that you advised him of those things, do you?

A. I can't sit here and tell you that I recall any specific incident that was unique that brings him to my attention that would make me think that I did not follow my normal procedure.

Q. Okay.

A. But I cannot recall anything that would have kept me from following my normal procedure.

Q. All right. You testified that there was no case number on the VCO order because you simply failed to put it on there.

A. I did.

Q. All right. If one of the officers who testified earlier said that it purposefully was not on there because of its connection with the Tyrone White case, was that officer telling the truth or not?

A. I have given you my explanation of why I think that that case number was not on there. I can't imagine any reason why it -- I mean it's obvious what case it was issued for. I mean this file reflects it clearly, there's no reason to -- it wouldn't hide or disguise anything to leave it off. I simply just didn't type it on there.

Q. All right.

MR. BLANCHARD: Nothing further.

THE COURT: All right. Anything else?

## Page 116

MS. MORRIS: Yes, Your Honor, briefly.

RECROSS-EXAMINATION

BY MS. MORRIS:

Q. I believe you have discussed with defense counsel about a meeting you had with Mr. Holder and -- Lieutenant Holder and Sergeant Murray, do you recall that meeting?

A. I believe I said that I recalled having met with both of them together and each of them individually, on more than one occasion.

MR. BLANCHARD: Judge, I believe this is outside of the scope of my redirect.

THE COURT: It is outside. Is there a reason I should allow it?

MS. MORRIS: Your Honor, this is dealing with, well, the VCO and when he issues VCOs.

THE COURT: I will go ahead and allow it. I don't have a jury here, this is for my purposes only and it may help me understand it. Go ahead and let's proceed. Finish up with this witness.

MS. MORRIS: Yes, Your Honor.

Q. You met with -- we were talking about the meetings you have had and they were meetings regarding pulling some files of some people that they thought might be involved in the Tyrone White investigation; is that correct?

A. That is correct.

Page 117

1  Q. And did you issue any VCOs on any of the other people
2  that they listed?
3  A. I issued VCO pickup orders on several of the
4  individuals.
5  Q. In that list for them, during that meeting on that --
6  when they met with you, I believe it was on the 27th of July,
7  with a list of files that y'all went through.
8  A. My recollection is that on that particular day I issued
9  only this one for Mr. Floyd, but there have been several
10 previously issued, but I am not positive of that.
11 Q. Okay.
12 A. We were working very long, hard hours and going through
13 a lot of documents and I just don't have a specific memory of
14 exactly how many of them I signed that day, I'm sorry.
15 Q. That's okay. Defense counsel was asking you just a
16 minute ago about your routine practices and whether you
17 remember specifically giving -- talking to Mr. Floyd about
18 his suspended sentence and his conditions of his suspended
19 sentence, do you recall that?
20 A. I do.
21 Q. And I think defense counsel asked you, as I just said,
22 if you specifically remember instructing Mr. Floyd; is that
23 correct?
24 A. Yes, ma'am.
25 Q. Do you ever recall a time you forgot to give your speil,

Page 118

1  for lack of a better word, for the conditions of a suspended
2  sentence? Any specific time that you forgot?
3  A. One time, in 20 something years.
4  Q. And other than that you have no other recollection that
5  you have ever forgotten?
6  A. No, ma'am.
7  Q. Why do you remember that one time?
8  A. Because I had been in the hospital, rather ill, and had
9  been given some strong medication and the doctor released me
10 from the hospital and told me not to go back to work for a
11 month. I went and began holding court the next morning, and
12 my blood sugar got out of whack and I in essence just
13 realized I was at the sentencing process and all of a sudden
14 I am looking at this file and this young man standing in
15 front of me having pled guilty to disorderly conduct and I am
16 trying to remember for how many months I am going to put him
17 in jail. And at that time my bailiff removed me from the
18 bench.
19 Q. And other than that one time when you were on heavy
20 medication you don't recall any other times that you forgot
21 to give the conditions of a suspended sentence; is that
22 correct?
23 A. That is absolutely correct.
24    MS. MORRIS: I have nothing further.
25    THE COURT: Anything further?

Page 119

1     MR. BLANCHARD: No.
2     THE COURT: All right. You may step down. Any
3  further witnesses from the Defendant?
4     MR. BLANCHARD: I would like to recall Mr. Bass for
5  some further questions.
6     THE COURT: All right. Come forward, you are still
7  under oath.
8     THE WITNESS: Yes, ma'am.
9        BRAD BASS, witness recalled by the Defendant,
10 having been previously duly sworn or affirmed, testified as
11 follows:
12           DIRECT EXAMINATION
13 BY MR. BLANCHARD:
14 Q. Mr. Bass, you have testified earlier you are the clerk
15 of the Auburn Municipal Court.
16 A. Yes, sir.
17 Q. Are you aware of any standard orders of probation that
18 have issued from that court?
19 A. We have, when an individual is put on say payment plans,
20 when they are escorted to the magistrate's, they sign payment
21 agreements and there's a form that's a written order on the
22 agreements.
23 Q. Is there any written document in Mr. Floyd's file which
24 you have reviewed today that advises him he is being put on
25 probation for six months, two years or any other period of

Page 120

1  probation?
2  A. No, sir.
3  Q. Have you ever been in court when Mr. Floyd was advised
4  orally from the bench that he was being put on probation for
5  any period of time?
6  A. I don't know. I mean I spend --
7  Q. You don't recollect?
8  A. No, sir, I have spent a lot of time in court and see a
9  lot of people, I don't know.
10 Q. All right. Mr. Bass, you remember that I visited Auburn
11 recently twice, do you not?
12 A. Yes, sir.
13 Q. All right. And on the -- I believe it was the first
14 occasion I visited I stayed around to speak with Judge
15 Bailey, you told me he came in at 1:00 o'clock.
16 A. Correct.
17 Q. You remember that?
18 A. Yes, sir.
19 Q. And I stayed to see him.
20 A. Correct.
21 Q. When 1:00 o'clock came he took the bench, one of your
22 people took me into the courtroom.
23 A. Correct.
24 Q. Do you recall that? There was I believe one group of two
25 people in front of me who spoke with the Judge on that day,

## Page 121

1 it was I believe a Monday. Do you recall that?
2 A. Yes, sir, I mean I may have, I am not sure who was in
3 the courtroom.
4 Q. I ask you this because the Judge described it as a busy
5 day. Am I correct that there were exactly three people
6 waiting to see the Judge?
7 A. I don't know how many people were in the courtroom, but
8 we don't hold court every day, but that doesn't mean we are
9 not busy, we have a lot of things to do throughout the day.
10 Q. Were you standing there next to the bench when I
11 approached the Judge?
12 A. I don't know that I was in when you initially came in,
13 but I was in and out and I was in the courtroom.
14 Q. You were there part of the time while I addressed the
15 Judge, right?
16 A. Correct.
17 Q. Do you recall that I showed him the VCO order?
18 A. I don't recall you showing me the -- I mean I don't
19 know that you did or didn't. I don't.
20 Q. You don't remember it?
21 A. No, sir.
22 Q. And do you remember him telling me that he would
23 investigate the matter and get back to me on it?
24 A. I don't recall exactly what was said. I mean I just came
25 into the courtroom and was there for just a few minutes.

## Page 122

1 Q. All right. You remember the discussion we had while I
2 was at the bench about the records and what records were
3 kept, right? I asked for some records.
4 A. You asked me for records, yes, sir. Yes, sir.
5 Q. While we were in the courtroom.
6 A. You didn't ask me for records in the courtroom, no, sir.
7 Q. All right.
8     MR. BLANCHARD: Nothing further.
9     THE COURT: Any questions for this witness?
10    MS. MORRIS: Two, I think. Well, don't hold me to
11 that, but very briefly.
12         CROSS-EXAMINATION
13 BY MS. MORRIS:
14 Q. Have you ever been in the courtroom when Judge Bailey
15 has explained the concept of a suspended sentence?
16 A. Yes, ma'am.
17 Q. And have you been in the courtroom when Judge Bailey has
18 explained that a suspended sentence is two years?
19 A. Yes, ma'am.
20 Q. Have you been in the courtroom when Judge Bailey has
21 explained to Defendants the conditions of the suspended
22 sentence?
23 A. Yes, ma'am.
24    MS. MORRIS: I have nothing further.
25    THE COURT: All right. Anything further?

## Page 123

1     MR. BLANCHARD: Judge, before I for get to do it I
2 may have forgotten to move Exhibit 5, Defendant's Exhibit 5
3 into evidence. I would like to do so now.
4     THE COURT: Any objection?
5     MS. MORRIS: I don't know what it is.
6     MR. BLANCHARD: I think that's the history profile
7 from the Court.
8     MS. MORRIS: No. No objection.
9     THE COURT: It's admitted. Anything else for this
10 witness?
11    MR. BLANCHARD: Nothing for this witness.
12    THE COURT: You may step down, thank you. Any other
13 witnesses?
14    MR. BLANCHARD: I would like to call Mr. Floyd for a
15 very limited purpose.
16    THE CLERK: You do solemnly swear or affirm that the
17 testimony you give in this cause will be the truth, the whole
18 truth, and nothing but the truth, so help you God.
19    THE WITNESS: I do.
20    SAWELIJA TYREE FLOYD, the Defendant, having been
21 duly sworn or affirmed, testified as follows:
22         DIRECT EXAMINATION
23 BY MR. BLANCHARD:
24 Q. State your name, please.
25 A. Sawelija Tyree Floyd.

## Page 124

1 Q. Mr. Floyd, were you taken into custody by the Auburn
2 police department on August 29th, 2005?
3 A. July 29th.
4 Q. I'm sorry, July 29th, 2005, exactly. And were you
5 released on August 1st, 2005?
6 A. Yes, sir.
7 Q. All right. Prior to your release were you taken before
8 Judge Bailey for any kind of hearing?
9 A. No, sir.
10 Q. From where were you released?
11 A. I think Lieutenant Holder brought me some papers back to
12 the back and let me sign some papers.
13 Q. Okay. You signed the papers and then you were released?
14 A. They took me back to the county jail, yeah, my
15 girlfriend picked me up.
16 Q. So there was no due process hearing of the kind
17 described by Judge Bailey before you were released?
18 A. No, sir, I haven't talked to Judge Bailey since I went
19 in front of the disorderly conduct.
20 Q. Has Judge Bailey ever told you you were on probation?
21 A. Never, sir. No, sir.
22 Q. Ever told you you were under any kind of unsupervised
23 probation for a period of two years?
24 A. No, sir.
25 Q. All right. That's all. Nothing further.

Page 125

1       THE COURT: Cross-examination.

2           CROSS-EXAMINATION

3 BY MS. MORRIS:

4 Q. I believe you said you went before Judge Bailey back

5 when you got picked up for disorderly conduct; is that

6 correct?

7 A. When I went to court.

8 Q. Right. When you went to court for the disorderly

9 conduct, and I believe --

10       THE COURT: Why don't you move your chair up a

11 little bit and pull that down.

12 Q. The date of your arrest was on February 26th of 2005,

13 does that sound about right?

14 A. Yes, ma'am.

15 Q. And on that date you got a suspended sentence; is that

16 correct?

17 A. On what date?

18 Q. Well, actually you went to court in April, on April 21st

19 of 2005, does that sound right?

20 A. Yes, ma'am.

21 Q. And you got a suspended sentence on that date; isn't

22 that correct?

23 A. Right.

24 Q. And on that date Judge Bailey explained to you that your

25 suspended sentence was for a period of two years. He may not

Page 126

1 have used the term probation but he told you about your

2 suspended sentence; is that correct?

3 A. No, ma'am.

4 Q. And that's not the first time you have been in front of

5 Judge Bailey, is it?

6 A. No, ma'am.

7 Q. You went back in front of him in May of 2004; isn't that

8 right? You were picked up for -- I say that, you didn't go in

9 front of him that day, I apologize, you were arrested on that

10 day for driving with your license revoked.

11 A. Right.

12 Q. I think you went to court July 29th of 2004, does that

13 sound about right?

14 A. I can't remember, but last time I went to court was -- I

15 have been to court for driving on suspended license and

16 disorderly conduct, I don't remember the exact dates they

17 were.

18 Q. If I tell you that your lawyer and I have stipulated

19 these are the dates, you wouldn't disagree with me; is that

20 right?

21 A. Right, right.

22 Q. And on that date you again got a suspended sentence and

23 a fine but a suspended sentence; is that correct?

24 A. Suspended sentence and fine.

25 Q. Right.

Page 127

1 A. Right.

2 Q. And Judge Bailey gave you that suspended sentence; is

3 that correct?

4 A. Right.

5 Q. And on that date he would have also explained to you the

6 conditions of your suspended sentence; is that right?

7 A. Right.

8 Q. And those conditions were -- and he probably also --

9 well, we know he also told you that suspended sentence was

10 for a period of two years.

11 A. No, he did not.

12 Q. So what conditions did he explain to you?

13 A. Only thing that he told me was I am going to suspend you

14 30 days and fine you, and asked me when could I pay, I told

15 him I was going to pay all today.

16 Q. So he never explained to you that it was two years?

17 A. No, ma'am.

18 Q. On either occasion.

19 A. On either occasion.

20 Q. And he never explained to you the conditions besides

21 your fine.

22 A. I mean he suspended time. Suspended time, it's nothing

23 like probation.

24 Q. What is your understanding of suspended time?

25 A. I mean he gave me time but he suspended it. I mean so

Page 128

1 how would you say that's probation.

2 Q. So your idea of probation is it just goes away? I'm

3 sorry, your understanding of a suspended sentence is the

4 sentence just goes away, is that what you are telling us?

5 A. I don't know exactly how it works. I know he suspends

6 time, he done done it on several occasions. I have done had

7 several suspended sentences.

8 Q. So you have had more than those two we just discussed?

9 A. In the past.

10 Q. Did Judge Bailey put you on those as well?

11 A. Yes, ma'am.

12 Q. Did you get a suspended sentence for your possession of

13 marijuana second degree?

14 A. Yes, ma'am.

15 Q. Was that Judge Bailey as well?

16 A. Judge Bailey.

17 Q. And you are saying at that time he just forgot to tell

18 you how long your suspended sentence was; is that right?

19 A. He never ever told me anything about probation or last

20 for two years or nothing like that.

21 Q. And when you were arrested for rendering false

22 information in 2001 did you go in front of Judge Bailey then?

23 A. Yes, ma'am.

24 Q. And you are saying that he didn't tell you then either.

25 A. No, ma'am.

**Condenselt™**

## Page 129

1  Q. So when this Judge took the bench and said that he does
2  this on all occasions that he can remember, then you are
3  saying he is lying; is that correct?
4  A. He never done it for me.
5  Q. Right. So if he says that he remembers doing it all the
6  time, and he only remembers one time in his whole life that
7  he has never done it, then he is lying, is that what you are
8  saying?
9  A. I guess.
10      MS. MORRIS: I have nothing further.
11      THE COURT: Anything else for this witness?
12          REDIRECT EXAMINATION
13  BY MR. BLANCHARD:
14  Q. Do you think it would be possible that Judge Bailey is
15  mistaken when he says he does this usually or most of the
16  time?
17  A. Probably so, sir.
18  Q. So he wouldn't necessarily be lying, he could be
19  mistaken?
20  A. Could be mistaken.
21  Q. All right, sir.
22      MR. BLANCHARD: Nothing further.
23      THE COURT: All right. You may step down.
24      THE WITNESS: Thank you.
25      THE COURT: Any other witnesses for the Defendant?

## Page 130

1      MR. BLANCHARD: No, Your Honor.
2      THE COURT: Any rebuttal for the government?
3      MS. MORRIS: No, Your Honor.
4      THE COURT: Anything anybody wants to say to me
5  before we recess?
6      MS. MORRIS: I would request that we be able to
7  submit post-hearing briefs on the issues.
8      THE COURT: All right. Mr. Blanchard, would you like
9  to do so also?
10      MR. BLANCHARD: I think it's a fine idea.
11      MS. MORRIS: I would then reserve argument for the
12  briefs.
13      THE COURT: All right. I will have the government
14  submit a brief, do you want to do it in seven days, is that
15  too soon?
16      MS. MORRIS: I am looking at Jimmy. Is there any
17  way we can get the transcript prior to and get a little bit
18  more time if that's okay?
19      THE COURT: When is the case set for trial?
20      MS. MORRIS: I have no idea.
21      MR. BLANCHARD: I have it. Do you know when it is?
22      THE DEFENDANT: February 23rd.
23      MR. BLANCHARD: February 23rd, my client says, and I
24  think he is probably right.
25      THE COURT: I will have to have a recommendation

## Page 131

1  done by approximately January 23rd under those circumstances.
2  I can certainly let you have until the beginning of January.
3      MS. MORRIS: Oh, that is fine.
4      THE COURT: Is that fine? That should give us time
5  to get the transcript. So we don't completely ruin your
6  holidays, let's -- actually let me just do an order with
7  briefing schedule, that will be easier to do. Mr. Blanchard,
8  can you get something to me within seven days after she does?
9      MR. BLANCHARD: Judge, I will -- I don't know why I
10  can't. If I run into a problem I will let you know.
11      THE COURT: If I push this off to January we will
12  have to get it done fairly rapidly after the first brief is
13  due. That's what I will do, I will give you a briefing
14  schedule and it will be in January.
15      MS. MORRIS: Thank you, Judge.
16      MR. BLANCHARD: Thank you.
17      THE CLERK: Court is recessed.
18      (At which time, 5:30 p.m., the hearing was
19  adjourned.)
20          *     *     *     *     *
21      I certify that the foregoing is a correct transcript
22  from the record of proceedings in the above-entitled matter.
23  This the 21st day of December, 2005.
24
25                              Official Court Reporter

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) CR. NO: 3:05-CR-0187-F | |
| | ) | |
| SAWELIJA TYREE FLOYD | ) | |

```
AO88-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT   E
NO.
```

## POST-HEARING BRIEF

COMES NOW the United States of America, by and through Leura Garrett Canary, United

States Attorney for the Middle District of Alabama, and files the instant post-hearing brief regarding

Defendant's ("Floyd's") Motion to Suppress Statements [and] Physical Evidence (Doc. # 20), filed

on October 17, 2005, as follows:

## PROCEDURAL POSTURE

1. On October 17, 2005, Floyd filed a motion to suppress statements made, and physical

evidence seized, during the course of this case. (Doc. # 20). On November 9, 2005, the United

States filed its response to Floyd's motion. (Doc. # 22). On December 14, 2005, this Court held a

hearing on Floyd's motion. After the hearing, this Court set a briefing schedule setting deadlines

for the government's and Floyd's post-hearing briefs at January 4, 2005 and January 11, 2005,

respectively.

## FACTS

2. On Friday, July 29, 2005, Auburn Police Department ("APD") officers went to Floyd's

residence to serve a Violation of Court Order Order ("VCO") on Floyd. (R-6:10-25; 66:25-67:8;

72:21-23). During the course of serving the VCO, APD Sergeant James Tatum ("Tatum") went to

the front door of Floyd's residence and knocked on the front door. (R-9:9-10; 68:6). A male voice

from inside the residence asked who was knocking. (R-9:15-18; 68:6-7). After replying that it was

the police department, Floyd's girlfriend (later identified as Jamillah McCray ("McCray")) opened the door. (R-9:19-21; 68:11-12; 69:6-9). As McCray opened the door, officers detected a strong odor of burning marijuana. (R-11:1-15; 69:14-17). Tatum asked McCray where Floyd was, and at that time Floyd came to the front door. (R-10:21-22; 12:2-11). Officers then advised Floyd of the VCO, read him his Miranda rights, and handcuffed Floyd. (R-12:8-11; 13:8-9).

3. APD Sergeant Chris Murray ("Murray"), APD Lieutenant Jerry Holder ("Holder") and APD Detective Brad Bass ("Bass"), then entered the residence and made contact with a male, later identified as J. B. Mitchell ("Mitchell") and McCray. (R-12:13-13:2). Officers asked McCray if there were firearms in the residence and she responded that there was and she directed officers to the weapon. (R-13:15-14:3). During the course of securing the residence to prevent the destruction of evidence, and as a safety precaution, officers observed a large amount of what appeared to be crack cocaine by a microwave oven. (R-12:18-21;14:4-15). APD Officer Brian Lynn advised Mitchell and McCray of their Miranda rights, after which Mitchell stated that he and Floyd were smoking marijuana when the officers knocked on the door. (R-15:19-16:4). Floyd then told Murray that the drugs that officers observed in plain view belonged to him. (R-13:13-14; 19:10-12). Both McCray and Floyd refused to give consent to search the residence. (R-16:17-21; 19:14-15).

4. Murray then left the residence to obtain a search warrant, while other officers kept the residence secured. (R-19:17-23). Murray obtained a search warrant from Lee County Judge District Judge Russell Bush. (R-19:24-20:2). Shortly thereafter, officers executed the search warrant locating crack cocaine that officers had previously seen, along with powder cocaine, two large trash bags of marijuana, and crack cocaine. (R-20:6-10). After photographing and logging the evidence seized, Murray interviewed Floyd, after he signed a Miranda waiver, and Floyd signed a written

2

confession admitting to ownership of the drugs located in the residence.

5. Pursuant to the VCO, Floyd was taken to the Lee County jail to serve the suspended portion of a traffic sentence. (R-31:21-24; 32:19:24). The VCO had been given directly to Holder, without being assigned a case number at that time. (R-48:16-23). It was Murray's understanding that this was done in an effort not to make the clerk's office aware of its existence because of concerns of improprieties in the clerk's office. (R-48:16-20). However, Judge Joe Bailey, who issued the VCO, recalled that he simply forgot to type in the case number. (R-112:2-3).

6. Judge Bailey issued the VCO on July 27, 2005, roughly two days before Floyd's arrest. (R-58:22-25). Contrary to Floyd's assertion, this was not done at the direction of law enforcement officers. (R-30:4-8; 59:20-22; 73:10-12). Judge Bailey issued the VCO after reviewing files with discrepancies in sentencing issues. (R-60:16-20). The gist of why Judge Bailey issued the VCO was that Floyd had received a suspended sentence on July 29, 2004, for driving with a revoked license. (R-103:25-104:21). This sentence was probated for two years, in accordance with Judge Bailey's normal procedure and Alabama law. (R-91:19-22; 92:21-24; 105:6-13; 108:10-11; 110:1-6; 122:17-23). Again, in accordance with Judge Bailey's normal procedure, defendants are advised of the conditions of probation, including, but not limited to, obtaining no more convictions with the two-year probation period. (R-106:11-15; 108:10-11). In Floyd's case, he received a subsequent disorderly conduct conviction within the two year period, on February 26, 2005. (R-105:14-21). Judge Bailey gave Floyd another suspended sentence for the disorderly conduct conviction because someone improperly convinced him to do so. (R-91:5-7; 96:25-97:3; 105:22-25). Imposition of a suspended sentence, while a defendant was still on probation from a previous suspended sentence, would have been against Judge Bailey's normal practice. (R-97:1-2; 106:8-20). Judge Bailey was

3

confident that the VCO issued on July 27, 2005, was appropriate in Floyd's case. (R-95:11-14; 96:22-97:3; 106:21-23).

7. It was the officers' intent to contact Floyd at some point regarding an ongoing investigation into another APD officer, Tyrone White. (R-50:24-51:8). Officers would have done so even had no VCO been issued for Floyd's arrest. (R-51:4-8; 73:3-8).

## ISSUES

### Validity/Relaince Upon VCO

8. Floyd claims the entry into his residence was without a warrant and thus violated his Fourth Amendment rights. Contrary to Floyd's assertion, his claim that the "initial approach to the house...without a legitimate warrant was a pretext designed to create an opportunity to conduct a search of the premises for evidence of a crime," (Def. Mot. at ¶ I(a)) is without merit.

a. In this case, a valid VCO was issued for Floyd's arrest. (R-95:11-14). Floyd had violated a condition of probation by obtaining a disorderly conduct conviction and for failure to pay fines on schedule, while he was on probation for driving with a revoked license. (R-91:12-13; R-106:8-20). Officers did not violate Floyd's Fourth Amendment rights because they were at his residence for the legitimate purpose of arresting him pursuant to a valid warrant (the VCO). See Maryland v. Buie, 494 U.S. 325, 328,334, n.1 (1990) (arrest warrant gives police the right to enter a home to execute the warrant).

b. Further, the idea that use of an arrest warrant as a pretext to search a home is *per se* violative of the Fourth Amendment has been rejected. So long as the facts and circumstances are reasonable, "[j]ust because a police officer is *glad* to have the opportunity to see that which is apparent at the scene of a valid arrest-when it is his *duty* to make the arrest-does not make his seeing

4

things invalid." United States v. Hromada, 49 F.3d 685, 691 (11ᵗʰ Cir. 1995).

     c. Further, the officers relied in good faith on the VCO to make the arrest. See United States v. Leon, 468 U.S. 897, 922-25 (1984) (warrant issued by a magistrate normally suffices to establish police officers acted in good faith in executing it, if such reliance was reasonable, not based upon false or reckless information provided by those officers, and the warrant it not facially deficient). In the instant cause, the officers routinely rely upon VCOs, such as the one in this case, to make arrests. (R30:16-32:4; 35:24-36:21; 48:15-49:3; 72:21-22). And, Judge Bailey routinely issues such VCOs; in fact it is a form on his computer. (R-1 12:7-20). Thus, it would not be unreasonable for the officers to rely on the VCO in this case because they routinely do so.

     d. Finally, nothing prevents any law enforcement officer from approaching a residence during the course of an investigation (i.e., a "knock and talk"). See United States v. Tobin, 923 F.2d 1506,1511 (11ᵗʰ Cir. 1991) (reasonable suspicion can justify agents approaching a house to question occupants); United States v. Jones, 239 F.3d 716, 720 (5ᵗʰ Cir. 2001) (federal courts have recognized the "knock and talk" strategy as a reasonable investigative tool); United States v. Landers, 417 F.3d 958, 960 (8ᵗʰ Cir. 2005) (agents conducted "knock and talk" and seized drugs and paraphernalia in plain view). Thus, even if the VCO had been invalid, officers were in a place where they could legally observe illegal activity (e.g., outside the open front door of Floyd's residence).

### Opening of Residence

     9. Floyd claims that the "opening of the residence was involuntary and without the consent of the occupants." Def. Mot. at ¶ I(b). This assertion is contrary to the facts. McCrary—one of the occupants—opened the residence, not law enforcement officers. (R-9:20-21; 69:6-7). As McCrary

was not an agent of the government, her opening of the residence cannot be deemed to violate

Floyd's Fourth Amendment rights.  U.S. Const. Amend IV; See Walter v. United States, 447 U.S.

649, 656 (1980) (search or seizure by private party does not violate Fourth Amendment).

### Validity/Reliance Upon Search Warrant

10.  Floyd claims that the "opening of the residence did not create probable cause and exigent

circumstances sufficient to justify entry into the residence by the officers." Def. Mot. at ¶ I(c).

However, the smell of burning marijuana and drugs observed in plain view justified securing the

residence while officers obtained a valid search warrant after the residents declined to consent to a

search of the residence.  "If an officer has lawfully executed a valid arrest warrant, he is not required

to shut his eyes to contraband in plain view in order to accommodate the arrestee's desire to avoid

further charges." Hromada, 49 F.3d 685, 690 (11th Cir. 1995).  As in Hromada, officers in the

instant cause executed a lawful arrest warrant (the VCO). Id. at 687, 690.  Unlike Hromada, officers

in the instant cause did not have to break into Floyd's home. Id. at 688.  But, as in Hromada,

contraband seized from inside the residence was in plain view of—and, in the instant cause, smell

of—the arresting officers.  Finally, unlike Hromada, where officers seized evidence without a search

warrant, officers in the instant cause took the extra step of obtaining a warrant. Id. at 688-89.

11.  Floyd also claims the search warrant signed by Judge Bush "must be invalidated (sic)

because it is based upon evidence discovered in an illegal and unconstitutional warrantless search."

Def. Mot. at ¶ II.  This claim is without merit, as the discussed in paragraphs 8-10, *supra*.  Further,

the officers relied in good faith on the search warrant. See Leon, supra.

### Statements by Defendant

12.  Floyd claims his confession was "obtained from him during an illegal detention in

6

violation of his right not to give evidence against himself." Def. Mot. at ¶ II. This claim is without

merit as Floyd was arrested pursuant to a valid warrant, and his confessions were made after he was

advised, orally and in writing, of his right to remain silent. Miranda v. Arizona, 384 U.S. 436

(1966). See Doc. #22, Exhibit D.

13. Accordingly, as Floyd's claims are without merit, the United States respectfully requests

this Court to deny Floyd's motion.

Respectfully submitted this 4th day of January, 2006.

> LEURA GARRETT CANARY
> UNITED STATES ATTORNEY
>
> /s/ Todd A. Brown
> TODD A. BROWN
> Assistant United States Attorney
> Post Office Box 197
> Montgomery, Alabama 36101-0197
> (334) 223-7280
> (334) 223-7135 fax
> ASB-1901-O64T
> Todd.Brown@usdoj.gov

### IN THE DISTRICT COURT OF THE UNITED STATES
### FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| v. | ) **CR. NO: 3:05-CR-0187-F** |
| | ) |
| **SAWELIJA TYREE FLOYD** | ) |

### CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2006, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the following:

William R. Blanchard, Esq..

> Respectfully submitted,
> LEURA GARRETT CANARY
> UNITED STATES ATTORNEY
>
>
> /s/ Todd A. Brown
> TODD A. BROWN
> Assistant United States Attorney
> Post Office Box 197
> Montgomery, Alabama 36101-0197
> (334) 223-7280
> (334) 223-7135 fax
> ASB-1901-O64T
> Todd.Brown@usdoj.gov

8

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

UNITED STATES OF AMERICA    )
    )
    )
vs.    )    3:05cr187-F
    )
    )
SAWELIJA TYREE FLOYD    )

### POST-HEARING BRIEF

COMES NOW the Defendant, Sawelija Tyree Floyd ("Floyd"), by and through counsel of record, and files this post-hearing brief in support of his Motion to Suppress Statements and Physical Evidence (Doc. #20), filed on October 17, 2005.

### PROCEDURAL POSTURE

1. Floyd adopts the Government's statement regarding the procedural posture of this case.

### FACTS

2. On July 27, 2005, Lieutenant Jerry Holder and Sergeant Chris Murray of the Auburn Police Department had a meeting with Auburn Municipal Judge Joe Bailey. (R-58: 22-25; R-59: 13-14). The purpose of the meeting was to review the Court records of a list of people Lieutenant Holder wanted to check on with regard to the investigation of Tyrone White, an Auburn Police Officer suspected by Lieutenant Holder of illegally fixing tickets. (R-59: 1-10; 23:3-5). Floyd's court file was among those reviewed on that date. (R-59: 1-3). Later on the same day, Judge Bailey signed and gave to Lieutenant Holder a document termed a violation of court order, or "VCC

Page 1 of 14

AO88-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.  F

authorizing the arrest of Floyd. (R-29: 7-25). A copy of the VCO was entered into evidence as Defendant's exhibit #1. It was styled "City of Auburn v. Sawelija Tyree Floyd) but did not contain or exhibit any specific case number. The text in the body of the VCO was very general and stated only the following: "For good cause shown it is the Court's opinion that the above-named defendant should be taken into custody and incarcerated in the Lee County Jail to serve the balance of his sentences of incarceration heretofore suspended, reimbursing the City/County for all medical expenses. The clerk is directed to set this matter for hearing on the next business day after the defendant is in custody". (R-30: 9-25; 31:1-25; 32:1-4; 35:7-13). Lieutenant Holder did not recall while under oath at the suppression hearing whether or not he had suggested to Judge Bailey that he wanted to talk with Floyd about his investigation of Tyrone White, but admitted that he "may have", and that he indeed needed to talk with Floyd about one of his municipal court cases in connection with the Tyrone White investigation (R-59:23-25; 60:1-10).

3. Two (2) days following the meeting with Judge Bailey, Lieutenant Holder, Sergeant Murray, and at least four (4) other members of the Auburn Police Department, including a canine handler, went to Floyd's residence on Ty Court in Auburn for the ostensible purpose of executing the VCO (R-6:18-25; 7:1-6). Sergeant James Tatum was in uniform. The other officers were all in plain clothes (R-7: 15-22). Sergeant Tatum approached the front door of the residence and knocked. A male voice from inside said "Who is it?". Sergeant Tatum replied "Police, open the door." (R-38:4-13; 67:11-25; 68:1-17). About a minute passed before Floyd's girlfriend, Jamillah McCray ("McCray") opened the door (R-69:3-13). At that time, the officers noted the

smell of burning marijuana, but were unable to see any drugs through the open door (R-69:14-20).

4.  Sergeant Tatum then asked McCray were Floyd was, and, shortly thereafter, Floyd came out of the front door and was taken into custody without incident (R-12:5-11). At that point, Sergeant Murray, Detective Brad Bass, Lieutenant Holder and Lieutenant Willie Smith stepped inside the door of the residence. (R-12: 13-16). Although Floyd was suspected to be a drug dealer, the Auburn Police Department had never had sufficient probable cause to acquire a search warrant for Floyd's residence and did not have one on July 29th when the officers made their initial entry into the house (R-26: 3-16). Furthermore, they did not have consent or permission to enter (R-69:1-2).

5.  Upon entering the residence, Sergeant Murray, Lieutenant Holder, and Detective Bass made contact with a male, later identified as J.B. Mitchell ("Mitchell") and McCray. (R-12: 13-13:2). Officers asked McCray if there were firearms in the residence and she responded that there was and she directed officers to the weapon. (R-13:15-14:3). During the course of securing the residence, officers observed what appeared to be crack cocaine by a microwave oven. (R-12:8-21; 14:4-15). Auburn Police Department Officer Brian Lynn advised Mitchell and McCray of their Miranda rights, after which Mitchell stated that he and Floyd were smoking marijuana when the officers knocked on the door. (R-15:19-16:4). Floyd then told Murray that the drugs that officers observed in plain view belonged to him. (R-13:13-14; 19:10-12). Both McCray and Floyd refused to give consent to search the residence. (R-16:17-21; 19:14-15).

6.  Murray then left the residence to obtain a search warrant, while other officers kept the residence secured. (R-19:17-23). Murray obtained a search warrant from Lee County District Judge Russell Bush. (R-19:24-20:2). Shortly thereafter, officers executed the search warrant locating crack cocaine that officers had previously seen, along with powder cocaine, two large trash bags of marijuana, and crack cocaine. (R-20:6-10). After photographing and logging the evidence seized, Murray interviewed Floyd, after he signed a Miranda waiver, and Floyd signed a written confession admitting ownership of the drugs located in the residence.

7.  Floyd was transported to the Lee County Jail on trafficking charged on Friday, July 29, 2005. Three (3) days later, on Monday, August 1st, he was released on bond without ever appearing before Judge Bailey on the VCO. Floyd had, however, been interviewed by Sergeant Murray and Lieutenant Holder about the Tyrone White investigation. (R-43:16-25; 44:1-25; 45:1-22).

### ISSUES

### VALIDITY/RELIANCE UPON VCO

8.  The Government claims that "... a valid VCO was issued for Floyd's arrest." (Government's brief page 4). For several reasons, the VCO was invalid and deficient, despite what the Government contends.

   a.     The municipal courts of Alabama are subject to and governed by the *Alabama Rules of Criminal Procedure* (see Committee Comments to Rule 1.1 of the A.R.C.R.P.). The Committee Comments to Rule 1.2 of the A.R.C.R.P., which sets out the purpose, objectives, and construction of the rules, specifically states that the rules carry with them the guarantee, found in the Alabama Constitution of 1901, that no

person shall "be deprived of life, liberty, or property, except by due process of law." Rule 27 of the *Alabama Rules of Criminal Procedure* governs probation. Rule 27.1 provides that "all conditions of probation must be incorporated into a court's written order of probation and given to the probationer." Rule 27.1 A.R.C.R.P. The same rule provides that the court or probation officer must explain the conditions of probation to the probationer in addition to providing him with a written copy of the order of probation. These rules were not followed in this case. No written order of probation admitting Floyd to probation for a specific period of time and setting conditions was produced by the Government, nor was one contained in Floyd's Auburn Municipal Court files (R-83:10-22; 84:2-10; 119:14-36; 120:1-8; Defendant's Exhibit 3). The *Alabama Rules of Criminal Procedure* also govern the initiation of revocation proceedings, securing the probationer's presence, and arrest. See generally R. 27.4 ARCP. According to Rule 27.4, either the probation officer, prosecutor, or the court may initiate revocation proceedings. If the court initiates proceedings (as the undisputed evidence shows was done in this case) then the court must begin the process by entering a written order to show cause "specifying the alleged violation of conditions, regulations, or instructions. A.R.C.R.P. R. 27. 4 (a)(2). Only after having first entered the Rule 27.4(a)(2) Show Cause Order may the court issue a warrant for the probationer's arrest, or direct him to appear by summons. R. 27.4 (b) AR.C.R.P. With regard to the warrant of arrest, the rules further provide that a person cited to appear for a show cause hearing "shall not be arrested unless the citation is accompanied by an arrest warrant issued in the same manner as provided in Rules 3.1(a) and 3.2(a)" (emphasis supplied) R. 33.3(c) A.R.C.R.P. Rule 3.2 provides, in

pertinent part, that the arrest warrant "…shall state the offense with which the defendant is charged" Rule 3.2(a) A.R.C.R.P. Floyd argues herein that the VCO cannot be valid unless it is in compliance with the substance of the *Alabama Rules of Criminal Procedure*. Because it was issued for an alleged violation of probation conditions not reduced to writing and provided to Floyd, because no written show cause order specifying any alleged condition or conditions was entered, and because the court issued an arrest warrant that did not state an offense, the so called "VCO" was not a valid arrest warrant under the laws of the state in which it was issued.

   b.      There is a separate but equally important reason for finding the arrest warrant invalid. It was not supported by probable cause, and was simply part of a ruse to obtain the arrest and interrogation of Floyd for the benefit of the officer's conducting the Tyrone White investigation. It is undisputed that on the same day the VCO was issued, Lieutenant Holder and Sergeant Murray met with Judge Bailey to go over the files of several individuals allegedly connected to Tyrone White in some way. (R-59: 1-10; 23:3-5). Lieutenant Holder could not recall if he told the judge he needed to interview Floyd, but "may have" done so. The VCO issued as a direct result of the meeting on July 27, 2005 (R-29:7-25). The Judge's insistence that he issued the VCO based upon the supposed fact that someone had improperly influenced him to suspend Floyd's sentence when Floyd had appeared in municipal court on April 21, 2005, for a disorderly conduct case lacks credibility (R-96:22-25; 97:1-21). The court was without legal power to amend or change the disorderly conduct sentence as of August 27, 2005, having lost jurisdiction to do so fourteen (14) days after it was pronounced. Section 12-14-70 (c), <u>Code of Alabama</u> 1975.

Since the Auburn Municipal Court merely suspended Floyd's April 21, 2005 sentence for disorderly conduct, and did not lawfully place Floyd on probation for a definite period of time and under definite conditions on that or any of his prior cases, revocation of probation was a legal impossibility. An "indefinite" suspension of sentence is unlawful in Alabama. Montgomery v. State, 231 Ala. 1, 163 S. 365, 367 (1935). There is a strong inference arising from the evidence in this case that the judge and the police officers acted as a unit and in concert to detain and interrogate Floyd about his knowledge of Tyrone White's activities, despite the fact that Floyd was not on probation and was not formally accused by the police of committing any crime with regard to the suspended sentence he received for disorderly conduct. The cooperation of the judge with the police is exhibited by the fact that he got a ride with the officers from Auburn to Montgomery for the suppression hearing, and discussed the case with them along the way. (R-55:22-25; R-56:1-19). Most damning of all, the municipal judge at one point during the suppression hearing appeared to conjure up a reason for having ordered Floyd's arrest which could not possibly have been true. According to municipal judge Joe Bailey, he issued the VCO against Floyd for Floyd's alleged failure to cooperate with an Auburn Police Department investigation (presumably the White investigation). The problem with this explanation is that Judge Bailey testified he ordered Floyd to cooperate with the investigation at the "due process' hearing on Monday, August 1[st] after Floyd's arrest the preceding Friday, July 29[th]. The judge could not possibly have ordered Floyd's arrest for violating an order he was not given until after being arrested, yet that is in substance what the judge stated under oath. (R-97:19-25; R 98-102). The judge's testimony here is

further undermined by the fact that Floyd testified that he was released on August 1st without a "due process" hearing and this fact was confirmed by the testimony of Sergeant Murray (R-124:1-24; 43:16-21). A magistrate loses his neutrality by becoming a "rubber stamp for the police". <u>Aguilar v. State of Texas</u>, 378 U.S. 108 (1964) or by becoming an "adjunct law enforcement officer". <u>Lo-Ji Sales, Inc. v. New York</u>, 442 U.S. 319, 327 (1979). In this case the fact that the police apparently involved the judge directly in the investigation of alleged misconduct the Auburn police department and members of the clerk's staff caused the municipal judge to lose his neutrality and become blinded to the need for probable cause or some other sufficient legal basis for the issuance of an arrest warrant against the defendant.

c.    The Government, citing <u>U.S. v Leon</u>, 468 U.S. 897, 922-25 (1984), argues that the police officers relied in good faith upon the VCO to make the arrest. In this case, it was not reasonable for the officers to rely upon the VCO. First, there is a strong inference, as stated previously, that the VCO arrest was merely a sham or ruse to facilitate investigation of the Tyrone White case, and was not based on probable cause or any evidence that Floyd had violated a specific written probation condition. This is not a case where the officers' subjective intent is irrelevant, because there was no objective basis for Floyd's arrest. <u>Whren & Brown v. U.S.</u>, 517 U.S. 806 (1996). A reasonably well-trained law enforcement officer should know that an individual cannot be arrested and incarcerated without probable cause and/or a proper written warrant specifying a charge. Neither was present in this case. The good faith exception simply does not extend to cases in which the police have no reasonable grounds to believe that a warrant is valid. See <u>Leon</u>, 468 U.S. at 922-23. The Supreme

Court has identified four (4) situations in which police reliance on a warrant is not objectively reasonable: (1) when the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit. Franks v. Delaware, 438 U.S. 154, 155-56, 171-72 (1978); (2) when the magistrate failed to act in a neutral and detached manner. Lo-Ji Sales v. New York, 442 U.S. 319, 326-28 (1979). "[T]he courts must... insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubberstamp for the police." Leon, 468 U.S. at 914. As Justice Powell has previously explained "[w]hatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." Shadwick v. City of Tampa, 407 U.S. 345, 350 (1972); (3) when the warrant was based on an affidavit "so lacking in *indicia* of probable cause as to render official belief in its existence entirely unreasonable. Leon, 468 U.S. at 923; and (4) when the warrant was so facially deficient that a reasonable police officer could not have believed it to be valid. See Leon, 468 U.S. at 923. Floyd asserts that, insofar as they have some analog to arrest warrants, virtually all of the above cited exceptions to the Good Faith rule apply in this case: (1) There was no underlying affidavit in this case, but the evidence failed to disclose any probable cause for the arrest of Floyd, either for violation of probation or for any new offense; (2) as pointed out earlier, Judge Bailey acted as an adjunct police officer in this case, issuing a plainly deficient VCO after meeting with the investigating officers for the White case and going over court files with them; (3) again, although there was no underlying affidavit, there was no probable cause to justify an arrest; and (4) the VCO was obviously deficient on its face because it did not reference any Show Cause Order or

specify and violation or offense. Accordingly, no reasonable police officer could have believed it to be a valid arrest warrant.

## OPENING OF RESIDENCE

9. The Government claims that the door to Floyd's residence was opened voluntarily, and that regardless of whether the VCO was or was not valid, the agents outside Floyd's front door were lawfully in a place where they could observe illegal activity. The Government's argument fails because the opening of the residence was plainly non-consensual. Six (6) law enforcement officers approached and surrounded the residence. The uniformed officer, Sergeant Tatum, approached and knocked on the door. After an initial verbal response from within the house, he replied "Police, open the door". Nearly a full minute passed before the door was finally opened, allowing the agents access to the smell of burning marijuana. It is clear that the agents in this case demanded entry under "color of authority" and that the opening of the door by Floyd's girlfriend after an appreciable delay was not consensual. Because of the manner in which the agents demanded entry, they effected an unconstitutional search when they gained olfactory access through the open door. The circumstances indicate that McCray opened the door in response to a "show of official authority", and cannot be deemed to have consented to the agents having obtained olfactory evidence indicating the presence of marijuana. U.S. v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986); U.S. v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991); Bumper v. North Carolina, 391 U.S. 543, 548 (1968); Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) (voluntariness of consent must be judged in light of the totality of the circumstances). Because there was no consensual opening of the door, the

Government's reliance on *U.S. v. Jones* and *U.S. v. Landers* is misplaced. Neither of those cases had facts indicating that the opening of the door pursuant to a "knock and talk" investigation was other than voluntary.

## PROBABLE CAUSE/EXIGENT CIRCUMSTANCES

10. Floyd agrees that, under the case law of this circuit, the odor of burning marijuana can sometimes be sufficient to create probable cause for a search. However, the warrantless search of a home is still presumably unreasonable, but is allowed where both probable cause <u>and</u> exigent circumstances are shown to co-exist. <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980); <u>U.S. v. Burgos</u>, 720 F.2d 1520, 1525 (11th Cir. 1983). Assuming solely for the purpose of argument that Floyd's front door had been opened consensually and not opened in response to a show of authority, the odor of burning marijuana could have created probable cause for further investigation. However, the presence of drugs, in and of itself, does not give rise to exigent circumstances. <u>Johnson v. U.S.</u>, 333 U.S. 10 (1948); <u>Welsh v. Wisconsin</u>, 466 U.S. 740 (1984); <u>Tobin</u>, *supra* at 1511; <u>Pineda v. Houston</u>, 124 F. Supp. 2d 1057 (S.D. Tex. 2000). The facts of this case disclose no sufficient reason why it would not have been reasonable for the police to seek a search warrant before entering and searching the residence. The Government argues in its brief that the smell of burning marijuana and drugs observed in plain view in the house justified securing the residence while officers obtained a valid search warrant, citing <u>U.S. v. Hromada</u>, 49 F.3d 685, 691(11th Cir. 1995). However, in Hromada the officers were possessed of a valid arrest warrant, authorizing their entry in the Hromada's house to effect the arrest. In this case, there was no valid arrest warrant, and the officers' entry into Floyd's home

was nonconsensual and in violation of the Fourth Amendment. Hromada therefore does not dictate the outcome of this case.

11. The search warrant signed by Judge Russell Bush must be invalidated and the items seized pursuant to the execution of that warrant suppressed. The uncontested facts are that the affidavit upon which Judge Bush's warrant was based cited as probable cause evidence discovered after the nonconsensual opening of the house (the odor of marijuana) and the agents' illegal entry (cocaine and scales) as well as a statement made to the officers by B.J. Mitchell after entering the house. (R-42:2-25; R-43: 1-4). Under the exclusionary rule, evidence obtained in an encounter that is in violation of the Fourth Amendment, including direct products of police misconduct and evidence derived from the illegal conduct or "fruit of the poisonous tree" cannot be used in a criminal trial against the victim of the illegal search and seizure. Weeks v. U.S., 232 U.S. 383 (1914); U.S. v. Tarzado-Madruga, 897 F.2d 1099, 1112 (11th Cir. 1990).

## STATEMENTS BY DEFENDANT

12. The Government claims that the Defendant's post-arrest statements are admissible against him as he was arrested pursuant to a valid warrant, and his confessions were made "after he was advised …of his right to remain silent". (Brief of the Government, p. 7). Floyd disagrees. Floyd was in custody pursuant to the VCO when he made statements to the effect that the drugs found in the residence belonged to him. Any confession obtained through custodial interrogation following an illegal arrest must be excluded unless intervening events breaks the causal connection between the illegal arrest and the confession. Taylor v. Alabama, 457 U.S. 687 (1982). Here, very

little time elapsed between the illegal arrest, the Defendant's first statement (at the house after the police entered) and at headquarters later that day.

## **CONCLUSION**

13. For all of the reasons shown above, and based upon the authorities cited herein, the Defendant respectfully requests that the Court grant his motion to suppress.

Respectfully submitted this the 10th day of January 2006.

s/ William R. Blanchard
WILLIAM R. BLANCHARD
Attorney for the Defendant

BLANCHARD LAW OFFICES
505 South Perry Street
Post Office Box 746
Montgomery, Alabama 36101-0746
(334) 269-9691

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **3:05cr187-F** |
| | ) | |
| | ) | |
| **SAWELIJA TYREE FLOYD** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2006, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to the following: AUSA Todd Brown, and I hereby certify that I have mailed by

United States Postal Service the document to the following non-CM/ECF participants:

n/a.

Respectfully submitted,

s/ William R. Blanchard
BLANCHARD LAW OFFICES
505 South Perry Street
Post Office Box 746
Montgomery, Alabama 36101-0746
Office: (334) 269-9691
Fax:    (334) 263-4766
(BLA029)

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR. NO. 3:05-CR-0187-F** |
| | ) | |
| **SAWELIJA TYREE FLOYD** | ) | |

### REPLY BRIEF

**COMES NOW** the United States, by and through Leura Garrett Canary, United States Attorney for the Middle District of Alabama, and files the instant Reply Brief in Response to Defendant's ("Floyd's") Post Hearing Brief, filed on January 10, 2006 (Doc. # 26), as follows:

### Validity/Reliance Upon VCO

1. Floyd claims in his Post-Hearing Brief, that because the municipal court order ("VCO") issued in this matter was procedurally invalid the law enforcement officers in this case were estopped from approaching Floyd's residence and knocking on the front door because (a) the VCO failed to comply with pertinent rules with the Alabama Rules of Criminal Procedure (Doc. # 26, at ¶ 8(a)), and (b) the VCO was not supported by probable cause, but was a ruse to interview Floyd in another investigation.

2. After further review of the pertinent Alabama caselaw, statutes, and court rules, the United States concedes that, if the municipal court did not provide Floyd with a written copy of the conditions of his probation, then he could not be revoked for any violation of those conditions. <u>Owens v. State</u>, 887 So. 2d 1015, 1017 (Ala. Crim. App. 2004); § 12-14-13, <u>Ala. Code 1975</u>; Ala. R. Crim. P. 1.1, 27.1. The record does not support the conclusion that the municipal court acted in accordance with these provisions. Therefore, any revocation of Floyd's probation is contrary to Alabama law.

AO88-C
**GOVERNMENT EXHIBIT**

CASE NO.

EXHIBIT NO.  G

3. However, the fact that Floyd's probation may have been improperly revoked does not end the inquiry into the officers' reliance on the municipal court order. "The constitutional validity of the search...must depend upon the constitutional validity of the....arrest. Whether that arrest was constitutionally valid depends...on whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [subject] had committed or was committing the offense. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." Beck v. Ohio, 379 U.S. 89, 91 (1964) (internal citations omitted).

4. Courts have held valid arrests can made based upon invalid warrants. See Di Bella v. United States, 284 F.2d 897 (2d Cir. 1960) (even though agent arrested subject on invalid warrant, arrest justified on ground that subject had committed narcotics violation); United States v. White, 342 F.2d 379 (4th Cir. 1965) (fact that authorities relied on invalid arrest warrant would not invalidate the arrest and the search and seizures which took place as incidents thereof if the officers had adequate knowledge independent of the warrant to constitute probable cause); Hagans v. United States, 315 F.2d 67 (5th Cir. 1963) (invalid arrest warrant justified by showing that at time of arrest, lawful arrest could have been made without warrant); United States v. Hairston, 763 F.2d 233 (7th Cir. 1985) (unlawful arrest of son of man with suspended license not invalidated when officer acted as reasonably prudent person in concluding there was probable cause for arrest); United States v. Lape, 413 F.2d 816 (9th Cir. 1969) (arrest based on warrant

2

later deemed invalid was nevertheless valid when officer relied on information from law enforcement channels to provide probable cause); and, United States v. Gobey, 12 F.3d 964 (10th Cir. 1993) (invalid arrest warrant, relied on by officers in good faith, did not warrant exclusion of subsequently seized evidence). Accordingly, while the VCO relied upon by the officers may have been invalid according to Alabama state law, the fact that the officers had so routinely relied upon them in the past,[1] and the fact that the municipal judge had so routinely issued them[2] in this format establish that the officers reasonably believed they had probable cause to execute them.

## Opening of Residence

5. Floyd's next claim is that his girlfriend, Jamillah McCray ("McCray"), did not consensually open the door to Floyd's residence, therefore the officers who approached the trailer and knocked on the door were not properly in a position to observe illegal conduct or contraband in plain view.[3] Specifically, he makes the claim that based on the "manner in which the agents demanded entry," (Doc. # 26, at ¶ 9) the opening of the residence door by McCray was nonconsensual. Such claim is contrary to the facts and the law.

6. First, agents did not "demand entry" into the residence. The testimony at the suppression hearing in this matter established that Auburn Police Department ("APD") Sergeant James Tatum knocked on the front door of the residence. (R-6:10-25; 66:25-67:8; 72:21-23). There is no evidence that Sgt. Tatum pounded on the door, or shouted, or otherwise "demanded

---

[1]  (R30:16-32:4; 35:24-36:21; 48:15-49:3; 72:21-22).

[2]  (R-112:7-20).

[3]  In the instant matter, the plain view analysis is initially predicated upon the smell of burning marijuana emanating from Floyd's residence. See United States v. Thompson, 928 F.2d 1060, 1065 (11th Cir. 1991) (no one...could conceivably have any legitimate expectation of privacy with regard to any object that would be in the plain view (or smell) of someone conducting a safety or documents check (internal quotes and citations omitted)).

3

entry." In fact, the only evidence is that Sgt. Tatum knocked on the door, and in response to a male voice asking who was at the door, Sgt. Tatum replied that it was the police department. (R9:15-18). Additionally, officers did not initially enter the residence, rather, McCray came to the door, and after being asked of Floyd's whereabouts, Floyd stepped outside. (R-10:19-22; 11:25-12:11). It was only upon the smelling of burning marijuana, evidence of which would certainly have been destroyed by the continued burning, that officers entered the residence to secure it. (R-12:13-21). Securing a residence for the purpose of obtaining search warrants is a legitimate law enforcement practice. See United States v. Sweeting, 933 F.2d 962, 963 (11th Cir. 1991).

7. Floyd relies primarily on United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986) for the proposition that McCray's opening of the door by the occupant was nonconsensual, because, Floyd claims, when a law enforcement officer knocks on the door of a residence, identifies himself as a police officer at the request of the occupant, and afterwards the occupant opens the door, that equates to a show of force. Reliance on Edmondson, based on the facts of the instant cause, is misplaced.

8. In Edmondson, numerous FBI agents, without a search warrant or arrest warrant, observed a possible bank robbery subject outside an apartment complex. Id. at 1513-14. After the subject went back into the apartment complex, with the area in front of the apartment surrounded, agents knocked on the apartment door, and the defendant-appellant ("Edmondson") looked out the window. Id. at 1514. Afterwards, an agent *yelled*, "FBI. Open the door." Id. Edmondson opened the door, stepped back, placed his hands on his head, and was arrested. Id. Agents followed Edmondson into the apartment, where they searched his person, *Mirandized*

4

him, and seized several items. Id. The Eleventh Circuit held that, based on the facts of this case, that Edmondson did not impliedly "consent to be arrested." Id. at 1515.

9. In United States v. Ramirez-Chilel, 289 F.3d 744 (11th Cir. 2002), the Eleventh Circuit found that actions similar to those in the instant cause, did not violate the Fourth Amendment. In Ramirez-Chilel, four officers approached a trailer around midnight after receiving a tip that the occupants were selling counterfeit immigration and identification documents from the trailer. Id. at 746. The officers had no probable cause for a search, no search warrant, and no exigent circumstances existed at this late hour of the night. Id. One of the four officers knocked on the door several times and announced they were police officers.[4] Id. The officers did not have their weapons drawn at this time. Id. After the defendant-appellant ("Ramirez") answered the door, the officer asked to be let inside the trailer to determine whether there were counterfeit documents inside. Id. at 747. Without verbally allowing the officers to enter, Ramirez yielded "'the right-of-way' to the officers and thus consented to entry into the home." Id. Afterwards, Ramirez also consented to the search of his home in writing. Id.

10. The Eleventh Circuit concluded the "officers' entry to be legal because [there was] no official show of force which would have 'forced' the defendant to let the officers in." Id. at 752. In reaching this conclusion, the Court viewed the issue in light of the fact that a suspect does not consent to a search of his residence when his consent to the entry into his residence is prompted by a show of official authority." Id. at 751. (emphasis added). Put another way, consent to enter does not equate to consent to search. Citing Edmonson, the Ramirez-Chilel

---

[4] The facts relied upon by the Eleventh Circuit in Ramirez-Chilel, after the point where the officer knocked on the door were in dispute between the Government and the defendants. Ramirez-Chilel, 289 F.3d at 746. However, the Court deferred to the magistrate judge's determination of the facts as stated herein. Id. at 749.

Court held that to show that entry into that home was illegal, the "facts must demonstrate that the defendant's consent to the officer's entry was 'prompted by a show of official authority.'" Id. (quoting Edmonson, 791 F.2d at 1515). The Court found the facts did not support a conclusion that the consent to officers' entry was not consensual, stating it was "hard to find a 'show of force' by the officers—guns were not drawn, nor were a large number of officers surrounding the trailer ready to arrest the suspect.   [Ramirez]...did not [do anything] which would have suggested intimidation and a show of force on the part of the officers." Id.

     11. The approach to Floyd's residence, and the events that unfolded, are more similar to those in Ramirez-Chilel, than those of Edmondson. In the instant cause, the officers were not observed by the trailer's occupants prior to McCray opening the door, established by the fact that an occupant had to ask who was actually knocking on the door. See United States v. Tobin, 923 F.2d 1506, 1508 (11th Cir. 1991) (agent knocked on door for three to four minutes, calling out in English and Spanish, identifying himself as police officer prior to consensual entry). Further, there is no evidence in the record that weapons were drawn, or that weapons were observed by the occupants to be drawn. Also, there was no showing that any of the occupants was intimidated by the actions of law enforcement. In fact, Floyd exited the residence and was taken into custody without incident. (R-12:10-11). Finally, none of the residents ever consented to the officers' entry, as was at issue in Edmonson or Ramirez-Chilel; in the instant cause the occupant (Floyd) came outside and, initially, the officers did not enter the trailer. In fact, the officers never entered the residence until they smelled burning marijuana emanating from the trailer. Thus, because there was no consent to allow the officers to enter the trailer, and there was no consent for those officers to search it, there was no show of force which "overcame [any] consent." Ramirez-Chilel, 289 F.3d at 751.

6

12.  A show of force can coerce someone to either consent to police officers' entry into a residence, or to a subsequent search of that residence.  Floyd, then, attempts to make the leap that it is only logical that an alleged show of force can also coerce someone into merely opening the front door.  Such a leap is too far to make.  Nothing prohibits a law enforcement officer, with or without an arrest or search warrant, from approaching a residence and knocking on the front door.  Tobin, 923 F.2d at 1511 (citing United States v. Knight, 451 F.2d 275, 278 (5th Cir. 1971); and Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964) (stating "[a]bsent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.")).  The knocking on Floyd's door, and the decision of McCray to open it after learning it was a police officer knocking, does not violate the Fourth Amendment.  Ramirez-Chilel, Ramirez-Chilel, 289 F.3d at 752 ; Tobin, 923 F.2d at 1511; United States v. Jones, 239 F.3d 716 (5th Cir. 2001); United States v. Landers, 417 F.3d 958, 960 (8th Cir. 2005).

### Probable Cause/Exigent Circumstances

13.  Floyd next claims that "the odor of burning marijuana could have created probable cause for further investigation…[and t]he facts of this case disclose no reason why it would not have been reasonable for the police to seek a search warrant before entering and searching the residence."  (Doc. # 26, ¶10).

14.  Floyd is correct in these assertions—that is why officers secured the residence and obtained a search warrant, when Floyd and McCray refused to give consent to search the

7

residence, even though the officers arguably needed no warrant to lawfully search the residence. If contraband is "observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no search within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). "[I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right to access to the object, the may seize it without a warrant." Id. "It is…an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." Horton v. California, 496 U.S. 128, 136 (1990). "Once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost." Illinois v. Andreas, 463 U.S. 765, 771 (1983).

15. "It is a 'basic principle of Fourth Amendment Law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). "A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." Tobin, 923 F.2d at 1510. One "test for whether or not exigent circumstances exist is whether the facts would lead a reasonable, experienced agent to believe that evidence might be destroyed or removed before a warrant could be secured." United States v. Reid, 69 F.3d 1109, 1113 (11th Cir. 1995) (citing United States v. Rodgers, 924 F.2d 219, 222 (11th Cir. 1991)). "[T]he need to invoke the exigent circumstances exception is 'particularly compelling in narcotics cases' because narcotics can be so easily and quickly destroyed." Id. (quoting United States v. Young, 909 F.2d 442, 446 (11th Cir. 1990)).

16.    In the instant cause, law enforcement officers had probable cause and exigent circumstances existed. Nevertheless, the officers took the extra, arguably unnecessary, step of obtaining a search warrant for the trailer. The officers smelled burning marijuana emanating from Floyd's trailer. At that point, officers were observing criminal activity and had probable cause for a warrant. Additionally, exigent circumstances existed because evidence of that crime was burning in their presence. Officers then took what they believed to be the necessary steps to prevent the destruction (burning) of the evidence by securing the residence. Plus, the officers were justified in a protective sweep of the residence for their safety, as evidenced by their query about the presence of firearms. (R-16:16-17); Tobin, 923 F.2d at 1513. In securing the residence, officers also observed, in plain view, what they believed to be cocaine. After being denied consent to search the entire trailer, they obtained a search warrant for the residence. Accordingly, the officers took every precaution to preserve the evidence, plus to protect the occupants' rights by obtaining a search warrant.

### Statements By Defendant

17.    Floyd's final contention is that any statement made by him was not voluntary, because he was detained pursuant to, what he claims was, an invalid VCO. Floyd states that any "confession obtained through custodial interrogation" following an illegal arrest must be excluded. (Doc. # 26, ¶ 12).

18.  The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. "In Miranda [the Supreme] Court...extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police." New York v. Quarles, 467 U.S. 649, 654 (1984). "The Miranda Court...presumed that interrogation in certain circumstances is

9

inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his Miranda rights and freely decides to forego those rights." Id. "It is Miranda's premise that the danger of coercion results from the interaction of custody and official interrogation." Illinois v. Perkins, 496 U.S. 292, 297 (1990). "[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). "Voluntary and spontaneous comments by an accused, even after *Miranda* rights are asserted, are admissible evidence if the comments were not made in response to government questioning." Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991).

19.    Floyd claims that Taylor v. Alabama, 457 U.S. 687 (1982) mandates that his confession be excluded because it was given pursuant to an illegal arrest and intervening events did not break the causal connection between the illegal arrest and the confession. Even after an illegal arrest, a subject's confession may be deemed valid. Edmondson, 791 F.2d at 1515-16.

20.    First, for Fourth Amendment purposes, Floyd, while clearly in custody, was not subject to official interrogation or a functional equivalent. The only evidence presented on this matter, evidence elicited at the suppression hearing, was that Floyd made the statement admitting ownership of the drugs while in custody, but not as a result of questioning. (R-13:12-14; 19:10-11).    Accordingly, Floyd's post-Miranda confession should not be excluded. Cannady v. Dugger, 931 F.2d at 754.

21.    Second, assuming *arguendo* Floyd's confession was the result of interrogation, Floyd's custodial detention was not illegal. While the VCO relied upon by the officers may have been invalid, they relied upon it in good faith to take Floyd into custody. See ¶¶ 1-4, *supra*. Furthermore, at the time officers took Floyd into custody, they had probable cause that he was

10

committing a crime (marijuana possession). See <u>Di Bella</u>, 284 F.2d at 903-04; <u>Hagans</u>, 315 F.2d at 69; <u>Hairston</u>, 763 F.2d at 235. Thus, as he was provided his <u>Miranda</u> warnings, and chose to make a statement afterwards, his confession should not be excluded.

22.     Finally, assuming *arguendo* both that Floyd's confession was the result of interrogation and his initial detention was illegal, his confession was nonetheless valid. At least 30 min passed between the contact with Floyd at 10:55 and when he signed his <u>Miranda</u> waiver form at 11:25.     See Doc. # 22, Exhibit D.     Thus, contrary to Floyd's assertion, enough time passed between the initial contact and the Floyd's statement made after he signed his <u>Miranda</u> waiver to attenuate any taint from the arrest on an invalid warrant.

Respectfully submitted this 13th day of January, 2006.

> LEURA GARRETT CANARY
> UNITED STATES ATTORNEY
>
> /s/ Todd A. Brown
> TODD A. BROWN
> Assistant United States Attorney
> Post Office Box 197
> Montgomery, Alabama 36101-0197
> (334) 223-7280
> (334) 223-7135 fax
> ASB-1901-O64T
> Todd.Brown@usdoj.gov

11

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **CR. NO: 3:05-CR-0187-F** |
| | ) | |
| SAWELIJA TYREE FLOYD | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2006, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following: William R. Blanchard, Esq.

Respectfully submitted,

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

/s/ Todd A. Brown
TODD A. BROWN
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
ASB-1901-O64T
Todd.Brown@usdoj.gov

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CR. NO. 3:05cr187-LSC |
| | ) | WO |
| SAWELIJA TYREE FLOYD | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is before the court on defendant Floyd's motion to suppress all physical

evidence seized and statements taken as a result of the search of his home and his arrest on

July 29, 2005. For the reasons discussed below, the motion is due to be denied.

### Facts

In December or January, 2005, the Auburn, Alabama police department began

investigating Tyrone White, a police officer then employed by the department, for "fixing

tickets." On July 27, 2005, Lt. Jerry Holder and Sgt. Chris Murray met with Auburn

Municipal Judge Joe Bailey. Lt. Holder had a list of people whose court files he wanted

Judge Bailey to review in connection with the Tyrone White investigation. On that list was

defendant Tyree Floyd. The officers believed, based on a statement in their possession, that

White had helped Floyd get a favorable plea agreement in a case before Judge Bailey.

The Auburn police officers wanted to talk with defendant Floyd – and, the court

infers, with others on the list – about the investigation of White. Judge Bailey reviewed

Floyd's file in the presence of the officers. He decided to issue a VCO (Violation of Court

Order) order for Floyd's arrest, an order used routinely by the municipal court as a "pickup"



AO88-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    H

order for those on suspended sentences. Judge Bailey believed that Floyd had violated a condition of his two-year probation[1] on a previous conviction (in May, 2004) for driving with a revoked license by incurring another conviction for disorderly conduct in February 2005.[2] Judge Bailey also believed that Floyd had associated with known criminals and failed to cooperate with the Auburn police department in its investigation of White.[3] White had persuaded Judge Bailey to suspend the 30 day jail sentence that he normally would have

---

[1] Judge Bailey testified at the suppression hearing in this case that he uses a municipal court unsupervised suspended sentence as unsupervised probation. According to Judge Bailey, two years is the term of probation in all cases, and there is a standard order to the effect that the term of probation is two years, although he did not know what the clerk's procedure was for providing that order to each defendant. A police officer, the court clerk, and the judge all testified that it is Bailey's practice to inform defendants orally that he is going to suspend the jail sentence, and that as long as they are not in any other trouble, and they do everything the court instructs them to do for two years, the matter will be terminated, or words to that effect. Because the municipal court is not a court of record, no recording or transcript is available to confirm or refute these contentions. There is no written record in Floyd's court file that he was told that his term of probation on the suspended sentence was two years, nor is there any evidence that he received a written order specifying the terms of his probation.

[2] Judge Bailey testified that he issued the pickup order because he had been advised a week to ten days prior to the date of the order that Floyd was not complying with an Auburn police department investigation, presumably that of White. (He initially said that he advised Floyd that he wanted his full and complete cooperation with the Auburn PD and the FBI during Floyd's due process hearing. However, that hearing may not have ever taken place – and, if it did, it would have occurred after, not before the pickup order was issued.) Judge Bailey initially indicated that another reason for the pickup order was that defendant failed to pay his fines on schedule, but he did not include that reason when he explained the VCO after he reviewed the defendant's file in court. Defendant affirmatively demonstrated that his fines were paid prior to the issuance of the order.

[3] The VCO order did not indicate the specific reason for its issuance on its face. According to Judge Bailey, his practice was to advise the defendant of the reason he was arrested at a due process hearing on the next regular business day. Bailey testified that he did hold a due process hearing in Floyd's case. However, officers indicated that Floyd was released prior to a hearing when he bonded out on the drug charges.

imposed on Floyd for the disorderly conduct conviction, and Judge Bailey believed that he had been improperly manipulated into doing so.

On Friday, July 29, 2005, officers from the Auburn police department, including Lt. Holder and Sgt. Murray, approached the front door of defendant's residence, a two-bedroom duplex. The officers went to the residence to arrest Floyd pursuant to the VCO order. They also wanted to talk with Floyd concerning the White investigation. Four officers in plain clothes approached the front of the duplex at approximately 10:30 a.m., while two others (one of them in uniform) went to the rear.[4] One of the officers knocked on the front door. A male voice said, "Who is it?" One of the officers, Sgt. James Tatum, replied, "Police department, open the door."[5]

Within 30 seconds to a minute, Floyd's girlfriend, Jamillah McCray, opened the door "all the way up." McCray was known to the officers from previous calls to her residence and that of her grandmother. As soon as McCray opened the door, Tatum asked her where Floyd was. The officers detected a strong odor of burning marijuana coming out of the residence.

---

[4] The officers had information prior to service of the VCO order that Floyd was involved in the drug trade. The officers experience is that three quarters of violent crime is somehow related to drug activity or drug abuse, and that drug distributors are likely to be armed with firearms. Murray indicated that officers take extra care when executing warrants on drug dealers for that reason.

[5] Sgt. Murray initially did not indicate that Sgt. Tatum added, "open the door" after identifying the police department. However, Lt. Holder recalled that Tatum said, "[P]olice, police department or police officer, come to the door." In response to further questioning, Holder agreed that a statement that he wrote on the day of the arrest indicated that Tatum had replied, "Police, open the door." The court finds that "Police, open the door" is most likely to be the phrase actually used by Tatum, as this reply was recorded in a written report on the date of the arrest.

3

Lt. Holder commented on the smell to the other officers. By this point, four to five officers had gathered at the door. Floyd came to the front door almost immediately. One of the officers told Floyd that he had a warrant for his arrest and asked him to step outside. Floyd did so, and was taken into custody. An officer read Floyd his <u>Miranda</u> rights. Floyd thereafter made a statement to officers that the drugs in the residence were his.

While Floyd was being arrested, four of the officers stepped inside to secure the residence and to keep evidence from being destroyed because they smelled burning marijuana. They asked McCray, who was just inside the front door with Mitchell, if there were any other persons present, and if there were firearms in the residence. McCray said that no-one else was there, but there was a weapon in the bedroom. McCray led the officers to the weapon. As officers entered the residence, they observed three or four fairly large pieces of crack cocaine on the kitchen counter, along with a box of baking soda and some kind of cooking device. McCray and Mitchell were placed in handcuffs and Mirandized. When both McCray and Floyd declined to consent to a search, the officers secured the residence and obtained a search warrant from Lee County District Judge Russell Bush before searching further or seizing evidence.

When police executed the warrant, they found, in addition to the crack cocaine they had previously observed, more crack cocaine inside a brown paper bag in the bedroom (for a total of 310-312 grams), some powder cocaine (587 grams), and a large trash bag containing several bags of marijuana (a little over 19 pounds). They also found a piece of a blunt and a small plastic bag of marijuana in or on the toilet, and several sets of scales, some

4

plastic bags, and $3000 in U.S. currency in the house. Thereafter, Floyd signed a <u>Miranda</u> waiver form and then signed a written confession admitting to ownership of the confiscated drugs.

The VCO order directed the clerk of the municipal court to set Floyd's case for a hearing "on the next regular business day after ... Defendant is in custody." Because Floyd was picked up on a Friday, the next regular business day was Monday, August 1, 2005. Judge Bailey released Floyd by written order, pending further order of the court, on August 1 after Floyd made bond on the drug charges. Floyd agreed "in some part" to cooperate with the investigation into the drug arrest. Police also took a statement from him regarding Tyrone White.

## Discussion

Defendant contends that the officer's initial entry into the defendant's residence was illegal because the VCO order was invalid, and because the order was without probable cause and was issued as a pretext to obtain the arrest and interrogation of defendant Floyd for the benefit of the officers conducting the Tyrone White investigation. Defendant also maintains that the opening of the residence was involuntary and without the consent of the occupants, and that the opening of the residence did not create probable cause and exigent circumstances sufficient to justify entry into the residence by the officers. He argues that the search warrant signed by Judge Bush after the initial entry must be invalidated because it relied on evidence that was obtained illegally, and that defendant's post-arrest statements should be suppressed because his arrest was illegal.

5

The government concedes that the Auburn municipal court could not lawfully revoke Floyd's probation on his May 2004 suspended sentence because the court had not previously provided Floyd with a written copy of the conditions of his probation as required by Alabama law.[6] However, the government maintains that the officers relied in good faith on the municipal court's VCO order in arresting Floyd, and argues that the warrantless entry was not pretextual. Further, the government contends that an occupant of the residence, not the officers, opened the residence, and that the officers did not enter to arrest Floyd (who stepped outside for that purpose) but to secure the residence only after they smelled the odor of burning marijuana emanating from the open door. The government argues that the smell of burning marijuana justified police in entering and securing the residence to prevent the destruction of evidence while they obtained a valid search warrant, after the residents declined to consent to a search of the residence. With regard to Floyd's statements, the government maintains that he did not make statements as a result of interrogation and, even assuming that he did respond to questioning while in custody, his detention was legal because it was based on an order that officers believed to be valid, and sufficient time elapsed between the officers' contact with Floyd and the time at which he signed the Miranda waiver form to cleanse any taint from an arrest on an invalid warrant.

Good Faith Exception

Because the government concedes in this case that the VCO order issued by the

---

[6] Owens v. State, 887 So. 2d 1015, 1017 (Ala. Crim App. 2004); Ala. Code §12-14-13; Ala. R. Crim. P. 1.1, 27.1.

municipal judge was not valid under Alabama law, the court begins its analysis by examining whether or not the officers executing the arrest order nevertheless relied on the order in good faith.  In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court carved out a good faith exception to the exclusionary rule, holding that the rule does not apply to evidence seized by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate that is subsequently found to be invalid.  The focus of the inquiry is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."  Id. at 923 n. 23.  The Leon good faith exception has been invoked in the context of arrest warrants as well as search warrants.  See Arizona v. Evans, 514 U.S. 1 (1995).

"The Leon good faith exception applies in all but four limited sets of circumstances...: (1) where 'the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth'; (2) 'where the issuing magistrate wholly abandoned his judicial role ...'; (3) where the affidavit supporting the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) where, depending upon the circumstances of the particular case, a warrant is 'so facially deficient--i.e., in failing to particularize the place to be searched or the things to be seized--that the executing officers cannot reasonably presume it to be valid.'"  United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002) (citations omitted).

None of these circumstances is present in this case.  Here, the municipal judge was

7

not misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. Instead, the judge issued the pickup order in question on his own motion. His decision to do so was not based on an affidavit from police, but on his review of defendant's case file. Further, the court is unpersuaded that Judge Bailey "wholly abandoned his judicial role" in preparing the VCO order. He did not initiate the meeting; instead, Lt. Holder asked the judge to review Floyd's case file along with a list of other files in connection with Holder's investigation. Rather than "rubber stamping" any request from Holder, the judge conducted an independent review of the file and determined for himself, without any apparent input from the officers, that Floyd was in violation of his probation or suspended sentence. In his judicial role, Judge Bailey prepares VCO orders routinely, using a standard form on his computer. He issued several other VCO orders for other individuals on Holder's list.

The court cannot conclude that the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, as no affidavit was required for the VCO order, which was essentially a bench warrant. The officers actually observed Judge Bailey as he reviewed Floyd's case file and made the determination that a violation had occurred. They had no reason to doubt the judge's view that Floyd had violated his probation, nor to question whether that determination constituted a sufficient finding of probable cause to arrest.

In addition, the VCO order was not so facially deficient that the executing officers could not reasonably presume it to be valid. Nothing about the order itself would have

8

alerted the officers that it was not a valid order. The order provided, *inter alia*:

> For good cause shown, it is the Court's opinion that the above-named Defendant should be taken into custody and incarcerated in the Lee County Jail to serve the balance of the sentence(s) of incarceration heretofore suspended reimbursing the City/County for all medical expenses.

> The Clerk is directed to set this matter for hearing on the next regular business day after said Defendant is in custody.

The VCO order is properly signed and dated and the case style is correct. The order clearly indicates the individual for whom the pickup order was intended. The officers did not think the order was unusual in failing to state the crime that was allegedly committed with any greater particularity. As one officer indicated, "I don't know that the judge has to specify that on an order that he gives."

According to the officers' uncontradicted testimony, the Auburn police department routinely serves VCO orders on people who violate their probation with the municipal court. There was no case number on this VCO order, but the officers believed that this was so because some employees in the court clerk's office were suspected of being involved in White's alleged ticket fixing, and it was their understanding that the warrant was given directly to Lt. Holder, rather than being routed through the clerk's office, to be kept confidential until they decided the execute it.[7] In fact, most of the time the officers do not have even have the VCO orders (or a case number) with them when they make an arrest. The pickup order is generally enforced on a traffic stop based on a "radio hit" about the

---

[7] In fact, Judge Bailey testified that, having no secretarial staff, he does all his own typing, and he "simply failed to type the case number on the order."

9

defendant.

In this case it is clear that the officers acted in objectively reasonable reliance on the VCO order in arresting Floyd. Any error concerning the order under the Alabama Rules of Criminal Procedure or other state law was attributable solely to the municipal judge, not to police. Clearly, application of the <u>Leon</u> good faith exception here "is justified because 'the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." <u>United States v. Ellis</u>, 971 F.2d 701, 704 (11th Cir. 1992) (citation omitted); <u>see also</u> <u>Arizona v. Evans</u>, 514 U.S. 1, 8 (1995) (Noting that there is no sound reason to apply the exclusionary rule as a means of deterring misconduct on the part of judicial officers who are responsible for issuing warrants.); <u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 990 (1984) (Applying the <u>Leon</u> exception where "it was the judge, not the police officers, who made the critical mistake."); <u>United States v. Smith</u>, 63 F.3d 766, 769 (11th Cir. 1995) (Determining that suppressing evidence because of judicial error will not serve the deterrent function that the exclusionary rule was designed to achieve.); <u>United States v. Gordon</u>, 50 F.3d 11, 1995 WL 108988, 3-4 (6th Cir. 1995) (Declining to apply the exclusionary rule to bench warrant where defects in warrant were attributable to the municipal judge and/or his staff rather than to any law enforcement agent involved in the case.).

In addition, even if the officers sought the VCO order as a pretext to obtain an opportunity to question defendant Floyd in connection with the Tyrone White investigation, the arrest may not be invalidated on this ground. "'Subjective intentions play no role in

ordinary, probable-cause Fourth Amendment analysis.'" United States v. Jones, 377 F.3d

1313, 1314 (11ᵗʰ Cir. 2004) (citing Whren v. United States, 517 U.S.806 (1996)). "Instead,

an arrest will be upheld if the objective circumstances justify the arrest." Id.   As noted

above, the officers acted in objectively reasonable reliance on the VCO order in arresting

Floyd. Their subjective intent in serving the warrant is irrelevant. Id.

Entry into the Residence

Defendant argues that the opening of the residence was involuntary and without the

consent of the occupants, and it did not create probable cause and exigent circumstances

sufficient to justify entry into the residence by the officers.

However, the court cannot conclude that the occupants' consent to open the door was

required in this case. As discussed above, police were at the residence to serve what they

reasonably believed was a valid VCO order for Floyd's arrest. They knocked and, in

response to an inquiry from within, announced their presence and told the occupants to "open

the door."   The officers were within their authority to demand entrance under these

circumstances. As the Eleventh Circuit has indicated, an arrest warrant founded on probable

cause implicitly carries with it the limited authority to enter a dwelling in which the suspect

lives when there is reason to believe the suspect is within. United States v. Bervaldi, 226

F.3d 1256, 1263 (11ᵗʰ Cir. 2000).[8] Here, because the officers believed n good faith that they

---

[8] In this case, defendant has not argued that police did not have a reasonable belief that
the location to be searched was Floyd's dwelling, or that they did not have reason to believe that
Floyd was within the dwelling.

had probable cause to arrest Floyd under the VCO order, they did not act unreasonably in telling the occupants of the residence to open the door. See United States v. Lauter, 57 F. 3d 212, 214-15 ("As the Supreme Court has observed, once an arrest warrant for a particular suspect has issued, it is constitutionally reasonable to require him to open his doors to the officers of the law.").[9]

Once the door was open and the officers smelled burning marijuana, they clearly had the authority to enter the residence to prevent the destruction of evidence and to secure the premises in order to obtain a search warrant. "[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being

---

[9] In the alternative, the court finds that, in the totality of the circumstances, McCray's decision to open the door was consensual. Police approached the residence in daylight and at a reasonable hour. Although there were at least four officers at the door when the police knocked, there is no evidence that McCray could see the number present, or that she knew that the police were there at all before they identified themselves. The officers at the door were in plain clothes. They knocked only once, not repeatedly, and nothing in the record suggests that their tone was loud or belligerent or that their weapons were drawn. The door was opened within a minute of the knock. Even so, the officers did not immediately storm in. Instead, they arrested Floyd, who exited without incident, before going inside. In addition, when she opened the door, McCray – who was familiar with some of the police who were present -- did not step back and place her hands behind her back, which would have suggested intimidation and a show of force on the part of the officers. See United States v. Ramirez-Chilel, 289 F.3d 744, 751 (2002). Instead, she seems to have simply "yield[ed] the right-of-way" when officers stepped inside, which does not suggest that she was overwhelmed by a show of official authority. McCray also voluntarily showed police the location of a weapon in the bedroom which, again, implies that she had previously given "some sort of implied consent to enter" based on her apparent cooperation. "Whether the consent is deemed involuntary depends upon the amount of threat presented." Tobin, 923 F.2d at 1512. Here, even though the words used by law enforcement were in the imperative, as in United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986) (holding that entry was not consensual when consent was given only after agent with weapon drawn shouted, "FBI. Open up."), the police did not shout "open the door" or draw their weapons. The amount of threat presented in this case, under the totality of the circumstances, was insufficient to constitute the kind of show of authority that would render McCray's decision to open the door non-consensual.

12

sought is not itself an unreasonable seizure of either the dwelling or its contents." Segura v.

United States, 468 U.S. 796, 810 (1984); see also Illinois v. McArthur, 531 U.S. 326, 121 S.

Ct. 946, 951-953 (2001) (Officers who had probable cause to believe that a home contained

contraband which was evidence of a crime, and who reasonably believed that the resident,

if left free of any restraint, would destroy that evidence, were authorized to secure the

residence to prevent the loss of evidence while they diligently sought a warrant.). Here, the

officers had information prior to their arrival at the residence that Floyd was dealing large

amounts of crack cocaine and marijuana from his residence. That information "rose to the

level of probable cause when, as the door stood open, [officers] detected what [they] knew

from [their] law enforcement experience to be the odor of marijuana." United States v. Tobin,

923 F.2d 1506, 1512 (11th Cir. 1991).[10] "Moreover," as the Eleventh Circuit indicated in

Tobin, "the defendant[] and anyone else who might have been present in the house would

have been aware of the [officers'] suspicions at that moment. Danger that the defendants or

someone else inside the house might destroy the evidence thus provided the exigent

circumstances required to justify a warrantless search." Id.; see also United States v.

Morales, 868 F.2d 1562, 1575 (11th Cir. 1989) ("This court has noted that the risk of removal

or destruction of narcotics involves exigent circumstances."). In addition, the officers were

entitled to conduct a protective sweep of the residence incident to the arrest of McCray and

---

[10] Sgt. Murray had previously smelled marijuana "probably a thousand times." He and
Lt. Holder were 26-year veterans of the Auburn Police department, and Murray had
approximately 20 years in narcotics.

13

Williams to ensure their safety. <u>United States v. Hromada</u>, 49 F.3d 685, 690 (11th Cir. 1995).

Accordingly, the court concludes that the evidence used by officers to secure the search warrant was not discovered in violation of the constitution and, thus, the drugs and other evidence seized as a result of the execution of that warrant are not due to be suppressed.

<u>Post-arrest Statements</u>

Defendant argues that, because his arrest was illegal, his statements following that arrest must be excluded unless intervening events break the causal connection between the illegal arrest and the confession. Defendant's argument is without merit for two reasons. First, as discussed above, his arrest on the VCO order was not unlawful, as police acted in objectively reasonable reliance on that order in detaining Floyd. Officers had additional probable cause to arrest defendant after they smelled the strong odor of burning marijuana emanating from the door of his residence.

Second, there is no evidence presently before the court that Floyd made any statement in response to official questioning. The facts elicited at the suppression hearing at this case from Lt. Holder were that, after Sgt. Tatum removed a sum of money from Floyd, Tatum called Holder outside. There defendant "made a statement to me, directly to me, that the drugs in the residence were his." Similarly, Sgt. Murray testified that "[s]ome time just briefly after being taken into custody," Floyd "was read his rights by Sergeant James Tatum." Thereafter, Murray said, Floyd made the statement to Tatum that "any drugs found in the house belongs to him basically." No testimony suggested that police solicited these statements or otherwise questioned defendant.

14

Case 3:05-cr-00187-LSC-SRW    Document 29    Filed 01/18/2006    Page 15 of 16

"Voluntary and spontaneous comments by an accused, even after <u>Miranda</u> rights are asserted, are admissible evidence if the comments were not made in response to government questioning." <u>Cannady v. Dugger</u>, 931 F.2d 752, 754 (11th Cir.1991); <u>see also United States</u> <u>v. Johnson</u>, 136 Fed.Appx. 279, 283 (11th Cir. 2005). Absent evidence that Floyd's statement(s) were the product of interrogation, the statements are not due to be suppressed. <u>See</u> <u>United States v. Washington</u>, 431 U.S. 181, 187 (1977) ("Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. ... Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.").

## Conclusion

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. # 20) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before January 26, 2006. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain

15

error or manifest injustice.  Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982).  See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982).  See also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 18th day of January, 2006.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | 3:05cr187-F |
| | ) | |
| | ) | |
| SAWELIJA TYREE FLOYD | ) | |

### OBJECTIONS TO THE REPORT OF THE MAGISTRATE JUDGE

**COMES NOW** the Defendant, Sawelija Tyree Floyd ("Floyd"), by and through counsel

of record, and makes the following objections to the recommendation of the Magistrate Judge

(Doc. 29) (hereinafter "Recommendation"):

I.        The Magistrate Judge found and concluded that although the arrest warrant (the

"VCO") used by the officers to arrest Floyd was not valid under Alabama law, the arrest was

legal nonetheless, because the officers relied upon it in good faith. The Magistrate Judge

further concluded that none of the exceptions to the Good Faith doctrine of <u>Leon</u> disagrees

and objects to the said findings and conclusions of the Magistrate Judge.

The Magistrate Judge has misconstrued the facts, and reached an erroneous conclusion.

It is clear that the municipal judge and the investigating officers literally conspired together

to find a way to bring Floyd into custody in aid of the Tyrone White investigation.

It is undisputed that on the same day the VCO was issued, Lieutenant Holder and

Sergeant Murray met with Judge Bailey to go over the files of several individuals allegedly

connected to Tyrone White in some way. (R-59: 1-10; 23:3-5). Lieutenant Holder could not

recall if he told the judge he needed to interview Floyd, but "may have" done so. The VCO



AO088-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.     I

issued as a direct result of the meeting on July 27, 2005 (R-29:7-25). The Judge's insistence

that he issued the VCO based upon the supposed fact that someone had improperly

influenced him to suspend Floyd's sentence when Floyd had appeared in municipal court on

April 21, 2005, for a disorderly conduct case lacks credibility (R-96:22-25; 97:1-21). The

court was without legal power to amend or change the disorderly conduct sentence as of

August 27, 2005, having lost jurisdiction to do so fourteen (14) days after it was pronounced.

Section 12-14-70 (c), Code of Alabama 1975. Since the Auburn Municipal Court merely

suspended Floyd's April 21, 2005 sentence for disorderly conduct, and did not lawfully place

Floyd on probation for a definite period of time and under definite conditions on that or any

of his prior cases, revocation of probation was a legal impossibility. An "indefinite"

suspension of sentence is unlawful in Alabama. Montgomery v. State, 231 Ala. 1, 163 S. 365,

367 (1935). There is a strong inference arising from the evidence in this case that the judge

and the police officers acted as a unit and in concert to detain and interrogate Floyd about his

knowledge of Tyrone White's activities, despite the fact that Floyd was not on probation and

was not formally accused by the police of committing any crime with regard to the

suspended sentence he received for disorderly conduct. The cooperation of the judge with the

police is exhibited by the fact that he got a ride with the officers from Auburn to

Montgomery for the suppression hearing, and discussed the case with them along the way.

(R-55:22-25; R-56:1-19). Most damning of all, the municipal judge at one point during the

suppression hearing appeared to conjure up a reason for having ordered Floyd's arrest which

could not possibly have been true. According to municipal judge Joe Bailey, he issued the

VCO against Floyd for Floyd's alleged failure to cooperate with an Auburn Police

Department investigation (presumably the White investigation). The problem with this

explanation is that Judge Bailey testified he ordered Floyd to cooperate with the investigation at the "due process' hearing on Monday, August 1[st] after Floyd's arrest the preceding Friday, July 29[th]. The judge could not possibly have ordered Floyd's arrest for violating an order he was not given until after being arrested, yet that is in substance what the judge stated under oath. (R-97:19-25; R 98-102). The judge's testimony here is further undermined by the fact that Floyd testified that he was released on August 1[st] without a "due process" hearing and this fact was confirmed by the testimony of Sergeant Murray (R-124:1-24; 43:16-21). A magistrate loses his neutrality by becoming a "rubber stamp for the police". Aguilar v. State of Texas, 378 U.S. 108 (1964) or by becoming an "adjunct law enforcement officer". Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 327 (1979). In this case the fact that the police apparently involved the judge directly in the investigation of alleged misconduct the Auburn police department and members of the clerk's staff caused the municipal judge to lose his neutrality and become blinded to the need for probable cause or some other sufficient legal basis for the issuance of an arrest warrant against the defendant.

In this case, it was not reasonable for the officers to rely upon the VCO. First, there is a strong inference that the VCO arrest was merely a sham or ruse to facilitate investigation of the Tyrone White case, and was not based on probable cause or any evidence that Floyd had violated a specific written probation condition. This is not a case where the officers' subjective intent is irrelevant, because there was no objective basis for Floyd's arrest in the first place. Whren & Brown v. U.S., 517 U.S. 806 (1996). A reasonably well-trained law enforcement officer should know that an individual cannot be arrested and incarcerated without probable cause and/or a proper written warrant specifying a charge. Neither was present in this case. The good faith exception simply does not extend to cases in which the

3

police have no reasonable grounds to believe that a warrant is valid. See Leon, 468 U.S. at 922-23. The Supreme Court has identified four (4) situations in which police reliance on a warrant is not objectively reasonable: (1) when the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit. Franks v. Delaware, 438 U.S. 154, 155-56, 171-72 (1978); (2) when the magistrate failed to act in a neutral and detached manner. Lo-Ji Sales v. New York, 442 U.S. 319, 326-28 (1979). "[T]he courts must... insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubberstamp for the police." Leon, 468 U.S. at 914. As Justice Powell has previously explained "[w]hatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." Shadwick v. City of Tampa, 407 U.S. 345, 350 (1972); (3) when the warrant was based on an affidavit "so lacking in *indicia* of probable cause as to render official belief in its existence entirely unreasonable. Leon, 468 U.S. at 923; and (4) when the warrant was so facially deficient that a reasonable police officer could not have believed it to be valid. See Leon, 468 U.S. at 923. Floyd asserts that, insofar as they have some analog to arrest warrants, virtually all of the above cited exceptions to the Good Faith rule apply in this case: (1) There was no underlying affidavit in this case, but the evidence failed to disclose any probable cause for the arrest of Floyd, either for violation of probation or for any new offense; (2) as pointed out earlier, Judge Bailey acted as an adjunct police officer in this case, issuing a plainly deficient VCO after meeting with the investigating officers for the White case and going over court files with them; (3) again, although there was no underlying affidavit, there was no probable cause to justify an arrest; and (4) the VCO was obviously deficient on its face because it did not

4

reference any Show Cause Order or specify and violation or offense. Accordingly, no reasonable police officer could have believed it to be a valid arrest warrant.

II.        The Magistrate Judge concluded that the consent of the occupants was not required in this case, and that the officers had authority to enter the duplex to arrest Floyd with or without permission. The Defendant objects to this conclusion. If, as argued above, the VCO was invalid and the Good Faith exception does not apply, the officers could not have lawfully gained access to the interior of the premises without the consent of the occupants.

III.       The Magistrate Judge also concluded that McCray's decision to open the door was voluntary. The Defendant also objects to this key finding by the Magistrate Judge.

Six (6) law enforcement officers approached and surrounded the residence. Sergeant Tatum approached and knocked on the door. After an initial verbal response from within the house, he replied "Police, open the door". Nearly a full minute passed before the door was finally opened, allowing the agents access to the smell of burning marijuana. It is clear that the agents in this case demanded entry under "color of authority" and that the opening of the door by Floyd's girlfriend (McCray) after an appreciable delay was not consensual. Because of the manner in which the agents demanded entry, they effected an unconstitutional search when they gained olfactory access through the open door. The circumstances indicate that McCray opened the door in response to a "show of official authority", and cannot be deemed to have consented to the agents having obtained olfactory evidence indicating the presence of marijuana. U.S. v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986); U.S. v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991); Bumper v. North Carolina, 391 U.S. 543, 548 (1968); Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) (voluntariness of consent must be judged in light of the totality of the circumstances).

## CONCLUSION

The above-identified findings of the Magistrate Judge are critical to the recommendation

to deny the Defendant's motion to suppress physical evidence. For the reasons stated herein, the

Court should reject those findings and reach an opposite result suppressing the physical evidence

seized from the Defendant's residence.

Respectfully submitted this the 26th day of January 2006.


s/ William R. Blanchard
WILLIAM R. BLANCHARD
Attorney for the Defendant

BLANCHARD LAW OFFICES
Post Office Box 746
Montgomery, Alabama 36101-0746
(334) 269-9691

6

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| vs. | )    **3:05cr187-F** |
| | ) |
| | ) |
| SAWELIJA TYREE FLOYD | ) |

### CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2006, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following: AUSA Todd Brown, and I hereby certify that I have mailed by United States Postal

Service the document to the following non-CM/ECF participants: n/a.

Respectfully submitted,

s/ William R. Blanchard
BLANCHARD LAW OFFICES
505 South Perry Street
Post Office Box 746
Montgomery, Alabama 36101-0746
Office: (334) 269-9691
Fax:    (334) 263-4766
(BLA029)

7

United States District Court
Middle District of Alabama
Eastern Division

UNITED STATES OF AMERICA,          ]
                                   ]
        Plaintiff,                 ]
                                   ]
    vs.                            ] 3:05-cr-187-LSC
                                   ]
Sawelija Tyree Floyd,              ]
                                   ]
        Defendant.                 ]

Order Accepting Report and Recommendation

This court has reviewed the Report and Recommendation of the

Honorable Susan Russ Walker, United States Magistrate Judge [Doc. 29]

entered the 18thth day of January, 2006 as well as the objections to the

Report and Recommendation made by the defendant [Doc. #34].  This

court has made a *de novo* determination of those findings and portions

objected to by the defendant in this case.

It is Ordered that the Report and Recommendation of the Honorable

Susan Russ Walker, United States Magistrate Judge [Doc. 29] be accepted

and hereby is accepted as entered.  This court adopts the report and

recommendation as the Order of this court as if the same were set forth

AO886-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    J

at this point *in extenso*.

Done this 30th day of January 2006.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124019

**FILED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

JAN 2 0 2006

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR. NO.   3:05-cr-187-F____** |
| | ) | **[21 USC 841(a)(1)]** |
| **SAWELIJA TYREE FLOYD, a/k/a** | ) | |
| **TYREE FLOYD, a/k/a,** | ) | |
| **TY FLOYD** | ) | **SUPERSEDING INDICTMENT** |

**The Grand Jury charges:**

### COUNT 1

On or about the 29th day of July, 2005, in Lee County, within the Middle District of

Alabama, the defendant,

SAWELIJA TYREE FLOYD, a/k/a,
TYREE FLOYD, a/k/a,
TY FLOYD,

did knowingly and intentionally possess with intent to distribute 50 grams or more of a mixture

and substance containing a detectible amount of cocaine base ("crack"), a Schedule II controlled

substance, in violation of Title 21, United States Code, Section 841(a)(1).

### COUNT 2

On or about the 29th day of July, 2005, in Lee County, within the Middle District of

Alabama, the defendant,

SAWELIJA TYREE FLOYD, a/k/a,
TYREE FLOYD, a/k/a,
TY FLOYD,

did knowingly and intentionally possess with intent to distribute a mixture and substance

containing a detectible amount of marijuana, a Schedule I controlled substance, in violation of

Title 21, United States Code, Section 841(a)(1).

AO896-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.    K

## COUNT 3

·· On or about the 29th day of July, 2005, in Lee County, within the Middle District of

Alabama, the defendant,

SAWELIJA TYREE FLOYD, a/k/a,
TYREE FLOYD, a/k/a,
TY FLOYD,

did knowingly and intentionally possess with intent to distribute 500 grams or more of a mixture

and substance containing a detectible amount of cocaine hydrochloride, a Schedule II controlled

substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 4

On or about the 29th day of July, 2005, in Lee County, within the Middle District of

Alabama, the defendant,

SAWELIJA TYREE FLOYD, a/k/a,
TYREE FLOYD, a/k/a,
TY FLOYD,

did knowingly and intentionally possess with intent to distribute a mixture and substance

containing a detectible amount of 3,4-methylenedioxymethamphetamine ("MDMA" or Ecstasy),

a Schedule I controlled substance, in violation of Title 21, United States Code, Section

841(a)(1).

A TRUE BILL:

*Jayone D Gilbert*
Foreperson

*Leura G. Canary*
LEURA GARRETT CANARY
United States Attorney

*Todd A. Brown*
Todd A. Brown
Assistant United States Attorney

2

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CR. NO. 03:05-CR-0187-F** |
| | ) | |
| **SAWELIGA TYREE FLOYD** | ) | |

## PLEA AGREEMENT

| | |
|---|---|
| **DEFENSE COUNSEL:** | **WILLIAM R. BLANCHARD** |
| **ASSISTANT U.S. ATTORNEY:** | **TODD A. BROWN** |

### COUNT AND STATUTES CHARGED:

Counts 1-4    21 U.S.C. § 841(a)(1)
               Possession of Controlled Substance with Intent to Distribute

### COUNT(S) PLEADING PURSUANT TO PLEA AGREEMENT:

Counts 1-4    21 U.S.C. § 841(a)(1)
               Possession of Controlled Substance with Intent to Distribute

### PENALTIES BY COUNT - MAXIMUM PENALTY
### (EACH ASSUMING NO PRIOR FELONY DRUG CONVICTION(S)):

Count 1    21 U.S.C. § 841(a)(1)
             Possession of Controlled Substance with Intent to Distribute

             A term of imprisonment which may not be less than 10 years and not more than life, a fine not to exceed $4,000,000, or both fine and imprisonment; a term of supervised release of no less than 5 years; and an assessment fee of $100.00.

Count 2    21 U.S.C. § 841(a)(1)
             Possession of Controlled Substance with Intent to Distribute

             A term of imprisonment which may not be more than 5 years, a fine not to exceed $250,000, or both fine and imprisonment; a term of supervised release of no less than 2 years; and an assessment fee of $100.00.



AO898-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.  L

Count 3    21 U.S.C. § 841(a)(1)
           Possession of Controlled Substance with Intent to Distribute

           A term of imprisonment which may not be less than 5 years and not more than 40
           years, a fine not to exceed $2,000,000, or both fine and imprisonment; a term of
           supervised release of no less than 4 years; and an assessment fee of $100.00.

Count 4    21 U.S.C. § 841(a)(1)
           Possession of Controlled Substance with Intent to Distribute

           A term of imprisonment which may not be more than 20 years, a fine not to exceed
           $1,000,000, or both fine and imprisonment; a term of supervised release of no less
           than 3 years; and an assessment fee of $100.00.

## ELEMENTS OF THE OFFENSE(S):

Counts 4    21 U.S.C. § 841(a)(1)
            Possession of Controlled Substance with Intent to Distribute

   1.    The defendant knowingly and willfully possessed a controlled substance, as charged;

   2.    That the defendant possessed the controlled substance with intent to distribute it; and,

   3.    That the quantity of the controlled substance was as listed in the indictment.

**********************************************************************************

Todd A. Brown, Assistant United States Attorney, and William R. Blanchard, Esq., attorney

for the defendant, pursuant to Rule 11(a)(2), Federal Rules of Criminal Procedure, as Amended,

have, with the authorization of the undersigned defendant, heretofore entered into discussions with a

view towards reaching a pretrial conclusion of the charges pending in the Indictment herein and a

Plea Agreement has been reached by said parties.

### GOVERNMENT'S PROVISIONS

1. Upon entering a plea of guilty by the defendant to the offense charged in Counts 1-

4 of the Indictment, the attorney for the Government will agree that a 2-level reduction in the

applicable offense level pursuant to U.S.S.G. § 3E1.1(a) for the defendant's acceptance of

2

responsibility is appropriate, so long as the defendant does not obstruct justice or otherwise fail to accept responsibility for the offense conduct.

2. The United States reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses and the defendant's background.

## DEFENDANT'S PROVISIONS

3. The defendant agrees to plead guilty to Counts 1-4 of the Indictment

## FACTUAL BASIS

4. The defendant admits the allegations charged in Counts 1-4, and understands that the nature of the charge to which the plea is offered involves proof as to Counts 1-4, that on or about July 29, 2005, in Lee County, Alabama, the defendant knowingly and intentionally possessed, with intent to distribute, controlled substances, namely, 50 grams or more of cocaine base, marijuana, 500 grams or more of cocaine hydrochloride, and 3,4-methylenedioxymethamphetamine ("MDMA" or "Ecstasy"), in violation of Title 21, United States Code, Section 841(a)(1).

## DEFENDANT RETAINS APPEAL AND COLLATERAL ATTACK RIGHTS

5. The defendant retains his rights to appeal and collaterally attack the sentence imposed in this case. This retention of appeal rights specifically includes the right to appeal the adverse determination of a specified pretrial motion, pursuant to Fed. R. Crim. P. 11(a)(2), namely, the decision to deny the defendant's motion to suppress evidence, supported by the Magistrate Judge's Recommendation, filed on January 18, 2006 (Doc. # 29), and the subsequent adoption of that Recommendation by the District Court. (Doc. # 35).

## DEFENDANT'S UNDERSTANDING AND ACKNOWLEDGMENT

6. The defendant, before entering a plea of guilty to Counts 1-4, as provided for herein by said Plea Agreement, advises the Court that:

a. The discussions between the attorney for the Government and the attorney for the defendant towards reaching an agreed plea in this case have taken place with the defendant's authorization and consent.

b. The defendant further understands that, pursuant to 18 U.S.C. § 3013, said $100.00 assessment fee is to be paid by the defendant on the date of sentencing and that, if a fine is imposed by the Court at sentencing, the defendant shall meet with a member of the Financial Litigation Section of the United States Attorney's Office on the day of sentencing and complete a written personal financial statement setting forth the defendant's assets and liabilities as of the date of the offense. The defendant will make an honest, good faith effort to pay said fine as directed by the Financial Litigation Section of the United States Attorney's Office.  The defendant further understands that by completing the financial statement, the defendant is representing that it is true and accurate to the best of the defendant's information, knowledge, and belief.

c. The defendant understands that the defendant has a right to be represented by an attorney at every stage of the proceedings against the defendant herein and is represented by the defendant's undersigned attorney.

d. The defendant understands that the defendant has the right to plead not guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right to call witnesses in the defendant's own behalf, and the right not to be compelled to incriminate the defendant, and that if the

4

defendant enters a plea of guilty herein, there will not be a further trial of any kind and that by the entry of such a plea, the defendant waives the right to a trial by jury or to a trial before the Court.

e. The defendant further understands that in entering a plea of guilty herein, the Court may ask questions about the offense to which the plea is entered and further understands that if the defendant answers these questions under oath, on the record, and in the presence of counsel, which questions and answers would be recorded, that the answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

f. The Defendant further understands and advises the Court that the Plea Agreement as set forth herein and the plea to be entered by the defendant as a result thereof is voluntary on the defendant's part and is not the result of any force or threats or of any promises apart from the aforesaid Plea Agreement. The defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the attorney for the Government and the attorney for the defendant, all conducted with the defendant's authorization, knowledge, and consent.

g. The defendant further advises the Court that the defendant's understanding of this Plea Agreement is as set forth in this document.

h. The defendant further understands that the Government can only make a recommendation, which is not binding upon the Court.

i. The defendant further advises the Court that the defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Indictment herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the defendant. However, the defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the

5

Indictment herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the defendant under oath, on the court record, and in the presence of counsel.

j. The defendant understands that there is no possibility of a sentence of probation.

k. The defendant is satisfied that defense counsel has been competent and effective in representing defendant.

7. The undersigned attorneys for the Government and for the defendant represent to the court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Fed. R. Crim. P. 11, as Amended. The attorney for the defendant further advises the Court that the defendant has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the defendant has been advised of the defendant's right to plead not guilty and to be tried by a jury on all issues herein; of the maximum possible penalty provided by law; that by the entering of a plea of guilty as aforesaid, the defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the defendant and the right not to be compelled to incriminate the defendant; and that if the defendant pleads guilty, there will not be a further trial of any kind. Further, the defendant has been advised that if the defendant pleads guilty, the Court may ask questions about the offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the defendant in a civil or criminal proceeding, but that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

8. The defendant understands that the U.S. Probation Office will prepare a presentence investigation report for the Court. The Probation Officer will consider the defendant's conduct related to the offense to which the plea is offered, as well as the defendant's criminal history. The

offense level or criminal history category, as calculated by the Probation Officer and determined by

the court, may differ from that projected by defendant's counsel or the U.S. Attorney.

This 3rd day of February, 2006.

Respectfully submitted,

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

Todd A. Brown
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101
(334)223-7280

Louis V. Franklin, Sr.
Chief, Criminal Division

7

I have read the foregoing Plea Agreement, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE AND CORRECT AND THAT I AM SATISFIED THAT I HAVE RECEIVED COMPETENT ADVICE AND REPRESENTATION FROM MY DEFENSE COUNSEL.

Sawelija Tyree Floyd
Defendant

2/06/06
Date

William R. Blanchard
Attorney for the Defendant

2/06/06
Date

1

RECEIVED

1          IN THE UNITED STATES DISTRICT COURT 2007 JAN 20  A 2: 08

2          FOR THE MIDDLE DISTRICT OF ALABAMA
                                             U. S. ATTORNEY
3                  EASTERN DIVISION          MIDDLE ALABAMA

4

5    UNITED STATES OF AMERICA

6        vs.                    CASE NO:   3:05cr187-LSC

7    SAWELIJA TYREE FLOYD,

8          Defendant.

9

10

11

12              * * * * * * * * * * *

13              CHANGE OF PLEA PROCEEDINGS

14              * * * * * * * * * * *

15          BEFORE THE HONORABLE SUSAN RUSS WALKER, UNITED STATES

     MAGISTRATE JUDGE, at Montgomery, Alabama, on Monday, February 6,

16   2006, commencing at 3:14 p.m.

17   APPEARANCES:

18   FOR THE GOVERNMENT:      Mr. Todd A. Brown
19                            Assistant United States Attorney
                              OFFICE OF THE UNITED STATES ATTORNEY
20                            One Court Square, Suite 201
                              Montgomery, Alabama  36104
21
     FOR THE DEFENDANT:       Mr. William R. Blanchard, Jr.
22                            Attorney at Law
                              BLANCHARD LAW OFFICES
23                            505 South Perry Street
                              Montgomery, Alabama  3610[?]
24
                   Proceedings reported stenographically
25                   transcript produced by computer.

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT    M
NO.

2

1    (The following proceedings were heard before the Honorable

2    Susan Russ Walker, United States Magistrate Judge, at

3    Montgomery, Alabama, on Monday, February 6, 2006,

4    commencing at 3:14 p.m.:)

5    (Defendant present)

6        THE COURT: We'll have United States versus Sawelija

7    Tyree Floyd. This will be 3:05cr0187.

8        Previously the Court was informed that the defendant

9    wishes to change his plea and consents to having the guilty plea

10   proceedings conducted by a United States magistrate judge. I am

11   a United States magistrate judge. The next higher ranking judge

12   is a district judge, and you have the right to have a district

13   judge take your plea. If you wish to have me take your plea

14   today, you need to read and sign the consent form, please.

15       (The defendant and Mr. Blanchard comply)

16       THE COURT: The form has been signed. Would counsel

17   briefly summarize the terms of the plea agreement?

18       MR. BROWN: I'll do that, Your Honor. This is an

19   11(a)(2) plea, which is -- this is a conditional plea. And the

20   terms of the agreement basically are that the defendant will

21   plead guilty to all four counts in the indictment and retain his

22   right to appeal generally and specifically, as required by the

23   rule, the pretrial motion that was the suppression motion that

24   this Court filed the recommendation on and the district court

25   adopted in Document Number 35.

3

1        THE COURT: Okay. Anything else, Mr. Blanchard?

2        MR. BLANCHARD: Your Honor, there is one further

3    provision. Under government's provisions, it says upon entering

4    a plea of guilty by the defendant to counts one through four,

5    the government will agree to a two-level reduction for

6    acceptance of responsibility.

7        THE COURT: All right. We'll swear in the defendant.

8        THE CLERK: If you'd raise your right hand.

9        (The defendant is sworn)

10       THE COURT: Mr. Floyd, do you understand that you are

11   now under oath and that if you answer any of the questions asked

12   here falsely, your answers may later be used against you in

13   another prosecution for perjury or making a false statement?

14       THE DEFENDANT: Yes, ma'am.

15       THE COURT: What is your full name, please?

16       THE DEFENDANT: Sawelija Tyree Floyd.

17       THE COURT: How old are you?

18       THE DEFENDANT: 28.

19       THE COURT: How far did you go in school?

20       THE DEFENDANT: A year of college.

21       THE COURT: Have you been treated recently for any

22   mental illness or addiction to narcotic drugs of any kind?

23       THE DEFENDANT: Yes, ma'am. I'm currently in the

24   Opelika Addiction Center.

25       THE COURT: Okay. Does that treatment or the

4

1    underlying addiction give you any problem understanding me

2    today?

3        THE DEFENDANT: No, ma'am.

4        THE COURT: Do you understand me?

5        THE DEFENDANT: Yes, ma'am.

6        THE COURT: Are you currently under the influence of

7    any drug or medication or alcoholic beverage of any kind?

8        THE DEFENDANT: No, ma'am.

9        THE COURT: Have you received a copy of the indictment

10   pending against you; that is, the written charges made against

11   you in this case?

12       THE DEFENDANT: Yes, ma'am.

13       THE COURT: Have you fully discussed those charges and

14   the case in general with Mr. Blanchard as your counsel?

15       THE DEFENDANT: Yes, ma'am.

16       THE COURT: Are you fully satisfied with the counsel,

17   representation, and advice given to you in this case by your

18   attorney, Mr. Blanchard?

19       THE DEFENDANT: Yes, ma'am.

20       THE COURT: There is a written plea agreement in this

21   case. Did you have the opportunity to read and discuss the plea

22   agreement with your lawyer before you signed it?

23       THE DEFENDANT: Yes, ma'am.

24       THE COURT: Does the plea agreement represent in its

25   entirety any understanding that you have with the government?

5

1        THE DEFENDANT: Yes, ma'am.

2        THE COURT: Do you understand the terms of the plea

3    agreement?

4        THE DEFENDANT: Yes, ma'am.

5        THE COURT: Has anyone made any other or different

6    promise or assurance of any kind to you in an effort to induce

7    you to plead guilty in this case?

8        THE DEFENDANT: No, ma'am.

9        THE COURT: Do you understand that the terms of the

10   plea agreement are merely recommendations to the court, that the

11   court can reject the recommendations without permitting you to

12   withdraw your plea of guilty and impose a sentence that is more

13   severe than you may anticipate?

14       THE DEFENDANT: Yes, ma'am.

15       THE COURT: Has anyone attempted in any way to force

16   you to plead guilty in this case?

17       THE DEFENDANT: No, ma'am.

18       THE COURT: Are you pleading guilty of your own free

19   will because you are guilty?

20       THE DEFENDANT: Yes, ma'am.

21       THE COURT: Do you understand that the offenses to

22   which you are pleading guilty are felony offenses; that if your

23   plea is accepted, you will be adjudged guilty of those offenses;

24   and that such adjudication may deprive you of valuable civil

25   rights, such as the right to vote, the right to hold public

6

1  office, the right to serve on a jury, and the right to possess
2  any kind of firearm?
3      THE DEFENDANT: Yes, ma'am.
4      THE COURT: The maximum penalty provided by law for
5  each count is as follows. For count one, no more than $4
6  million fine, no less than ten years and no more than life
7  imprisonment, or both the fine and the imprisonment, no less
8  than five years' supervised release, a $100 assessment fee, and
9  you may be asked to make restitution to any victim of the
10  offense. For count two, the maximum punishment is no more than
11  $250,000 fine, no more than five years' imprisonment, or both
12  the fine and the imprisonment, no less than two years'
13  supervised release, a $100 assessment fee, and you may be asked
14  to make restitution. For count three, the maximum punishment is
15  no more than $2 million fine, no less than five years and no
16  more than 40 years' imprisonment, or both the fine and the
17  imprisonment, no less than four years' supervised release, a
18  $100 assessment fee, and you may be asked to make restitution.
19  And finally, for count four, the maximum punishment is no more
20  than $1 million fine, no more than 20 years' imprisonment, or
21  both the fine and the imprisonment, no less than three years'
22  supervised release, a $100 assessment fee, and again, you may be
23  asked to make restitution to any victim of the offense. Do you
24  understand the maximum punishment for each of these counts?
25      THE DEFENDANT: Yes, ma'am.

7

1      THE COURT: With regard to supervised release, do you
2  understand that if you violate the conditions of supervised
3  release, you can be given additional time in prison?
4      THE DEFENDANT: Yes, ma'am.
5      THE COURT: Do you understand that you must pay a $100
6  assessment fee for each count in this case?
7      THE DEFENDANT: Yes, ma'am.
8      THE COURT: Do you understand that under the Sentencing
9  Reform Act of 1984, the United States Sentencing Commission has
10  issued guidelines for judges to follow in determining the
11  sentence in a criminal case?
12      THE DEFENDANT: Yes, ma'am.
13      THE COURT: And do you understand that under recent
14  Supreme Court decisions, those guidelines are now considered
15  advisory guidelines?
16      THE DEFENDANT: Yes, ma'am.
17      THE COURT: Have you and your attorney talked about how
18  the advisory sentencing guidelines might apply to your case?
19      THE DEFENDANT: Yes, ma'am.
20      THE COURT: Do you understand that the court will not
21  be able to determine an advisory guideline sentence for your
22  case until after the presentence report has been completed and
23  you and the government have had the opportunity to challenge the
24  reported facts and the application of the advisory guidelines
25  recommended by the probation officer and that the sentence

8

1  imposed may be different than any estimate that your attorney or
2  the probation officer or anyone else may have given you?
3      THE DEFENDANT: Yes, ma'am. I understand.
4      THE COURT: I'm sorry?
5      THE DEFENDANT: I understand.
6      THE COURT: Do you also understand that after your
7  advisory guideline range has been determined, the court has the
8  authority in some circumstances to depart from the advisory
9  guidelines and impose a sentence that is more severe or less
10  severe than the sentence called for by those guidelines?
11      THE DEFENDANT: Yes, ma'am.
12      THE COURT: Do you understand that parole has been
13  abolished and that if you are sentenced to prison, you will not
14  be released on parole?
15      THE DEFENDANT: Yes, ma'am.
16      THE COURT: Do you understand that under some
17  circumstances, you or the government may have the right to
18  appeal any sentence that the court imposes?
19      THE DEFENDANT: Yes, ma'am.
20      THE COURT: Do you understand that you have the right
21  to plead not guilty to any offense charged against you and to
22  persist in that plea; that you would then have the right to a
23  trial by jury; that at trial, you would be presumed to be
24  innocent and the government would have to prove your guilt
25  beyond a reasonable doubt?

9

1      THE DEFENDANT: Yes, ma'am.
2      THE COURT: Do you understand that you would have the
3  right to the assistance of counsel for your defense, the right
4  to see and hear all the witnesses and have them cross-examined
5  in your defense, the right on your own part to decline to
6  testify unless you voluntarily elected to do so in your own
7  defense, and the right to the issuance of subpoenas or
8  compulsory process to compel the attendance of witnesses to
9  testify in your defense?
10      THE DEFENDANT: Yes, ma'am.
11      THE COURT: Do you understand that should you decide
12  not to testify or put on any evidence, these facts cannot be
13  used against you?
14      THE DEFENDANT: Yes, ma'am.
15      THE COURT: Do you further understand that by entering
16  a plea of guilty, if that plea is accepted by the district
17  judge, there will be no trial and you will have waived, or given
18  up, your right to a trial as well as those other rights
19  associated with a trial as I just described them?
20      THE DEFENDANT: Yes, ma'am.
21      THE COURT: The charges to which you're pleading guilty
22  on this conditional plea are set out in the superseding
23  indictment. Count one charges that on or about July 29th, 2005,
24  in Lee County, within the Middle District, that you knowingly
25  and intentionally possessed with intent to distribute 50 grams

10

1  or more of cocaine base or crack, a Schedule II controlled
2  substance, in violation of 21 U.S.C., Section 841(a)(1).  Count
3  two charges that on or about July 29th, 2005, in Lee County,
4  within the Middle District, that you knowingly and intentionally
5  possessed with intent to distribute a -- I'm sorry -- with
6  intent to distribute a quantity of marijuana, a Schedule I
7  controlled substance, in violation of 21 U.S.C., Section
8  841(a)(1).  Count three charges that on or about July 29th,
9  2005, in Lee County, within the Middle District, that you
10  knowingly and intentionally possessed with intent to distribute
11  500 grams or more of cocaine hydrochloride, a Schedule III --
12  Schedule II controlled substance, in violation of 21 U.S.C.,
13  Section 841(a)(1).  Count four charges that on or about July
14  29th, 2005, in Lee County, within the Middle District, that you
15  knowingly and intentionally possessed with intent to distribute
16  a quantity of 3,4 --
17        MR. BROWN:  I can look it up.
18        THE COURT:  -- methylenedioxymethamphetamine --
19        MR. BROWN:  You got it, Judge.
20        THE COURT:  -- thank you -- MDMA or Ectasy, a Schedule
21  I controlled substance, in violation of 21 U.S.C., Section
22  841(a)(1).  Do you understand that those are the charges to
23  which you're pleading guilty?
24        THE DEFENDANT:  Yes, ma'am.
25        THE COURT:  The elements of these offenses are as

11

1  follows.  For count one -- I'm not sure, counsel, that I have a
2  full set of the elements.  I'm looking at, on page 2 in the plea
3  agreement, something that says count four.
4        MR. BROWN:  Right.  It says counts four, Your Honor.  I
5  think that's a typographical error.  It should have been counts
6  one through four.  They all have the same elements.
7        THE COURT:  All right.  Thank you.  For counts one
8  through four, each of those counts will have the following
9  elements.  Number one, that you knowingly and willfully
10  possessed a controlled substance, as charged; two, that you
11  possessed the controlled substance with the intent to distribute
12  it; and three, that the quantity of the controlled substance was
13  as listed in the indictment.  Do you understand those elements?
14        THE DEFENDANT:  Yes, ma'am.
15        THE COURT:  I need to find whether or not there is a
16  factual basis for the plea.  How would you like to proceed?
17        MR. BLANCHARD:  Judge, I will ask.
18        THE COURT:  Thank you.
19        MR. BLANCHARD:  Mr. Floyd, are you a resident of Lee
20  County?
21        THE DEFENDANT:  Yes, sir.
22        MR. BLANCHARD:  Live in Auburn, Alabama?
23        THE DEFENDANT:  Yes, sir.
24        MR. BLANCHARD:  On Ty Court?
25        THE DEFENDANT:  Yes, sir.

12

1        MR. BLANCHARD:  On July 29th of last year, did the
2  Auburn Police Department or elements of the Auburn Police
3  Department come to your residence?
4        THE DEFENDANT:  Yes, sir.
5        MR. BLANCHARD:  Did they conduct a search within your
6  residence?
7        THE DEFENDANT:  Yes, sir.
8        MR. BLANCHARD:  Were you there at the time?
9        THE DEFENDANT:  Yes, sir.
10        MR. BLANCHARD:  Did they find various controlled
11  substances or drugs in your residence?
12        THE DEFENDANT:  Yes, sir.
13        MR. BLANCHARD:  Were you aware that those controlled
14  substances were present in your residence?
15        THE DEFENDANT:  Yes, sir.
16        MR. BLANCHARD:  Did they belong to you?
17        THE DEFENDANT:  Yes, sir.
18        MR. BLANCHARD:  All right.  Did you intend to
19  distribute them?
20        THE DEFENDANT:  Yes, sir.
21        MR. BLANCHARD:  Did those controlled substances
22  contain -- or among those controlled substances, was there at
23  least 50 grams of crack cocaine, sometimes called cocaine base?
24        THE DEFENDANT:  Yes, sir.
25        MR. BLANCHARD:  And was there at least 500 grams of

13

1  powder cocaine, sometimes called cocaine hydrochloride?
2        THE DEFENDANT:  Yes, sir.
3        MR. BLANCHARD:  Was there a quantity of marijuana?
4        THE DEFENDANT:  Yes, sir.
5        MR. BLANCHARD:  And was there also a substance called
6  MDMA, or methamphetamine?  You heard the chemical name read out
7  in court a moment ago.
8        THE DEFENDANT:  Yes, sir.
9        MR. BLANCHARD:  Was that also present among what you
10  had?
11        THE DEFENDANT:  Yes, sir.
12        MR. BLANCHARD:  And was that all in Lee County,
13  Alabama?
14        THE DEFENDANT:  Yes, sir.
15        MR. BLANCHARD:  Judge, I believe --
16        MR. BROWN:  Satisfied, Your Honor.
17        THE COURT:  All right.  Very good.  How do you now
18  plead to the charges against you in counts one through four of
19  the superseding indictment, guilty or not guilty?
20        THE DEFENDANT:  Guilty.
21        THE COURT:  Let me note for the record that the written
22  plea agreement does not mention that the plea is to the counts
23  in the superseding indictment.  It says just the indictment.  Do
24  counsel think that that needs to be amended on the record?
25        MR. BLANCHARD:  Judge, I can state on the record that

14

1  we know and understand it to be to the superseding indictment.

2      MR. BROWN: And the original indictment only contained

3  two counts, so that the -- it would comport with the plea

4  colloquy that Mr. Floyd set forth a moment ago.

5      THE COURT: All right. Well, I'll say for the record

6  that I understand this plea to be to counts one through four of

7  the superseding indictment.

8      And let me just ask you, Mr. Floyd, would you agree

9  with that?

10      THE DEFENDANT: Yes, ma'am.

11      THE COURT: Okay. It is the finding of the Court in

12  the case of United States versus Sawelija Tyree Floyd that the

13  defendant is fully competent and capable of entering an informed

14  plea; that the defendant is aware of the nature of the charges

15  and the consequences of the plea; and that the plea of guilty is

16  a knowing and voluntary plea supported by an independent basis

17  in fact containing each of the essential elements of the

18  offense. The plea is therefore accepted, and the defendant is

19  now adjudged guilty of those offenses.

20      A written presentence report will be prepared by the

21  probation office to assist the court in sentencing. You'll be

22  asked to give information for the report, and your attorney may

23  be present for that if you wish. The court will permit you and

24  your counsel to read the presentence report and file any

25  objections to it before the sentencing hearing, and you and your

15

1  counsel will have the opportunity to speak on your behalf at the

2  sentencing hearing. The date for sentencing will be set by

3  order.

4      This is one of those cases in which there is a

5  presumption that you will be committed to the custody of the

6  marshal after your plea is taken. And the only possibility for

7  release is if there are exceptional reasons why your detention

8  would be inappropriate; that is, exceptional circumstances.

9  Does anybody want to be heard on that?

10      MR. BROWN: Your Honor, I had a discussion with

11  Mr. Blanchard, I believe it was Friday afternoon, about the

12  possibility of Mr. Floyd cooperating in another investigation.

13  That -- nothing has materialized, as far as that is concerned,

14  although the thought process at that time was that we -- that it

15  would be helpful, if not necessary, for Mr. Floyd to be able to

16  come to our office and cooperate and so forth. Now, I

17  understand that since that time, I've become aware of some

18  information from the probation office, so I'll leave it to

19  Mr. Blanchard to -- to set forth reasons why there are

20  exceptional circumstances and --

21      THE COURT: Well, I guess one of the questions is how

22  could he cooperate with the government if he has positive drug

23  tests.

24      MR. BROWN: There is that issue, Your Honor, that we

25  didn't -- we weren't aware of when Mr. Blanchard and I had the

16

1  discussion. So --

2      THE COURT: All right. Mr. Blanchard, anything you

3  want to say?

4      MR. BLANCHARD: Judge, we were not aware -- that is, I

5  was not aware of it either and have just become aware of it

6  today. I do note that in the report provided by Mr. Robinson,

7  there is an indication that Mr. Floyd has, since his reprimand

8  on December 30th, been more compliant with his drug treatment.

9  There are still -- the record is still not a full record on

10  that, but I would -- I would note for the record here that

11  people who have substance abuse problems often do have problems,

12  and they do backslide and have difficulty. The report here from

13  the pretrial services indicates that Mr. Floyd would be able to

14  get drug treatment in prison. That may be true eventually. But

15  I'm not aware of any effective drug treatment that's given to

16  anybody in the Montgomery City Jail. In fact, it may be just

17  the opposite.

18      I think Mr. Floyd, given the fact that there is the

19  issue of this cooperation that's just come up and given the fact

20  that he is doing better with his -- with his drug treatment, has

21  been more compliant, and that he can in fact get drug treatment

22  that he needs while he's out, that all those things combined

23  should constitute extraordinary circumstances to allow him to

24  remain on release. Also, there is the issue of the fact that

25  this is a conditional plea and that he will appeal as soon as he

17

1  receives his sentence -- he cannot do so now -- and would at

2  that point expect to be given some consideration as far as an

3  appeal bond or release on appeal to continue to hopefully do

4  better abiding by the conditions of the Court during the phase

5  of his appeal. And I would ask that the Court give that

6  consideration also.

7      THE COURT: Let me hear from the probation officer with

8  regard to whether you think there are exceptional circumstances

9  based on what -- based on your supervision.

10      PROBATION OFFICER: Your Honor, as we've discussed

11  previously, the law is not very clear as far as the exact

12  definition of exceptional, you know, reasons why --

13      THE COURT: Well, I know I have to apply the law, but

14  you can tell me with regard to facts.

15      PROBATION OFFICER: As to his cooperation, that's --

16  that would be more to the U.S. attorney to speak. I do know

17  that the distance that he is from the Montgomery area, as far as

18  the type of supervision that could be provided, causes some

19  difficulty. The U.S. attorney has mentioned to me that possibly

20  a compromise could be reached that -- electronic monitoring

21  would be a good compromise at this point to where he could still

22  cooperate and yet adequate supervision could be performed if the

23  defense would --

24      THE COURT: What is your --

25      PROBATION OFFICER: I agree with the electronic

18

1  monitoring, Your Honor. I think that would adequately address
2  the concerns about the drug use and to ensure that he works and
3  gives him the structure in regards to --
4        THE COURT: Okay. Well, since I was just about to
5  incarcerate Mr. Floyd, I take it he would agree to electronic
6  monitoring as well?
7        THE DEFENDANT: Yes, ma'am.
8        MR. BLANCHARD: Yes, Your Honor.
9        THE COURT: He would. Is there a telephone line?
10       MR. BLANCHARD: Is there a hard-line telephone in your
11  house?
12       THE DEFENDANT: Yes, sir. Yes, ma'am.
13       THE COURT: And does the government agree with
14  electronic monitoring as well?
15       MR. BROWN: I think that would be fine, Your Honor,
16  with the understanding, of course, that if Mr. Floyd were to
17  test positive one more time, that that -- that he would be
18  incarcerated pending his sentence.
19       THE COURT: Mr. Floyd, they just can't use your help if
20  you test positive, which means that you don't have the ability
21  to help yourself on this if you do. Do you understand that it's
22  pretty important to your future that you not test positive if I
23  do release you?
24       THE DEFENDANT: Yes, ma'am.
25       THE COURT: And do you understand they are going to

19

1  test you?
2        THE DEFENDANT: Yes, ma'am.
3        THE COURT: Okay. I will release you on the condition
4  of electronic monitoring. I will ask the probation officer to
5  provide you whatever paperwork is necessary for that.
6        PROBATION OFFICER: Yes, Your Honor.
7        THE COURT: If I need to sign a separate order, I'll do
8  that.
9        PROBATION OFFICER: Yes, Your Honor.
10       THE COURT: And I'll just tell you that they will
11  hold -- the marshal will hold you in custody until that phone
12  line can be set up, and that may take a little bit of time. But
13  I will find the exceptional circumstances under those
14  conditions. And specifically, pursuant to 18 U.S.C., 3145(c), I
15  will find exceptional reasons why the defendant's detention
16  would not be appropriate and that the defendant is not likely to
17  flee or pose a danger to the safety of any other person or the
18  community pending imposition of sentence. It is therefore
19  ordered that the defendant be released and continued under the
20  same conditions with the addition of electronic monitoring that
21  were imposed by the United States magistrate judge on September
22  15th, 2005.
23       Mr. Floyd, Mr. Blanchard's right. You won't have a
24  better chance at drug treatment for a long time either. So take
25  advantage of it.

20

1        PROBATION OFFICER: Your Honor, may I ask a question?
2        THE COURT: Yes.
3        PROBATION OFFICER: Just to be clear, is Mr. Floyd to
4  be held until such time as we can set up --
5        THE COURT: That's correct. He will be held -- and
6  when I said released, I mean released subsequent to the setting
7  up of electronic monitoring. Anything further in this case?
8        MR. BLANCHARD: No, Your Honor.
9        MR. BROWN: No, Your Honor.
10       THE COURT: All right. Thank you.
11  (Proceedings concluded at 3:38 p.m.)
12              * * * * * * * * * * *
13            COURT REPORTER'S CERTIFICATE
14       I certify that the foregoing is a correct transcript
15  from the record of proceedings in the above-entitled matter.
16       This 19th day of January, 2007.
17
18                        /s/ Risa L. Entrekin
19                        Registered Diplomate Reporter
                          Certified Realtime Reporter
20                        Official Court Reporter
21
22
23
24
25

| | |
|---|---|
| 1  IN THE UNITED STATES DISTRICT COURT | 1  about what occurred, the gist of it being that he was |
| 2  FOR THE MIDDLE DISTRICT OF ALABAMA | 2  evidently -- does the government want to state the facts of that |
| 3  EASTERN DIVISION | 3  and let's see if we have got an agreement as to what the facts |

**Page 1 (Left column)**

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE MIDDLE DISTRICT OF ALABAMA

3  EASTERN DIVISION

4

5  UNITED STATES OF AMERICA

6  vs.                    CR NO: 06cr-187-LSC

7  SAWELIJA TYREE FLOYD,

8       Defendant

9

10

11              * * * * * * * * * * *

12              SENTENCE HEARING

13              * * * * * * * * * * *

14      Before the Honorable L. Scott Coogler,

15         United States District Judge, at

16    Montgomery, Alabama, on December 18, 2006

17              * * * * * * * * * * *

18

19  APPEARANCES:

20  FOR THE GOVERNMENT:    Todd A. Brown,
                           Assistant United States Attorney

21

22  FOR THE DEFENDANT:  William R. Blanchard, Jr.,
                        Attorney at Law

23

24

25

**Page 3 (Right column)**

1  about what occurred, the gist of it being that he was

2  evidently -- does the government want to state the facts of that

3  and let's see if we have got an agreement as to what the facts

4  were with regard to what occurred?  But basically that he ran

5  when they were trying to arrest him.  Do you have an offense

6  report or something on that, arrest report?

7       MR. BROWN:  Jackie, do you -- I don't know that I do,

8  Your Honor.

9       PROBATION OFFICER:  I do have an offense report.

10      THE COURT:  You do, all right.  Can I see it?

11      PROBATION OFFICER:  Yes, sir.

12      THE COURT:  And we can I assume mark it as an exhibit.

13  Has the defense seen the offense report or arrest report?

14      MR. BLANCHARD:  Your Honor, I have seen what Ms. Caple

15  put into her report which I think was drawn from the offense

16  report.  I have also participated in a preliminary hearing and

17  so I am familiar with what the state alleges.

18      THE COURT:  I just don't want to get you to the point

19  where you are having to state the facts against your client,

20  that's why I am trying not to ask you directly.  Let's do this,

21  let's make a copy of whatever the probation office has.  Let's

22  make a copy for me, the defense and the government, please,

23  Ann --

24      PROBATION OFFICER:  You can have this.

25      THE COURT:  Yeah, but I need them to have one.  Let me

**Page 2 (Lower left column)**

1      (The above case coming on for hearing at Montgomery,

2  Alabama, on December 18, 2006, before the Honorable L. Scott

3  Coogler, United States District Judge, the following proceedings

4  were had commencing at 11:09 a.m.:)

5      THE COURT:  Okay.  This is the United States of

6  America versus Sawelija Tyree Floyd, case number 05-187.  We are

7  here for the purpose of sentencing the Defendant.  Is the

8  government ready to proceed?

9      MR. BROWN:  We are, Your Honor

10      THE COURT:  Is the defense ready to proceed?

11      MR. BLANCHARD:  We are, Your Honor

12      THE COURT:  Mr. Blanchard, have you and your client had

13  at least 35 days to review the presentence report?

14      MR. BLANCHARD:  We have, Your Honor.

15      MR. BLANCHARD:  Originally I notice you did not have an

16  objection to the presentence report, but I also note that the

17  original presentence report was written up such that the

18  Defendant was given credit of two points -- two level credit for

19  acceptance of responsibility.  The probation office following

20  his arrest in June has recommended that he not receive that

21  acceptance of responsibility, modified the presentence report to

22  substitute withdraw the acceptance of responsibility, and I

23  assume that you have an objection to that.

24      MR. BLANCHARD:  Yes, Your Honor.

25      THE COURT:  I have read the probation office's report

**Page 4 (Lower right column)**

1  see it, make sure that we do need a copy I guess.

2      THE CLERK:  (complies)

3      THE COURT:  Yeah, I need a copy of it.  Go ahead and

4  make the copies.  We will wait for you.

5      (pause)

6      THE COURT:  All right.  I have the document here before

7  me.  I am going to mark it as Court's Exhibit 1.  It appears to

8  be a fax copy of an Alabama Uniform Arrest Report dealing with

9  this particular incident.  I will give both sides an opportunity

10  to read it while the Court reads it.

11      (pause)

12      THE COURT:  Have both sides had an opportunity to

13  review it?

14      MR. BROWN:  Yes, sir.

15      MR. BLANCHARD:  Yes, Your Honor

16      THE COURT:  It appears to be consistent with what the

17  probation office had indicated.  You were present at the

18  preliminary hearing I suppose in state court on this?

19      MR. BLANCHARD:  I was, Your Honor, I represented

20  Mr. Floyd at that hearing.

21      THE COURT:  Do you have any reason to believe that the

22  officer would testify differently if he appeared today?

23      MR. BLANCHARD:  That he would testify in any materially

24  different way, no, Your Honor, I don't.

25      THE COURT:  Okay.  The reason why I am asking that is

EXHIBIT
NO.  N

5

1  because I have to make a decision, and while hearsay is
2  admissible and certainly an incident offense report would be
3  admissible, you told me that you had been in a preliminary
4  hearing and if you heard something different there then I
5  certainly would want to know that, if the officer would change
6  his story about what occurred.
7      MR. BLANCHARD:  No, Your Honor.  The only difference I
8  would perhaps cite to the Court would be that the officer's
9  statement is a little short on the facts about what led up to
10 the arrest.  It appeared that Mr. Floyd was known to the officer
11 and was being followed.
12     THE COURT:  Yeah.  I guess I am not really so much -- I
13 don't want to put you in a position where you are testifying
14 against your client.
15     MR. BLANCHARD:  Correct.
16     THE COURT:  But if you did, in fact, know something
17 that would be beneficial to your client and my decision about
18 whether or not he has continued his criminal conduct or whether
19 I find that it appears that he's continued his criminal conduct
20 such that I would consider withdrawing -- or not allowing him to
21 gain the benefit of the acceptance of responsibility, then I
22 would want to know that.  Does that makes sense?
23     MR. BLANCHARD:  It does.
24     THE COURT:  And the officer's knowing him and following
25 him would not be relevant to my consideration of that at all, I

6

1  wouldn't think.
2      MR. BLANCHARD:  I understand what Your Honor is
3  saying.  I guess I am struggling to try to articulate to the
4  Court what possible defenses might be available to him.  And one
5  might be that the officers were aware of him and targeted him,
6  followed him, and perhaps the drugs that were found were not, in
7  fact, on his possession at the time.
8      THE COURT:  But the officer is going to say that they
9  were and he threw them over the counter and that kind of thing.
10     MR. BLANCHARD:  He would say that.  He did say that at
11 the preliminary hearing.
12     THE COURT:  All right.  Does anyone else have anything
13 else they want to present with regard to this issue of
14 acceptance of responsibility?
15     MR. BROWN:  Not from the government.
16     MR. BLANCHARD:  Your Honor, I would like to argue on
17 behalf of my client that he should retain the two level decrease
18 for acceptance of responsibility.  He did, in fact, plead guilty
19 to all four of the charges in the indictment, and did so in a
20 timely manner, in a manner in which allowed the government to
21 not waste resources, to not waste time preparing for trial and
22 all that kind of thing, which is -- my understanding that's what
23 the two level departure is supposed to reward.  And he did all
24 those things.
25     In addition to that, I would point out to the Court

7

1  that though he was arrested he has not been convicted, nor has
2  he, in fact, even been indicted at this time.  I did look at the
3  guidelines and looked at some cases on this.  There is one case
4  that I found in particular, which is an 11th Circuit case,
5  United States versus Villarino, 930 F.2d 1527.  And that case
6  says that post-plea continuation of criminal conduct may justify
7  removal of the two or three level adjustment for acceptance of
8  responsibility.
9      The reason I point out that case, however, is that when
10 you get into the facts and read it after the plea in
11 Mr. Villarino's case he had been convicted of I think eight or
12 nine separate felony charges following his plea.  In this case
13 Mr. Floyd has been convicted of none, though we certainly
14 concede that he has been arrested.  It's for the Court in Lee
15 County to determine what the ultimate outcome of that would be.
16     But my argument is that because he did what he was
17 supposed to do or agreed to do and entered his plea, allowed the
18 government to conserve its resources, that he should be allowed
19 at least the two level benefit for acceptance of responsibility.
20     THE COURT:  All right.  Here's my question.  If I do
21 not allow him to retain the acceptance of responsibility two
22 level reduction do I have to allow him an opportunity to
23 withdraw his guilty plea?
24     MR. BROWN:  No, Your Honor.  The guilty plea calls
25 for -- the plea agreement in this case calls for the

8

1  government's recommendation of a two level reduction for
2  acceptance of responsibility.  It's in paragraph one under
3  government's provisions.  But it also says with the provision
4  that so long as the Defendant does not obstruct justice or
5  otherwise fail to accept responsibility for the offense conduct,
6  which would be Your Honor's determination in this case.
7      THE COURT:  Okay.  Would you agree with that or do you
8  want to make any argument that you would be allowed to withdraw
9  your guilty plea?
10     MR. BLANCHARD:  No, Your Honor, I don't disagree with
11 what the prosecutor has said about the plea agreement.  If I
12 could add just one thing to what I said a moment ago.
13     THE COURT:  Uh-huh. (positive response)
14     MR. BLANCHARD:  As Your Honor is aware the guidelines
15 are no longer mandatory and Your Honor is free to fashion a
16 sentence insofar as it complies with the considerations in 18
17 U.S.C. 3553.  My point is this, if Mr. Floyd were given the
18 benefit of the acceptance of responsibility, two levels, and if
19 also he is given the three level departure that the government
20 is seeking, that would generate a sentence range of one hundred
21 and 51 to one hundred and 88 months.
22     My point there, Your Honor, is that such a sentence, it
23 would appear to me, would be in compliance with the
24 considerations listed in Title 18 Section 3553, those being, as
25 the Court I am sure knows, to reflect the seriousness of the

9

1  offense, promote respect for the law and provide just punishment
2  for the offense, first of all, then to afford adequate
3  deterrence to criminal conduct, to protect the public from
4  further crimes of the Defendant, and provide the Defendant with
5  needed educational or vocational training, medical care or other
6  correctional treatment in the most effective manner. I would
7  argue to the Court that a sentence in that range of a hundred
8  and 51 to a hundred and 88 months adequately achieves those
9  objectives.
10     THE COURT: All right. I am going to overrule the
11  Defendant's objection to the withdrawal of his acceptance of
12  responsibility. I believe that the Defendant has continued his
13  criminal conduct right up from the arrest, as evidenced by
14  his -- this incident. At least has continued it on the occasion
15  indicated. And I believe that it would be inappropriate for him
16  to receive a reduction based on his acceptance of responsibility
17  when he has not changed his criminal conduct. Any further
18  objections from the Defendant to the presentence report?
19     MR. BLANCHARD: No, sir, Your Honor.
20     THE COURT: Any objections from the government with
21  regard to the presentence report?
22     MR. BROWN: No objection, Your Honor.
23     THE COURT. Having ruled on all of the objections, the
24  Court makes specific findings that the guideline offense level
25  is 34, the criminal history category is VI, the advisory

10

1  imprisonment range thus is from two hundred and 62 to three
2  hundred and 27 months, the supervised release period for count
3  one is five years, the supervised release period for count two
4  is two years to three years, and the supervised release period
5  for count three is four to five years, the supervised release
6  period for count four is three years, and the fine range is from
7  17 thousand five hundred to seven million dollars. Restitution
8  is not an issue in the case. However, the government has made a
9  motion for downward departure pursuant to Section 5K1.1, and I,
10  of course, will need the government -- the attorneys to come up
11  here and indicate to me the support for the motion. Is there
12  any request that it be on the record?
13     MR. BROWN: Your Honor, I believe we can do it from
14  counsel table. This matter basically involves the Defendant's
15  cooperation during trial, so that's obviously --
16     THE COURT: All right. Then go ahead. If there's no
17  reason for it to be sealed, you can go ahead and tell me.
18     MR. BROWN: Yes, sir. In a prosecution of an Auburn
19  police officer who was charged with multiple Hobbs Act
20  violations for taking bribes in order to have Municipal Court
21  charges over in Auburn -- the City of Auburn reduced, the
22  government prosecuted that case, it was an ongoing case for
23  quite a while, almost simultaneously with Mr. Floyd's case. We
24  became aware that Mr. Floyd may have also had this Auburn police
25  officer take care of some Municipal Court cases that he was

11

1  involved in.
2     Mr. Floyd from the beginning was up front with the
3  government on that. Gave us the information that we needed to
4  prosecute the Auburn police officer, who -- by the name of
5  Tyrone White -- is listed in the motion. Mr. Floyd was
6  cooperative in that he testified before the grand jury, which
7  substantiated the indictment in that case, at least as to counts
8  involving Mr. Floyd, and then he testified at the trial -- at
9  the trial, which was back in October of this year. And at which
10  time the Defendant, Tyrone White, and a co-Defendant, Adam
11  Floyd, not related to Mr. -- the Defendant in this case,
12  Mr. Tyree Floyd, were both convicted.
13     THE COURT: Okay. Does the defense have anything to
14  add to that?
15     MR. BLANCHARD: No, Your Honor.
16     THE COURT: All right. I find that there is sufficient
17  substantial assistance provided by the Defendant to grant the
18  government's motion for downward departure pursuant to Section
19  5K1, and will grant it. And that there's sufficient substantial
20  assistance to grant a three level departure as requested by the
21  government. I think that is appropriate. That will change the
22  offense level to 31, and when combined with the criminal history
23  category VI results in a guideline imprisonment range from one
24  hundred and 88 to two hundred and 35 months. Is that correct?
25     PROBATION OFFICER: That's correct, sir.

12

1     THE COURT: Okay. Would that change any of the
2  supervised release periods that I have indicated?
3     PROBATION OFFICER: It will not change any of the
4  supervised release periods, it may change the fine range.
5     THE COURT: The fine will go to what, 15 thousand?
6     PROBATION OFFICER: 15 thousand, based on an offense
7  level of 31.
8     THE COURT: 15 thousand to seven million?
9     PROBATION OFFICER: That is correct.
10     THE COURT: So, the guideline offense level will become
11  31, when combined with the criminal history category of VI
12  results in a guideline imprisonment range of one hundred and 88
13  to two hundred and 35 months, the supervised release period will
14  remain as I stated before, the fine range will change from what
15  I stated and will become 15 thousand to seven million dollars.
16  The restitution is not an issue in the case.
17     Mr. Blanchard, would you and your client approach the
18  podium for me, please. Do you have anything to say in
19  mitigation or otherwise before I pronounce the sentence of law
20  upon your client?
21     MR. BLANCHARD: Your Honor, I understand what you have
22  determined the proper sentencing range to be under the
23  guidelines. I would ask for a sentence at the low end of that
24  range, that is, the one hundred and 88 month portion of the
25  range. And as that -- in support of that I would direct the 3

13

1  Urt's attention back to 18 U.S.C. 3553 which
2  specifically states that the sentence imposed should not be
3  greater than that necessary to achieve the objectives that I
4  listed earlier. Should be sufficient, but not greater than
5  necessary.
6      And my argument here is that the sentence at the low
7  end of this guideline is a sentence in excess of 15 years, most
8  of which he would serve, which is far greater than any sentence
9  he had ever received up until now, and certainly would be great
10  enough to achieve those objectives listed, particularly to allow
11  him to receive any needed treatment. I think viewing his record
12  in this case it's clear that his conduct, such as it has been,
13  is one that's been driven by drugs and the need for drugs, and
14  behaviors around that. I don't think he's ever received any
15  effective drug treatment, and I would like to see him receive
16  that while he is incarcerated. I know he can do that within the
17  one hundred and 88 month time frame. So I would ask for a
18  sentence at that end of the range.
19      THE COURT: Mr. Floyd, this is your opportunity to say
20  anything you want to say in mitigation or otherwise before I
21  pronounce the sentence of law upon you. Do you have anything
22  you want to say?
23      THE DEFENDANT: No, sir.
24      THE COURT: All right. Government, what is your
25  recommendation?

14

1      MR. BROWN: We will just concur with whatever the Court
2  comes up with, Your Honor.
3      THE COURT: Do you have a plea agreement for anything?
4      MR. BROWN: We do not, Your Honor. At the time that --
5  this Defendant had not agreed to cooperate and we were not aware
6  of his ability to cooperate so the government -- the particular
7  reduction, the 5K motion was not contemplated at the time of the
8  plea agreement.
9      THE COURT: All right. Let me say for the record that
10  I note that any -- that the advisory guideline imprisonment
11  range of one hundred and 88 months to two hundred and 35 months
12  is just that, it's advisory, it's not binding upon the Court.
13  The Court is to take into consideration that factor. It's a
14  serious factor that I am to consider in deciding what is an
15  appropriate sentence, but I am also to consider all the other
16  factors set forth in 18 U.S.C. Section 3553 in determining what
17  is an appropriate sentence. I particularly take into
18  consideration under those factors the need to reflect the
19  seriousness of the offense and to promote respect for the law
20  and to provide just punishment for the offense, and further to
21  protect the public from further crimes of this Defendant who
22  seems to not get it.
23      I believe that an appropriate sentence to give the
24  Defendant is two hundred and ten months. That will be composed
25  of a sentence of two hundred and ten months with regard to count

15

1  one, 60 months as to count two, two hundred and ten months as to
2  count three, and two hundred and ten months as to count four,
3  with each of those sentences to run concurrent with the other.
4      I further order that upon your completion of your
5  imprisonment you be placed on supervised release for a period of
6  five years as to count one, three years as to count two, five
7  years as to count three, three years as to count four, with each
8  of those supervised release terms to run concurrent with the
9  other. I do not order that you pay a fine due to your inability
10  to pay a fine; however, I order that you pay a special
11  assessment fee in the amount of four hundred dollars. That
12  special assessment fee is due immediately. Restitution is not
13  an issue in the case.
14      I want to state also for the record that if the
15  Defendant had retained the acceptance of responsibility with
16  regard to this particular case I still would have sentenced him
17  at the same level because I believe that is what is
18  appropriate. And I find that that is a reasonable sentence.
19  And if I change it, if, for instance, he was to somehow or
20  another appeal this case and I have to -- the 11th Circuit finds
21  that I was incorrect in not allowing him to retain his
22  acceptance of responsibility and recalculate it I would still
23  find that the appropriate sentence considering the factors set
24  forth in 18 U.S.C. Section 3553(e) -- excuse me, 3553 would be
25  the same sentence I gave considering his -- the incident, the

16

1  actual facts of this case, the amount of drugs involved in this
2  case, the previous conduct of the Defendant, the previous
3  convictions of the Defendant. When you take all that into
4  consideration it's clear that that is what is an appropriate
5  sentence to give the Defendant in this case.
6      Are you asking that the Defendant be permitted to
7  participate in the five hundred hour drug treatment program
8  that's available in the prison?
9      MR. BLANCHARD: I am, Your Honor.
10      THE COURT: I don't know whether he will be entitled to
11  receive any credit off his time -- sentence because of these
12  convictions, but if he is, that's great, if he's not, that's,
13  you know, up to the Bureau of Prisons, but I will certainly make
14  the request that he be permitted to participate, but I want you
15  to understand that I am not by doing that saying that I expect
16  him to receive any credit against his sentence, that would be up
17  to the statute and -- the statutory authority and the Bureau of
18  Prisons' policy. His family lives in what area?
19      MR. BLANCHARD: In the Lee County area.
20      THE COURT: Does he want to be housed as close to his
21  family as I can possibly get him?
22      MR. BLANCHARD: He does, Your Honor.
23      THE COURT: What town in Lee County?
24      MR. BLANCHARD: What town in Lee County? Auburn-
25  Lochapoka, Your Honor.

17

1   THE COURT: Auburn?

2   MR. BLANCHARD: Auburn-Lochapoka area.

3   THE COURT: All right. Then I will ask that he be

4   housed as close to there as possible. While you are on

5   supervised release you will comply with the standard and

6   mandatory conditions of supervised release of record in this

7   Court, as well as the following special conditions: You shall

8   submit to a search of your person, residence, office or vehicle

9   pursuant to the search policy of this Court; you shall cooperate

10  in the collection of DNA as directed by the probation office;

11  and you shall participate in drug testing and treatment and

12  shall contribute to the cost of any such treatment based on your

13  ability to pay and the availability of third-party payments.

14  And that program will be administratively supervised by the

15  probation office.

16      Is there any objection from any party as to the

17  findings of fact and calculations of sentence or the manner in

18  which the sentence was pronounced or imposed other than as

19  previously stated? From the Defendant?

20  MR. BLANCHARD: None other than as previously stated.

21  THE COURT: All right. From the government?

22  MR. BROWN: No objection, Your Honor.

23  THE COURT: You have the right to appeal the sentence

24  imposed within ten days if you believe that it's in violation of

25  the law; however, you may have waived some or all of your rights

18

1   to appeal as part of your plea agreement. If you did, in fact,

2   waive some or all of your rights to appeal as part of your plea

3   agreement such waivers are generally found to be enforceable.

4   If you believe it is unenforceable you can present that theory

5   to the appropriate appellate court. With few exceptions,

6   however, your notice of appeal must be filed within ten days of

7   judgement being rendered in your case. If you are unable to pay

8   the cost of an appeal you may apply for leave to appeal in forma

9   pauperis and for the appointment of counsel. If granted the

10  Clerk of Court will assist you in preparing and filing your

11  notice of appeal. Any questions? Did I miss anything,

12  probation?

13  PROBATION OFFICER: No, sir, you covered everything.

14  THE COURT: Any questions?

15  MR. BLANCHARD: No, Your Honor

16  THE COURT: All right. Have a nice day.

17  (At which time, 11:40 a.m., the hearing was adjourned.)

18  * * * * * * * * * *

19  COURT REPORTER'S CERTIFICATE

20  I certify that the foregoing is a correct transcript

21  from the record of proceedings in the above-entitled matter.

22  This 11th day of January, 2007.

23

24  /s/ James R. Dickens
    Official Court Reporter

25

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Middle District of Alabama

UNITED STATES OF AMERICA

    v.                                Case Number 3:05-CR-187-LSC

SAWELIJA TYREE FLOYD              USM Number 11774-002
    Defendant.

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant, SAWELIJA TYREE FLOYD, was represented by William Rives Blanchard, Jr.

The defendant pleaded guilty to counts 1, 2, 3, and 4. Accordingly, the defendant is adjudged guilty of the following counts, involving the indicated offenses:

| Title & Section | Nature of Offense | Offense Ended | Count Numbers |
|---|---|---|---|
| 21 USC 841(a)(1) | Possession with Intent to Distribute Cocaine Base | 7/29/2005 | 1 |
| 21 USC 841(a)(1) | Possession with Intent to Distribute Marijuana | 7/29/2005 | 2 |
| 21 USC 841(a)(1) | Possession with Intent to Distribute Cocaine Hydrochloride | 7/29/2005 | 3 |
| 21 USC 841(a)(1) | Possession with Intent to Distribute MDMA/Ecstasy | 7/29/2005 | 4 |

As pronounced on December 18, 2006, the defendant is sentenced as provided in pages 2 through 5 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant shall pay to the United States a special assessment of $400.00, for counts 1, 2, 3, and 4, which shall be due immediately, payable to the Clerk, U.S. District Court, Middle District of Alabama, P.O. Box 711, Montgomery, AL 36104.

It is further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid.

Done this 19th day of December 2006.



                                  L. SCOTT COOGLER
                    UNITED STATES DISTRICT JUDGE
                            124019



AO98-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.   O

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 2 - Imprisonment

Judgment--Page 2 of 5

Defendant:  SAWELIJA TYREE FLOYD
Case Number:  3:05-CR-187-LSC

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of TWO HUNDRED TEN (210) months.  This term consists of terms of 210 months as to Counts one, three, and four and 60 months as to Count two, separately, with each count to run concurrently.

The Court recommends to the Bureau of Prisons that the defendant be evaluated and allowed to participate in the 500 hour Intensive Residential Substance Abuse Treatment Program and be housed as close as possible to his family in Auburn, Lee County, Alabama.  The drug treatment should take first priority.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

Defendant delivered on _____ to_____ at _____
_____, with a certified copy of this Judgment.


_____
United States Marshal


By    _____
Deputy Marshal

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 3 - Supervised Release

Judgment--Page 3 of 5

Defendant: SAWELIJA TYREE FLOYD
Case Number: 3:05-CR-187-LSC

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 60 months. This term consists of five years on Counts one and three and three years on Counts two and four, with all counts to run concurrently. The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of supervised release.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

✔    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

✔    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 3 - Continuation of Standard Conditions of Supervised Release

Judgment--Page 4 of 5

Defendant:  SAWELIJA TYREE FLOYD
Case Number:  3:05-CR-187-LSC

**CONTINUATION OF STANDARD CONDITIONS OF SUPERVISED RELEASE**

9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 3 (cont'd) - Supervised Release

Judgment--Page 5 of 5

Defendant:  SAWELIJA TYREE FLOYD
Case Number:  3:05-CR-187-LSC

### SPECIAL CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this Judgment:

1)  The defendant shall submit to a search of his person, residence, office, or vehicle pursuant to the search policy of this court.
2)  The defendant shall cooperate in the collection of DNA as directed by the probation officer.
3)  The defendant shall participate in drug testing and treatment, under the administrative supervision of the probation office, and shall contribute to the cost of any treatment based on his ability to pay and availability of third party payments.

## CASE NO. 07-10005-F

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*llee,*

**SAWEL**    GX P

*ellant.*

## On Appeal from the United States District Court
## for the Middle District of Alabama
## Northern Division
## 3:05cr-000187-LSC-SRW-ALL

## BRIEF OF THE APPELLANT
## SAWELIGA TYREE FLOYD

**WILLIAM R. BLANCHARD (BLA-029)**
**BLANCHARD LAW OFFICES**
**Counsel for Appellant**
**505 South Perry Street**
**Post Office Box 746**
**Montgomery, Alabama, 36101-0746**
**Telephone No. (334) 269-9691**
**Fax: (334) 263-4766**



AO88B-C
**GOVERNMENT EXHIBIT**

CASE
NO.

EXHIBIT
NO.    P

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### United States v. SAWELIGA TYREE FLOYD
### Circuit Court Case No. 05-11508-AA
### District Court Case No. 3:05cr-000187-LSC-SRW-ALL

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

1.  The Honorable Mark E. Fuller, United States District Judge, Middle District of Alabama.

2.  The Honorable L. Scott Coogler, United States District Judge, Middle District of Alabama.

3.  The Honorable Susan Russ Walker, United States Magistrate Judge, Middle District of Alabama.

4.  Todd A. Brown, Assistant United States Attorney, Middle District of Alabama.

5.  Leura G. Canary, United States Attorney, Middle District of Alabama.

6.  Clark A. Morris, Assistant United States Attorney, Middle District of Alabama.

7.  William R. Blanchard, Counsel for Appellant.

8.  David Bryson Byrne, Jr., formerly Counsel for Appellant.

9.  Saweliga Tyree Floyd, Appellant.

10. United States of America, Plaintiff/Appellee

i

**WILLIAM R. BLANCHARD**
**AL Bar Code: BLA029**
**Attorney for Appellant**


OF COUNSEL:

BLANCHARD LAW OFFICES
505 South Perry Street
Post Office Box 746
Montgomery, Alabama, 36101-0746
Telephone No. (334) 269-9691
Fax: (334) 263-4766

ii

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Saweliga Tyree Floyd requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a) and Eleventh Circuit Rule 34-3(c). The issues raised in Appellant's brief are complex and may be more adequately articulated by the presentment of oral argument. Appellant therefore respectfully requests the opportunity to present oral arguments to ensure that the errors alleged within this Appeal are properly considered by this Court in rendering its decision.

## CERTIFICATE OF TYPE SIZE AND STYLE

This brief is printed using 14-pitch, Times New Roman type which is proportionately spaced.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . iii

CERTIFICATE OF TYPE SIZE AND STYLE . . . . . . . . . . . . . . . . . . . . . . . .. . . .... iv

TABLE OF CONTENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

TABLE OF CITATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  x

STATEMENT OF THE ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

      Procedural History and Disposition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
      Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
      Standards of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

SUMMARY OF THE ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

ARGUMENT AND CITATIONS OF AUTHORITY. . . . . . . . . . . . . . . . . . . . . . .11

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

APPENDICES

Appendix I          Violation of Court Order.............................................42
Appendix II        Municipal Court and Payment Histories....................43
Appendix III     Order of Release.......................................................44
Appendix IV    Search Warrant Affidavit..........................................45
Appendix V     Plea Agreement........................................................46

# TABLE OF CITATIONS

## CASES :

*Agnello v. United States,*
    269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925) ...............................................34

*Amos v. United States,*
    255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921) ...................................27, 36

*Bumper v. North Carolina,*
    391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)............................36, 36

*Dorman v. United States,*
    435 F.3d 385, 392 (U.S. App. D.C. 1970) .....................................................31

*Franks v. Delaware,*
    438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed. 667 (1978) ......................................11

*Illinois v. McArthur,*
    531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) ................................30

*James v. Louisiana,*
    382 U.S. 36, 86 S.Ct. 151, 15 L.Ed.2d 30 (1965) ........................................34

*Johnson v. United States,*
    333 U. S. 10, 68 S. Ct. 367, 92 L.Ed. 436 (1948).................26, 27, 33, 34, 37

*Katz v. Untied States,*
    389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ...................................32

*Lo-Ji Sales, Inc. v. New York,*
442 U. S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979) .................................13,14,20

*McDonald v. United States,*
    355 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).........................................31

vi

*Nix v. Williams,*
467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ...........................................37

*Nyland v. Moore,*
216 F.3d 1264, 1266 (11th Cir. 2000)..............................................................9

*Payton v. New York,*
445 U. S. 573, 100 S.Ct. 1371, 63 L.Ed. 2d 639 (1980).................... 12,30,32

*Segura v. United States,*
468 U.S. 768, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) ................................28

*Shadwick v. City of Tampa,*
407 U. S. 345, 92 S.Ct. 2119, 32 L.Ed. 2d 783 (1972) ...........................................20

*Silverthorne Lumber Co. v. United States,*
251 U.S. 385, 40 S.Ct. 182, 64 l.Ed. 319 (1920)...........................................29

*Stoner v. California,*
376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).....................................34

*Taylor v. United States,*
286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932)...........................................28

*United States v. Bervaldi,*
226 F.3d 1256 (11th Cir. 2000) ....................................................................36

*United States v. Calandra,*
414 U.S. 338, 94 S.Ct. 613, 38 L.Ed. 561 (1974) ........................................12

*United States v, Ceccolini,*
435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978)...................................38

*United States v. Edmondson,*
791 F.2d 1512 (11th. Cir. 1986) ..................................................................35

*United States v. Jones,*
   377 F.3d 1313, (11th Cir. 2004).........................................................19

*United States v. Lauter,*
   57 F.3d 212 (2nd Cir. 1995) ..............................................................36

*United States v. Leon,*
468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).......................12, 24

*United States v. Magluta,*
   44 F.3d 1530 (11th Cir. 1995)..............................................................9

*United States v. Martin,*
   297 F.3d 1308 (11th Cir. 2002).......................................................12, 13

*United States v. Morales,*
   868 F.2d 1562 (11th Cir. 1989)...........................................................33

*United States v. Norton,*
   867 F.2d 1354 (11th Cir. 1989).............................................................9

*United States v. Santana,*
   427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)...........................32

*United States v. Tarzado-Madruga,*
   897 F.2d 1099 (11th Cir. 1990)...........................................................37

*United States v. Tobin,*
   923 F.2d 1506 (11th Cir. 1991)...........................................................31

*United States v. Torres,*
   705 F.2d 1287 (11th Cir. 1983)...........................................................32

*United States v. United States District Court,*
407 U.S. 297, 92 S. Ct. 2125, 32 L.Ed.2d 752 (1972) ............................12

*Vale v. Louisiana,*
399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970)................................................34

*Welsh v. Wisconsin,*
466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed. 732 (1984)..........................................12, 31

*Whren v. United States,*
517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)................................. .19

## STATUTORY AND OTHER AUTHORITY:

Amend. 4, United States Constitution ................................. 9, 10*

§13A-12-214(b), Code of Alabama 1975 ................................32

18 U.S.C. § 3231   ................................................. x

18 U.S.C. § 3742 ................................................. x

28 U.S.C. § 1291   ................................................. x

Fed. R. Appellate P. 32(a)(7). .......................................40

11th Circuit Rule 31-5 ............................................. 40

## STATEMENT OF JURISDICTION

The District Court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the Defendant/Appellant was charged with an offense against the laws of the United States. Judgment and sentence were entered on 19 December 2006 in open court. (R1: 57). This Appeal was timely filed on 28 December 2006. (R1:58). This Honorable Court of Appeals has jurisdiction over this Appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the Courts of Appeal jurisdiction over all final decisions and sentences of the District Courts of the United States. Appellant is currently incarcerated.

## STATEMENT OF THE ISSUES

I.    WHETHER THE DISTRICT COURT ERRED IN ADOPTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES?

    a.    MAY AN OFFICER IN GOOD FAITH RELY UPON A LEGALLY INVALID ARREST WARRANT WHERE THE WARRANT WAS FACIALLY DEFECTIVE, THE OFFICERS SHOULD HAVE KNOWN IT WAS AN INVALID WARRANT, AND WHERE THE ISSUING MAGISTRATE HAD ABANDONED NEUTRALITY?

    b.    IS THE WARRANTLESS SEARCH OF A RESIDENCE JUSTIFIED MERELY AND SOLELY FROM THE PERCEIVED AROMA OF BURNING MARIJUANA?

    c.    MAY AN OFFICER GAIN WARRANTLESS ENTRY INTO A RESIDENCE THROUGH THE EMPLOYMENT OF INTIMIDATION AND FORCE?

    d.    MAY A LAWFUL SEARCH WARRANT BE OBTAINED BASED UPON PROBABLE CAUSE ORIGINATING FROM AN INITIALLY UNLAWFUL, WARRANTLESS INTRUSION?

1

### STATEMENT OF THE CASE

**(i)    Procedural History and Disposition of the Case**

Appellant, Saweliga Tyree Floyd (hereinafter referred to as "Appellant"), was initially arrested on 29 July 2005 by officers of the Auburn Police Department, charged with possession of controlled substances under Alabama state law. Based on the same underlying facts as the initial state law charges, on 8 September 2005 a two-count indictment was filed in the District Court of the United States for the Middle District of Alabama, Northern Division, charging Appellant with two violations of Title 21, United States Code, Section 841(a)(1). A warrant for the arrest of Appellant on these charges was issued 12 September 2005, which warrant was executed by the United States Marshal's Service on 15 September 2005. (R1: 9). On 3 October 2005 the "Motion to Withdraw as Attorney" filed by Appellant's former counsel David B. Byrne, Jr. (R1: 15) was granted by Honorable Susan Russ Walker, United States Magistrate Judge for the Middle District of Alabama. (R1: 16). The undersigned counsel filed his Notice of Appearance as counsel for Appellant on 6 October 2005. (R1: 17).

On 27 October 2005 Appellant, by and through the undersigned counsel, filed his Motion to Suppress Statements and Physical Evidence (R1: 20), to which Motion the government responded on 9 November 2005. (R1: 22). The case was reassigned from Honorable Mark E. Fuller to Honorable L. Scott Coogler, United States District Judge for the Middle District of Alabama, on 8 December 2005. On 14 December 2005 a hearing on Appellant's Motion to Suppress was conducted before Honorable Susan Russ Walker, United States Magistrate Judge for the Middle District of Alabama. (R2). Opposing post-hearing briefs regarding Appellant's Motion to Suppress were filed by Assistant United States Attorney on 4 and 13 January 2006

2

(R1: 25, 28), and by the Appellant on 10 January (R: 26). Honorable Judge Walker's "Recommendation of the Magistrate Judge," dated 18 January 2006, denied Appellant's Motion to Suppress. (R1: 29). On 20 January 2006 the government filed a superseding indictment, which, in addition to the identical counts contained within the 8 September 2005 indictment, charged two additional violations of Title 21, United States Code, Section 841(a)(1). (R1:31). Upon the government's Motion to Dismiss the prior indictment, on 6 February 2006 (R1: 38), Honorable Magistrate Judge Walker so Ordered on the same day. (R1: 42).

On 26 January 2006, the undersigned filed on behalf of Appellant an "Objection to Report and Recommendations." (R1: 34). Honorable Judge L. Scott Coogler issued an "Order Accepting the Report and Recommendation" on 30 January 2006 (R1: 35). On 2 February 2006 Appellant noticed the both Court and government of his intent to change his plea to guilty (R1: 36). Following a hearing on this issue, Honorable Judge Walker accepted this plea to the four counts of the superseding indictment by oral Order on the same day, and on 8 February 2006 the Magistrate Judge entered a "Detention/Release Order Pending Sentencing," (R1: 43) which released Appellant from custody under the terms previously imposed on 15 September 2005. (R1: 5).

On 14 February 2006 a sentencing hearing was scheduled for 29 June 2006 (R1: 45), and on 17 October 2006 the sentencing hearing was reset to 18 December 2006 (R1: 51). On 18 December 2006 the sentencing hearing was conducted before Honorable District Judge L. Scott Coogler (R3), who orally Ordered that the government's contemporaneously filed "Motion for Downward Departure for Substantial Assistance" (R1: 55) be granted; on the following day, 19 December 2006, judgment was entered (R1: 57); the Court found Appellant guilty of four violations of Title 21, United States Code, Section 841(a)(1), and sentenced Appellant to a total term of two hundred and ten (210) months in the custody of the Bureau of

3

Prisons, followed by five (5) years supervised release. (R1: 57).

Pursuant to the Plea Agreement executed in this case, Appellant specifically retained the right to appeal: (a) the adverse determination of his "Motion to Suppress Statements and Physical Evidence;" and (b) the adoption by the District Court of the Recommendation denying that motion; and (On 28 December 2006 Appellant timely appealed these issues. (R1: 58; Appendix V: 2).

Appellant Saweliga Tyree Floyd is presently incarcerated at the Lee County Jail in Auburn, Alabama.

**(ii)    Statement of the Facts**

Prior to the arrest of Appellant which grounds the conviction and sentence now being appealed, officers of the Auburn Police Department had initiated and were actively conducting an independent investigation of a fellow officer, Tyrone White, for "fixing tickets." (R2: 23-24, testimony of Sergeant Chris Murray; R2: 59, testimony of Lieutenant Jerry Holder). In relation to this investigation, the officers "had received some information that he [Appellant] had gotten some help" from Officer White (R2: 23-24); the nature of this help, and the source of the information, was undisclosed. In the course of this investigation, Lieutenant Jerry Holder directed Municipal Court Judge Joe S. Bailey to obtain a number of municipal court files from the office of the Auburn Municipal Clerk, among them those of the Appellant, and have them delivered to Holder. (R2: 62-63); on 27 July 2005 Sgt. Murray and Lt. Holder met with Judge Bailey for the purpose of continuing their investigation of Officer Tyrone White. (R2: 58-59; 62-63). The record is unclear regarding who brought the files investigated by the judge and officers to the meeting, or who maintained custody and control of the files in the time between the judge's removal of them from the office of the Municipal Clerk

4

and the time of the meeting, although Lieutenant Holder testified alternatively that he took Appellant's file from Judge Bailey on 27 July 2005 (R2: 62), or that he had the files in his possession since on or before 27 July 2005 (R2: 63).

As the judge and the officers were conducting their investigation, Judge Bailey reviewed Appellant's file. Sometime during this meeting Lieutenant Holder "may have" suggested that he would like to talk to Appellant about Tyrone White. (R2: 59-60). Following this review, the judge reached, according to his own testimony, all or some of the following conclusions: (a) that Appellant had been given too lenient a sentence for a previous misdemeanor conviction, but "because of some alleged wrong doing on some people's parts I was convinced not to put the individual on pro- in jail and allowed him to be put on probation." (R2: 91); (b) that Appellant "also failed to comply with a payment plan for previous charges that he had." (R2: 91); (As will be shown, Appellant had in fact paid all fines in full at this time); (c), that "Auburn detectives had told me that he had been seen ... let me see how I should put this. He was frequenting individuals that were known to have criminal records and that is also a reason he was picked up because that's a part of - was in violation of his unsupervised probation" (R2: 91) (Again, as will be shown, Appellant was not on probation or supervised release at this time); and (d), that "It is my recollection that he had failed to cooperate with an ongoing investigation of another criminal matter, and under Alabama law the provisions of any suspended jail sentence can be modified at any time, and I directed [Appellant] to - I told him I wanted him to cooperate fully with the ongoing investigation." (R2: 98). As will be shown, the judge never told Appellant anything of the sort.

Judge Bailey signed and gave to Lieutenant Holder a document termed a Violation of Court Order, ("VCO"), authorizing the arrest of Appellant. (R2: 29) A copy of the VCO was entered into evidence as Defendant's Exhibit #1 (R2; 35),

5

and is attached to this Appeal as "Appendix 1."[1] It is styled "City of Auburn v. Sawelija Tyree Floyd" but does not contain or exhibit any specific case number. The text in the body of the VCO states only the following: "For good cause shown it is the Court's opinion that the above-named defendant should be taken into custody and incarcerated in the Lee County Jail to serve the balance of his sentences of incarceration heretofore suspended, reimbursing the City/County for all medical expenses. The clerk is directed to set this matter for hearing on the next business day after the defendant is in custody". (R2: 30-32, 35; Appendix 1). Lieutenant Holder did not recall while under oath at the suppression hearing whether or not he had suggested to Judge Bailey that he wanted to talk with Appellant about his investigation of Tyrone White, only that he "may have"; he did, however, concede that he indeed had needed to talk with Appellant about one of his municipal court cases in connection with the Tyrone White investigation (R2: 59- 60). Judge Bailey's testimony concerning the reasons for, and issuance of, the VCO will be explored at length presently within this appeal.

Although it was rumored that Appellant was involved with drugs, this suspicion was not, and never had been, supported by probable cause; the Auburn Police Department had never attempted to acquire a warrant for the search of Appellant's home (R2: 26); had never made any controlled purchases of drugs from the Appellant's home (R2: 25); and in fact never had enough information to even seek a warrant for the search of the home of the Appellant. (R2: 26). The officers did not have a search warrant 29 July 2005 when they made their initial entry into the house, and furthermore they did not have consent or permission to enter (R2: 69).

---

[1] This document was entered without objection as "Defendant's Exhibit 1" at the suppression hearing.

6

The police never had any reason to suspect the Appellant was a violent individual. (R2: 37).

Sergeant Murray testified that he and other officers "routinely serve violation of court orders for people who violate their probation with the City Court" (R2: 54) but that "most of the time we don't have them with us, no sir. Usually it's on a traffic stop or something and you get a radio hit with them." (R2: 55). Yet two (2) days following the meeting with Judge Bailey, and armed with the VCO, Lieutenant Holder, Sergeant Murray and at least five (5) other members of the Auburn Police Department, including a canine handler, descended upon Appellant's residence on Ty Court in Auburn ostensibly for the purpose of executing the VCO (R2: 6-7; R2: 36), which was a misdemeanor warrant. (R2: 6). Sergeant James Tatum and Officer Jason Crook, two of the accompanying policemen, were in uniform; the other officers were in plain clothes (R2: 7). The officers positioned themselves in the front and rear of Appellant's residence. (R2: 8). Sergeant Tatum approached the front door of the residence and knocked. A male voice from inside said "What?" (R2: 67). Sergeant Tatum replied "Police, open the door." (R2 :38; 67-68). No more than a minute passed before Appellant's girlfriend, Jamillah McCray (hereinafter referred to as"McCray"), opened the door (R2: 69) At that time, some of the officers noted what they believed to be the smell of burning marijuana, but saw no contraband. (R2: 69).

Sergeant Tatum then asked McCray for Appellant, using Appellant's middle name of "Tyree"; almost immediately, Appellant exited his home through the front door and was taken into custody without incident. (R: 12). At that point, Sergeant Murray, Detective Brad Bass, Lieutenant Holder and Lieutenant Willie Smith entered the residence. The stated purpose of this entry was to "secure" the residence and "keep any evidence from being destroyed or anything like that." (R:

7

12).

Upon entering the residence, Sergeant Murray, Lieutenant Holder, and Detective Bass made contact with a male, later identified as J.B. Mitchell ("Mitchell") and McCray. (R2 :12-13) Officers asked McCray if there were firearms in the residence and she responded that there were, directing officers to the weapon. (R2: 13-14). In the course of "securing" the residence, officers observed what appeared to be crack cocaine by a microwave oven. (R2: 14). Auburn Police Department Officer Brian Lynn advised Mitchell and McCray of their *Miranda* rights, after which Mitchell stated that he and Floyd were smoking marijuana when the officers knocked on the door. (R2: 15). Both McCray (R2: 16) and the Appellant (R2: 19) refused to give consent to search the residence.

Murray then left the residence to obtain a search warrant, while the other officers remained. (R2: 19). Murray obtained a search warrant from Lee County District Judge Russell Bush. (R2: 19). Shortly thereafter, officers executing the search warrant located crack cocaine that officers had previously seen, along with powder cocaine, two large trash bags of marijuana, and crack cocaine. (R: 20). After photographing and logging the evidence seized, Murray interviewed the Appellant who, after he signed a *Miranda* waiver, also signed a written confession admitting ownership of the drugs located in the residence.

Appellant was transported to the Lee County Jail on drug charges on Friday, 29 July 2005. Three (3) days later, on Monday, 1 August 2005, he was released on bond without ever appearing before Judge Bailey on the VCO; he had, however, been interviewed extensively by Sergeant Murray and Lieutenant Holder about the Tyrone White investigation. (R2: 43-45).

As recited in the procedural history above, Appellant pled guilty to four drug

8

charges and a sentencing hearing was conducted on On 18 December 2006 before Honorable District Judge L. Scott Coogler (R3).

**(iii)     Standard of Review**

Probable cause determinations involve both questions of law and mixed questions of law and fact, issues a  Court of Appeals reviews *de novo*. *Nyland v. Moore*, 216 F.3d 1264, 1266 (11th Cir. 2000); *United States v. Magluta*, 44 F.3d 1530, 1536 (11th Cir. 1995). This Circuit has held that the legal issue of whether the good faith exception to the exclusionary rule enunciated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which is discussed fully below, applies or not is reviewed *de novo*, whereas the "the underlying facts upon which that determination is based are binding on appeal unless clearly erroneous.." *United States v. Martin,* 297 F.3d 1308, 1312 (11th Cir. 2002), citing *United States v. Norton,* 867 F.2d 1354, 1360 (11th Cir. 1989).

9

## **SUMMARY OF THE ARGUMENT**

The District Court erred in adopting the Honorable Judge Walker's "Recommendation of the Magistrate Judge," dated 18 January 2006, which denied Appellant's Motion to Suppress (R1: 29).

Incapable of securing a warrant for the search of Appellant's home for lack of probable cause, and lacking the means to compel Appellant's cooperation in the investigation of Officer Tyrone White, the police and municipal court judge concocted a clearly pretextual and illegal arrest warrant. The warrant was both facially and substantively defective. As will be shown, this invalidity of the warrant is conceded by the government in its pleadings in the court below, and by the Magistrate Judge in her report. Execution of the plainly illegal warrant burgeoned into a plainly illegal search which yielded evidence that, pursuant to all applicable case law interpreting the Fourth Amendment, should have been suppressed.

10

## ARGUMENT AND CITATIONS OF AUTHORITY

II. WHETHER THE DISTRICT COURT ERRED IN ADOPTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES?

    a.    MAY AN OFFICER IN GOOD FAITH RELY UPON A LEGALLY INVALID ARREST WARRANT WHERE THE WARRANT WAS FACIALLY DEFECTIVE, THE OFFICERS SHOULD HAVE KNOWN IT WAS AN INVALID WARRANT, AND WHERE THE ISSUING JUDGE HAD ABANDONED NEUTRALITY?

The arrest warrant ("VCO") upon which Appellant was taken into custody, and which provided direct, *ad hoc* justification for the subsequent search of Appellant's home, was invalid. This is a point simultaneously conceded by the government and the trial court, and yet dismissed as somehow inconsequential. Appellant submits that the illegality and pretext of the warrant is of supreme consequence. It will be fruitful to begin the analysis of the legitimacy of the warrant by examining it in the light provided by holdings of the Supreme Court and this Honorable Court which pertain to the Fourth Amendment to the Constitution of the United States.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures.' U.S. Const. Amend. IV. Evidence seized as the result of an illegal search may not be used by the government in a subsequent criminal prosecution." *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 l.eD. 667 (1978). "The exclusionary rule, as it is known, is a 'judicially created remedy designed to

safeguard Fourth Amendment rights generally through its deterrent effect.' " *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed. 561 (1974), cited in *United States v. Martin,* 297 F.3d 1308 at 1312 (11th Cir. 2002).

Homes have traditionally received the most vigilant application of Fourth Amendment protections against the unwarranted entry, search and seizure by police. "Searches and seizures inside a home without a search warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed. 2d 639 (1980)."It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 2097, 80 L.Ed. 732 (1984), citing *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). Exceptions to the exclusionary rule generally have multiplied exponentially in recent years, but these exceptions have been less liberally applied to warrantless searches of homes; a citizen's sanctum remains afforded undiminished shielding from illegal entry, search, and seizure.

One exception affecting the search of homes has derived in large part from the holding in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Often cited as "the good faith exception," the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause. The *Leon* good faith exception applies in all but four limited sets of circumstances. Id at 923, 104 S.Ct. 3405. The four sets of circumstances are as follows: (1) where "the Magistrate Judge or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"; (2) "where the issuing Magistrate Judge wholly abandoned his judicial role in a

12

manner condemned in" *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render the official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient-i.e., in failing to particularize the place to be searched or the things to be seized - that the executing officers cannot reasonably presume it to be valid." *Id.*

"The purpose of the exclusionary rule is to deter unlawful police misconduct; therefore, when officers engage in 'objectively reasonable law enforcement activity' and have acted in good faith when obtaining a search warrant from a judge or Magistrate, the *Leon* good faith exception applies." *United States v. Martin,* 297 F.3d 1308 at 1313. As will be shown, the facts and circumstances of the present case compartmentalize readily into two, and arguably three, of the four instances delineated in *Leon* where good faith cannot exist.

### The Abandonment of Neutrality by the Magistrate Judge

The municipal court judge issuing the arrest warrant in the instant case was not neutral and detached. The judge had become an active participant, if not a co-leader, in the investigation initiated by the police, and in fact was at times acting at the direct behest and in the service of the police in their investigation of a fellow officer (R2: 63), all apparently without the imprimatur of the office of the District Attorney. The judge was "one with the police," as reproved by the *Lo-Ji Sales, Inc.,* Court, 99 S.Ct. At 2325.

The reasons advanced by the judge for his issuance of the arrest warrant are facile, conflicting, and demonstrably inaccurate. While, as will be shown, the government and the Magistrate Judge concede that the VCO was invalid (R1: 29:

13

6-7), both would end any further inquiry into the VCO there. Such apathy concerning the grounds for the arrest warrant is altogether illogical; when the fatuous justifications proffered by the municipal court judge are perused, any credible claim of good faith emerges as preposterous as the pretextual nature of the warrant, originating from an impermissible collaboration between the judiciary and law enforcement, comes into clear focus.

While the judge, Lieutenant Holder, and Sergeant Murray were investigating Officer White (R2: 29), poring over files the judge removed from the office of the clerk (R2: 62-63), a decision was made by the judge to have Appellant arrested by issuance of a VCO warrant. (R2: 35; R2: 90). Sometime during this meeting Lieutenant Holder "may have" suggested that he would like to talk to Appellant about Tyrone White. (R2: 59-60). The reasons articulated by the judge for the decision to have Appellant arrested merit close scrutiny.

Initially the judge announced that "There were several reasons that the document [VCO] was executed. One reason is that the individual had previously been put on probation for another offense and when he came to court on the next offense he should have been incarcerated, but because of some alleged wrong doing on some people's parts I was convinced not to put the individual on pro – in jail and allowed him to be put on probation." (R2: 91).

The specific offenses to which the judge was referring are unclear, although , as will be shown, it may possibly have been either disorderly conduct or driving while suspended or rendering false information. However, that question is rendered academic because, at the time of the issuance of the VCO, Appellant owed no fines, had completed all sentences, and was not on any type of probation. Again, this is conceded by the government and Magistrate Judge Judge (R1: 29: 6-7);

14

testimony by Brad Bass, Auburn City Clerk, corroborated this.  (R2: 82).

Of great interest is the municipal judge's rationale in responding the way he did to his discovery that he had been somehow manipulated when sentencing Appellant. This will be discussed more fully below; it is clearly a novel response, i.e., ordering the re-arrest of a person who had been sentenced for a violation or Class C misdemeanor, and moreover had completed this sentence, because of the alleged wrongdoing of a *third party* in obtaining the sentence. No component of this response can be said to remotely encompass good faith or fairness.

The judge went on to say that Appellant "also failed to comply with a payment plan for previous charges that he had." (R2: 91). Again, this was wholly inaccurate. Brad Bass, Auburn City Clerk, testified that, upon reviewing Appellant's municipal court history (Attached hereto as "Appendix II[2]), all of Appellant's cases were closed, meaning that all fines have been paid., at the time of his arrest on the VCO order. (R2: 76-79; 82). Presumably it was these records that the judge was reviewing; as they obviously show no ground for a violation order, the Magistrate Judge's lengthy recitation of cases dealing with judicial "error" are misplaced. (R1: 29: 10). Under the circumstances surrounding the issuance of the VCO, error is unfathomable.

The judge continued his testimony at the suppression hearing by saying that as a "standing order" every defendant brought before him is automatically placed on two (2) years probation. (R2: 92), and that "every time" a "pickup order" is issued, the clerk is directed to set a due process hearing for that individual on the next regular business day to be heard as to why the individual shouldn't remain

---

[2]  Also contained within Appendix II is Appellant's payment history, which shows all fines and costs as having been timely paid long before the issuance of the VCO. This document was entered without objection as "Defendant's Exhibit 4" at the suppression hearing. It was authenticated by the Auburn Municipal Clerk (R2: 77).

incarcerated. "We do have that hearing with him present." (R2: 92). Nothing resembling this process occurred in the present case. After being arrested by at least six (6) officers at his home on a VCO that police testified is generally not executed until after a traffic "hit" (R2: 54), Appellant was released without any hearing whatsoever before any judge. (R2: 124, testimony of Appellant). In fact, Appellant was released by the judge at the direction of the officers, just as the judge had Appellant arrested at the direction of the officers. (R2: 43-44, testimony of Sergeant Murray, to be discussed more fully below).

The judge went on: "There was as I recall at least one previous offense where he - I believe the charge was rendering false information, I am not positive of that." (R2: 94). "I am going to have to tell you,   I do not remember every particular event pertaining to this case ... I can guarantee you with one hundred percent confidence that there was a legitimate reason for that pickup order to be issued." (R2: 95). "Sir, it is my opinion at this time that the pickup order was issued because of the disorderly conduct charge where [Appellant] was arrested on February 26th of 2005. He had a court disposition of April 21, 2005. This is the case where I previously mentioned that someone improperly convinced me to suspend the 30 day jail sentence that I would have normally imposed. When I found out about that and some other alleged activities of people involved - that [Appellant] was being involved with is when I issued the pickup order." (R2: 96-97).

Almost immediately following this statement during the suppression hearing, the municipal court judge advanced a new theory as to why the VCO may have been issued. After stating that Appellant was ordered picked up to serve the balance of a thirty (30) day suspended sentence (R2: 97) (which sentence had been imposed and its terms completed at least five weeks prior to the issuance of the VCO-Appendix II), the judge stated that, "It is my recollection that he had failed

16

to cooperate with an ongoing investigation of another criminal matter, and under Alabama law the provisions of any suspended jail sentence can be modified at any time, and I directed [Appellant] to - I told him I wanted him to cooperate fully with the ongoing investigation." (R2: 98). When asked what investigation the Appellant was asked to cooperate with, the judge responded, "I told him that it had been brought to my attention that he was not cooperating with an ongoing investigation by the detectives for the City of Auburn...and that I wanted his full and complete cooperation with that ongoing testimony - investigation." (R2: 98). What is especially striking about this new theory of the genesis of the VCO is that the judge shortly thereafter admits that he didn't ask for Appellant's cooperation in this investigation until two days *after* Appellant had been picked up on the VCO which the judge just stated was issued *because* of his failure to cooperate. (R2: 98-100). Equally striking is the fact that, despite the judge's recital of the sequence of events in which he claims to have talked to Appellant (R2: 99), he never in fact saw Appellant at all after Appellant's 29 June 2005 arrest, so it would have been impossible for the judge to have ordered him to comply at any time, even after the issuance of the VCO for *non*-compliance. When questioned regarding the temporal impossibility of the sequence described by the judge in his testimony, the judge responded "I guess we need to try not to play semantics here, but I issued the pickup order because I had been told he was not complying, previous to the date, and that information was conveyed to me, I would say at least a week or ten days prior to the issue of the reinstatement order." (R2: 101). Aside from the fact that the judge had admittedly never directed Appellant to cooperate with any investigation prior to the issuance of the VCO, this statement is noteworthy for the close work between the judge and police it unavoidably implies; who would bring any such refusal to cooperate to the judge's attention other than the police? The

17

fact that the judge and the police traveled together and discussed the Motion to Suppress together only reinforces the snug relationship that illegitimizes any claims of neutrality and detachment . (R2: 55-56)

Any remaining doubt concerning the judge's abandonment of his judicial role for that of law enforcement can be assuaged by the fact that, just as the judge had issued a pretextual and invalid warrant for Appellant's arrest at the direction of police, he also ordered him released at the direction of police. Appendix III, attached hereto, is an order releasing Appellant "for good cause shown" dated 1 August 2005 and signed by Judge Bailey. No "probable cause" hearing, which the judge announced was conducted in every VCO arrest, ever transpired. Sgt. Murray told Appellant that "if he can make bond on the trafficking charges I would get the judge to release him from the VCO." (R2: 45).

The inescapable inference to be derived from the testimony at the suppression hearing is that whatever the reason for the issuance of the VCO, it was not solely related to those espoused by the municipal court judge, though it may have in large part been related to the cooperation aspect the judge finally and recalcitrantly acknowledged; but, whether the reason was compulsion to assist in a separate prosecution, or to obviate the need for a search warrant that police had no probable cause to legally obtain, or some mixture of the two, is irrelevant. Neither merits the issuance of a warrant for some contrived infraction. This is corroborated by the fact that, for all the talk of imaginary non-payment of fines and improper influence at sentencing, Appellant was released from custody contemporaneously with his cooperation in the investigation of Officer White. The pretextual nature of the VCO could hardly be more glaringly evident;  this transparent pretext was apprehended by the Magistrate Judge, who noted the temporal inconsistencies within the municipal judge's testimony in her Recommendations (R1: 2, footnotes

18

2 and 3). The Magistrate Judge, however, erroneously determined that any pretext involving the acquisition of the warrant was permissible under the holding in *United States v. Jones,* 377 F.3d 1313, 1314 (11th Cir. 2004), citing *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). These authorities, however, are inapposite and easily distinguishable from the instant case. In both of those cases, no pretext was necessary for a valid arrest; In *Jones,* the mere delay by officers in executing a *valid* warrant in hope of finding additional crimes was held permissible. In *Whren,* the fact that an officer had subjective reasons for conducting a traffic stop had no effect on the legitimacy of the stop itself. In the instant case, no warrant would have been possible at all absent pretext, a clear violation of the Fourth Amendment and the exceptions to the good faith-exception thereto delineated in *Leon, supra.* Therefore, the Magistrate Judge's finding that "even if the officers sought the VCO as a pretext to obtain an opportunity to question [Appellant] in connection with the Tyrone White investigation, the arrest may not be invalidated on this ground" (R2: 29: 10), is absolutely incorrect. Nothing in *Whren* or *Jones* condones the conspiracy between police officers and a judge to obtain the issuance of a pretextual and invalid arrest warrant for the purpose of interrogating the hapless misdemeanant. Indeed, nothing in American jurisprudence permits the issuance of a false warrant at all, which must still be grounded on good faith and probable cause. The Magistrate Judge's allowance of a pretextual warrant (as opposed to the pretextual execution of a valid warrant as in *Jones* and *Whren*) is both novel and dangerous.

Because this pretext was improvised jointly between the police and the judge, any claim to neutrality and detachment rings demonstrably hollow and specious. "Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from the activities of law enforcement." *Shadwick*

19

*v. City of Tampa,* 407 U.S. 345, 350, 92 S.Ct. 2119, 2123, 32 L.Ed. 2d 783 (1972). Likewise, as will be shown below, any claim of good-faith reliance on the VCO by the officers who actively contrived in the pretext to have it issued is similarly disingenuous. The arrest warrant issued from a judge actively working with police, not a neutral and detached judicial officer; therefore, application of the second *Leon* exception demands that the fruits of the illegal and warrantless search be suppressed.

In partial summary, the municipal judge became and remained an adjunct law enforcement officer in this case; a member, if not a leader, of a police operation. His acquiescence to every demand of the police regarding Appellant's arrest and release, even when such acquiescence required pretext if not outright deceit, made the judge the epitome of the "rubber stamp" condemned by the courts. The exchange by a judge of his robe for the uniform of a policeman, while remaining on the bench, is clearly proscribed by all applicable authorities. *See, generally, Lo-Ji Sales, Inc., supra,* 442 U.S. at 326, 327, 99 S.t. at 2324, 2325.

### Good Faith Reliance upon a Defective Arrest Warrant

The reasons for invalidation of the pretextual warrant delineated above (concerning the abandonment of judicial neutrality) just as strongly demand the invalidation on the grounds that the police acted in bad faith reliance thereupon.

The police in this case admit that usually they are not even in possession of VCO orders, but rather execute the order if and when the subject is stopped for a traffic violation. (R2: 54). Clearly this was no routine VCO pickup. The police and the judge, while investigating Tyrone White, determined that it was necessary to interrogate Appellant. (R2: 59-60, testimony of Lt. Holder; R2: 101, testimony of Judge Bailey). Indisputably this was not a usual pickup order resulting from a

20

failure to appear, failure to pay a fine, or failure to pay restitution; the testimony of the officers to the effect that the VCO was merely a routine order is not credible, and in fact is abandoned in the course of the suppression hearing. Sergeant Murray testified that "[S]ometime prior to the week of July 29[th], 2005 I learned that we, [Auburn Police Department] had an outstanding warrant on [Appellant] for violation of court order." (R2: 27). Moments later Murray stated that, in another hearing in state court, he had previously testified that Lieutenant Holder "obtained" the warrant (R2: 29); this is indisputably a more accurate representation of the actual issuance. Obtaining a warrant is clearly a separate action from that of running the license of a person stopped for a traffic infraction and discovering the existence of a capias. As has been discussed above, the descending by the police upon a citizen's home in great numbers and demanding entry is likewise not the usual procedure for execution of such "violation" warrants.

However, assuming *arguendo* that the VCO had not been obtained under false pretexts and was otherwise valid (an assumption that, as has been shown, neither the government or the Magistrate Judge is prepared to fully adopt), the warrant was so facially defective and bereft of any indicia of probable cause that reliance thereupon was not reasonable, in contravention of the third and fourth *Leon* exceptions. As will be shown, none of the officers testifying at the suppression hearing could state why the warrant was issued or even in relation to what case the Appellant was being arrested, or what the warrant was for, other than arrest.

The VCO is attached hereto as Appendix I. A cursory examination reveals that it lacks a case number, or even a designated place where a case number should appear; it does not specify what "good cause" was shown to justify arrest, or who presented the "good cause"; it does not specify what "sentence(s)" of incarceration must be served; it orders that all "the City/County" medical expenses must be

21

reimbursed. It states that "The Clerk is directed to set this matter for hearing on the next regular business day after said Defendant is in custody." It is dated the "27ᵗʰ day of July 2005." (Appendix I).

Sergeant Murray offered his explanation as to the substance of the warrant at the suppression hearing. When asked if it was unusual for a VCO to lack a case number, he initially responded, "I can explain the reason there isn't one. I think I can." (R2: 31), then added, "I don't know about unusual but in this case it was not one put on it." (R2: 31). When asked if he was aware of any suspended time that the Appellant had to serve at that point, Murray responded, "It was my understanding that he had been given a suspended sentence on a driving suspended charge and also on a disorderly conduct charge." (R2: 32), although he was "not clear on the dates." (R2: 32). A few moments later the officer speculated as to what sentence Appellant may have received for these offenses ("I think it was a hundred and 80," R2: 33), but when informed that it was actually thirty (30), Murray responded that "I am not - I don't recall when it was entered in the court record." (R2: 33). Of notable interest is the fact that the officer was aware that

Appellant had paid all his fines and court costs well in advance of the time that Murray arrested him (R2: 33-34), a fact upon which the issuing judge himself was hopelessly unclear, as demonstrated above. Sergeant Murray eventually acceded that he didn't know what Appellant was ordered arrested for; that it could have been driving while suspended or disorderly conduct or either one. (R2: 35).

But the officer somehow knew that the sentence and fines for these offenses had been completed. (R2: 33). Clearly his reliance on an arrest order for violation of some aspect of the sentence(s) was therefore unreasonable; Appellant was probably one of the few visitors to the municipal court who scrupulously *did* abide by sentenced fine and cost payment requirements. The Magistrate Judge's finding that

22

the officers "had no reason to doubt the judge's view that [Appellant] had violated his probation, nor to question whether that determination constituted a sufficient finding of probable cause to arrest" is completely inaccurate. (R1: 29: 8) The officers encouraged the judge to issue a warrant, and at least one of them, Sgt. Murray, knew that Appellant had paid all his fines and completed his sentence. Clearly the officers knew that no indicia of probable cause existed for Appellant's arrest on these stale cases whose terms had been fulfilled long ago. Or, more properly, a reasonable officer in possession of this knowledge would have so known. Further testimony elicited that normally a VCO could specify what a defendant was being arrested for (R2: 36), but that this one did not.

(It must be remembered that this VCO was issued in the presence and at the behest of the arresting officers; it is not as if the officers had effected a routine traffic stop and were then apprized of the existence of a warrant. This fact renders even more inscrutable the complete dearth on the part of the officers of any articulable justifications, by which they were willing to stand, for the VCO).

Lieutenant Jerry Holder's testimony disclosed that he knew even less about the VCO than Sgt. Murray. Lt. Holder stated that when he and Sgt. Bailey met with Judge Bailey on 27 July 2005, he was unaware of any court orders that Appellant had violated "other than what the Judge pointed out when he reviewed his file." (R2: 60). Asked further, Holder responded, "When he reviewed his file he pointed out that he had several suspended sentences from other cases in court and that he was in violation of the Court's order so he issued a writ." (R2: 60). When asked how Appellant was in violation, Holder said "you will have to ask Judge Bailey that, sir, he's the one that said he was in violation and issued a writ for it." (R2: 60).

The issue of the objective deficiencies in the VCO are difficult to extricate from

23

the transparently false pretexts grounding it, so that an examination of the VCO alone for justifiable good faith is almost impossible. However, even if it is possible to momentarily ignore the origin of the VCO and the attendant tendentiously evasive explanations for its issuance, the document standing alone can support no reasonable reliance in good faith. This makes the Magistrate Judge's observation that "the officers actually observed Judge Bailey as he reviewed [Appellant's] case file and made the determination that a violation occurred" (R1: 29: 8) nothing short of bizarre; that this in fact occurred yet not one of the officers or judge could state *why* the VCO was issued  discloses the incontrovertible charade surrounding the entire process.

The standard for reviewing the reasonableness of an officer's actions is objective. *Leon,* supra,  468 U.S. at 919, 104 S.Ct. at 3419, FN20. In this case no facial probable cause supported the VCO's self-contained assertion that good cause had been "shown;" no reference was made to any particular case or cases, which ineluctably smacks of  a "general warrant" such as has been abhorred by United States courts since the birth of the nation. Both officers conceded that the VCO wasn't clear on its face why Appellant was being arrested. Therefore no officer could objectively rely with any degree of good faith on such an arrest warrant. (Again, as the officers themselves prevailed upon the judge to clandestinely issue the warrant, a genuine inquiry into their objective reliance thereupon is somewhat extraneous; a more meaningful question would be entail whether officers uninvolved in the VCO's pretextual procurement would have been justified in reliance thereupon; the clear answer is "no").

In  partial  summary,  the  Order  of  the  District  Court  adopting  the Recommendations of the Magistrate Judge is plainly erroneous. The arrest warrant issued in this case was transparently pretextual, the result of an unlawful

24

collaboration between a judge who had abandoned any semblance of detached neutrality and police officers who directed him. The VCO which grounded Appellant's arrest was devoid of any indicia of probable cause and moreover so facially deficient in specifying particulars that no reasonable officer could have presumed it to be valid. These averments are, again, substantiated by the fact that Appellant was never required to meet any of the requirements on the VCO (never required to serve the balance of any sentence, never required to pay any medical bills), but rather Appellant was released virtually immediately after being interrogated concerning the investigation being conducted by the judge and the police. While pretext is sometimes permitted in otherwise objectively valid traffic stops, and while warrants may be held for a reasonable time in hopes of being served at a time opportune for additional charges, nothing in the history of American jurisprudence permits purely pretextual arrest warrants to issue to satisfy the ulterior motives of police and Magistrate Judges.

b. IS THE WARRANTLESS SEARCH OF A RESIDENCE JUSTIFIED MERELY AND SOLELY FROM THE PERCEIVED AROMA OF BURNING MARIJUANA?

The warrantless entry and search of a residence has never been condoned when the sole grounds therefor, without more, is the perceived aroma of burning marijuana. As Sgt. Chris Murray testified, the sole reason for the entry of the agents into the home of Appellant was the smell of burning marijuana. (R2: 45).

The events culminating with the descent of six (6) or (7) law enforcement agents upon the residence of Appellant, ostensibly to execute the Violation of Court warrant, have been discussed at length in the preceding paragraphs. According to Sgt. Chris Murray, this was a misdemeanor warrant (R2: 6). Sergeant James Tatum and Officer Jason Crook, two of the accompanying policemen, were

25

in uniform; the other officers were in plain clothes (R2: 7). The officers positioned themselves in the front and rear of Appellant's residence. (R2: 8). Four (4) or five (5) officers were gathered at the front door. Sergeant Tatum approached the front door of the residence and knocked. A male voice from inside said "Who is it?" (R2: 68). Sergeant Tatum replied "Police, open the door." (R2: 38; 67-68). No more than a minute passed before Appellant's girlfriend, Jamillah McCray (hereinafter referred to as"McCray"), opened the door (R2: 69) At that time, some of the officers noted what they believed to be the smell of burning marijuana, but saw no contraband. (R2: 69).

Appellant came to the door almost immediately and was taken into custody outside the residence. According to Sgt. Murray, their mission was complete at this point. (R2: 40). Yet the officers entered the home, their sole purpose for entering the residence being the smell of burning marijuana (R2: 45).

Olfactory detection of burning marijuana indicates that, at worst, a misdemeanor crime, possession of marijuana in an amount small enough to burn in a cigarette or a pipe, is being committed. This is of some significance, as the cases cited below illustrate.

*Johnson v. United States,* 333 U.S. 10, 68 S. Ct. 367, 92 L.Ed. 436 (1948), a case in which the facts closely resemble those of the instant case, furnishes often-cited Fourth Amendment interpretation: "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Id* at 369. The neutrality of the municipal judge in the instant case is shown to be compromised elsewhere within

26

this appeal.

In *Johnson* v. *United States,* a police lieutenant was told by an informant that opium was being smoked at a hotel. The policeman and the informer went to the hotel, where, after determining that opium was being smoked by the smell of the drug burning, he left and returned to the hotel with four narcotics a short time later. The lieutenant knocked on the door of Room 1, from where the aroma seemed to be coming. After identifying himself, the lady occupying the room opened the door; after being told that police wanted to "talk to her a little bit," the female "stepped back acquiescently and admitted" the officers inside. *Id* at 368. The police told the woman that she was under arrest and searched the room, finding opium and a warm pipe. The defendant challenged the search of her home as a violation of the rights secured to in common with others, by the Fourth Amendment to the United States Constitution. The Supreme Court found that the odor possible probable cause to obtain a warrant, but not warrantless, non-consensual entry and search.

Equally germane to the separate issue of the voluntariness of the consent to opening the door in the instant case, the *Johnson* court held that "[E]ntry to defendant's living quarters, which was the beginning of the search, was demanded under color of office. It was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right. Cf. *Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654." *Id* at 368. This issue will be addressed presently within this appeal.

The Supreme Court went on; "At the time entry was demanded the officers were possessed of evidence which a Magistrate Judge might have found to be probable cause for issuing a search warrant. We cannot sustain defendant's contention, erroneously made, on the strength of *Taylor v. United States,* 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932), that odors cannot be sufficient to constitute probable

27

grounds for any search. *That decision only held that odors alone do not authorize a search without a warrant.*" *Id* at 368-369; emphasis added. In *Taylor*, the Supreme Court held that evidence discovered by agents who, after smelling whiskey, arrested the owner of the property and conducted a warrantless search, was inadmissible. "Prohibition officers may rely on a distinctive odor as a physical fact indicative of a possible crime; but its presence alone does not strip the owner of a building of constitutional guaranties (Const. Amend. 4) against unreasonable searches." *Taylor* at 467.

The finding of the District Court (via its adoption of the Recommendation of the Magistrate Judge Judge) that "[O]nce the door was open and the officers smelled the burning marijuana, they clearly had the authority to enter the residence to prevent the destruction of evidence and to secure the premises in order to obtain a search warrant" (R1: 29: 12) is absolutely incorrect. The Court's reliance upon the cases of *Segura v. United States,* 468 U.S. 768, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) and *Illinois v. McArthur,* 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) is misplaced, for neither supports the unwarranted entry and search of a home based on the odor of marijuana. In *Segura,* agents of the New York Drug Enforcement Task Force had been maintaining constant surveillance over the defendants for over a month on suspicion of cocaine trafficking. Agents observed a meeting between Segura (one of the defendants) and another couple, at which it was later developed that the sale of drugs was discussed. Three days later, Segura and the couple agreed to meet at a fast food restaurant, where a drug transaction took place. Agents followed the couple and arrested them in possession of the cocaine. The male cooperated and told agents that he was scheduled to possibly buy more drugs from Segura. After getting permission from the Assistant U.S. Attorney to arrest Segura, agents did so in the lobby of his apartment building. They took him

28

to his apartment, and when they knocked on the door, a woman answered. When the door was opened, the agents entered the apartment without requesting or receiving permission. The woman who answered the door was arrested, and she and Segura were taken to DEA headquarters. During a security check of the apartment the agents saw, in plain view, accouterments of the drug trade including scales, cellophane bags, and lactose. The Agents waited in the apartment for nineteen (19) hours until a search warrant was issued. At that time they found further contraband.

The District Court suppressed all evidence, both that in plain view and that later discovered after the warrant was obtained. The Court of Appeals reversed, holding that the items found after the warrant was obtained were seized legally. *Both Courts found that the initial entry into the apartment was illegal, as no exigent circumstances existed to justify a warrantless search. Segura, supra,* at 803, 104 S.Ct. at 3384, footnote 4. Emphasis added.

The Supreme Court held that because none of the information on which the warrant was secured was derived in any way from the initial, illegal entry into the defendant's apartment, but came from sources wholly unconnected with the entry and was known to agents well before the initial entry, no Fourth Amendment privations were inflicted upon appellants, pursuant to *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 l.Ed. 319 (1920). The evidence discovered the following day, during the search conducted with the valid warrant, was admissible as being sufficiently attenuated to the illegal entry to purge any taint. *Segura* at 468 U.S. at 814, 104 S.Ct. at 3388. This issue will be discussed in more detail presently.

This holding is inapposite to the instant issue raised in this case. Nothing in *Segura* suggests that a warrantless entry and search may be made based solely on the perception of burning marijuana. The holding is, however, favorably apposite

29

to Appellant's Issue (d), herein, and will be discussed presently.

Nor is the holding in the *Illinois v. McArthur, supra,* applicable to the instant case; there, a man was prevented from entering his home until a search warrant was obtained. In the instant case, officers entered the home prior to obtaining any warrant, based only on the perceived smell of burning marijuana. *Illinois,* cited by the Magistrate Judge in her Recommendation, contains the following dicta: "Temporarily keeping a person from entering his home, a consequence whenever police stop a person on the street, is considerably less intrusive than police entry into the home itself in order to make a warrantless arrest or conduct a search." *Id,* 531 U.S. at 337, 121 S.Ct. at 953. Yet the latter is precisely what happened in the instant case.

> "Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. Before the agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. See *Payton v. New York, supra,* 455 U.S. at 586, 100 S.Ct., at 1380. When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached Magistrate Judge."

30

*Welsh v. Wisconsin, supra,* 466 U.S. at 750, 104 S.Ct. at 2098.

The gravity of the underlying offense is a principal factor. *Dorman v. United States,* 435 F.3d 385, 392 (U.S. App. D.C. 1970). "It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in follow-up offenses that involve no violence or threats of it." Justice Jackson, writing in concurrence in *McDonald v. United States,* 355 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), as cited in *Welsh, supra.*

While drug offenses are no doubt serious, the only drug offense suspected with any degree of probable cause in the instant case was the personal use of marijuana which is, under Alabama law, a misdemeanor,[3] and most certainly a "minor crime" as contemplated in *Welsh.*

The Magistrate Judge finally cites *United States v. Tobin,* 923 F.2d 1506 (11th Cir. 1991) as justification for the warrantless, non-consensual entry and search of the home based on the smell of marijuana. (R1: 29: 13). Again, this reference is flawed for two reasons; for one, the door to the residence in that case was voluntarily opened in response to the knocking thereon by police, allowing olfactory access to the inside of the residence which , as will be shown, was not the case in the present action; and, two, as in *Segura,* above, the officers had been maintaining surveillance in the neighborhood, and saw, through binoculars, the suspects unload what they believed to be a large quantity of cocaine from a car into a garage. Eventually the agents knocked on the door of the residence where the unloading happened, which was opened. One of the suspects permitted the agents entry into the garage, where a large quantity of cocaine was discovered. The fact

---

[3] §13A-12-214(b), Code of Alabama 1975.

31

that marijuana was detected by aroma served only to raise the level of the agents' suspicions to probable cause; the danger that defendants might destroy evidence justified the warrantless search, per the holding in *Tobin*. However, the "evidence" referenced there at 923 F.2d 1512 is not specified, and appears to be the large quantity of cocaine, and not the small amount of marijuana that detection of burning marijuana logically bespeaks. Moreover, the smell of marijuana in that case led police not to the interior of the residence, as in the present case, but to a garage where the cocaine was believed to be.

Exigency is a factor to be considered in warrantless searches; "[S]earches conducted outside the judicial process, without prior approval by judge or Magistrate Judge, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions. *Katz v. United States,* 389 U.S. 347, 357, 88 s.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Hot pursuit of a fleeing felon has justified warrantless entry into a home; *United States v. Santana,* 427 U.S. 38, 42-43, 96 S.Ct. 2406, 2409-2410, 49 L.Ed.2d 300 (1976). Exigent circumstances were found to be absent in *Johnson, supra;* there, the crime which was suggested by olfactory evidence was possession of opium, a felony. This Circuit has held that the mere presence of contraband, without more, does not give rise to exigent circumstances. *United States v. Torres,* 705 F.2d 1287, 1297 (11th Cir. 1983). "Absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." *Payton v. New York, supra,* 445 U.S. at 587-588, 100 S.Ct. at 1384.

It cannot be plausibly argued that exigency existed in executing the arrest warrant itself, even presuming it to be valid. Police testified that such VCO orders are usually not executed until the subject is stopped in traffic. The fact that six (6) or seven (7) officers thought it necessary to execute this one upon an admittedly

non-violent individual for any of the fatuous reasons provided by the judge (late on payment, should have been sentenced more harshly, associating with the criminal element, etc.) in no way diminishes the objective absurdity of the excessive action by police in this case.

The Magistrate Judge's citation of *United States v. Morales*, 868 F.2d 1562 (11th Cir. 1989) (R1: 29: 13) is again an inapposite reference, in that it concerns a large cocaine conspiracy and surveillance. It does not aid in concluding that a warrantless, non-consensual invasion by the government is permitted merely upon the suspicion that marijuana is being consumed in a home.

The Magistrate Judge found in the instant case that the "officers had information prior to their arrival at the residence that [Appellant] was dealing large amounts of crack cocaine and marijuana from his residence. That information 'rose to the level of probable cause when, as the door stood open, [officers] detected what [they] knew from [their] law enforcement experience to be the odor of marijuana.' " (R1: 29: 13, Recommendation of the Magistrate Judge, quoting *Tobin, supra*). However, as police testified, they did not and never had sufficient probable cause to obtain a warrant (R2: 25-26) (a fact which, Appellant posits, combined with the desire to interrogate him on the Tyrone White issue, necessitated the transparent ruse employed by the municipal judge and officers), and moreover, probable cause based on odors merely justifies *obtaining* a warrant, not wholesale entry into every home from which marijuana smoke may be emanating. *Johnson, supra.*

Nor can the entry and search of the home be excused as incident to the arrest of Appellant, who exited the residence and was taken into custody outside it. (R2: 12).

"If a search of a house is to be upheld as incident to arrest,

33

that arrest must take place inside of the house, cf. *Agnello v. United States,* 269 U.S. 20, 32, 46 s.Ct. 4, 6, 70 L.Ed.145, (1925), not somewhere outside-whether two blocks away, *James v. Louisiana,* 382 U.S. 36, 86 S.Ct. 151, 15 L.Ed.2d 30 (1965), twenty feet away [...] or on the sidewalk near the front steps. 'Belief, *however well founded*, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant' *Agnello v. United States, supra,* 269 U.S. at 33, 46 S.Ct. at 6. This basic rule 'has never been questioned in this Court.' *Stoner v. California,* 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856 (1964).

*Vale v. Louisiana,* 399 U.S. 30, 33-34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970).

As has been shown, there was no valid warrant for arrest in the instant case; as will be shown below, any opening of the door to the residence in the instant case was non-consensual and the response to command under color of authority. Aside from these facts, however, and in partial summary, no authorities exist, including that cited by the Magistrate Judge, which support the warrantless entry and search of a home based merely and solely on the perceived odor of marijuana.

## c. MAY AN OFFICER GAIN WARRANTLESS ENTRY INTO A RESIDENCE THROUGH THE EMPLOYMENT OF INTIMIDATION AND FORCE?

This issue, assuming that it requires decision, is substantially controlled by the holdings in *United States v. Edmondson,* 791 F.2d 1512 (11ᵗʰ. Cir. 1986) and *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). If warrantless entry is demanded or ordered under a show of authority, such entry is non-consensual. Such is precisely what occurred in this case.

As described above, the entry to the home transpired under the following circumstances: Sergeant James Tatum and Officer Jason Crook, two of the accompanying policemen, were in uniform; the other officers were in plain clothes (R2: 7). The officers positioned themselves in the front and rear of Appellant's residence. (R2: 8). Sergeant Tatum approached the front door of the residence and knocked. A male voice from inside said "What?" (R2: 67). Sergeant Tatum replied "Police, open the door." (R2 :38; 67-68). No more than a minute passed before Appellant's girlfriend, Jamillah McCray (hereinafter referred to as"McCray"), opened the door (R2: 69).

Appellant submits that the fact that the warrant upon which police were operating has been conclusively shown to be purely pretextual, concocted in bad faith by a municipal judge and the police at whose direction he was acting, invalidates and renders inadmissible all tainted evidence which was seized under its authority under the "fruit of the poisonous tree" doctrine, which will be discussed presently. For the purposes of this issue, Appellant contends that no valid warrant existed.

The Magistrate Judge in her Recommendations found either that police were justified in demanding entry, or, conversely, that McCray's admission of the officers

35

was consensual. (R1: 29: 11-12). Neither of these findings is remotely supported by the record.

The Magistrate Judges cites cases in which a valid arrest warrant supported by probable cause existed, and which indicate that a search warrant is not necessary to enter a suspect's home when executing such a valid arrest warrant. (*United States v. Bervaldi,* 226 F.3d 1256 (11th Cir. 2000) and *United States v. Lauter,* 57 F.3d 212 (2nd Cir. 1995)). These cases would support the Magistrate Judge's finding if Appellant had been arrested in his home; he was not. He was arrested outside it, and such an arrest, pursuant to *Vale, supra,* does not justify a search of the arrestee's home. Nor, of course, did a valid arrest warrant exist in this case.

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina, supra,* 391 U.S. at 548, 88 S.Ct. at 1792. "[E]ntry to defendant's living quarters, which was the beginning of the search, was demanded under color of office. It was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right. Cf. *Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654." *Johnson v. U.S., supra,* at 368. In *Johnson*, upon being told that police wanted to enter talk to her, the arrestee "stepped back acquiescently" which is the exact response exhibited by McCray in the instant case. In the instant case, however, police had surrounded the residence, and demanded that the occupants "open the door." (R2: 38; 67-68). Although the Magistrate Judge found that "the officers at the door were in plain clothes" (R1: 29: 12), the record clearly states otherwise; Sgt. Tatum, the officer who was pounding on the door and demanding entry, was in uniform. (R2: 7). Likewise, the Magistrate Judge found that police did not shout

36

access to the burning marijuana was gained through a "show of official authority" and cannot be said to have been consensual. *Edmondson, supra.*

In partial summary, the Magistrate Judge plainly misapprehended the record concerning this issue; and moreover, given the fact that police had surrounded the residence and were demanding entry, the opening of the door, under settled authority, was not consensual.

d. MAY A LAWFUL SEARCH WARRANT BE OBTAINED BASED UPON PROBABLE CAUSE ORIGINATING FROM AN INITIALLY UNLAWFUL, WARRANTLESS INTRUSION?

An illegal entry and search cannot form the basis of a subsequent valid search warrant which lists, as probable cause, the items observed during the initial entry, subject to three recognized exceptions, none of which are applicable here.

" 'The exclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence.' *Nix v. Williams,* 467 U.S. 431, 441, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984) (citing *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 l.Ed. 319 (1920))." *United States v. Tarzado-Madruga,* 897 F.2d 1099, 1112-1113 (11ᵗʰ Cir. 1990).

The "inevitable discovery" doctrine, the "attenuation" doctrine, and the "independent source" doctrine are three exceptions to this rule. In cases where the illegally found evidence would have been found legally at a later date, it is not rendered inadmissible. *Nix v. Williams, supra,* 467 U.S. 444, 104 S.Ct. at 2509.

If the causal connection between the constitutional violation and the discovery of evidence has become so attenuated as to dissipate the taint of the illegality, then the evidence may be admitted. *United States v, Ceccolini,* 435 U.S. 268, 273, 98 S.Ct.

37

1054, 1058, 55 L.Ed.2d 268 (1978); finally, if the challenged evidence is derived from a source independent of the illegal conduct, it may be admitted. *Silverthorne, supra,* 251 U.S. at 392, 40 S.Ct at 183.

Clearly none of the exceptions apply here. The affidavit[4] by which the officers gained the search warrant uses all the incriminating evidence illegally discovered as grounds for the warrant, including cocaine and scales. (Appendix IV). There was no warrant to search waiting in the wings; the officers conceded that they lacked probable cause for a search warrant despite rumors that drug activity was transpiring at the residence. Attenuation is not an issue; as soon as the officers illegally entered and found contraband, they hurried to obtain the warrant that they couldn't obtain legally.

In partial summary, the otherwise valid warrant cannot purge the taint of the illegal entry and search when it is grounded on items observed illegally. Nor can the smell of marijuana also used as a basis for the warrant be excised from the illegally observed grounds in the warrant, for the reasons discussed above regarding the illegality of the initial VCO and the non-consensual access to the smoke purloined by the officers.

---

[4] This affidavit is attached hereto as Appendix IV

## CONCLUSION

For the reasons presented within this document, Appellant respectfully requests that this Honorable Court will Vacate the Sentence imposed, and Reverse the Trial Court's Denial of his Motion to Suppress.


**WILLIAM R. BLANCHARD (BLA-029)**
**Counsel for Appellant**
**505 South Perry Street**
**Post Office Box 746**
**Montgomery, Alabama, 36101-0746**
**Telephone No. (334) 269-9691**
**Fax: (334) 263-4766**

39

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

*This brief is in compliance with Federal Rules of Appellate Procedure 32(a)(7)(B) because:*

The entire document, minus the Appendices, contains the word-processor total of thirteen-thousand and sixteen (13016) words.

*This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the typestyle requirements of 32(a)(6) because:*

The size and style of type utilized throughout Appellant's Brief is Times New Roman, 14 pitch, which is proportionately spaced.

Pursuant to 11th Circuit Rule 31-5, this brief has been uploaded to this Court's website at www.ca11.uscourts.gov in pdf format.


**WILLIAM R. BLANCHARD (BLA-029)**
**Counsel for Appellant**
**505 South Perry Street**
**Post Office Box 746**
**Montgomery, Alabama, 36101-0746**
**Telephone No. (334) 269-9691**
**Fax: (334) 263-4766**

40

## CERTIFICATE OF SERVICE

I Hereby CERTIFY that a copy of the foregoing Brief of Appellant was served by United States mail, postage prepaid and properly addressed this 13th day of March, 2007, upon Hon. Todd A. Brown , Assistant United States Attorney, P.O. Box 197, Montgomery, Alabama 36104-0197.


**WILLIAM R. BLANCHARD (BLA-029)**
**Counsel for Appellant**
**505 South Perry Street**
**Post Office Box 746**
**Montgomery, Alabama, 36101-0746**
**Telephone No. (334) 269-9691**
**Fax: (334) 263-4766**

41

# <u>APPENDIX I</u>

**Violation of Court Order**

## IN THE MUNICIPAL COURT FOR THE CITY OF AUBURN, AL

CITY OF AUBURN,                      )
                                     )
    Plaintiff                    )
                                     )
v.                                   )
                                     )
SAWELIJA TYREE FLOYD.                )
                                     )
    Defendant.                   )

### ORDER

For good cause shown. it is the Court's opinion that the above-named Defendant should be taken into custody and incarcerated in the Lee County Jail to serve the balance of the sentence(s) of incarceration heretofore suspended reimbursing the City/County for all medical expenses.

The Clerk is directed to set this matter for hearing on the next regular business day after said Defendant is in custody.

So **ORDERED** this the 27th day of July 2005.

                            Municipal Judge

A copy of this Order is to be forwarded to the following:

Defendant

# APPENDIX II

**Municipal Court and Payment Histories**

# HISTORY FOR
## SAWELIA TRYEE FLOYD (S422020573)

--- PROFILE ---

| Address | | | Alias | Phone |
|---|---|---|---|---|
| 1289 TY CT   AUBURN AL 36830 | | | TYREE | (334) 502-4768 |

| Social Security Number | Date of Birth | Age | Race | Sex | Height |
|---|---|---|---|---|---|
| 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 | 1977-03-01 | 28 | BLACK | M | 6'  01" |

| Weight | Hair | Eyes | Other | Tatoos |
|---|---|---|---|---|
| 220 | BLACK | BROWN | | TOOMSTONE UPPER LEFT ARM |

| Drivers License | Class | Vehicle Tag | Tag Year |
|---|---|---|---|
| AL  6149890 | D | GA  AKV9239 | 2006 |

--- WARRANTS ---

| Number | Type | Date Issued | Charge | Disposition | Date Served |
|---|---|---|---|---|---|
| 00-000001662 | CAPIAS | 2000-08-09 | VIOLATION OF COURT ORDER | EXECUTED | 2000-08-31 |
| 01-000001210 | ON-VIEW | 2001-04-25 | POSSESSION OF MARIJUANA 2ND DEGREE | EXECUTED | 2001-04-26 |
| 01-000002039 | CAPIAS | 2001-07-09 | VIOLATION OF COURT ORDER | EXECUTED | 2001-09-13 |
| 02-000003315 | CAPIAS | 2002-11-12 | VIOLATION OF COURT ORDER | HELD | |
| 03-000000770 | CAPIAS | 2003-04-17 | VIOLATION OF COURT ORDER | EXECUTED | 2003-11-19 |
| 05-000000408 | ON-VIEW | 2005-02-26 | DISORDERLY CONDUCT | EXECUTED | 2005-02-28 |
| 98-000002645 | ON-VIEW | 1998-09-16 | RENDERING FALSE INFORMATION | EXECUTED | 1998-09-16 |
| 99-000001855 | CAPIAS | 1999-09-14 | VIOLATION OF COURT ORDER | EXECUTED | 2000-04-20 |

--- CASES ---

| Case #/Charge | Arrest Date | Status | Court Date | Disposition/Police # | Bond | Owed |
|---|---|---|---|---|---|---|
| MC01-0052348  POSSESSION OF MARIJUANA 2ND DEGREE | 2001-04-25 | CLOSED | 2003-02-14 | GUILTY (2001-09-13) | | |
| MC05-0060889  DISORDERLY CONDUCT | 2005-02-26 | CLOSED | 2005-04-21 | GUILTY (2005-04-21) | | |
| MC98-0047233  RENDERING FALSE INFORMATION | 1998-09-16 | CLOSED | 2001-06-27 | GUILTY (1998-10-15) | | |
| TR03-0007689  DRIVING WHILE LICENSE REVOKED | 2003-12-08 | CLOSED | 2004-02-26 | NOL PROS (2004-03-09)  03013118 | | |
| TR04-0003616  DRIVING WHILE LICENSE REVOKED | 2004-05-14 | CLOSED | 2004-07-29 | GUILTY (2004-07-29)  04005405 | | |
| TR04-0005412  SPEEDING | 2004-07-19 | CLOSED | 2004-08-05 | GUILTY (2004-07-29)  04008224 | | |
| TR04-0005413  INSURANCE REQ | 2004-07-19 | CLOSED | 2004-08-05 | NOL PROS (2004-07-29)  04008224 | | |
| TR05-0007832  RUNNING RED LIGHT | 2005-10-04 | CLOSED | 2005-12-08 | GUILTY (2005-10-21)  05013633 | | |

# HISTORY FOR
## SAWELIA TRYEE FLOYD (S422020573)

--- CASES ---

| Case #/Charge | Arrest Date | Status | Court Date | Disposition/Police # | Bond | Owed |
|---|---|---|---|---|---|---|
| TR98-0003226 | 1998-04-08 | CLOSED | 2003-02-14 | GUILTY (1998-05-14) | | |
| DRIVING WHILE LICENSE SUSPENDED | | | | | | |
| TR98-0007301 | 1998-09-16 | CLOSED | 2003-02-14 | GUILTY (1998-10-15) 98010262 | | |
| DRIVING WHILE LICENSE SUSPENDED | | | | | | |
| TR93-0007903 | 1993-09-29 | CLOSED | 1993-10-21 | GUILTY (1993-10-11) | | |
| RUNNING RED LIGHT | | | | | | |
| TR96-0007005 | 1996-09-06 | CLOSED | 1996-11-07 | NOL PROS (1996-11-07) | | |
| EXPIRED DRIVER'S LICENSE | | | | | | |

# PAYMENT HISTORY FOR
## SAWELIJA TRYEE FLOYD (S422020573)

| Case # | Receipt | Date Paid | Method | Credit | Due | PIF | VOID |
|---|---|---|---|---|---|---|---|
| MC01-0052348 | 0000243686 | 2001-09-13 | SETUP | $0.00 | $515.00 | | |
| | 0000245539 | 2001-09-28 | CASH | $20.00 | $495.00 | | |
| | 0000249243 | 2001-10-30 | CASH | $20.00 | $475.00 | | |
| | 0000251605 | 2001-11-30 | CASH | $20.00 | $455.00 | | |
| | 0000253243 | 2001-12-31 | CASH | $20.00 | $435.00 | | |
| | 0000256163 | 2002-01-31 | CASH | $20.00 | $415.00 | | |
| | 0000256949 | 2002-02-08 | CASH | $20.00 | $395.00 | | |
| | 0000262609 | 2002-03-29 | CASH | $20.00 | $375.00 | | |
| | 0000264651 | 2002-04-22 | CASH | $20.00 | $355.00 | | |
| | 0000268276 | 2002-05-31 | CASH | $20.00 | $335.00 | | |
| | 0000270369 | 2002-06-28 | CASH | $20.00 | $315.00 | | |
| | 0000272594 | 2002-07-31 | CASH | $20.00 | $295.00 | | |
| | 0000274721 | 2002-08-30 | CASH | $20.00 | $275.00 | | |
| | 0000280547 | 2002-10-31 | CASH | $20.00 | $255.00 | | |
| | 0000286119 | 2003-01-15 | CASH | $5.00 | $250.00 | | |
| | 0000330610 | 2004-05-19 | CASH | $250.00 | $0.00 | | |
| MC05-0060889 | 0000360385 | 2005-04-21 | CASH | $325.00 | $0.00 | | |
| MC98-0047233 | 0000140764 | 1998-10-20 | SETUP | $0.00 | $595.00 | | |
| | 0000190136 | 2000-04-21 | CASH | $60.00 | $535.00 | | |
| | 0000190137 | 2000-04-21 | CASH | $35.00 | $500.00 | | |
| | 0000203563 | 2000-09-01 | CASH | $325.50 | $174.50 | | |
| | 0000243687 | 2001-09-13 | CASH | $174.50 | $0.00 | | |
| TR03-0007689 | 0000323952 | 2004-03-09 | NOL | $0.00 | $0.00 | | |
| TR04-0003618 | 0000336794 | 2004-07-29 | CASH | $242.00 | $0.00 | | |
| TR04-0005412 | 0000336779 | 2004-07-29 | CASH | $112.00 | $0.00 | | |
| TR04-0005413 | 0000336780 | 2004-07-29 | NOL | $0.00 | $0.00 | | |
| TR98-0003226 | 0000124854 | 1998-05-14 | SETUP | $0.00 | $147.50 | | |
| can't locate | 0000203565 | 2000-09-01 | CASH | $47.50 | $100.00 | | |
| | 0000322229 | 2004-02-19 | CASH | $10.50 | $89.50 | | |
| | 0000326203 | 2004-03-31 | CASH | $25.00 | $64.50 | | |
| | 0000327974 | 2004-04-22 | CASH | $25.00 | $39.50 | | |
| | 0000330609 | 2004-05-19 | CASH | $39.50 | $0.00 | | |
| TR98-0007301 | 0000140763 | 1998-10-20 | SETUP | $0.00 | $212.00 | | |
| can't locate | 0000190138 | 2000-04-21 | CASH | $5.00 | $207.00 | | |
| | 0000190202 | 2000-04-21 | CASH | $80.00 | $127.00 | | |
| | 0000203564 | 2000-09-01 | CASH | $27.00 | $100.00 | | |
| | 0000243688 | 2001-09-13 | CASH | $25.50 | $74.50 | | |
| | 0000286118 | 2003-01-15 | CASH | $15.00 | $59.50 | | |
| | 0000289366 | 2003-02-12 | CASH | $20.00 | $39.50 | | |
| | 0000318983 | 2004-01-12 | CASH | $25.00 | $14.50 | | |

| Case # | Receipt | Date Paid | Method | Credit | Due | PIF | VOID |
|--------|---------|-----------|--------|--------|-----|-----|------|
| | 0000322228 | 2004-02-19 | CASH | $14.50 | $0.00 | | |
| TR96-0007005 | 0000073046 | 1996-11-07 | NOL | $0.00 | $0.00 | | |

# <u>APPENDIX III</u>

**Order of Release**

44

## IN THE MUNICIPAL COURT FOR THE CITY OF AUBURN, AL

CITY OF AUBURN,                     )
                                    )
    Plaintiff,              )
                                    )
v.                                  )
                                    )
SAWELIA TYREE FLOYD,                )
                                    )
    Defendant.              )

### ORDER

For good cause shown, the Defendant should be released from incarceration in the

Lee County Jail pending further orders of this Court.

So **ORDERED** this the 1st day of August 2005.

_____
Municipal Court Judge

000058

# **APPENDIX IV**

**Search Warrant Affidavit**

| State of Alabama<br>Unified Judicial System<br><br>Form CR-1-a          Rev. 2/95 | AFFIDAVIT IN SUPPORT OF<br>APPLICATION FOR SEARCH WARRANT | Case or<br>Warrant Number |
|---|---|---|

IN THE __Circuit_____ COURT OF _____LEE_____, ALABAMA
    (Circuit, District, Municipal)                (Name of County or Municipality)

[ X ] STATE OF ALABAMA
[ ] MUNICIPALITY OF ___State of Alabama___ v. Sawelija Tyree Floyd alias, Jamillah Resheda McCray
                                           Defendant

After an Application for a Search Warrant was made or will be made to the court, I, Sergeant Chris Murray, the undersigned, after being duly sworn to tell the truth and in support of the Application, hereby depose and say as follows: that there is now being kept or concealed Cocaine and Marijuana at the residence known as 1289 Ty Court, Auburn, Lee County, Alabama. On July 29, 2005, Sergeant Chris Murray and other members of the Auburn Police Department went to serve a Violation of Court Order warrant issued by Auburn Municipal Court on Sawelija Tyree Floyd, alias, at 1289 Ty Court, Auburn Lee County, Alabama. Officers knocked on the front door and when it opened, a very strong odor of burning Marijuana was detected immediately coming from inside the residence. Floyd, alias, was taken into custody. Officers entered the residence and from the front door, officers could see suspected "crack" Cocaine and a set of scales on the kitchen counter. Also present in the residence were J.B. Mitchell and Jamillah Resheda McCray, alias (a resident). All three were read their Miranda rights. J. B. Mitchell, alias, stated to Sgt.Murray that he and Sawelija Tyree Floyd were smoking Marijuana when officers knocked on the door. Both McCray and Floyd refused to give consent to a further search of the apartment.

_____
                            Affiant

Sworn to and subscribed before me on this the
__29th__ day of __July__ , __2005__
_____
    Judge/Magistrate

43

# **APPENDIX V**

**Plea Agreement**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )    CR. NO. 03:05-CR-0187-F |
| | ) |
| SAWELIGA TYREE FLOYD | ) |

## PLEA AGREEMENT

**DEFENSE COUNSEL:**          **WILLIAM R. BLANCHARD**

**ASSISTANT U.S. ATTORNEY:**      **TODD A. BROWN**

## COUNT AND STATUTES CHARGED:

Counts 1-4    21 U.S.C. § 841(a)(1)
              Possession of Controlled Substance with Intent to Distribute

## COUNT(S) PLEADING PURSUANT TO PLEA AGREEMENT:

Counts 1-4    21 U.S.C. § 841(a)(1)
              Possession of Controlled Substance with Intent to Distribute

## PENALTIES BY COUNT - MAXIMUM PENALTY
## (EACH ASSUMING NO PRIOR FELONY DRUG CONVICTION(S)):

Count 1    21 U.S.C. § 841(a)(1)
           Possession of Controlled Substance with Intent to Distribute

           A term of imprisonment which may not be less than 10 years and not more than life,
           a fine not to exceed $4,000,000, or both fine and imprisonment; a term of supervised
           release of no less than 5 years; and an assessment fee of $100.00.

Count 2    21 U.S.C. § 841(a)(1)
           Possession of Controlled Substance with Intent to Distribute

           A term of imprisonment which may not be more than 5 years, a fine not to exceed
           $250,000, or both fine and imprisonment; a term of supervised release of no less than
           2 years; and an assessment fee of $100.00.

Count 3     21 U.S.C. § 841(a)(1)
Possession of Controlled Substance with Intent to Distribute

A term of imprisonment which may not be less than 5 years and not more than 40 years, a fine not to exceed $2,000,000, or both fine and imprisonment; a term of supervised release of no less than 4 years; and an assessment fee of $100.00.

Count 4     21 U.S.C. § 841(a)(1)
Possession of Controlled Substance with Intent to Distribute

A term of imprisonment which may not be more than 20 years, a fine not to exceed $1,000,000, or both fine and imprisonment; a term of supervised release of no less than 3 years; and an assessment fee of $100.00.

## ELEMENTS OF THE OFFENSE(S):

Counts 4     21 U.S.C. § 841(a)(1)
Possession of Controlled Substance with Intent to Distribute

1. The defendant knowingly and willfully possessed a controlled substance, as charged;

2. That the defendant possessed the controlled substance with intent to distribute it; and,

3. That the quantity of the controlled substance was as listed in the indictment.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Todd A. Brown, Assistant United States Attorney, and William R. Blanchard, Esq., attorney for the defendant, pursuant to Rule 11(a)(2), Federal Rules of Criminal Procedure, as Amended, have, with the authorization of the undersigned defendant, heretofore entered into discussions with a view towards reaching a pretrial conclusion of the charges pending in the Indictment herein and a Plea Agreement has been reached by said parties.

## GOVERNMENT'S PROVISIONS

1. Upon entering a plea of guilty by the defendant to the offense charged in Counts 1-4 of the Indictment, the attorney for the Government will agree that a 2-level reduction in the applicable offense level pursuant to U.S.S.G. § 3E1.1(a) for the defendant's acceptance of

responsibility is appropriate, so long as the defendant does not obstruct justice or otherwise fail to accept responsibility for the offense conduct.

2. The United States reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses and the defendant's background.

## DEFENDANT'S PROVISIONS

3. The defendant agrees to plead guilty to Counts 1-4 of the Indictment

## FACTUAL BASIS

4. The defendant admits the allegations charged in Counts 1-4, and understands that the nature of the charge to which the plea is offered involves proof as to Counts 1-4, that on or about July 29, 2005, in Lee County, Alabama, the defendant knowingly and intentionally possessed, with intent to distribute, controlled substances, namely, 50 grams or more of cocaine base, marijuana, 500 grams or more of cocaine hydrochloride, and 3,4-methylenedioxymethamphetamine ("MDMA" or "Ecstasy"), in violation of Title 21, United States Code, Section 841(a)(1).

## DEFENDANT RETAINS APPEAL AND COLLATERAL ATTACK RIGHTS

5. The defendant retains his rights to appeal and collaterally attack the sentence imposed in this case. This retention of appeal rights specifically includes the right to appeal the adverse determination of a specified pretrial motion, pursuant to Fed. R. Crim. P. 11(a)(2), namely, the decision to deny the defendant's motion to suppress evidence, supported by the Magistrate Judge's Recommendation, filed on January 18, 2006 (Doc. # 29), and the subsequent adoption of that Recommendation by the District Court. (Doc. # 35).

3

## DEFENDANT'S UNDERSTANDING AND ACKNOWLEDGMENT

6. The defendant, before entering a plea of guilty to Counts 1-4, as provided for herein by said Plea Agreement, advises the Court that:

a. The discussions between the attorney for the Government and the attorney for the defendant towards reaching an agreed plea in this case have taken place with the defendant's authorization and consent.

b. The defendant further understands that, pursuant to 18 U.S.C. § 3013, said $100.00 assessment fee is to be paid by the defendant on the date of sentencing and that, if a fine is imposed by the Court at sentencing, the defendant shall meet with a member of the Financial Litigation Section of the United States Attorney's Office on the day of sentencing and complete a written personal financial statement setting forth the defendant's assets and liabilities as of the date of the offense. The defendant will make an honest, good faith effort to pay said fine as directed by the Financial Litigation Section of the United States Attorney's Office. The defendant further understands that by completing the financial statement, the defendant is representing that it is true and accurate to the best of the defendant's information, knowledge, and belief.

c. The defendant understands that the defendant has a right to be represented by an attorney at every stage of the proceedings against the defendant herein and is represented by the defendant's undersigned attorney.

d. The defendant understands that the defendant has the right to plead not guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right to call witnesses in the defendant's own behalf, and the right not to be compelled to incriminate the defendant, and that if the

4

defendant enters a plea of guilty herein, there will not be a further trial of any kind and that by the entry of such a plea, the defendant waives the right to a trial by jury or to a trial before the Court.

e. The defendant further understands that in entering a plea of guilty herein, the Court may ask questions about the offense to which the plea is entered and further understands that if the defendant answers these questions under oath, on the record, and in the presence of counsel, which questions and answers would be recorded, that the answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

f. The Defendant further understands and advises the Court that the Plea Agreement as set forth herein and the plea to be entered by the defendant as a result thereof is voluntary on the defendant's part and is not the result of any force or threats or of any promises apart from the aforesaid Plea Agreement. The defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the attorney for the Government and the attorney for the defendant, all conducted with the defendant's authorization, knowledge, and consent.

g. The defendant further advises the Court that the defendant's understanding of this Plea Agreement is as set forth in this document.

h. The defendant further understands that the Government can only make a recommendation, which is not binding upon the Court.

i. The defendant further advises the Court that the defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Indictment herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the defendant. However, the defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the

5

Indictment herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the defendant under oath, on the court record, and in the presence of counsel.

j. The defendant understands that there is no possibility of a sentence of probation.

k. The defendant is satisfied that defense counsel has been competent and effective in representing defendant.

7. The undersigned attorneys for the Government and for the defendant represent to the court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Fed. R. Crim. P. 11, as Amended. The attorney for the defendant further advises the Court that the defendant has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the defendant has been advised of the defendant's right to plead not guilty and to be tried by a jury on all issues herein; of the maximum possible penalty provided by law; that by the entering of a plea of guilty as aforesaid, the defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the defendant and the right not to be compelled to incriminate the defendant; and that if the defendant pleads guilty, there will not be a further trial of any kind. Further, the defendant has been advised that if the defendant pleads guilty, the Court may ask questions about the offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the defendant in a civil or criminal proceeding, but that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

8. The defendant understands that the U.S. Probation Office will prepare a presentence investigation report for the Court. The Probation Officer will consider the defendant's conduct related to the offense to which the plea is offered, as well as the defendant's criminal history. The

6

offense level or criminal history category, as calculated by the Probation Officer and determined by

the court, may differ from that projected by defendant's counsel or the U.S. Attorney.

This 3rd day of February, 2006.

Respectfully submitted,

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

Todd A. Brown
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101
(334)223-7280

Louis V. Franklin, Sr.
Chief, Criminal Division

7

I have read the foregoing Plea Agreement, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE AND CORRECT AND THAT I AM SATISFIED THAT I HAVE RECEIVED COMPETENT ADVICE AND REPRESENTATION FROM MY DEFENSE COUNSEL.

Sawelija Tyree Floyd
Defendant

2/06/06
Date

William R. Blanchard
Attorney for the Defendant

2/06/06
Date

8

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. 07-10005-F

SAWELIGA TYREE FLOYD,
Appellant

versus

UNITED STATES OF AMERICA,
Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

BRIEF OF APPELLEE

LEURA G. CANARY
UNITED STATES ATTORNEY

TODD A. BROWN
Assistant U. S. Attorney
Post Office Box 197
Montgomery, Alabama  36101

ATTORNEYS FOR APPELLEE

AO88-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.        Q

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

SAWELIGA TYREE FLOYD          )
      Appellant          )
                  )
v.          )          APPEAL NO. 07-10005-FF
                  )
UNITED STATES OF AMERICA          )
      Appellee          )

## CERTIFICATE OF INTERESTED PERSONS

## AND CORPORATE DISCLOSURE STATEMENT

The following persons have an interest in the outcome of this case:

William R. Blanchard, Counsel for Appellant

David Bryson Byrne, Jr., Former Counsel for Appellant

Todd A. Brown, Assistant United States Attorney

Leura G. Canary, United States Attorney

L. Scott Coogler, United States District Judge

Saweliga Tyree Floyd, Appellant

Louis V. Franklin, Sr., Assistant United States Attorney

Mark E. Fuller, United States District Judge

A. Clark Morris, Assistant United States Attorney

Susan Russ Walker, United States Magistrate Judge

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not request oral argument.  The facts and legal arguments are addressed sufficiently by the briefs of the parties and the United States does not believe oral argument would materially assist the Court in its consideration and disposition of the issues involved in this appeal.  <u>See</u> Fed. R. App. P. 34(a)(2)(C).

## CERTIFICATE OF TYPE SIZE AND STYLE

The size and style of type utilized throughout Appellee's Brief is Times New Roman, 14pt 10 pitch (Legal).

i

# **TABLE OF CONTENTS**

PAGE

Certificate of Interested Persons .............................. C-1 of 1

Statement Regarding Oral Argument .............................. i

Authorities Cited ............................................ iv

Statement of Jurisdiction ...................................... 1

Statement of the Issue ....................................... 1

Statement of the Case ....................................... 1

    (i)     Course of Proceedings and Disposition in the Court Below ....... 1

    (ii)    Statement of Facts ...................................... 3

    (iii)   Standard of Review ..................................... 6

Summary of the Argument ..................................... 7

Argument and Citations of Authority ................................ 8

    1)    **LAW ENFORCEMENT OFFICERS ACTED IN GOOD FAITH WHEN THEY ATTEMPTED TO SERVE A VCO UPON FLOYD** ................................................. 8

    2)    **LAW ENFORCEMENT OFFICERS WERE AUTHORIZED TO ENTER THE RESIDENCE WHERE THEY LOCATED FLOYD TO SECURE CONTRABAND EVIDENCE WHILE AWAITING THE ISSUANCE OF A SEARCH WARRANT BECAUSE THEY FIRST SMELLED SMELLING BURNING MARIJUANA COMING FROM THAT RESIDENCE** ................... 14

Conclusion ................................................. 25

ii

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# AUTHORITIES CITED

**PAGE**

Arizona v. Evans,

      514 U.S. 1 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Beck v. Ohio,

      379 U.S. 89, 91 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Davis v. United States,

      327 F.2d 301, 303 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Hagans v. United States,

      315 F.2d 67 (5th Cir.), cert. denied, 375 U.S. 826 (1963) . . . . . . . . . . . . 12

Horton v. California,

      496 U.S. 128, 136 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Illinois v. Andreas,

      463 U.S. 765, 771 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Maryland v. Buie,

      494 U.S. 325, 328, 334, n.1 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Minnesota v. Dickerson,

      508 U.S. 366, 375 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Owens v. State,

      887 So. 2d 1015, 1017 (Ala. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . . . . . 8

Payton v. New York,

      445 U.S. 573, 586 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Bervaldi,

      226 F.3d 1256, 1263 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Edmondson,

      791 F.2d 1512, 1515 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 19-22

United States v. Ellis,

      971 F.2d 701, 704 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Gobey,

      12 F.3d 964 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Hairston,

      763 F.2d 233 (7th Cir.), cert. denied, 474 U.S. 854 (1985) . . . . . . . . . . . . 12

United States v. Hromada,

      49 F.3d 685, 691 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

United States v. Leon,

      468 U.S. 897, 922-25 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 12, 24

United States v. Jones,

    239 F.3d 716 (5th Cir.), cert. denied, 534 U.S. 861 (2001) . . . . . . . . . . . 23

United States v. Jones,

    377 F.3d 1313, 1314 (11th Cir. 2004), cert. denied,

    545 U.S. 1130 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Knight,

    451 F.2d 275, 278 (5th Cir. 1971), cert. denied, 405 U.S. 965 (1972) . . . 23

United States v. Lape,

    413 F.2d 816 (9th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Landers,

    417 F.3d 958, 960 (8th Cir. 2005), cert. denied, 126 S.Ct. 1881 (2006) . . 24

United States v. Lape,

    413 F.2d 816 (9th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Martin,

    297 F.3d 1308, 1312 (11th Cir.), cert. denied, 537 U.S. 1076 (2002) . 7,10

United States v. Ramirez-Chilel,

    289 F.3d 744 (11th Cir. 2002), cert. denied, 537 U.S. 1114 (2003) . . . . . . .

    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22, 23

United States v. Reid,

    69 F.3d 1109, 1113 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Robinson,

    336 F.3d 1293, 1295 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Rodgers,

    924 F.2d 219, 222 (11th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Sweeting,

    933 F.2d 962, 963 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Thompson,

    928 F.2d 1060, 1065 (11th Cir.), cert. denied, 502 U.S. 897 (1991) . . . . . 19

United States v. Tobin,

    923 F.2d 1506, 1510 (11th Cir.), cert. denied,

    502 U.S. 907 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 22, 23

United States v. White,

    342 F.2d 379 (4th Cir.), cert. denied, 382 U.S. 871 (1965) . . . . . . . . . . . . 12

United States v. Young,

    909 F.2d 442, 446 (11th Cir. 1990), cert. denied, 502 U.S. 825 (1991) . . 17

*FEDERAL STATUTES*

Title 18, United States Code, Section 3742(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Title 28, United States Code, Section 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 11(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Federal Rule of Appellate Procedure 32(a)(7)(B)(i) . . . . . . . . . . . . . . . . . . . . . . 26

## STATEMENT OF JURISDICTION

The United States District Court for the Middle District of Alabama entered a

final judgment of conviction and sentence against Defendant/Appellant Saweliga

Tyree Floyd ("Floyd") on December 19, 2006. (R1:41). Floyd filed a timely notice

of appeal from that judgment on December 28, 2006. (R1:48). This Court has

jurisdiction over this appeal. See 18 U.S.C. § 3742(a); 28 U.S.C. § 1291; Fed. R.

App. P. 3 and 4(b).

## STATEMENT OF THE ISSUES

1. Did law enforcement officers act in good faith in their attempt to serve a

Violation of Court Order Order upon Floyd?

2. Were law enforcement officers authorized to enter the residence where they

located Floyd, and secure contraband evidence while awaiting the issuance of a

search warrant, after smelling burning marijuana coming from that residence?

## STATEMENT OF THE CASE

### (i)    Course of Proceedings and Disposition In The Court Below

On September 8, 2005, a federal grand jury returned a two-count Indictment

charging Floyd with possessing cocaine base ("crack") and marijuana with intent to

distribute them. (R1-1). On October 27, 2005, Floyd filed a motion to suppress

physical evidence seized at the residence where he was arrested along with any post-

1

arrest statements that he made to law enforcement. (R1-20). The United States filed

its response on October 31, 2005. (R1-22). Following the suppression hearing held

on December 14, 2005, the Magistrate Judge set a post-hearing briefing schedule for

both parties. (R1-23, 24).

The United States filed its post-hearing brief on January 4, 2006. (R1-25).

Floyd filed his on January 10, 2006. (R1-26). The United States filed a reply brief

on January 13, 2006. (R1-28). On January 18, 2006, the Magistrate Judge

recommended Floyd's motion to suppress be denied. (R1-29).

On January 20, 2006, a second federal grand jury returned a four-count

superseding indictment against Floyd. (R1-31). The superseding indictment added

two counts to the original indictment.  Id.  Those counts charged Floyd with also

possessing   cocaine   hydrochloride   ("powder   cocaine")   and

methylenedioxymethamphetamine ("ecstasy"), with intent to distribute them. Id.

Floyd filed objections to the Magistrate Judge's recommendation on January

26, 2006. (R1-34). On January 30, 2007, the District Court overruled Floyd's

objections and adopted the Magistrate Judge's findings.  (R1-35).

Pursuant to a plea agreement entered into pursuant to Fed. R. Crim. P.

11(a)(2), Floyd entered a conditional guilty plea on February 6, 2006. (R1-40, 41).

On December 19, 2006, the District Court entered judgment against Floyd, sentencing

him to 210 months imprisonment. (R1-57). Floyd filed a timely notice of appeal from that judgment on December 28, 2006. (R1:48).

**(ii)**   **Statement of the Facts**

On Friday, July 29, 2005, Auburn Police Department ("APD") officers went to Floyd's residence to serve a Violation of Court Order ("VCO") Order on Floyd. (R2-6:10-25; 66:25-67:8; 72:21-23). During the course of serving the VCO, APD Sergeant James Tatum ("Tatum") went to the front door of Floyd's residence and knocked on the front door. (R2-9:9-10; 68:6). A male voice from inside the trailer asked who was knocking. (R2-9:15-18; 68:6-7). After replying that it was the police department, Floyd's girlfriend (later identified as Jamillah McCray ("McCray")) opened the door. (R2-9:19-21; 68:11-12; 69:6-9). As McCray opened the door, officers detected a strong odor of burning marijuana. (R2-11:1-15; 69:14-17). Tatum asked McCray where Floyd was, and at that time Floyd came to the front door. (R2-10:21-22; 12:2-11). Officers then advised Floyd of the VCO, read him his Miranda rights, and handcuffed Floyd. (R2-12:8-11; 13:8-9).

APD Sergeant Chris Murray ("Murray"), APD Lieutenant Jerry Holder ("Holder"), and APD Detective Brad Bass ("Bass"), then entered the residence and made contact with a male, later identified as J. B. Mitchell ("Mitchell") and McCray. (R2-12:13-13:2). Officers asked McCray if there were firearms in the residence and

3

she responded that there was and she directed officers to the weapon. (R2-13:15-14:3). During the course of securing the residence to prevent the destruction of evidence, and as a safety precaution, officers observed a large amount of what appeared to be crack cocaine by a microwave oven. (R2-12:18-21;14:4-15). APD Officer Brian Lynn advised Mitchell and McCray of their Miranda rights, after which Mitchell stated that he and Floyd were smoking marijuana when the officers knocked on the door. (R2-15:19-16:4). Spontaneously, Floyd told Murray that the drugs that officers observed in plain view belonged to him. (R2-13:13-14; 19:10-12). Both McCray and Floyd refused to give consent to search the residence. (R2-16:17-21; 19:14-15).

Sergeant Murray then left the residence to obtain a search warrant, while other officers kept the residence secured. (R2-19:17-23). Murray obtained a search warrant from Lee County, Alabama, District Judge Russell Bush. (R2-19:24-20:2). Shortly thereafter, officers executed the search warrant locating crack cocaine that officers had previously seen, along with powder cocaine, two large trash bags of marijuana, and crack cocaine. (R2-20:6-10). After photographing and logging the evidence seized, Murray interviewed Floyd, after he signed a Miranda waiver, and Floyd signed a written confession admitting to ownership of the drugs located in the residence. (R2-13:6-14).

4

Pursuant to the VCO, Floyd was taken to the Lee County jail to serve the suspended portion of a traffic sentence. (R2-31:21-24; 32:19:24). The VCO had been given directly to Lt. Holder by Judge Bailey, without being assigned a case number at that time. (R2-48:16-23). It was Murray's understanding that this was done in an effort not to make the clerk's office aware of the VCO's existence because of concerns of improprieties in the clerk's office. (R2-48:16-20). However, Judge Joe Bailey, who issued the VCO, recalled that he simply forgot to type in the case number. (R2-112:2-3).

Judge Bailey issued the VCO on July 27, 2005, roughly two days before Floyd's arrest. (R2-58:22-25). Contrary to Floyd's assertion, this was not done at the direction of law enforcement officers. (R2-30:4-8; 59:20-22; 73:10-12). Judge Bailey issued the VCO after reviewing files with discrepancies in sentencing issues. (R2-60:16-20). The gist of why Judge Bailey issued the VCO was that Floyd had received a suspended sentence on July 29, 2004, for driving with a revoked license. (R2-103:25-104:21). This sentence was probated for two years, in accordance with Judge Bailey's normal procedure and Alabama law. (R2-91:19-22; 92:21-24; 105:6-13; 108:10-11; 110:1-6; 122:17-23). Again, in accordance with Judge Bailey's normal procedure, defendants are advised of the conditions of probation, including, but not limited to, obtaining no further convictions within the two-year probation

5

period. (R2-106:11-15; 108:10-11). In Floyd's case, he received a subsequent

disorderly conduct conviction within the two-year period, on February 26, 2005. (R2-

105:14-21). Judge Bailey gave Floyd another suspended sentence for the subsequent

disorderly conduct conviction, which would have been against his normal practice,

because, as he learned later, someone improperly influenced him to do so. (R2-91:5-

7; 96:25-97:3; 105:22-25). Subsequent imposition of a suspended sentence, while a

defendant was still on probation from a previous suspended sentence, would have

been against Judge Bailey's normal practice. (R2-97:1-2; 106:8-20). For this reason,

Judge Bailey was confident that the VCO issued on July 27, 2005, was appropriate

in Floyd's case. (R2-95:11-14; 96:22-97:3; 106:21-23).

Additionally, it was the officers' intent to contact Floyd at some point

regarding an ongoing investigation into another APD officer, Tyrone White. (R2-

50:24-51:8). Officers would have contacted Floyd regarding the White investigation

at some point even had no VCO been issued for Floyd's arrest. (R2-51:4-8; 73:3-8).

### (iii) **Standards of Review**

This Court "review[s] *de novo* whether the [United States v. Leon, 468 U.S.

897 (1984)] good faith exception to the exclusionary rule applies to a search, but 'the

underlying facts upon which that determination is based are binding on appeal unless

clearly erroneous.'" United States v. Robinson, 336 F.3d 1293, 1295 (11th Cir. 2003),

6

citing <u>United States v. Martin</u>, 297 F.3d 1308, 1312 (11th Cir.), <u>cert. denied</u>, 537 U.S. 1076 (2002).

## SUMMARY OF THE ARGUMENT

Law enforcement officers relied in good faith upon the VCO issued by Judge Bailey in approaching the residence where Floyd was located. Officers' subsequent contact at that residence, where they observed ongoing drug activity, provided the basis for securing the residence, obtaining a search warrant, and seizing contraband pursuant to that warrant.

7

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.   LAW ENFORCEMENT OFFICERS ACTED IN GOOD FAITH WHEN THEY ATTEMPTED TO SERVE A VCO UPON FLOYD.

It is undisputed that the VCO issued by Judge Bailey did not comport with Alabama law. It does not appear the municipal court provided Floyd with a written copy of the conditions of his probation. According to Alabama law, it would have then been improper to revoke the probationary sentence Floyd received from Judge Bailey for any violation of the conditions of that probation. Owens v. State, 887 So. 2d 1015, 1017 (Ala. Crim. App. 2004); Ala. Code § 12-14-13; Ala. R. Crim. P. 1.1, 27.1. As the record does not support the conclusion that the municipal court acted in accordance with these provisions, any revocation of Floyd's probation is contrary to Alabama law. Thus, the VCO, under these circumstances, would not have been valid. Nevertheless, the fact that Floyd's probation may have been improperly revoked does not end the inquiry into the officers' reliance on the municipal court VCO. "The constitutional validity of the search...must depend upon the constitutional validity of the....arrest. Whether that arrest was constitutionally valid depends...on whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in

8

believing that the [subject] had committed or was committing the offense. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." Beck v. Ohio, 379 U.S. 89, 91 (1964) (internal citations omitted).

In the instant matter, law enforcement officers relied in good faith on the VCO, despite the fact that it may have been issued improperly, to make the arrest.    See United States v. Leon, 468 U.S. 897, 922-25 (1984) (warrant issued by a magistrate normally suffices to establish police officers acted in good faith in executing it, if such reliance was reasonable, not based upon false or reckless information provided by those officers, and the warrant it not facially deficient).    The record clearly establishes the officers in this matter routinely rely upon VCOs, such as the one issued by Judge Bailey in this case, to make arrests.  (R30:16-32:4; 35:24-36:21; 48:15-49:3; 72:21-22).  And, Judge Bailey routinely issues such VCOs; in fact, it is a form on his computer.  (R2-112:7-20).  Thus, it would not be unreasonable for the officers to rely on the VCO in this case because they routinely do so.

In her Report and Recommendation, the Magistrate Judge properly pointed out that none of the limitations to the good faith exception are present in this case.  (R1-

9

29, at 7). Those "four limited circumstances" would be (1) if Judge Bailey had been misled by information provided by an affidavit that an affiant knew was false or was provided by the affiant in reckless disregard for the truth; (2) if Judge Bailey wholly abandoned his judicial role; (3) if some affidavit supporting the VCO was so lacking of probable cause to render belief in it entirely unreasonable; and, (4) if the VCO was so facially deficient (by failing to identify Floyd as the person to be arrested) that the officers could not reasonably presume it to be valid. See United States v. Martin, 297 F.3d 1308, 1312 (11th Cir.), cert. denied, 537 U.S. 1076 (2002).

None of these limitations exist in this matter. First, Judge Bailey issued the VCO upon his own motion. (R2-30:4-8, 59:17-22). Since there was no supporting affidavit, Judge Bailey could not have been misled by information that some affiant knew to be false or provided in reckless disregard of the truth.

Second, Judge Bailey maintained his judicial role in preparing the VCO. Upon being informed by law enforcement officers of possible improprieties in some cases in which he presided, Judge Bailey reviewed a number of municipal court files—not just Floyd's. (R2-95:17-18). Independently, Judge Bailey determined Floyd was in violation of the terms of his probation. (R2-30:4-8; 59:20-22; 60:16-20; 73:10-12). Further, Judge Bailey routinely issued VCOs in this format, so much so that it is even a form on his computer. (R2-112:7-20).

10

Third, there was no affidavit to support the VCO. The Magistrate Judge properly points out the VCO was essentially a bench warrant, unsupported by an affidavit. (R1-29, at 8). Plus, the officers in this case actually observed Judge Bailey review Floyd's file and determine that a probation violation, in his opinion, had occurred. The Judge, not law enforcement officers, pointed out what he believed to be Floyd's probation violation. (R2-60:14-20). Thus, as the officers had no reason to doubt the judge's determination, it cannot be true that they had some reason to believe that there was no probable cause for Judge Bailey issuing the VCO. And, even if Floyd is to be believed, and the officers had some ulterior motive in bringing attention to the discrepancy which led to Judge Bailey's issuance of the VCO, their subjective intent is irrelevant. United States v. Jones, 377 F.3d 1313, 1314 (11th Cir. 2004), cert. denied, 545 U.S. 1130 (2005). Because, objectively, the VCO justified Floyd's arrest, the officers were reasonable in their reliance upon it, regardless of any other reason they may have had to make contact with Floyd. Id.

Finally, Judge Bailey's VCO was not facially deficient to the extent that the officers could not have presumed it to be invalid. The VCO was properly signed. The case style was correct. Floyd was properly identified. And, although Floyd's crime was not specifically identified on the face of the VCO, as Sgt. Murray pointed out, that was not unexpected. (R2-36:2-9). These officers routinely relied upon

11

VCOs such as the one in this matter in previous cases. (R2-30:16-32:4; 35:24-36:21; 48:15-49:3; 72:21-22). And, while there was no case number annotated on this VCO, the officers believed it was because employees in the clerk's office may have been complicit in the illegal activity of Officer White, and those clerk's office employees may have tipped Officer White off about the existence of the other investigation. (R2-48:11-49:3). Plus, unbeknownst to the officers, Judge Bailey, since he had no secretarial staff, would have normally annotated the number on the VCO, but "simply failed to" do so in this case. (R2-111:21-112:3).

Leon's good faith exception to the search warrant requirement extends to arrest warrants. Arizona v. Evans, 514 U.S. 1 (1995). Courts have explicitly held valid arrests and searches can made based upon invalid warrants. See United States v. White, 342 F.2d 379 (4th Cir.), cert. denied, 382 U.S. 871 (1965) (fact that authorities relied on invalid arrest warrant would not invalidate the arrest and the search and seizures which took place as incidents thereof if the officers had adequate knowledge independent of the warrant to constitute probable cause); Hagans v. United States, 315 F.2d 67 (5th Cir.), cert. denied, 375 U.S. 826 (1963) (invalid arrest warrant justified by showing that at time of arrest, lawful arrest could have been made without warrant); United States v. Hairston, 763 F.2d 233 (7th Cir.), cert. denied, 474 U.S. 854 (1985) (unlawful arrest of son of man with suspended license not invalidated

when officer acted as reasonably prudent person in concluding there was probable cause for arrest); <u>United States v. Lape</u>, 413 F.2d 816 (9th Cir. 1969) (arrest based on warrant later deemed invalid was nevertheless valid when officer relied on information from law enforcement channels to provide probable cause); and, <u>United States v. Gobey</u>, 12 F.3d 964 (10th Cir. 1993) (invalid arrest warrant, relied on by officers in good faith, did not warrant exclusion of subsequently seized evidence).

While the VCO relied upon by the officers may have been issued improperly according to Alabama state law, the fact that the officers had so routinely relied upon them in the past, and the fact that the municipal judge had so routinely issued them in this format, establish that the officers reasonably believed they had probable cause to execute them. Whatever error Judge Bailey made in reference to the validity of the VCO was attributable to him alone and not to the law enforcement officers who relied upon it. Suppression of the evidence given the facts of this case would be contrary to the intent of the exclusionary rule—to deter *police* misconduct. See <u>United States v. Ellis</u>, 971 F.2d 701, 704 (11th Cir. 1992) (purpose of exclusionary rule to deter police misconduct, not to punish errors of judges and magistrates).

Based on the foregoing, the Magistrate Judge's finding that the officers acted in good faith, and the District Court's adoption of that finding, was not erroneous and is firmly supported by the record.

13

## II.  LAW ENFORCEMENT OFFICERS WERE AUTHORIZED TO ENTER THE RESIDENCE WHERE THEY LOCATED FLOYD TO SECURE CONTRABAND EVIDENCE WHILE AWAITING THE ISSUANCE OF A SEARCH WARRANT BECAUSE THEY FIRST SMELLED SMELLING BURNING MARIJUANA COMING FROM THAT RESIDENCE.

**(a)  Law Enforcement Officers were Authorized to Approach Floyd's Residence to Serve What They Believed to be a Valid Court Order.**

Floyd claims that the entry without a warrant into the residence where he was arrested was violative of the Fourth Amendment.  This assertion is contrary to the facts and the law.  In this case, a VCO was issued for Floyd's arrest.  (R2-95:11-14). The initial approach to the residence was based upon the belief of law enforcement officers that Floyd had violated a condition of probation by obtaining a disorderly conduct conviction and for failure to pay fines on schedule, while he was on probation for driving with a revoked license, for which the VCO had been issued. (R2-91:12-13; R2-106:8-20).  Officers did not violate Floyd's Fourth Amendment rights because they were at his residence for the legitimate purpose of arresting him pursuant to a valid warrant (the VCO).   See Maryland v. Buie, 494 U.S. 325, 328, 334, n.1 (1990) (arrest warrant gives police the right to enter a home to execute the warrant);  United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000).

Floyd counters with the position that the VCO, which admittedly was issued

14

improperly, was obtained by law enforcement as a pretext to interview Floyd or otherwise get Floyd to cooperate with them in the ongoing investigation of Officer White. However, the idea that use of an arrest warrant as a pretext to search a home is *per se* violative of the Fourth Amendment has been rejected. So long as the facts and circumstances are reasonable, "[j]ust because a police officer is *glad* to have the opportunity to see that which is apparent at the scene of a valid arrest-when it is his *duty* to make the arrest-does not make his seeing things invalid." United States v. Hromada, 49 F.3d 685, 691 (11th Cir. 1995).

**(b) Upon Observing Contraband, Officers Properly Secured the Residence While They Obtained a Search Warrant for the Premises.**

Floyd next claims, regardless of the validity of the VCO, the smell of burning marijuana when McCray opened the residence, did not create probable cause and exigent circumstances sufficient to justify a "warrantless search" of the residence by the officers. Floyd's description of what occurred after the door opened is a bit disingenuous. First, there was no "warrantless search" following the initial smell of marijuana. Officers secured the residence because the marijuana was being destroyed by the fact it was being burned. During the course of securing the premises, officers observed other drugs and paraphernalia in plain view. Officers then asked Floyd and McCray for consent to search the residence.

15

When Floyd and McCray refused to give consent to search the residence, officers secured the premises and obtained a search warrant, even though the officers arguably needed no warrant to lawfully search the trailer. If contraband is "observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no search within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). "[I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right to access to the object, they may seize it without a warrant." Id. "It is…an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." Horton v. California, 496 U.S. 128, 136 (1990). "Once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost." Illinois v. Andreas, 463 U.S. 765, 771 (1983).

While "[i]t is a 'basic principle of Fourth Amendment Law' that searches and seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U.S. 573, 586 (1980), "[a] warrantless search is allowed [ ] where both probable cause and exigent circumstances exist." United States v. Tobin, 923

16

F.2d 1506, 1510 (11th Cir.), cert. denied, 502 U.S. 907 (1991). One "test for whether or not exigent circumstances exist is whether the facts would lead a reasonable, experienced agent to believe that evidence might be destroyed or removed before a warrant could be secured." United States v. Reid, 69 F.3d 1109, 1113 (11th Cir. 1995), cert. denied, 517 U.S. 1228 (1996) (citing United States v. Rodgers, 924 F.2d 219, 222 (11th Cir.), cert. denied, 501 U.S. 1221 (1991)). "[T]he need to invoke the exigent circumstances exception is 'particularly compelling in narcotics cases' because narcotics can be so easily and quickly destroyed." Id. (quoting United States v. Young, 909 F.2d 442, 446 (11th Cir. 1990), cert. denied, 502 U.S. 825 (1991)).

In the instant cause, the officers smelled burning marijuana emanating from Floyd's trailer. At that point, officers were observing criminal activity and had probable cause for a warrant. Additionally, exigent circumstances existed because evidence of that crime was burning in their presence. Officers likely could have seized all contraband at that point because they had probable cause that a drug crime was being committed and exigent circumstances existed. Nevertheless, the officers took what they believed to be the necessary steps to prevent the destruction (burning) of the evidence by securing the residence. Plus, the officers were justified in a protective sweep of the premises for their safety, as evidenced by their query about the presence of firearms. (R2-16:16-17); Tobin, 923 F.2d at 1513. In securing the

17

residence, officers also observed, in plain view, what they believed to be cocaine.

After being denied consent to search the entire trailer, they obtained a search warrant

for the residence, although that step was arguably unnecessary. Accordingly, the

officers took every precaution to preserve the evidence, plus to protect the occupants'

rights by obtaining a search warrant.

### (c) Officers Did Not Overwhelm the Trailer's Occupants With a Show of Force to Get the Occupants to Open the Door.

Floyd goes on to claim that his girlfriend, McCray, did not consensually open

the door to Floyd's residence, therefore the officers who approached the trailer and

knocked on the door were not properly in a position to observe illegal conduct or

contraband in plain view. Such claim is contrary to the facts and the law.

First, the record establishes that law enforcement officers did not "demand

*entry*" into the residence. The only evidence is that the officers directed the

occupants of the residence to "open the door." (R2-68:13-14). APD Sergeant Tatum

knocked on the front door of the residence. (R2-6:10-25; 66:25-67:8; 72:21-23).

There is no evidence that Tatum pounded on the door, or shouted, or otherwise

"demanded *entry*." In fact, the only evidence is that Sgt. Tatum knocked on the door,

and in response to a male voice asking who was at the door, Tatum replied that it was

the police department. (R9:15-18). Additionally, officers did not initially enter the

18

residence, rather, McCray came to the door, and after being asked of Floyd's whereabouts, Floyd stepped outside. (R2-10:19-22; 11:25-12:11). It was only upon officers smelling burning marijuana, evidence of which would certainly have been destroyed by the continued burning, that officers entered the residence to secure it. (R2-12:13-21). Securing a residence for the purpose of obtaining a search warrant is a legitimate law enforcement practice. See United States v. Sweeting, 933 F.2d 962, 963 (11th Cir. 1991). In this case, the evidence being destroyed was in plain view, or smell, of the officers standing outside the opened residence. See United States v. Thompson, 928 F.2d 1060, 1065 (11th Cir.), cert. denied, 502 U.S. 897 (1991) (no one…could conceivably have any legitimate expectation of privacy with regard to any object that would be in the plain view (or smell) of someone conducting a safety or documents check).

Floyd claims that an improper show of force by the officers convinced McCray to open the door against her will. Floyd relies primarily on     United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986) for the proposition that McCray's opening of the door by the occupant was nonconsensual, because, Floyd claims, when a law enforcement officer knocks on the door of a residence, identifies himself as a police officer at the request of the occupant, and afterwards the occupant opens the door, that equates to a show of force. Reliance on Edmondson, based on the facts of

19

the instant cause, is misplaced.

In <u>Edmondson</u>, numerous FBI agents, without a search warrant or arrest warrant, observed a possible bank robbery subject outside an apartment complex. <u>Id</u>. at 1513-14. After the subject went back into the apartment complex, with the area in front of the apartment surrounded, agents knocked on the apartment door, and the defendant-appellant ("Edmondson") looked out the window<u>Id</u>. at 1514. Afterwards, an agent *yelled*, "FBI. Open the door." <u>Id</u>. Edmondson opened the door, stepped back, placed his hands on his head, and was arrested.        <u>Id</u>.    Agents followed Edmondson into the apartment, where they searched his person, <u>Mirandized</u> him, and seized several items. <u>Id</u>. This Court held that, based on the facts of Edmondson's case, that he did not impliedly "consent to be arrested." <u>Id</u>. at 1515.

In <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744 (11th Cir. 2002), <u>cert</u>. <u>denied</u>, 537 U.S. 1114 (2003), this Court found that actions similar to those in the instant cause, did not violate the Fourth Amendment. In <u>Ramirez-Chilel</u>, four officers approached a trailer around midnight after receiving a tip that the occupants were selling counterfeit immigration and identification documents from the trailer. <u>Id</u>. at 746. The officers had no probable cause for a search, no search warrant, and no exigent circumstances existed at this late hour of the night.    <u>Id</u>. One of the four officers knocked on the door several times and announced they were police officers.

20

Id. The officers did not have their weapons drawn at this time.        Id.  After the

defendant-appellant ("Ramirez") answered the door, the officer asked to be let inside

the trailer to determine whether there were counterfeit documents inside. Id. at 747.

Without verbally allowing the officers to enter, Ramirez yielded "'the right-of-way'

to the officers and thus consented to entry into the home." Id.  Afterwards, Ramirez

also consented to the search of his home in writing.  Id.

 This Court concluded the "officers' entry to be legal because [there was] no

official show of force which would have 'forced' the defendant to let the officers in."

Id. at 752. In reaching this conclusion, this Court viewed the issue in light of the fact

that a suspect does not consent to a search of his residence when his consent to the

entry into his residence is prompted by a show of official authority." Id. at 751.

(emphasis added).  Put another way, consent to enter does not equate to consent to

search.  Citing Edmonson, this Court held that to show that entry into that home was

illegal, the "facts must demonstrate that the defendant's consent to the officer's entry

was 'prompted by a show of official authority.'" Id. (quoting Edmonson, 791 F.2d

at 1515).  This Court found the facts did not support a conclusion that Ramirez'

consent to officers' entry was not consensual, stating it was "hard to find a 'show of

force' by the officers—guns were not drawn, nor were a large number of officers

surrounding the trailer ready to arrest the suspect. [Ramirez]…did not [do anything]

which would have suggested intimidation and a show of force on the part of the officers." Id.

The approach to Floyd's residence, and the events that unfolded afterwards, are more similar to those in Ramirez-Chilel, than those of Edmondson. In the instant cause, the officers were not observed by the trailer's occupants prior to McCray opening the door, as evidenced by the fact that an occupant had to ask who was actually knocking on the door. See Tobin, 923 F.2d at 1508 (agent knocked on door for three to four minutes, calling out in English and Spanish, identifying himself as police officer prior to consensual entry). Further, there is no evidence in the record that weapons were drawn, or that weapons were observed by the occupants to be drawn. Also, there was no showing that any of the occupants was intimidated by the actions of law enforcement. In fact, Floyd exited the residence and was taken into custody without incident. (R2-12:10-11). Finally, none of the residents ever consented to the officers' *entry*, as was at issue in Edmonson or Ramirez-Chilel. In the instant cause, the occupant (Floyd) came outside and, initially, the officers did not enter the trailer. In fact, the officers never entered the residence until they smelled burning marijuana emanating from the trailer. Thus, because there was no consent to allow the officers to enter the trailer, and there was no consent for those officers to search it, there was no show of force which "overcame [any] consent." Ramirez-

22

Chilel, 289 F.3d at 751.

While a show of force might coerce someone to either consent to police officers' entry into a residence, or to a subsequent search of that residence, Floyd attempts to make the leap that it is therefore only logical that an alleged show of force can also coerce someone into merely opening the front door. Such a leap is too far to make. Nothing prohibits a law enforcement officer, with or without an arrest or search warrant, from approaching a residence and knocking on the front door. Tobin, 923 F.2d at 1511 (citing United States v. Knight, 451 F.2d 275, 278 (5th Cir. 1971), cert. denied, 405 U.S. 965 (1972); and Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964) (stating "[a]bsent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.")). The knocking on Floyd's door, and the decision of McCray to open it after learning it was a police officer knocking, does not violate the Fourth Amendment. Ramirez-Chilel, 289 F.3d at 752 ; Tobin, 923 F.2d at 1511; United States v. Jones, 239 F.3d 716 (5th Cir.), cert. denied, 534 U.S. 861 (2001); United States v. Landers, 417 F.3d

23

958, 960 (8th Cir. 2005), <u>cert</u>. <u>denied</u>, 126 S.Ct. 1881 (2006).

**(d)  The Search Warrant in this Case was Lawfully Obtained by the Officers.**

Floyd claims the search warrant signed by Judge Bush was improperly based upon evidence discovered in a warrantless and illegal entry and search. This claim is without merit, as the entry into the residence to secure it for the purposes of preventing evidence being destroyed and so that the search warrant could be obtained, was proper. Further, the officers relied in good faith on Judge Bush's search warrant, the validity of which no one has called into question. <u>See</u> <u>Leon</u>, *supra.*

Again, the existence of probable cause that a drug crime was being committed, coupled with the ongoing destruction (burning) of evidence of that crime, likely were sufficient to allow the officers to seize the contraband without obtaining the search warrant from Judge Bush.  Nevertheless, the officers took the extra, arguably unnecessary, step of obtaining a search warrant for the trailer after the residents declined to consent to a search of it.  But, at a minimum, the smell of burning marijuana and officers' observation of drugs in plain view justified securing the residence, and provided a sufficient basis for the search warrant signed by Judge Bush.

24

## CONCLUSION

Based on the foregoing, the United States respectfully requests that this Honorable Court affirm the District Court's denial of Floyd's Motion to Suppress and affirm his conviction and sentence.

Respectfully submitted this the 16th day of April, 2007.

<div style="margin-left: 40%">

LEURA G. CANARY
UNITED STATES ATTORNEY

_____

TODD A. BROWN
Assistant United States Attorney
United States Attorney's Office
One Court Square, Suite 201
Montgomery, AL 36104
(334) 223-7280

</div>

25

## CERTIFICATE OF COMPLIANCE

This brief is in compliance with <u>Federal Rule of Appellate Procedure</u> <u>32(a)(7)(B)(i)</u> in that the principal brief contains fewer than 30 pages.

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of April, 2007, the foregoing brief was served on counsel for the Defendant/Appellant by placing copies of the same in the United States mail, first class and postage prepaid, addressed as follows:

> William R. Blanchard
> Blanchard Law Offices
> Post Office Box 746
> Montgomery, Alabama 36101-0746

TODD A. BROWN
Assistant United States Attorney

26

CASE NO. 07-10005-F

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

### UNITED STATES OF AMERICA,
*Plaintiff/appellee,*

v.

### SAWELIJA TYREE FLOYD,
*Defendant/appellant.*

## On Appeal from the United States District Court
### for the Middle District of Alabama
### Northern Division
### 3:05cr-000187-LSC-SRW-ALL

### REPLY BRIEF OF THE APPELLANT
### SAWELIJA TYREE FLOYD

**WILLIAM R. BLANCHARD (BLA-029)**
**BLANCHARD LAW OFFICES**
**Counsel for Appellant**
**505 South Perry Street**
**Post Office Box 746**
**Montgomery, Alabama, 36101-0746**
**Telephone No. (334) 269-9691**
**Fax: (334) 263-4766**

AO338-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    R

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CITATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

SUMMARY OF THE ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

ARGUMENT AND CITATIONS OF AUTHORITY. . . . . . . . . . . . . . . . . . . .11

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

i

# TABLE OF CITATIONS

## CASES :

*Illinois v. Andreas,*
    463 U.S. 765, 771 (1983)..................................................................16

*Johnson v. United States,*
    333 U. S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948).....................................11, 13

*Lo-Ji Sales, Inc. v. New York,*
    442 U. S. 319, 99 S. Ct. 2319, 60 L. Ed.2d 920 (1979) ................................3

*Minnesota v. Dickerson,*
    508 U.S. 366, 375 (1993)..................................................................16

*Payton v. New York,*
    445 U. S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)..............................11

*Taylor v. United States,*
286 U.S. 1, 52 S. Ct. 466, 76 L. Ed. 951 (1932).........................................12

*United States v. Edmondson,*
    791 F.2d 1512 (11th. Cir. 1986) ........................................................14, 15

*United States v. Ellis,*
971 F.2d 701, 704 (11th Cir.1992).......................................................9

*United States v. Leon,*
468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed.2d 677 (1984)................................3

*United States v. Ramirez-Chilel,*
    289 F.3d 744 (11th Cir. 2002)..........................................................15

*United States v. Thompson,*
928 F.2d 1060, 1065 (11th Cir. 1991)....................................................13

*Vale v. Louisiana,*
399 U.S. 30, 90 S. Ct. 1969, 26 L. Ed.2d 409 (1970)..................................10

*Welsh v. Wisconsin,*
466 U.S. 740, 104 S. Ct. 2091, 80 L. Ed. 732 (1984)..................................11

**STATUTORY AND OTHER AUTHORITY:**

U.S. Const. amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 12

Fed. R. App. P. 32(a)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

11th Cir. R. 31-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

iii

## SUMMARY OF THE ARGUMENT

The fact that the warrant which grounded the arrest of the Appellant was blatantly pretextual and conceded to be illegal by the Magistrate Judge, the trial court, and the Government is somehow sanctioned by these entities on the ground that, notwithstanding the copious evidence of bad faith surrounding the warrant, the officers acted in good faith in the execution thereof. This position is an affront to logic and fairness, and moreover is unsupported by the record. As will be shown, the judge issuing the warrant offered a list of invalid reasons for the issuance of the warrant before finally admitting that it was issued for yet another invalid reason. This was known to the officers as the issuance was accomplished in their very presence. As will further be demonstrated, the cases cited by the Appellee regarding execution of warrants are inapposite, as they all relate either to valid warrants or invalid warrants which were truly issued in good faith. Neither of those circumstances are present in the instant case.

None of the few cases cited in the Appellee's brief support the argument advanced by the Appellee that police may enter a home without a warrant merely because officers smell what they believe to be the aroma of burning marijuana. The cases which are cited have little, if anything, to do with the facts of the instant case, as will be shown; the Plain View Doctrine is deformed to accommodate the actions of the police. Additionally, the argument that exigent circumstances justifying a warrantless entry into a home were present because officers believed a misdemeanor crime was in progress is without merit or precedent. The cases cited by Appellee uniformly deal with felony offenses, further distinguishing the facts of those cases from those of the instant

1

case.

As will be shown, six (6) or seven (7) officers surrounded the Appellant's home and directed the occupants to "open the door." (R2:38; 67-68). Shortly thereafter they entered the home. Clearly this was a demand for entry accompanied by a show of overwhelming force, despite Appellee's argument to the contrary. The Appellant was outside his home at the time of his arrest, a fact of some significance to be shown below. (R2:40).

As will be shown, an illegal search cannot be remedied by the later acquisition of a warrant based on items observed during the initial, illegal search.

2

## **ARGUMENT AND CITATIONS OF AUTHORITY**

### **The Abandonment of Judicial Neutrality**

As was shown in Appellant's initial brief, the judge issuing the Violation of Court Order warrant ("VCO") had abandoned all manifestations of neutrality and was acting as one with the police in their joint investigation of a fellow officer. Although this fact is substantially ignored by the Appellee in its brief, it is of supreme importance as it brings the actions of the judge, and the officers with whom he was improperly collaborating in the investigation of an alleged crime, squarely into the realm of explicit abandonment of judicial neutrality, and thus into the second exception to good faith execution of warrants as dictated in *United States v. Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed.2d 677 (1984). This "good faith exception" permits the admissibility of evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause, except, *inter alia*, where the issuing magistrate wholly abandoned his judicial role. See also *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S. Ct. 2319, 60 L. Ed.2d 920 (1979).

The Appellee remarks that officers routinely execute VCO orders and offers this as evidence of good faith. This scenario ignores that the officers who executed the VCO were with the judge at the time of its issuance while conducting, with the judge, a criminal investigation, and that the judge was acting at the direction of the police in having files removed from the clerk's office. Although these matters are addressed at length in the Appellant's initial brief, they are of such importance that they warrant

3

revisiting here.

It is of great interest that in its brief the Appellee states that "pursuant to the VCO, [Appellant] was taken to Lee County jail to serve the unsuspended portion of a traffic sentence." Brief of Appellee, page 5. In making this declaration, Appellee is apparently privy to information that is to be found nowhere in the record. The Appellee refers to testimony from Officer Murray; however, the judge himself offered several different reasons for the VCO before settling on a final justification which had nothing to do with a traffic sentence. These reasons warrant repetition here.

At the suppression hearing (R2), the judge advanced numerous patently spurious justifications for issuance of the VCO. Initially the judge announced that "There were several reasons that the document [VCO] was executed. One reason is that the individual had previously been put on probation for another offense and when he came to court on the next offense he should have been incarcerated, but because of some alleged wrong doing on some people's parts I was convinced not to put the individual on pro – in jail and allowed him to be put on probation." (R2: 91).

The specific offenses to which the judge was referring are unclear, although, as will be shown, it may possibly have been either disorderly conduct or driving while suspended or rendering false information. However, that question is rendered academic because, at the time of the issuance of the VCO, Appellant owed no fines, had completed all sentences, and was not on any type of probation. Again,

4

this is conceded by the Government and Magistrate Judge (R1: 29: 6-7) and corroborated by the testimony of Brad Bass, Auburn City Clerk (R2: 82). Attached to Appellant's initial brief in Appendix II was the court history of Appellant, including payment history. It is clear that Appellant owed no fines and had completed all sentences. The conspicuous absence of any valid reason for having Appellant arrested cannot be overemphasized.

The judge went on to say that Appellant "also failed to comply with a payment plan for previous charges that he had." (R2: 91). Again, this was wholly inaccurate. Brad Bass, Auburn City Clerk, testified that, upon reviewing Appellant's municipal court history, all of Appellant's cases were closed, meaning that all fines have been paid at the time of his arrest on the VCO order. (R2: 76-79; 82). Presumably it was these records that the judge was reviewing, and because they obviously show no ground for a violation order, the Magistrate Judge's lengthy recitation of cases dealing with judicial "error" are misplaced. (R1: 29: 10). Under the circumstances surrounding the issuance of the VCO, error is unfathomable.

The judge went on: "There was as I recall at least one previous offense where he - I believe the charge was rendering false information, I am not positive of that." (R2: 94). "I am going to have to tell you,   I do not remember every particular event pertaining to this case ... I can guarantee you with one hundred percent confidence that there was a legitimate reason for that pickup order to be issued."  (R2: 95). "Sir, it is my opinion at this time that the pickup order was

5

issued because of the disorderly conduct charge where [Appellant] was arrested on February 26th of 2005. He had a court disposition of April 21, 2005. This is the case where I previously mentioned that someone improperly convinced me to suspend the 30 day jail sentence that I would have normally imposed. When I found out about that and some other alleged activities of people involved - that [Appellant] was being involved with is when I issued the pickup order." (R2: 96-97). Almost immediately following this statement during the suppression hearing, the municipal court judge advanced a new theory as to why the VCO may have been issued. After stating that Appellant was ordered picked up to serve the balance of a thirty (30) day suspended sentence (R2: 97) (which sentence had been imposed and its terms completed at least five weeks prior to the issuance of the VCO-Appendix II), the judge stated that, "It is my recollection that he had failed to cooperate with an ongoing investigation of another criminal matter, and under Alabama law the provisions of any suspended jail sentence can be modified at any time, and I directed [Appellant] to - I told him I wanted him to cooperate fully with the ongoing investigation." (R2: 98). When asked what investigation the Appellant was asked to cooperate with, the judge responded, "I told him that it had been brought to my attention that he was not cooperating with an ongoing investigation by the detectives for the City of Auburn...and that I wanted his full and complete cooperation with that ongoing testimony - investigation." (R2: 98). Eventually the judge opined that "I guess we need to try not to play semantics here, but I issued the pickup order because I had been told he was not complying, previous to the

6

date, and that information was conveyed to me, I would say at least a week or ten days prior to the issue of the reinstatement order." (R2: 101). Whether this is a tacit admission that the judge had previously been "playing semantics" and that all his prior responses were not based in truth, but rather in a game of semantics, is a question the answer to which is not material; the fact is that the Appellant was not arrested based on any good faith reason, as the specious and painfully transparent responses by the judge unavoidably indicate. The responses moreover show the depth of cooperation that existed between the police and the judge in the improper investigation. Who was keeping the judge apprized of all this information regarding cooperation and suspected crimes of third parties? Only the police. This method of criminal investigation, aside from completely and improperly dispensing with the office of the district attorney, is a proscribed marriage of the executive and judicial branches of government to form some new creation; what is clear is that the judge forcefully abandoned neutrality and donned the uniform of a police officer. The fact that the judge and the police traveled together and discussed the Motion to Suppress together only reinforces the close working relationship they enjoy which illegitimizes any claims of neutrality and detachment; the claim of the officers, in pretending that this VCO was "routine," openly mocks the entire system of justice, and makes their claim of "good faith reliance" outrageous and incredible.

If we assume that the final theory posited by the judge concerning the genesis on the VCO is the most nearly correct, if for no other reason than it was the

7

last offered, then it is even less creditable; as was discussed at length in Appellant's initial brief, it was temporally impossible for the judge to order Appellant's cooperation in the sequence described by the judge. The only probable true course of events is that the VCO was issued in response to the intimation by Lieutenant Holder that he wanted to talk to Appellant. (Holder "may have" suggested that he would like to talk to Appellant about the object of the joint investigation, Tyrone White. (R2: 59-60). The judge ordered Appellant arrested so that Appellant would be more motivated to have this talk with Holder concerning the investigation of White. This is essentially conclusively proven by the fact that, once this "talk" had been completed, Appellant was immediately released from custody without even appearing before the judge. No serving of the balance of any sentence, and no bond required on any municipal court charges, was required. Appellant was released following the cooperation which the entire VCO machination was engineered to elicit. The judge's eagerness to accommodate every demand of the police regarding Appellant's arrest and release, even when such joint efforts required pretext if not outright prevarication, made the judge the epitome of the "rubber stamp" condemned by the courts. All the circuitous, facile reasoning for the VCO evaporated, rendering the Appellee's averment that Appellant was transported to Lee County jail to serve the balance of a traffic sentence a benchmark of either gullibility or deliberate disingenuousness; this is underscored by the fact that the issuing judge himself abandoned this reason as one for issuance of the VCO when he adopted the (final) reason having to do with

8

Appellant's failure to cooperate.

Nothing came of the previous fabrications concerning probation violation because there was no validity to them in the first place, a fact which the testimony by the judge, the city clerk, and the officers show inescapably. Thus, the authorities cited by Appellee which deal with proper arrest based on good faith execution of an invalid warrant bear no resemblance to the instant case, which is riddled and irreparably tainted with bad faith from the inception. In the instant case the officers were even aware that Appellant had paid all his fines and court costs well in advance of the time that Murray arrested him. (R2: 33-34). Similarly, cases such as *United States v. Ellis,* 971 F.2d 701, 704 (11th Cir.1992), which stand for the proposition that errors by a judge are not grounds for suppression, are of no value in a determination of the issues raised in this case. There was no error here. The judge and police deliberately and with clear intention achieved their goal of forcing Appellant to talk to them regarding the White investigation by having him arrested, on grounds that were obviously manufactured, and when this was accomplished, they immediately released him. (R2: 124). Far from being error, the entire arrest and compulsion to either talk or be denied liberty was a calculated deprivation of the Appellant's civil rights under the Fourth Amendment.

9

**Warrantless Entry Based Upon the**

**Perceived Odor of Marijuana**

The Appellee contends that the initial approach to Appellant's home was based on the belief by law enforcement officers that Appellant had violated a condition of probation by obtaining a disorderly conduct conviction and for failure to pay fines on schedule while he was on probation for driving with a revoked license, for which the VCO had issued. Brief of Appellee, page 14. It is remarkable that the Appellee obstinately clings to this fiction long after the judge who himself issued the VCO has abandoned it; it must be remembered that the judge, after tiring of "playing semantics" stated that the VCO issued because Appellant wasn't cooperative in the White investigation. (R2: 98, 101). As was shown in the Appellant's initial brief, the Appellant's payment history and court file disclosed that all fines were paid and all sentences completed. (R2: 82), and these documents were all before the judge at the time of the issuance of the VCO.

The Appellee then contends that use of an arrest warrant as a pretext to search a home is approved by the Fourth Amendment. Appellant need not address this matter, as in the instant case Appellant was arrested outside his home, making the entry of officers warrantless and prohibited and the questionable contention academic. Search of a home incident to arrest is valid only if the arrest occurs inside the home. *Vale v. Louisiana,* 399 U.S. 30, 33-34, 90 S.Ct. 1969, 1971, 26 L. Ed.2d 409 (1970).

The Appellee insists that no warrantless search of the Appellant's home

10

occurred, but rather that the fear that evidence of a crime was being destroyed by burning justified the warrantless entry into the home of Appellant. This rationale was explicitly rejected in the case of *Johnson v. United States,* 333 U.S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948). As was stated in Appellant's initial brief, olfactory detection of burning marijuana indicates that, at worst, a misdemeanor crime, i.e., possession of marijuana in an amount small enough to burn in a cigarette or a pipe, is being committed.

> "Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. Before the agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. See *Payton v. New York, supra,* 455 U.S. at 586, 100 S.Ct., at 1380. When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached Magistrate Judge."

*Welsh v. Wisconsin, supra,* 466 U.S. at 750, 104 S.Ct. at 2098.

Briefly, in *Johnson* a police lieutenant was told by an informant that opium was being smoked at a hotel. The policeman and informer went to the hotel, where, after determining that opium was being smoked by the smell of the drug burning, he left and returned to the hotel with four narcotics agents a short time later. The lieutenant knocked on the door of Room 1, from where the aroma seemed to be coming. After identifying himself, the lady occupying the room opened the door; after being told that police wanted to "talk to her a little bit," the female "stepped

11

back acquiescently and admitted" the officers inside. *Id* at 368. The police told the woman that she was under arrest and searched the room, finding opium and a warm pipe. The defendant challenged the search of her home as a violation of the rights secured to in common with others, by the Fourth Amendment to the United States Constitution. The Supreme Court found that the odor possible probable cause to obtain a warrant, but not warrantless, non-consensual entry and search.

The Supreme Court went on; "At the time entry was demanded the officers were possessed of evidence which a magistrate might have found to be probable cause for issuing a search warrant. We cannot sustain defendant's contention, erroneously made, on the strength of *Taylor v. United States,* 286 U.S. 1, 52 S.Ct. 466, 76 L. Ed. 951 (1932), that odors cannot be sufficient to constitute probable grounds for any search. *That decision only held that odors alone do not authorize a search without a warrant.*" *Id* at 368-369; emphasis added. In *Taylor*, the Supreme Court held that evidence discovered by agents who, after smelling whiskey, arrested the owner of the property and conducted a warrantless search, was inadmissible. "Prohibition officers may rely on a distinctive odor as a physical fact indicative of a possible crime; but its presence alone does not strip the owner of a building of constitutional guaranties (Const. Amend. 4) against unreasonable searches." *Taylor* at 467.

The Appellee seeks to sever the warrantless entry from the warrantless search. This is impossible. If the officers who entered were truly seeking merely to "secure" the residence based on the destruction of evidence by burning, obviously

12

they would be required to search for the source of the fire. The Fourth Amendment, and its construction in the holdings in *Taylor* and *Johnson* are clear: Odors alone do not authorize a search without a warrant. The insidious erosion of the protections guaranteed under the Fourth Amendment must be halted at some point to preserve those protections in some recognizable incarnation, and the Supreme Court has chosen to invalidate, as one threshold, entry and search based on odors alone.

The Appellee cites numerous inapposite holdings which deal with the plain view doctrine. In none of these cases was the warrant issued in bad faith, as was the case here, which is one important distinguishing feature. Moreover, as the holdings in *Taylor* and *Johnson* show, the Supreme Court has found "plain smell" to be distinguishable from plain view, in that odors alone do not justify warrantless entry and search, whereas plain view observation *may*.

It is not necessary to rebut the Appellee's interpretation of the cases cited in its brief regarding exigent circumstances; the cases cited therein all deal with serious felonies, not misdemeanor possession crimes, which is the maximum level of offense which the officers could have reasonably suspected in the instant case. See *Welsh* and *Payton*, *supra*. Nor is there any question of the pretextual nature of a warrant involved in those cases. The Appellee's citation of *United States v. Thompson*, 928 F.2d 1060, 1065 (11th Cir. 1991) for its holding regarding no expectation of privacy with regard to objects in plain view or plain smell is misplaced; that case deals with Coast Guard inspections of ships on the open seas, not fixed homes on land.

13

The issue presented is not recondite; it is narrow and it is well-defined: Does the odor of what is believed to be burning marijuana justify warrantless entry and search of a home? All pertinent authorities on the subject clearly answer negatively.

**Entry to the Residence Through Show of Force**

The Appellee's recitation of the facts encompassing the officers' entry to the residence is truncated. In reality the facts are virtually identical to the facts of *United States v. Edmondson,* 791 F.2d 1512 (11th. Cir. 1986), wherein this Honorable Court found that entry was non-consensual because it was gained through a show of authority.

In the instant case, in effort to execute what was ostensibly a misdemeanor traffic warrant, Sergeant James Tatum and Officer Jason Crook, two of the accompanying policemen, were in uniform; the other four or five officers were in plain clothes (R2: 7) as they surrounded the dwelling. [It should be noted that the Appellant's home is a free standing brick structure, and not a trailer as Appellee mistakenly designates]. The officers positioned themselves in the front and rear of Appellant's residence. (R2: 8). Sergeant Tatum approached the front door of the residence and knocked.  A male voice from inside said "What?" (R2: 67). Sergeant Tatum replied "Police, open the door." (R2 :38; 67-68). No more than a minute passed before Appellant's girlfriend, Jamillah McCray (hereinafter referred to as"McCray"), opened the door (R2: 69).

These facts are identical to the facts in *Edmondson*. The only conceivable discerning question is at what comparative decibel the command to "open the

14

door" was shouted by the officers. Fourth Amendment inquiries of such portent and moment cannot reasonably be resolved on the discrepancies in relative tone or inflection of synonymous commands.

Conversely, the facts of the instant case bear no resemblance to those of *United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002); in that case police asked the occupants of the home to be let inside the home, and were allowed in without objection, indeed with a facilitative movement to allow the entry. In the case at bar, police asked nothing, but rather walked in without asking anything. The Appellee's opinion that the officers were not observed by the occupants of the home is convenient, though unsupported by the record. Three or four officers were certainly observed standing at the door, likely prior to the occupants' response to their demands to open the same door. Appellee's argument regarding consent is meaningless; again, officers never asked to enter, they merely entered. The occupants were never afforded any opportunity whatsoever to refuse entry. The occupants *did* refuse to permit a search (R2: 1; R2: 19), but this refusal was ignored. This fact logically indicates, if anything, that consent to enter would likewise have been denied had it been sought.

It must be remarked that this overwhelming show of force for the ostensible purpose of executing a minor traffic violation warrant strains credulity. As the information contained in Appendix II of Appellant's initial brief shows, he had scrupulously fulfilled all the requirements of his sentences for the commonplace violations he committed. No valid warrant was even outstanding on any of *these*

15

banal offenses. The Appellant had never been suspected of any violence, as the officers conceded. (R2: 37). This is important in that it substantiates the fact that the officers had ulterior motives from the inception of the charade. The Appellant contends that the police, in collaboration with the judge, fully intended to arrest the Appellant and conduct a search of his home; moreover, this in actuality was the final denouement. Police testified, they did not and never had sufficient probable cause to obtain a warrant for any suspected drug activity. (R2: 25-26). It is not, however, necessary for this Honorable Court to embrace this contention in order to find the actions by the judge and police unconstitutional; the unconstitutionality stands alone, and is as obtrusively apparent as it is repugnant.

Again, the cases recited by Appellee for its position that contraband observed in plain view obviates the need for a warrant are misplaced. No contraband was observed by the officers at all until after they had warrantlessly entered the residence; the plain language of the cited cases refutes their application to the facts of the instant case. ("If police are lawfully in a position from which they *view* an object..." *Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993); "...it is...an essential predicate to any valid warrantless seizure that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly *viewed*." *Horton v. California*, 496 U.S. 128, 136 (1990); "Once police are lawfully in a position to *observe* an item first-hand, its owner's privacy right in the item is lost." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983)). Emphasis added. In the instant case officers viewed nothing until they had illegally entered

16

the residence.

As has been argued exhaustively in the Appellant's initial brief and again to some extent above within this reply, Appellant contends that no statutory or case-legal authority condones the warrantless entry into a residence based on exigent circumstances following the perception of what is believed to be burning marijuana. The logical progression from the sequence of events which transpired in the instant case is that police in collusion with a sympathetic judge could cause a misdemeanor warrant to be issued for any reason or purpose, despite its transparent pretextual genesis; descend upon a hapless citizen's home based on the invalid warrant; and upon smelling what they believe to be marijuana enter the home in full force without a search warrant. This scenario, its evident unconstitutionality notwithstanding, is precisely what happened in the instant case. This kind of fishing expedition has been historically abhorred in the United States, and is reminiscent of the "general warrant" which the Founders reviled.

The Appellant relies on the arguments advanced in his initial brief regarding the failure of a subsequently obtained search warrant to cure an illegal search in their entireties.

To permit this conviction to stand would render the germane protections guaranteed by the Fourth Amendment completely void, and relegate the Amendment to the status of a quaint reminder of a time where citizens weren't subject to home invasion and arrest at the caprice of officers, and judges who have abandoned neutrality by concocting, on their own volition or, as in this case, at the

17

behest of police, a clearly invalid and dishonest ground for arrest.

**RESPECTFULLY SUBMITTED** this 2nd day of May 2007.

**WILLIAM R. BLANCHARD (BLA-029)**
**Counsel for Appellant**
**505 South Perry Street**
**Post Office Box 746**
**Montgomery, Alabama, 36101-0746**
**Telephone No. (334) 269-9691**
**Fax: (334) 263-4766**
**Bill@blanchardlaw.com**

18

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

*This brief is in compliance with Federal Rules of Appellate Procedure 32(a)(7)(B) because:*

The entire document, minus the Appendices, contains the word-processor total of five thousand one hundred and thirty-six (5136) words, less than half of the thirteen-thousand and sixteen (13016) words contained in Appellant's initial brief.

*This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the typestyle requirements of 32(a)(6) because:*

The size and style of type utilized throughout Appellant's Brief is Times New Roman, 14 pitch, which is proportionately spaced.

Pursuant to 11th Circuit Rule 31-5, this brief has been uploaded to this Court's website at www.ca11.uscourts.gov in pdf format.

WILLIAM R. BLANCHARD (BLA-029)

## CERTIFICATE OF SERVICE

I Hereby CERTIFY that a copy of the foregoing Reply Brief of Appellant was served by United States mail, postage prepaid and properly addressed this 2nd day of May, 2007, upon Hon. Todd A. Brown , Assistant United States Attorney, P.O. Box 197, Montgomery, Alabama 36104-0197.

**WILLIAM R. BLANCHARD (BLA-029)**
**Counsel for Appellant**
**505 South Perry Street**
**Post Office Box 746**
**Montgomery, Alabama, 36101-0746**
**Telephone No. (334) 269-9691**
**Fax: (334) 263-4766**
Bill@blanchardlaw.com

20

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

| FILED |
| U.S. COURT OF APPEALS |
| ELEVENTH CIRCUIT |
| JULY 12, 2007 |
| THOMAS K. KAHN |
| CLERK |

No. 07-10005
Non-Argument Calendar

D. C. Docket No. 05-00187-CR-E

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SAWELIJA TYREE FLOYD,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Alabama

**(July 12, 2007)**

Before TJOFLAT, HULL and FAY, Circuit Judges.

PER CURIAM:



Sawelija Tyree Floyd appeals his convictions for possession with the intent to distribute cocaine base, marijuana, cocaine hydrochloride, and MDMA,[1] all in violation of 21 U.S.C. § 841(a)(1). On appeal, Floyd argues that the district court erred in denying his motion to suppress evidence because the arresting officers did not rely in good faith upon an invalid arrest warrant and, furthermore, there existed no probable cause or exigent circumstances supporting the officers' entry into his home. The district court determined that the arresting officers reasonably relied in good faith upon the arrest warrant because there was no evidence that the officers influenced the issuing judge, that the judge acted outside of his judicial role, or that the arrest warrant was so facially deficient as to prevent the officers from reasonably presuming its validity. Additionally, the court concluded that, because Floyd was a known drug dealer, a smell of burning marijuana emanated from Floyd's house, and there were multiple occupants of the house, the officers had probable cause and exigent circumstances to enter. For the reasons set forth more fully below, we affirm.

## I. Background

A federal grand jury issued an initial two-count indictment against Floyd, charging him with possession with the intent to distribute cocaine base and

---

[1] 3,4-methylenedioxymethamphetamine.

2

marijuana, in violation of § 841(a)(1).[2]  Thereafter, Floyd filed a motion to suppress statements taken and physical evidence seized as a result of his arrest and subsequent search of his home.  In his motion, Floyd argued that the police officers did not have a legitimate warrant or probable cause to approach his house in the first instance.  He further asserted that the initial opening of his house was not consensual and did not create probable cause or exigent circumstances.  He concluded that, because the warrantless search was illegal, the subsequent search warrant, which the officers secured after entering the house, was also invalid because it was based upon evidence discovered during the warrantless search.

The following factual history is taken from the testimony of the government's witnesses at Floyd's suppression hearing.  The basic underlying facts are undisputed.

On July 27, 2005, Sergeant Chris Murray and Lieutenant Jerry Holder, both of the Auburn, Alabama Police Department, met with Municipal Judge Joe Bailey regarding individuals who were involved in one of the officers' other investigations.  The officers asked Judge Bailey to review the files of those individuals in connection with that investigation.  In so doing, Judge Bailey

---

[2]After the suppression hearing, a federal grand jury returned a four-count superseding indictment against Floyd, charging him with possession with the intent to distribute: (1) cocaine base; (2) marijuana; (3) cocaine hydrochloride; and (4) MDMA/ecstasy, all in violation of § 841(a).

3

reviewed Floyd's file and determined that the file indicated that Floyd had violated

a pre-existing order. Thus, Judge Bailey issued a Violation of Court Order

("VCO") warrant for Floyd's arrest. The officers testified that they did not request

that Judge Bailey issue a VCO for Floyd and they did not know the exact violation

for which Judge Bailey issued Floyd's VCO. The VCO identified Floyd by name,

but it did not include a case number or indicate which order Floyd had violated,

and it was not filed in the clerk's office. The officers also indicated that they

routinely relied upon VCOs in making arrests and that they knew Judge Bailey

routinely issued such VCOs. According to Judge Bailey, he typically issued VCOs

and wrote them from a standard form on his computer.

On July 29, 2005, Sergeant Murray and six other officers executed the

outstanding VCO, which was a misdemeanor warrant, at Floyd's home. Because

the officers had information from confidential informants ("CI") that Floyd was a

substantial drug-dealer, they utilized a group of officers to execute the arrest

warrant. Four officers went to Floyd's front door and knocked. A male's voice

came from inside the house and asked, "Who is it?" The officers responded that it

was the police and that they should open the door. Seconds later, Jamillah

McCray, Floyd's girlfriend, opened the door. The officers inquired into Floyd's

whereabouts. Almost immediately, Floyd approached the door, officers informed

him that they had a warrant for his arrest, and the officers took him into custody

outside of his house. However, when McCray first opened the door, the officers

smelled the odor of burning marijuana emanating from inside the house.

Thereafter, the officers stepped inside the house, where McCray and J.B.

Mitchell were located. Upon entering the house, Sergeant Murray saw three or

four large pieces of crack cocaine on the kitchen counter-top. Sergeant Murray

asked who had been smoking marijuana, and Mitchell answered that he and Floyd

had been smoking just prior to the officers' knocking on the door. Sergeant

Murray then asked for permission to search the house, but both Floyd and McCray

declined permission. At that point, Sergeant Murray left to obtain a search

warrant. Once he obtained a search warrant, the officers executed it and located

crack cocaine, marijuana, powder cocaine, $3000, and other drug paraphernalia in

the house.

After the suppression hearing, the magistrate judge considered the evidence

and the parties' post-hearing briefs and recommended denying Floyd's motion to

suppress. The district court adopted the magistrate's report and recommendation,

over Floyd's objections, and denied Floyd's motion to suppress. Floyd then pled

guilty to all four counts of his superseding indictment. In his plea agreement with

the government, Floyd reserved his right to appeal the denial of his motion to

suppress. The court sentenced Floyd to 210 months' imprisonment.

## II. Discussion

We review the district court's denial of a defendant's motion to suppress

under a mixed standard of review, reviewing the court's findings of fact for clear

error and application of the law to those facts de novo. United States v. Smith, 459

F.3d 1276, 1290 (11th Cir. 2006), cert. denied, ___ U.S. ___, 127 S.Ct. 990, 166

L.Ed.2d 747 (2007). Moreover, we will "construe the facts in the light most

favorable to the party who prevailed below." United States v. Muegge, 225 F.3d

1267, 1269 (11th Cir. 2000).

The Fourth Amendment provides that: "[t]he right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated . . . ." U.S. Const. amend. IV. We have held that

warrantless searches and seizures inside a person's home are presumptively

unreasonable. United States v. Burgos, 720 F.2d 1520, 1525 (11th Cir. 1983).

## (A) Good Faith Reliance On Invalid VCO[3]

Generally, the Fourth Amendment excludes from a criminal prosecution

evidence that has been seized as a result of an illegal search. United States v.

Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). However, one exception to the

---

[3]The government concedes that the VCO that Judge Bailey issued for Floyd's arrest was invalid under Alabama law. Thus, we need not address the issue of the validity of the VCO.

6

exclusionary rule is the good faith exception, as carved out by the Supreme Court

in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

Martin, 297 F.3d at 1312. As such, we must first determine whether the executing

officers in Floyd's case nevertheless relied upon the invalid VCO in good faith.

In Leon, the Supreme Court held that courts generally should not exclude

evidence seized by officers acting in reasonable reliance upon a search warrant that

ultimately was found to be invalid. Leon, 468 U.S. at 922, 104 S.Ct. at 3420. The

good faith exception applies in all but four circumstances:

> (1) where the magistrate or judge in issuing a warrant was misled by
> information in an affidavit that the affiant knew was false or would
> have known was false except for his reckless disregard of the truth;
> (2) where the issuing magistrate wholly abandoned his judicial role . .
> . ; (3) where the affidavit supporting the warrant is so lacking in
> indicia of probable cause as to render official belief in its existence
> entirely unreasonable; and (4) where, depending upon the
> circumstances of the particular case, a warrant is so facially deficient -
> i.e., in failing to particularize the place to be searched or the things to
> be seized - that the executing officers cannot reasonably presume it to
> be valid.

Martin, 297 F.3d at 1313 (quotations and citation omitted). The Leon good faith

analysis has been invoked in cases involving invalid arrest warrants, as opposed to

an invalid search warrant, as was the case in Leon. See Arizona v. Evans, 514 U.S.

1, 14-15, 115 S.Ct. 1185, 1187, 1193-94, 131 L.Ed.2d 34 (1995). "The purpose of

the exclusionary rule is to deter unlawful police misconduct; therefore, when

7

officers engage in objectively reasonable law enforcement activity and have acted in good faith when obtaining a search warrant from a judge or magistrate, the Leon good faith exception applies." Martin, 297 F.3d at 1313 (quotation omitted).

Floyd argues on appeal that the circumstances in his case fit into at least two of the four limitations to the good faith rule. Reviewing the facts of this case under each limitation to the good faith exception, we conclude that none of the limitations apply. First, the testimony from the suppression hearing indicates that there existed no affidavit from the officers upon which Judge Bailey relied in issuing the VCO. While the officers did ask Judge Bailey to review Floyd's file in connection with a separate investigation, they unequivocally testified that they did not request that Judge Bailey issue the VCO. Judge Bailey confirmed that he issued the VCO of his own volition. Therefore, the first limitation to the good faith exception does not apply because there was no affidavit that could have misled Judge Bailey. Similarly, the third limitation to the good faith exception also does not apply because there existed no affidavit that could have been so lacking in probable cause as to render official belief in its validity unreasonable.

As to the second limitation to the good faith exception, namely, that the issuing judge abandoned his judicial role, the evidence does not support such a conclusion. Judge Bailey testified that, while he was asked by the officers to

8

review Floyd's file, his independent review of the file revealed facts that he believed warranted the recall of Floyd's probation. There was no testimony at the hearing to indicate that Judge Bailey was influenced in any way by the officers or their desire to speak with Floyd regarding the other investigation. To the extent that Floyd argues that the officers asked Judge Bailey to issue the VCO, the record stands contrary to that assertion. Thus, there is no evidence to suggest that Judge Bailey abandoned his judicial role in issuing the VCO for Floyd's arrest. Moreover, the evidence supports the conclusion that the error that caused the invalidity of the VCO was solely attributable to Judge Bailey, and, thus, exclusion under the second limitation here would not further the purpose of the exclusionary rule, namely, to deter police misconduct. See Evans, 514 U.S. at 11-12, 115 S.Ct. at 1191-92 (reiterating that "there was no sound reason to apply the exclusionary rule as a means of deterring misconduct on the part of judicial officers who are responsible for issuing warrants" because such exclusion would not meet the ultimate goal of deterring police misconduct).

Finally, the record does not support a conclusion that the VCO was so facially deficient as to prevent the officers from reasonably presuming its validity. The Fourth Amendment provides that, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be

9

searched, and the persons or things to be seized." U.S. Const. amend. IV. Judge

Bailey's VCO identified Floyd by his full name and indicated that, "[f]or good

cause shown, it is the Court's opinion that [Floyd] should be taken into custody . . .

to serve the balance of the sentence(s) of incarceration heretofore suspended." The

officers testified that they observed Judge Bailey review Floyd's file and find that

he had violated a term of his probation. While the officers were unclear as to the

exact violation, they nonetheless witnessed the judge perform an independent

review and reach that conclusion. Furthermore, the officers routinely relied upon

judge-issued VCOs and Judge Bailey routinely issued them from a standard form

on his computer.

As to the missing case number on the VCO, Sergeant Murray testified that

he believed that the number was missing because Judge Bailey wanted to avoid

alerting the clerk's office due to the on-going White investigation. Despite the fact

that such a motivation for leaving a case number off of a court order is arguably

questionable, the officer's testimony nevertheless supplied a reason why he

believed the number was missing. The magistrate observed the officer's testimony

and obviously found it credible. See United States v. Ramirez-Chilel, 289 F.3d

744, 749 (11th Cir. 2002) (stating that credibility determinations are typically

within the province of the fact finder). Additionally, Judge Bailey explained that

the missing case number was an inadvertent mistake on his part. As such, considering the totality of the circumstances, the officers had no reason to believe from the face of the VCO that it was invalid.

**(B)    Entry Into And Search Of Floyd's Home**

As discussed above, warrantless entries into and searches inside a person's home are presumptively unreasonable. United States v. Santa, 236 F.3d 662, 668 (11th Cir. 2000). With regard to an officer's entry into a person's home, a person does not show consent to enter when the consent is prompted by an official show of authority. Ramirez-Chilel, 289 F.3d at 751. However, as to warrantless searches, they may be justified where both probable cause and exigent circumstances exist. United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991). "Probable cause exists when under the totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. In other words . . . where the facts lead a reasonably cautious person to believe that the search will uncover evidence of a crime." Id. (citation and quotations omitted). Exigent circumstances may exist where there is a danger that evidence will be destroyed or removed. Id. However, "the presence of contraband without more does not give rise to exigent circumstances," but such circumstances may arise where there is a danger that the contraband will be destroyed. Id.

(quotation omitted). "This Court has held that the need to invoke the exigent circumstances exception to the warrant requirement is particularly compelling in narcotics cases because narcotics can be so quickly destroyed." Id. (quotation omitted). In determining whether exigent circumstances existed, we employ the following objective test: "whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." United States v. Young, 909 F.2d 442, 446 (11th Cir. 1990).

Here, Floyd's assertion that the officers violated his Fourth Amendment rights by inducing McCray to open the front door without consent is meritless. It is noteworthy that Floyd is not arguing that the officers gained non-consensual entry into his home, but rather that they induced a non-consensual opening of his front door. However, it is not unconstitutional for an officer to approach an individual's home and knock on the door when the officer has an arrest warrant for that individual. See, e.g., United States v. Bervaldi, 226 F.3d 1256, 1263, 1267 (11th Cir. 2000) (holding that police officers did not violate a person's Fourth Amendment rights by entering the person's home where the officers had an arrest warrant for a suspect, went to the address that they believed was the suspect's home, believed the suspect was inside the home, knocked on the door, and later

entered the house); see also Payton v. New York, 445 U.S. 573, 602-03, 100 S.Ct.
1371, 1388, 63 L.Ed.2d 639 (1980) (holding that, once an arrest warrant has been
issued, it is constitutionally reasonable to require the suspect to open the doors of
his home to police officers because "for Fourth Amendment purposes, an arrest
warrant founded on probable cause implicitly carries with it the limited authority to
enter a dwelling in which the suspect lives when there is reason to believe the
suspect is within"). Moreover, there is nothing in the record to support the
contention that McCray's decision to open the door was non-consensual. The
officers did not have their weapons drawn, yell at McCray, or pound on the door.
See Ramirez-Chilel, 289 F.3d at 751 (concluding that officers did not gain entry
into a suspect's home by a show of force where the officers did not draw their
weapons or surround the house, and where the suspect did not exhibit intimidated
behavior when he opened the door).

    With regard to the officers' eventual entry into Floyd's home, Floyd
maintains that the smell of burning marijuana alone did not provide the
necessary probable cause or exigent circumstances. Floyd's argument is
without merit. The officers approached Floyd's house armed with an arrest
warrant that they believed was valid and information that Floyd was a drug
dealer. The officers knocked on the door, inquired as to Floyd's

13

whereabouts, and arrested Floyd when he stepped outside of his house.

However, when McCray opened the door, the officers smelled burning

marijuana emanating from the house.  At that point, the officers had probable

cause because their knowledge of Floyd's drug-dealing habits and the smell

of burning marijuana reasonably could have led them to believe that a search

would reveal evidence of a crime.  See Tobin, 923 F.2d at 1510.  The facts as

they existed at the time that the officers smelled the burning marijuana also

established that exigent circumstances existed because those facts would

have led a reasonable officer to believe that McCray or someone else inside

the house would attempt to destroy the drugs before they could secure a

warrant.  See Young, 909 F.2d at 446; see also Tobin, 923 F.2d at 1510

(explaining that "the need to invoke the exigent circumstances exception to

the warrant requirement is particularly compelling in narcotics cases because

narcotics can be so quickly destroyed") (quotation omitted).  Given the

information the officers had regarding Floyd's drug-dealing history, coupled

with the smell of burning marijuana and the fact that there were other

occupants in Floyd's home, this is not a case where the only information the

officers had was the existence of drugs alone.

14

Floyd lastly argues that, because the officers' entry into his home was unconstitutional, the search warrant that they subsequently obtained was invalid because it was based upon information that the officers obtained from their illegal entry. See United States v. Terzado-Madruga, 897 F.2d 1099, 1112 (11th Cir. 1990) (explaining that the exclusionary rule also applies to evidence obtained from illegal conduct or "fruit of the poisonous tree"). However, in light of the above discussion of the legality of the officers' initial entry into Floyd's home, his argument that the subsequent search warrant was based upon fruit of a poisonous tree is meritless.

## III.  Conclusion

In sum, the officers relied in good faith upon the invalid VCO arrest warrant in initially approaching Floyd's home. Moreover, the officers did not unconstitutionally knock on Floyd's door or enter his house based upon the smell of burning marijuana emanating from the house. Accordingly, we conclude that the district court did not err in denying Floyd's motion to suppress. Thus, Floyd's convictions are

**AFFIRMED.**

15