IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

2008 MAY -2  A 10: 00

DEBRA P. HACKETT, C.
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

|  |  |  |
|---|---|---|
| SAWELIJA TYREE FLOYD, | ) | |
| PETITIONER | ) | |
|  | ) CIVIL ACTION No: 3: 08 cv 133-MEF | |
| VS. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| RESPONDENT | ) | |

---

## PETITIONER'S  BRIEF AND RESPONSE

---

Sawelija Tyree Floyd, pro-se
A.I.S.# 190962/F3-24B
S. C. C.
P. O. Box # 56
Elmore, AL 36025-0056

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

|                                        |                                           |
| -------------------------------------- | ----------------------------------------- |
| **SAWELIJA TYREE FLOYD,**              | )                                         |
| **PETITIONER**                         | )                                         |
|                                        | ) **CIVIL ACTION No: 3: 08 cv-133-MEF**   |
| **VS.**                                | )                                         |
|                                        | )                                         |
| **UNITED STATES OF AMERICA,**          | )                                         |
| **RESPONDENT**                         | )                                         |

### PETITIONER'S BRIEF AND RESPONSE

Come now the Petitioner, Sawelija Tyree Floyd, in the above styled cause and hereby submits his Brief and Response to the issues presented unto this Honorable Court for review under Title 28 U. S. C. 2255, Habeas Corpus.

### ARGUMENT

The Petitioner argues that the assertions of law as stated by the Government as to ground (1) is without force and must be given the full weigh of this Honorable Court in light most favorable to the Petitioner.

The Petitioner has styled his attack for relief as ground under the Ineffective Assistance of Counsel as guaranteed under the 6th. Amendment of the U.S. Constitution.

The Government argues that these claims lack merit, and are without factual support and rest on allegations that fail to establish either deficient performance and prejudice within the meaning of the Strickland Test as set out in **Strickland V. Washington 466 U.S. 68 (1984).**

**I.** Ineffective Assistance of Counsel:

**(1) Standard of Review,**

In **Strickland V. Washington, 466 U. S. 668, 690, 104 S. Ct. 2052, 80 L.Ed. 2d. 674 (1984),** the Supreme Court delineated the proper scope of review in examining a claim of ineffective assistance of counsel;

> A convicted felon making a claim of ineffective assistance of counsel must identify the acts or omissions that are alleged not to have the results of reasonable judgment. The court must then determine whether, in light of all the circumstances, the identified acts were outside the wide range of professionally competent assistance. In making that determination the court should keep in mind that counsel's functions, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made significant decisions in the exercise of reasonable professional judgment

The petitioner has attacked his Attorney's performance as that of being ineffective of assistance by reason of unreasonable performance and prejudice to his defense.

The Petitioner presents before this Honorable Court a list of issues and grounds to support his contention as factual.

(a)The question of the affidavit filed by Sgt. Murray and used to secure a search warrant for the search and seizure of the articles of evidence used to convict the petitioner is of a sound reasonable inquiry as to the law when it involves an infringement of the secure rights of the petitioner, under the due process right of the 14th. Amendments of the Constitution as well the 4th Amendment of the constitution of these United States.

The Petitioner contends that an illegal infringement into the privacy of a United States Citizen is an infringement of his 4th. Amendment Constitution Rights.

**This fact is supported by Sgt. Murray's testimony. (see exhibits, A & B)**

The United States Supreme Court and the 11th. Circuit has concluded that the smell alone would not pass the exclusionary rule to excuses the 4th. amendment or the 14th. amendment right to due process, to justify the illegally gained entry into the Petitioner's resident.

Under **Johnson & Taylor V. United States, supra**, that such would have to be supported by other facts of reasonable. see also **Weeks V. U.S. supra, Agello V. U. S. and Mapp V. Ohio supra.**

Sgt Murray in his testimony decried that such reasons was supported by an unknown confidential informant, "that the Petitioner was a known drug dealer".
(see Exhibit B)

During the Suppression Hearing the Petitioner's Attorney did in fact question Sgt. Murray and the other Officers who corroborated along with Sgt. Murray's testimony that a confidential informant's affidavit did not exist and infact according to Sgt. Murray's testimony, he admitted under oath that no such information about the Petitioner as being a known drug dealer was enough information or probable cause to acquire a search warrant. (see exhibit B)

**That no such buy or other drug dealing investigation was done to substantiated the information supposedly given by a confidential informant.**

Trial Attorney's failure to object and challenge on Appeal the information supporting Affidavit to obtain a search warrant which did not provide the magistrate judge with any substantial basis for determining any factual existence of probable cause and the law enforcement Officers statement was wholly conclusory and self serving would render counsel's abandonment of this viable issue on Appeal, a deficiency of unreasonable performance which had certainly prejudiced the Petitioner's defense. (see Exhibit A & B)

The bare fact of this testimony given by Sgt. Murray would in view of the totality of the circumstances render the then probable cause theory to be just a hunch or a mere

suspicion, which is not enough to excuse the Constitutional rights of the Petitioner on a mere small of what was believe to marijuana scent. see Taylor V. U. S., supra.

Sgt. Murray's statement alone shows that the entry of the Petitioner residence was in "bad faith" and based solely on their intent to ignore and subvert the petitioner's Fourth Amendment right, and unsupported by probable cause-reasoned.

So therefore Attorney Blanchard failure to attack the Affidavit and warrant of unsupported probable cause certainly prejudice the Petitioner's Appeal when seeking relief and such failure to attack or challenge the affidavit and search warrant derived from the unsupported facts of Sgt. Murray from any prior, investigation of the petitioner as being a known drug dealer would certainly render the probable cause exclusionary rule inapplicable under the due process clause of the 4th. Amendment of the United States Constitution, as just a theory that the Petitioner was a known dealer to be nothing but a falsity and the lack of attack on Appeal by Attorney Blanchard were ineffective for deficiency and unreasonable performance of that of a professional defense counselor.

"During the suppression hearing the Officers said they had information prior to their arrival". The Magistrate Judge ruled that the information rose to the level of probable cause. (see exhibit C)

The lack of information to support an affidavit to gain a legal search warrant as admitted by Sgt. Murray would not support the good faith claim by the police authority to excuse from the constitutional duties of the due process clause and the 4th. Amendment to illegally gain entry into the home of the Petitioner for the purpose of search and seizure, a mere suspicion by presupposition is only and hypothesis and will not support enough information for probable cause to gain an affidavit for a search warrant.

Petitioner claim that had his Attorney attacked the affidavit probable cause to secure a search warrant, the outcome of his appeals ruling would have been most favorable to the Petitioner in the courts recent good faith bad faith ruling in comparison to **Leon V. U. S. supra.**

The Petitioner claim that such probable cause to the exclusionary rule to excuse police misconduct of the Petitioner's Constitutional right in violation of the 14th. and 4th. Amendment is without force and can not be up held as a showing of lawful act to violate the petitioner's right.

The Petitioner averment and contentions that his Attorney performance fell below the objective as pointed out in his claim of ineffective assistance of counsel in within the precedents of **Strickland V. Washingtom, supra.**


The Strickland standard calls for a two-part test, First, the defendant must show that counsel that counsel made errors so serious that counsel was not functioning as the "counsel guaranteed the defendant must show that the deficient performance prejudiced the defense. This required showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose results is reliable.

The Petitioners claim in addition that such unprofessional unreasonable, performance has prejudice his case by the failure of counsel to challenge the affidavit filed by Sgt. Murray to gain a valid search warrant after having already conducted a search and seizure without enough prior information to support probable cause from the alleged confidential informant to lawfully gain a search warrant to enter the premises.

Officer Murray's probable cause information rest solely on the illegal search and seizure of cocaine and marijuana drugs found in the resident of the Petitioner, (not before), had Counsel for the Petitioner challenge the validity of the affidavit as made by the affiant and the supporting cause given to establish probable cause, it would have come into serious question as to the lawfulness of the arrest, search and the seizure.

The Petitioner avers that such a question of whether or not a hearsay statement can be used by the affiant to establish probable cause to gain the illegal entry into the Petitioner's residents to search, then to seize property and to be allowed to use the fruits of the illegal search as evidence as probable cause in his affidavit to justify the issuing of a search warrant by the Hon: Judge Bush , is a serious question of the rights of the

Petitioner to be secured from unreasonable search and seizure in the privacy of his home under the 4th, and 14th. Amendments of the U. S. Constitution.

The Petitioner claim of an unreasonable probable cause to support cause for a search warrant after a warrant less search and seizure has already been conducted by the Auburn Police Department and Narcotic Division does not meet the exclusionary rule to violation of the Petitioner's constitutional rights and that such an affidavit can not be used to validate cause for issuance of a warrant when the search and seizure had already been conducted. (see exhibit A)

This issue of law is not at bar from review because Counsel was ineffective in assistance in representation of the Petitioner for his failure to not attack the validity of the Affidavit which has certainly prejudice the Petitioner. The Petitioner decry for justice.

It is an undisputed fact by Sgt. Murray and all of the Auburn Police and Narcotic agents who came to arrest the petitioner on a simple V. C. O. warrant, came to search the Petitioner's home just as they wanted to do without a justifiable warrant, but more importantly all testified that the vantage point was not at the door, but rather after the entry into the Petitioner's home which was the boundary line and at which point the law was broken despite the contrary to the rights of the Petitioner. (Exhibit-E) The Petitioner avers that had the assistance of his Attorney's performance been sufficiently effective in attacking the validity of the affidavit and warrant, and had been properly pursued by Counsel, the out come of the suppression hearing would have been most favorable to the Petitioner. The Petitioner concludes his argument with Ground (1) of ineffective assistance of Counsel, is with a colorable showing that the trial counselor was ineffective both by his deficient, unreasonable performance and by his prejudice to the Petitioner's Appeal, when he chose not to challenge the validity of the affidavit and warrant.

In the furtherance of the Petitioner's contention of ineffective assistance of counsel the Petitioner have averred that trial counsel performance was unreasonably deficient and prejudicial to the Petitioner when he failed to challenge ground three of the defective indictment under the elements of the offense for possession with the intent to

distribute marijuana, ecstasy and MDMA, when sentencing the Petitioner under the guidelines of 21 USC 841 (a)(1). (see Exhibit D)

The Petitioner claim that the key element of the amount of drugs seized should have been specified in the indictment for the provision of properly charging the Petitioner as applicable to 24 Fed Rules of Evidence to serve 130 and 841 (a)(1).

The Petitioner avers that under 18 USC Appx. 2D1.1, it is mandatory specify the amount of drugs charged for the purpose of properly punishing or sentencing the Petitioner accordingly within appropriate guidelines.

The Petitioner avers that without such a specificity of the amount charged in the indictment would render the charge insufficient and the sentence defective. The Petitioner's claim of ground (3) is with merit and not barred from review of this courts finding. The petitioner argues that had his Attorney effectively challenged the charge as charged in the indictment for counts two and four, then the likely hood of the petitioner sentence would have wholly been different in his plea barging for leniency.

The Petitioner assertion of Ground four is with merit and should have been challenged because the key element of exclusionary rule to enter the Petitioner's home without a warrant rest solely on the claim of the Auburn Police Tactical Squads belief uncorroborated by support of an affidavit that the Petitioner was a known drug dealer. (Exhibit B)

Petitioner avers that had his Attorney effectively challenged the facts necessary element of exclusionary powers invested in the authorities reasoning for believing that the Petitioner was a known drug dealer on appeal, through a confidential informant's "hearsay" information absent of unsupported proof by affidavit, then the likelihood of irreparable damage would not have occurred when challenging the 4th. Amendment violation of the Constitution by the Auburn Police Tactical Narcotic Squad in concert with due process of the 14th. Amendment of the United States Constitution.

The Petitioner asserts that the basis for which the Auburn Narcotic Tactical Police Officers testified to base their probable cause reasoning after smelling what appeared to be the order of burning marijuana has been decided by the 11th, Circuit and the U.S. Supreme Court In Taylor V. U. S. supra, that the smell along does not permit for police officers without a warrant to search and seize evidence.

That there must be other factual facts to believe that the Petitioner is a known drug dealer and concealing drugs and that such delay in response would endanger the evidence being disposed of.

The failure of Attorney Blanchard to effectively challenge the hearsay information of the unknown confidential informant, on appeal prejudiced the Petitioner.

The Petitioner assert in addition that trial counsel failure to file motion to the hearsay information by Auburn narcotic officers, to confront the claim of a confidential informant that Petitioner was a known drug dealer was wholly prejuicdicial and deficiently ineffective of assistance of counsel. (see exhibit B)

The Petitioner avers that the lack ness of trial counsel unreasonable failure to file motions to the hearsay information as evident to establish along with the smell of marijuana to excuse police constitutional duties consistent with the exclusionary rule as in the case of **Taylor V. U. S. supra** to violate the Petitioner's 4th. and  due process right of the 14th. Amendment clearly shows that his performance was deficient and below professional reasoning of performance.

Lastly, the Petitioner avers that had trial counsel filed motion to the hearsay evidence accumulated from the Auburn Police the outcome of his suppression hearing would have been most favorable to the Petitioner under the totality of the circumstances and probable cause reasoning. Petitioner contends that for this cause of unreasonable deficiently professional performance the trial counselor assistance was wholly ineffective.

## **CONCLUSION**

The Petitioner Sawelija Tyree Floyd,  avers that counsel's performance during the Suppression hearing, during the Appellate proceedings was deficient and has and will continue to prejudice his defense, counsel allowed law officers with the Auburn Police to interject the fruits of an illegal search and seizure, counsel in abandoning the facts that Officers openly admitted that their entry into the residence was without a warrant even though their vantage point outside the residence yielded no direct view of any illegal contraband but yet after the forceful custodial entry into the residence. In  evaluating counsel's performance under the Strickland standard, the reviewing court must  view the totality of the circumstances,  the challenged action and deem counsel's blatant failure to object to the speculations during the Suppression hearing as incompetent performance and sustain the argument herein.

Submitted By

*Sawelija Tyree Floyd*

Sawelija Tyree Floyd, pro-se

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon the following by

placing a copy of the same in the United States Mail, postage prepaid on this the _29_

day of _April_ , 2008.

United States District Clerk
Debra P. Hackett
B119 Frank M. Johnson, Jr. U. S. Courthouse Complex
One Church St.
P. O. Box# 711
Montgomery, AL 36101-0711

Hon; Todd Brown
Assistant United States Attorney
Court Square, Suite 201,
Montgomery, AL 36104

Attorney William R. Blanchard
505 South Perry St.
Post Office Box # 746
Montgomery, Al 36101-0746

Respectfully Submitted.

_Sawelija Tyree Floyd_

Sawelija Tyree Floyd, pro-se
A .I. S .# 190962/F3-24B
S. C. C.
P. O. Box # 56
Elmore, AL 36025-0056



Sawelija Tyree Floyd, # 190962/F3-24B
S. C. C.
P. O. Box # 56
Elmore, AL 36025-0056


United States District Clerk
Debra P. Hackett
B119 Frank M. Johnson, Jr.  U. S. Courthouse Complex
One Church St.
P. O. Box# 711
Montgomery, AL 36101-0711

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

~~~ ~~~ - 2  A 10: 00

)

CLERK R. HACKETT
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

**SAWELIJA TYREE FLOYD,**
**PETITIONER**

)

)

**VS.**

) **CIVIL ACTION No: 3: 08 cv 133-MEF**

)

)

**UNITED STATES OF AMERICA,** )
**RESPONDENT**

)

)

)

---

### PETITIONER'S  EXHIBITS IN SUPPORT

---

**Sawelija Tyree Floyd, pro-se**
**A.I.S.# 190962/F3-24B**
**S. C. C.**
**P. O. Box # 56**
**Elmore, AL 36025-0056**

Exhibit A

| State of Alabama<br>Unified Judicial System | AFFIDAVIT IN SUPPORT OF<br>APPLICATION FOR SEARCH WARRANT | Case or<br>Warrant Number |
|---|---|---|
| Form CR-1-a          Rev. 2/95 | | |

IN THE ___Circuit___          COURT OF _____LEE_____ , ALABAMA
(Circuit, District, Municipal)                  (Name of County or Municipality)

[ X ]  STATE OF ALABAMA
[   ]  MUNICIPALITY OF ___State of Alabama___ v. Sawelija Tyree Floyd alias, Jamillah Resheda McCray
Defendant

After an Application for a Search Warrant was made or will be made to the court, I, Sergeant Chris Murray, the undersigned, after being duly sworn to tell the truth and in support of the Application, hereby depose and say as follows: **that there is now being kept or concealed Cocaine and Marijuana at the residence known as 1289 Ty Court, Auburn, Lee County, Alabama.** On July 29, 2005, Sergeant Chris Murray and other members of the Auburn Police Department went to serve a Violation of Court Order warrant issued by Auburn Municipal Court on Sawelija Tyree Floyd, alias, at 1289 Ty Court, Auburn Lee County, Alabama. Officers knocked on the front door and when it opened, **a very strong odor of burning Marijuana was detected immediately coming from inside the residence.** Floyd, alias, was taken into custody. **Officers entered the residence and from the front door, officers could see suspected "crack" Cocaine and a set of scales on the kitchen counter.** Also present in the residence were J.B. Mitchell and Jamillah Resheda McCray, alias (a resident). All three were read their Miranda rights. J. B. Mitchell, alias, stated to Sgt. Murray that he and Sawelija Tyree Floyd were smoking Marijuana when officers knocked on the door. Both McCray and Floyd refused to give consent to a further search of the apartment.

_____
Affiant

Sworn to and subscribed before me on this the
29th day of July 2005
_____
Judge/Magistrate

Page 41

1  A. I don't recall seeing him myself, no, sir.
2  Q. Well, wasn't there an exterior wall between you and the
3  kitchen area where he was seated?
4  A. Yes, sir.
5  Q. And it jutted out so that you could not see that area
6  until you entered the house.
7  A. That's correct. But I believe when we came in he was
8  standing up. At some point he had moved kind of away from
9  the kitchen table, but I don't recall myself seeing him from
10  the outside.
11  Q. All right. Now, you told us about what you found inside
12  the house, that you saw inside the house when you got there,
13  and you later went and got a search warrant.

14  A. Yes, sir.                        *Exhibit A*

15  Q. All right. **You are the one that obtained the search**
16  **warrant.**
17  A. Yes, sir.
18  Q. **Did you utilize as your probable cause for that search**
19  **warrant the facts that you had discovered in the house?**
20  A. Along with the odor of burning marijuana, yes, sir,
21  coming out when she opened the door.
22  Q. All right.
23  A. When Jamillah McCray opened the door.
24  Q. But you also used the alleged crack cocaine, the blunt,
25  the marijuana, the gun, all of those things that you found in

Page 42

1  the house.
2  A. No, sir. **The initial affidavit, I used the odor of**
3  **burning marijuana and I believe just the evidence that we saw**
4  **in plain view in the kitchen area when we entered.**
5  Q. Which was what?
6  A. Some crack cocaine over by the microwave. I can't recall
7  if I used anything at this point without reviewing the
8  affidavit whether there were items in plain view on the
9  kitchen table or not.
10      MR. BLANCHARD: If I could have a moment to try and
11  find that, Your Honor. Do you have a copy of it?
12      MS. MORRIS: (complies)
13  Q. Do you recall if you mentioned a set of scales being on
14  the kitchen counter?
15      MS. MORRIS: If you could just refresh his
16  recollection.
17      MR. BLANCHARD: May I approach, Your Honor?
18      THE COURT: Yes.
19  Q. (complies) Is that your affidavit?
20  A. Yes, sir. Yes, sir.
21  Q. So as probable cause you cited the odor of burning
22  marijuana, the suspected crack cocaine and a set of scales
23  that you saw inside.
24  A. Yes, sir.
25  Q. And the fact that -- you also cited the fact that

Page 43

1  Mitchell and Floyd -- excuse me, strike that. That Mitchell
2  stated to Murray that he and Floyd were smoking marijuana
3  when you knocked on the door.
4  A. That's correct.
5  Q. All right.
6      MR. BLANCHARD: I think that's yours. (complies)
7      MS. MORRIS: Thank you.
8  Q. When you arrested Mr. Floyd on this alleged VCO order,
9  what was your understanding of what was to be done with him?
10  A. As far as the VCO was concerned he was to be transported
11  to the Lee County jail.
12  Q. And later brought -- I'm sorry, later brought before the
13  Judge for some order regarding the service of his, quote,
14  suspended sentences?
15  A. Yes, sir.
16  Q. Are you aware that without him ever appearing before the
17  Court an order was issued from Judge Bailey on August 1st
18  simply releasing him?
19  A. Yes, sir, I am familiar with that.
20  Q. Did you have anything to do with obtaining that order?
21  A. Probably some, yes, sir.
22  Q. Well, explain what you mean probably some.
23  A. I am sure I communicated with Lieutenant Holder that Mr.
24  Floyd and I had had a conversation concerning the drug
25  charges, and that he had agreed in some part to cooperate

Page 44

1  with us to further our investigation into the drug -- to
2  further the investigation into his drug arrest, so-to-speak.
3  Q. Did you communicate to Lieutenant Holder that you had a
4  discussion with him about Tyrone White?
5  A. I had a very small part in that conversation. Lieutenant
6  Holder and Lieutenant Smith took a statement from him
7  regarding that aspect of it.
8  Q. Let me show you --
9      MR. BLANCHARD: May I approach, Your Honor?
10      THE COURT: Yes.
11  Q. -- what has been marked as Defendant's Exhibit Number 2.
12  Have you seen that before?
13      MS. MORRIS: Excuse me, what is it?
14      MR. BLANCHARD: I'm sorry. (complies)
15      MS. MORRIS: The release, okay.
16  A. Yes, sir, I have seen it.
17  Q. What is it?
18  A. This is an order, City of Auburn, Plaintiff, versus
19  Sawelija Tyree Floyd, Defendant, for good cause shown the
20  Defendant should be released from incarceration in the Lee
21  County jail pending further orders of this Court. So ordered,
22  this the 1st day of August, 2005. It reflects Joe Bailey's --
23  Judge Bailey's signature.
24  Q. That order was entered two days after you arrested him,
25  Floyd.

Page 21

1  A. Somewhere between three hundred and ten to three hundred
2  and 12 grams of crack cocaine.
3      MS. MORRIS: May I approach?
4      THE COURT: You may.
5  Q. Sergeant Murray, I am showing you what has been
6  previously marked as Government's Exhibit 3. Do you recognize
7  that?
8  A. Yes, ma'am, I do.
9  Q. And what is it?
10 A. This is a photograph of the toilet that's in the
11 bathroom adjacent to the master bedroom. Inside the toilet
12 lays a piece of -- I guess you refer to it as a blunt of a
13 cigar that's been hollowed out and put in marijuana. And also
14 on the rim on the toilet seat there's a small plastic bag
15 containing what we believed to be marijuana.
16 Q. And does that picture fairly and accurately depict the
17 scene as you saw it on July 29th of this year?
18 A. Yes, ma'am, it does.
19 Q. At Mr. Floyd's residence, I should say.
20 A. Yes, ma'am.
21 Q. And this is what you found during the course of the
22 search warrant; is that correct?
23 A. Yes, ma'am.
24     MS. MORRIS: At this time we'd move to admit
25 Government's Exhibit 3.

Page 22

1      MR. BLANCHARD: No objection.
2      THE COURT: It's admitted.
3  Q. Did you find any money throughout the house?
4  A. Yes, ma'am. We found three thousand dollars in a dresser
5  drawer in U.S. currency in the bedroom, master bedroom.
6  Q. And did you find any other drug paraphernalia throughout
7  the house?
8  A. There were several items of -- I say several items, we
9  found several sets of scales, plastic bags and what not in
10 different areas of the residence.
11 Q. Now, Sergeant Murray, prior to your obtaining the search
12 warrant and executing the search, did any -- did you or any
13 of the officers working with you search this house?
14 A. No, ma'am.
15 Q. All right.
16     MS. MORRIS: If I may just have a moment, Your
17 Honor.
18     THE COURT: You may.
19     (pause)
20     MS. MORRIS: I think that's all I have at this time,
21 Your Honor.
22     THE COURT: All right. Cross-examination.
23     MR. BLANCHARD: Thank you, Your Honor.
24
25

Page 23

1      CROSS-EXAMINATION
2  BY MR. BLANCHARD:
3  Q. Sergeant Murray, who is Tyrone White?
4  A. He is a police officer -- ex-police officer with the
5  City of Auburn that we are investigating for fixing tickets.
6  Q. Are you a part of that investigation?
7  A. Yes, sir.
8  Q. When did the White investigation begin?
9  A. Either in December of 2004 or January of 2005.
10 Q. Prior to the time that you arrested Mr. Floyd in July of
11 2005 you were already investigating Officer White.
12     MS. MORRIS: Your Honor, I am going to object as to
13 relevance.
14     THE COURT: I have waited to hear how it's
15 relevance.
16     MR. BLANCHARD: I will tie it up, Your Honor.
17     THE COURT: Let me give him a chance to do that.
18 Overruled.
19 Q. Okay. It is correct that prior to the time you arrested
20 Mr. Floyd in July of 2005 you were already investigating Mr.
21 White, or Officer White.
22 A. Yes, sir, that's correct.
23 Q. And you had received information, had you not, that
24 Officer White may have fixed a ticket for Mr. Floyd?
25 A. I don't know -- we had received some information that he

Page 24

1  had gotten some help but I don't think it was over a ticket.
2  Q. You wanted to talk with him about that, didn't you?
3  A. That's correct, yes, sir.
4      THE COURT: Talk with him being Floyd?
5  Q. I'm sorry, talk to Floyd about your investigation of
6  Officer White.
7  A. Yes, ma'am -- I mean yes, sir.
8  Q. And at the time you arrested him you knew you wanted to
9  talk to him about it; isn't that correct?
10 A. Yes, sir.
11 Q. And, in fact, when you interviewed him that day that is
12 a primary subject -- and I am talking about Floyd -- when you
13 interrogated Floyd that day that is a primary subject you
14 interrogated him about, isn't it?
15 A. Well, I don't know if it was a primary subject. He was
16 interviewed about that, but, of course, the drugs were the
17 primary subject, you know, once we located them.
18 Q. You stated that you had information that drugs were
19 being dealt out of his residence, from who, confidential
20 informants?
21 A. Confidential informants, yes, sir.
22 Q. Are you prepared to name them?
23 A. I can name them if I need to.
24 Q. Well, will you name them?
25 A. I don't want to name them in court.

Exhibit
B

Page 21 - Page 24

Page 25

1   THE COURT: I will have to rule on it after this
2   proceeding if there's an objection, so let me find out.
3       MS. MORRIS: There will be an objection at this
4   time, Your Honor. I mean I have not quite frankly talked to
5   this officer about naming confidential informants and I feel
6   really uncomfortable with allowing him to do it at this time.
7       THE COURT: All right. Well, if the defense wants to
8   do that I will wait for a motion and we will have the proper
9   hearing if necessary, since there is an objection.
10      MS. MORRIS: Again, Your Honor, it may be something
11  that the government turns over readily.
12      THE COURT: Do you want to speak with him now or are
13  you trying to reserve for later that decision?
14      MS. MORRIS: I would like to reserve for later since
15  this isn't exactly my case and I would like to talk to the
16  prosecutor.
17      THE COURT: I will reserve the ruling.  If you do
18  receive a motion from the Defendant I will rule then.
19  Q. Let me ask it this way, Sergeant Murray, had any
20  controlled buys been made from Tyree Floyd's residence?
21  A. Not at that residence, no, sir.
22  Q. And the informants, whoever they were, that you dealt
23  with, did you deem them to be reliable informants?
24  A. Yes, sir, I did.
25  Q. Had they given you information on prior occasions that

Page 26

Exhibit B

1   had panned out?
2   A. Yes, sir, they had.
3   Q. Did you ever seek a search warrant based on -- of Mr.
4   Floyd's residence based on the information of those
5   informants or any other information you had?
6   A. No, sir, we had not.
7   Q. Did you feel that you did not have enough information to
8   obtain a search warrant?
9   A. I had not. No, I did not, no, sir.
10  Q. You did not?
11  A. No, sir.
12  Q. You did not have enough.
13  A. No, sir.
14  Q. So at that time there was no probable cause for a
15  warrant to search his residence.
16  A. That's correct, yes, sir.
17  Q. Even though you say you had information that he was a
18  major drug dealer from reliable confidential informants.
19  A. That's correct.
20  Q. When did you first learn, Sergeant Murray, that there
21  was a warrant, sometimes termed a VCO, violation of court
22  order, warrant for Mr. Floyd?
23  A. July the 27th of 2005.
24  Q. That was the first time you learned of it?
25  A. Yes, sir.

Page 27

1   Q. Did you make a report in this case, file a written
2   report?
3   A. I did.
4   Q. Have you reviewed it lately?
5   A. Yes, sir, I have.
6   Q. Now, let me put my copy of it onto the screen. Can you
7   see it?
8   A. Yes, sir.
9   Q. Now, maybe you can see it better. All right. Can you
10  read that?
11  A. Yes, sir.
12  Q. Is that your report?
13  A. It is.
14  Q. Would you read the first line, please.
15  A. Sometime prior to the week of July the 29th, 2005 I
16  learned that we, APD, had an outstanding warrant on Sawelija
17  Tyree Floyd for violation of court order.
18  Q. So according to your report you learned of that sometime
19  prior to the week of July 29th.
20  A. Yes, sir.  That's what I state in my report, yes, sir.
21  Q. July 29th was a Friday, was it not?
22  A. That's correct.
23  Q. So sometime prior to that week, according to your
24  report, you learned of the existence of this court order.
25  A. That's what my statement reflects but I have had --

Page 28

1   since this suppression here came up have had time to review
2   some other notes.
3   Q. You now know that it wasn't issued until July 27th; is
4   that correct?
5   A. Yes.
6   Q. So your statement is not correct.
7   A. That part of it is not correct.
8   Q. Why did you write it that way?
9   A. Well, what is the date on my statement?
10  Q. July 29th, 2005.
11  A. On the top of it?
12  Q. Yes, sir.
13  A. I don't know why I wrote it like that, but I found out
14  since that time that the warrant was issued July 27th.
15  Q. So is your statement incorrect in that regard?
16  A. That part of it might be, yes, sir.
17  Q. Okay. Who obtained the violation of court order warrant?
18  A. It was not a situation where the warrant was obtained.
19  If you will let me explain that. We --
20  Q. Well, let me -- if I could just follow up --
21      MS. MORRIS: Your Honor, if he could be allowed to
22  explain.
23      THE COURT: You can question him on that if you
24  wish.  I will allow counsel to continue.
25  Q. Did you testify at a preliminary hearing in Lee County

sought is not itself an unreasonable seizure of either the dwelling or its contents." Segura v. United States, 468 U.S. 796, 810 (1984); see also Illinois v. McArthur, 531 U.S. 326, 121 S. Ct. 946, 951-953 (2001) (Officers who had probable cause to believe that a home contained contraband which was evidence of a crime, and who reasonably believed that the resident, if left free of any restraint, would destroy that evidence, were authorized to secure the residence to prevent the loss of evidence while they diligently sought a warrant.). Here, the officers had information prior to their arrival at the residence that Floyd was dealing large amounts of crack cocaine and marijuana from his residence. That information "rose to the level of probable cause when, as the door stood open, [officers] detected what [they] knew from [their] law enforcement experience to be the odor of marijuana." United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991).[10] "Moreover," as the Eleventh Circuit indicated in Tobin, "the defendant[] and anyone else who might have been present in the house would have been aware of the [officers'] suspicions at that moment. Danger that the defendants or someone else inside the house might destroy the evidence thus provided the exigent circumstances required to justify a warrantless search." Id.; see also United States v. Morales, 868 F.2d 1562, 1575 (11th Cir. 1989) ("This court has noted that the risk of removal or destruction of narcotics involves exigent circumstances."). In addition, the officers were entitled to conduct a protective sweep of the residence incident to the arrest of McCray and

Exhibit C

---

[10] Sgt. Murray had previously smelled marijuana "probably a thousand times." He and Lt. Holder were 26-year veterans of the Auburn Police department, and Murray had approximately 20 years in narcotics.

13

**FILED**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

JAN 2 0 2006

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CR. NO.   3:05-cr-187-F** |
| | ) | **[21 USC 841(a)(1)]** |
| **SAWELIJA TYREE FLOYD, a/k/a** | ) | |
| **TYREE FLOYD, a/k/a,** | ) | |
| **TY FLOYD** | ) | **SUPERSEDING INDICTMENT** |

**The Grand Jury charges:**

Exhibit D

## COUNT 1

On or about the 29th day of July, 2005, in Lee County, within the Middle District of

Alabama, the defendant,

SAWELIJA TYREE FLOYD, a/k/a,
TYREE FLOYD, a/k/a,
TY FLOYD,

did knowingly and intentionally possess with intent to distribute 50 grams or more of a mixture

and substance containing a detectible amount of cocaine base ("crack"), a Schedule II controlled

substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 2

On or about the 29th day of July, 2005, in Lee County, within the Middle District of

Alabama, the defendant,

SAWELIJA TYREE FLOYD, a/k/a,
TYREE FLOYD, a/k/a,
TY FLOYD,

did knowingly and intentionally possess with intent to distribute a mixture and substance

containing a detectible amount of marijuana, a Schedule I controlled substance, in violation of

Title 21, United States Code, Section 841(a)(1).

## COUNT 3

On or about the 29th day of July, 2005, in Lee County, within the Middle District of

Alabama, the defendant,

<div style="text-align:center">

SAWELIJA TYREE FLOYD, a/k/a,
TYREE FLOYD, a/k/a,
TY FLOYD,

</div>

Exhibit D

did knowingly and intentionally possess with intent to distribute 500 grams or more of a mixture

and substance containing a detectible amount of cocaine hydrochloride, a Schedule II controlled

substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 4

On or about the 29th day of July, 2005, in Lee County, within the Middle District of

Alabama, the defendant,

<div style="text-align:center">

SAWELIJA TYREE FLOYD, a/k/a,
TYREE FLOYD, a/k/a,
TY FLOYD,

</div>

did knowingly and intentionally possess with intent to distribute a mixture and substance

containing a detectible amount of 3,4-methylenedioxymethamphetamine ("MDMA" or Ecstasy),

a Schedule I controlled substance, in violation of Title 21, United States Code, Section

841(a)(1).

A TRUE BILL:

_Jayne D Gilbert_
Foreperson

_Leura G. Canary_
LEURA GARRETT CANARY
United States Attorney

_Todd A. Brown_
Todd A. Brown
Assistant United States Attorney

2

Page 45

1  A. I would have to look at the calendar. Are there 31 days
2  in July or 30?
3  Q. Either two or three days.
4  A. He was released the following Monday. He was arrested on
5  a Friday and he was released on the following Monday.
6  Q. Isn't it the truth that it was either communicated by
7  you or Lieutenant Holder or someone to Judge Bailey that you
8  had interrogated Floyd about Tyrone White and didn't need him
9  any more?
10 A. It's my understanding, I talked with Lieutenant Holder
11 and I had talked with Mr. Floyd, and told Mr. Floyd that if
12 he can make bond on the trafficking charges that I would get
13 the Judge to release him from the VCO.
14 Q. After you had talked with him about Tyrone White.
15 A. I had talked with him just briefly about it on that
16 Friday, then Lieutenant Holder and Willie Smith interviewed
17 him concerning Officer Tyrone White.
18     MR. BLANCHARD: Your Honor, I would like to admit
19 Defendant's Exhibit 2, please.
20     THE COURT: Any objection?
21     MS. MORRIS: No, Your Honor.
22     THE COURT: It's admitted.
23 Q. Sergeant Murray, was the sole purpose of your going into
24 the house on Ty Court the smell of the burning marijuana?
25 A. That's what led us inside the residence, yes, sir.

*Exhibit E* (handwritten)

Page 46

1  Q. There was nothing else going on inside the residence
2  that you knew of that caused you to go into the residence
3  A. Nothing else going -- no, sir, not at that point.
4  Q. And both of the occupants of the house, that is Tyree
5  Floyd and Jamillah McCray refused consent to search; is that
6  correct?
7  A. Yes, sir, that's correct.
8      THE COURT: Just to make sure I understand, did they
9  refuse consent before you walked into the residence?
10     THE WITNESS: No, ma'am.
11     THE COURT: Afterward?
12     THE WITNESS: Yes, ma'am.
13     THE COURT: Okay.
14 Q. Did you ask consent to go into the residence?
15 A. No, sir.
16 Q. And you did not have a search warrant at that time.
17 A. No, sir, we did not.
18 Q. All right. Thank you, I have nothing else at this time.
19     THE COURT: All right. Any redirect?
20     MS. MORRIS: Briefly, Your Honor.
21         REDIRECT EXAMINATION
22 BY MS. MORRIS:
23 Q. Sergeant Murray, defense counsel asked you about any
24 information you had that Mr. Floyd, I believe he said was a
25 violent individual, do you recall that line of questioning?

Page 47

1  A. Yes. sir -- yes, ma'am, I do.
2  Q. I believe you testified at least on direct examination
3  and possibly on cross that you had information that Mr. Floyd
4  was distributing drugs or was involved in the drug trade, do
5  you recall that line of questioning?
6  A. Yes, ma'am, I do.
7  Q. Sergeant Murray, in your 15 years in narcotics have you
8  discovered any relationship between drugs and violence?
9  A. Yes, ma'am, I have.
10 Q. Could you explain that to the Court.
11 A. I would suspect that three quarters of your violent
12 crime is somehow related to drug activity or drug abuse.
13 Q. Have you in the course of your narcotics work executed
14 search warrants before?
15 A. Yes, ma'am.
16 Q. Have you found that there's any relationship or to your
17 knowledge is there any relationship between drugs and guns?
18 A. Yes, ma'am.
19 Q. Could you explain that to the Court.
20 A. A lot of the people, not all of them, but a lot of the
21 people we encounter that are distributing drugs are usually
22 armed with some type of firearm.
23 Q. And as a narcotics officer do you take extra care when
24 executing search warrants on drug dealers for that purpose --
25 for that reason? Excuse me.

Page 48

1  A. Yes, ma'am, we do.
2  Q. As a narcotics officer do you routinely rely on court
3  orders when arresting people?
4  A. From time to time, yes, ma'am.
5  Q. Do you rely on arrest warrants when you arrest people?
6  A. Yes, ma'am.
7  Q. Were you relying on the Court -- the order issued by the
8  Court, the Municipal Court in Auburn when you went to arrest
9  Mr. Floyd?
10 A. Yes, ma'am, that's correct.
11 Q. Now, Mr. Blanchard asked you about the case number on
12 the VCO as it's been termed and I believe you started to
13 explain to the Court why there was not a case number on the
14 that. Could you go ahead and explain that to the Court.
15 A. Yes, ma'am. As part of the investigation, again, at that
16 time, Officer Tyrone White, we had suspected or we had
17 information and some evidence that some people that worked in
18 the court clerk's office may have been involved in some of
19 the ticket fixing and arrest fixing, so-to-speak, that
20 Officer White was involved in. And so the warrant was
21 given -- it's my understanding, was given directly to
22 Lieutenant Holder to be kept confidential until such time as
23 we decided to execute it. And on the normal thing it would
24 have been given to the court clerk and entered in the
25 computer and been given a case number, but due to our

## Page 69

1  Q. Did you have permission when you entered the residence?
2  A. No, I did not.
3  Q. Backing up just a minute. When the knock on the door was
4  made, the voice from inside said what, Tatum said police,
5  open the door, what happened then and how long did it take?
6  A. It didn't take very long at all. Ms. McCray came to the
7  door, opened the door. She was asked if Mr. Floyd was at
8  home. She said he was. And then he approached the door
9  from -- coming from towards the rear of the house.
10  Q. Would you say it was a minute or less than a minute that
11  it took her to come to the door?
12  A. Best I can recall I would say less than a minute, maybe
13  about a minute.
14  Q. At the time you were standing outside of the
15  residence looking in, before you entered it, could you smell
16  marijuana?
17  A. Yes, sir, very obviously and very clearly.
18  Q. Could you see any drugs inside the house from your
19  vantage point outside?
20  A. At that time I did not.
21  Q. Could you see any individuals in the house other than
22  Ms. McCray?
23  A. There was an individual in the kitchen area.
24  Q. But you couldn't see him, could you?
25  A. I think we asked or someone asked her if anyone else was

*Exhibit E* (handwritten)

## Page 70

1  in the house, and at that time either he stood up where we
2  could see him or she said there's one more person here or
3  whatever, but it became clear that he was in the kitchen.
4  Q. That was after you entered, wasn't it?
5  A. No.
6  Q. You asked before you entered?
7  A. Yeah.
8  Q. Okay. Well, you said you think you did or someone else
9  did, you are not sure?
10  A. I am not sure. I remember he was in the kitchen area
11  right there to the right of the door sitting at the table.
12  Q. Now, you had to enter the house before you could see
13  anybody in the kitchen area, didn't you?
14  A. I don't recall if he could be seen or if anybody saw him
15  before we entered or not.
16      MR. BLANCHARD: I am searching for my photographs,
17  Judge. I am going to try to turn this thing on and use it
18  here. There we go.
19      MS. MORRIS: Can I see that?
20      MR. BLANCHARD: Certainly, I'm sorry.
21      MS. MORRIS: Have we been provided this in
22  reciprocal discovery?
23      MR. BLANCHARD: It's just pictures inside the house
24  which you all have.
25      MS. MORRIS: Get us a copy, please.

## Page 71

1      MR. BLANCHARD: Okay.
2  Q. Are you able to see that on the screen, Lieutenant?
3  A. I can see that.
4  Q. All right. Are you familiar with that scene? Does it
5  look familiar to you?
6  A. I honestly can't tell.
7  Q. You don't recognize it?
8  A. No, sir. I mean it appears to be a kitchen table.
9  Q. Okay.
10  A. But I can't from the vantage of where it was taken, it
11  could have been taken in any apartment really.
12  Q. Let me show you another one then.
13      MR. BLANCHARD: Here. It's got some writing on it, I
14  didn't put it on there, but it's on there. (complies)
15  Q. All right. Do you see that one?
16  A. Yes, sir. That one is a little more clear now that I can
17  see the front door standing open and that does appear to be a
18  little more recognizable to me.
19  Q. All right, sir. And there's some writing on it that
20  says J.B. Mitchell was sitting in a certain location, you can
21  disregard that. That was written there for my benefit. He
22  either was or he wasn't. But I am asking you if you recognize
23  that as the dining room area where you encountered Mr.
24  Mitchell?
25  A. Yes, sir.

## Page 72

1  Q. Okay. And if he was sitting in the chair where it's
2  indicated on that picture there would have been no way to see
3  him until you got inside the door, would there?
4  A. That is correct.
5  Q. Okay.
6      MR. BLANCHARD: I believe that's all I have of this
7  witness, Your Honor.
8      THE COURT: Any cross-examination?
9      MS. MORRIS: Very, very briefly.
10      THE COURT: All right.
11      MS. MORRIS: Just one second, Your Honor.
12      CROSS-EXAMINATION
13  BY MS. MORRIS:
14  Q. Lieutenant Holder, do you routinely rely on court orders
15  in your job?
16  A. Rely on them?
17  Q. Uh-huh.(positive response)
18  A. Yes.
19  Q. Routinely rely on warrants issued by the Court?
20  A. Sure.
21  Q. And did you rely on this VCO that we have been terming
22  when you were at Mr. Floyd's house?
23  A. Yes.
24  Q. Now, you and defense counsel spoke a bit about the
25  Tyrone White case. And I believe you said that you had gone